IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED
SEP 16 2021
Nathan Ochsner, Clerk of Court

STEVEN KURT BAUGHMAN, #2180609
Petitioner-Applicant ,

V.

BRYAN COLLIER, Exec. Director- TDCJ
Respondent

Cause No. ____________________
(To be supplied by Clerk)

Conviction from Texas Case Number(s) 1423420, 1423421, & 1532840
In The 174th Judicial District Court Of Harris County, Texas

# PETITIONER - APPLICANT'S MEMORANDUM OF LAW
# IN SUPPORT OF
# PETITION FOR WRIT OF HABEAS CORPUS

Steven Kurt Baughman #2180609
Powledge Unit, 15-15
1400 FM 3452
Palestine, TX 75803

Appearing Pro Se

# TABLE OF CONTENTS

| | PAGES |
|---|---|
| COVER | i |
| TABLE OF CONTENTS | ii |
| TABLE OF AUTHORITIES | iii |
| JURISDICTION | 1 |
| GROUND ONE ARGUMENT AND AUTHORITIES | 1- |
| GROUND TWO ARGUMENT AND AUTHORITIES | 3 |
| GROUND THREE ARGUMENT AND AUTHORITIES | 5 |
| GROUND FOUR ARGUMENT AND AUTHORITIES | 9 |
| GROUND FIVE ARGUMENT AND AUTHORITIES | 13 |
| GROUND SIX ARGUMENT AND AUTHORITIES | 18 |
| GROUND SEVEN ARGUMENT AND AUTHORITIES | 20 |
| GROUND EIGHT ARGUMENT AND AUTHORITIES | 25 |
| GROUND NINE ARGUMENT AND AUTHORITIES | 28 |
| GROUND TEN ARGUMENT AND AUTHORITIES | 32 |
| GROUND ELEVEN ARGUMENT AND AUTHORITIES | 37 |
| CONCLUSION | 39 |
| CERTIFICATE OF COMPLIANCE | 39 |

TABLE OF AUTHORITIES

| STATE CASES | PAGES |
| --- | --- |
| Aitch V. State, 879 S.W.2d 167,172 (Tex.App.-Houston [14th Dist.]1994) | 8 |
| Baughman V State, 2019 Tex.App. LEXIS 5265 (Tex.Crim.App. June 25, 2019) | 20 |
| Burkhalter V. State, 493 S.W.2d 214,218(TexCrim.App. 1973) | 17 |
| Clarke V. State, 461 S.W.3d 244,249 (Tex.App.-Eastland 2015) | 33 |
| Degrate V. State, 2005 WL 165182 (Tex.App.-Dallas Jan.26,2005) | 33 |
| Deleon V. State, 126 S.W.3d 210 (Tex.App.-Houston [1st Dist.] 2003) | 38 |
| Duggan V. State, 778 S.W.2d 465,468 (Tex.Crim.App. 1989) | 13,17,18 |
| Dunn V. State, 819 S.W.2d 510,520 (Tex.Crim.App. 1991) | 2 |
| Ex parte Castellano, 863 S.W.2d 476, 480-81 (Tex.Crim.App. 1993) | 13 |
| Ex parte Duffy, 607 S.W.2d 501,513 (Tex.Crim.App. 1992) | 28,31,34,35,37 |
| Exparte Fierro, 943 S.W.2d 370 (Tex.Crim.App. 1996) | 13,17 |
| Ex parte Marez, 505 S.W.2d 930 (Tex.Crim.App. 1974) | 36 |
| Exparte Torres, 943 S.W.2d 469,475 (Tex.Crim.App. 1997) | 28,37 |
| Ex parte Ybarra, 629 S.W.2d 943,948 (Tex.Crim.App. 1982) | 21,31,34,35 |
| Franklin V. State, 138 S.W.3d 351,356 (Tex.Crim.App. 2004) | 17,19 |
| Granger V. State, 3 S.W.3d 36,38 (Tex.Crim.App. 1999) | 36 |
| Herring V. State, 147 S.W.3d 380, 396 (Tex.Crim.App. 2004) | 4 |
| Jackson V. State, 468 S.W.3d 189 (Tex.App.-Houston [14th Dist] 2015) | 21 |
| Juarez V. State, 2009 WL768595 (Tex.App.-Tyler June 10, 2009) | 36 |
| Maracopolous, 2018 Tex. App. LEXIS 2351 | 21 |
| McDaniel V. State, 2015 Tex.App. LEXIS 4697 (Tex.App.-Dallas May 7,2015) | 38 |
| McFaraland V. State, 928 S.W.2d 482,500 (Tex.Crim.App. 1996) | 21,31 |
| McIlroy V. State, 188 S.W.3d 789, 791 (Tex.Crim.App. 2006) | 5,38 |
| McQuarters V. State, 58 S.W.3d 250,258 (Tex.App.-Ft. Worth 2001) | 24 |
| Melendez V. Salinas, 895 S.W.2d 714,715 Tex.App.-Corpus Christi 1994) | 4 |
| Mobery V. State, 810 S.W.2d at 193-94 | 21 |
| Perrero V. State, 990 S.W.2d 896 (Tex.App.-ElPaso 1999) | 36 |
| Ragland V. State, 2008 WL448268 (Tex.App.-Austin Oct. 3, 2008) | 34 |

Page

State V. Ortiz, 346 S.W.3d 127 (Tex.App.-Amarillo 2011) 29

Tamez V. State, 11 S.W.3d 198, 202,210 (Tex.Crim.App. 2000) 4

Taylor V. State, 2008 Tex.App. LEXIS 1597 (Tex.App.-Houston[1st Dist] marcch 6, 2008) 21,31

Thomas V. State, 550 S.W.2d 64,68 (Tex.Crim.App. 1997) 21,38

Walters V. State, 247 S.W.3d 204,209 (Tex.Crim.App. 2007) 37

Weems V. State, 434 S.W.3d 655,667 (Tex.App.-SanAntonio 2014) 23

Federal CASES

Alcorta V. Texas, 355 U.S. 2,31 (1957) 13,17

Appel V. Horn, 250 F.3d 203,212 (3rd Cir. 2001) 3

Appelby V. Butler, 2004 WL502310 (N.D.Cal. March 9,2004) 33

Bell V. Cone, 122 S.Ct. 1843, 1851-52 (2002) 36

Bell V. Tibbals, 2013 WL128386 (N.D. Ohio March 26,2013) 5,25

Brady V. Maryland, 373 U.S. 83,85 (1963) 5,12,25

Bragg V. Norris, 128 F.Supp.2d 587, 604-05 (E.D.Ark. 2000) 13

Brown V. Craven, 424 F.2d 1166,1170 (9th Cir. 1970) 35

Buitrago V. Scully, 705 F.Supp.2d 952 (S.D.N.Y. 1989) 13,17

Caraway V. Beto, 421 F.2d 636,637 (5th Cir. 1970 34

Colorado V. Bertine, 479 U.S. 367,376 (1987) 20

Crawford V. Washington, 541 U.S. 36,68 (2004) 19

Daniels V. Woodford, 428 F.3d 1181,1196 (9th Cir. 2005) 3,35

Darden V. Wainright, 477 U.S. 168,181(1986) 13,18

Faretta V. California, 422 U.S. 806, 819-20 (1975) 36

Florida V. Wells, 110 S.CT. 1632,1636 (1990) 8,20,21,23,27,28

Giglio V. U.S., 405 US.S. 130,153 (1972) 12,17

Herring V. Estelle, 491 F.2d 125,128 (5th Cir. 1974) 34

Iowa V. Tovar, 541 U.S. 77,80-81 (2004) 33

Martel V. Clair, 565 U.S. 648,664 (2012) 2

McCoy V. Louisiana, 138 S.Ct. 1500,1503 (2018) 36,37,38

| | |
|---|---|
| McMann V. Richardson,397 U.S. 759,771 (1970) | 33 |
| Melendez V. Scribner, 2006 WL2520301 (E.D.Cal. Aug.30,2006) | 33 |
| Miller V. Pate, 386 U.S. 1 (1967) | 13 |
| Mitchell V. Mason,325 F.3d 723,743-44 (6th Cir. 2003) | 36 |
| Misouri V. Frye, 566 U,S, 134,143-44 (2012) | 3 |
| Mooney V. Holohan, 294 U.S. 103 (1935) | 17 |
| Naupe V. Illinois, 360 US.S 264,269 (1959) | 13,17 |
| Old Chief V. U.S., 159 U.S. 172,174 (1997) | 4,38 |
| Perry V. Leeke, 488 U.S. 272,280 (1989) | 3 |
| Pointer V. Texas, 380 U.S. 400,406 (1965) | 19 |
| Pyle V. Kansas, 317 U.S. 213 (1942) | 17 |
| Rummel V. Estelle, 590 F.2d 103,104 (5th Cir. 1974) | 35 |
| Segura V. U.S., 468 U.S. 796,804 (1984) | 24 |
| Smith V. Dretke, 417 F.3d 438 (5th Cir. 2005) | 36 |
| Stearnes V. Clinton, 780 S.W.2d 216,221 (Tex.CRim.App.1989) | 2 |
| Strickland V. Washington, 466 U.S. 668,692 (1984) | 3,24,29,32,38 |
| Summerlin V. Schriro, 427 F.3d 623,629 (9th Cir. 2005) | 33 |
| Terry V. Dretke, 416 F3d 404 (5th Cir. 2005) | 36 |
| U.S. V Adelzo-gonzalez, 268 F.3d 772,779 (9th Cir. 2005) | 3 |
| U.S. Antone, 603 F2d 566,569 (5th Cir. 1979) | 13,17 |
| U.S. V. Bagley, 473 U.S. 667,676 (1985) | 2,25 |
| U.S. Cronic, 466 U.S. 648 (1984) | 32,35,38 |
| U.S.V. Gonzalez, 113 F3d 1026,1028-29 (9th Cir. 1997) | 2 |
| U.S.V. Gonzalez-Lopez, 548 U.S. 140 (2000) | 2 |
| U.S. V. Meros, 866 F.2d 1304 (11th Cir. 1989) | 13,17 |
| U.S.V. Mintzes, 733 F.2d 424,428 (6th Cir. 1984) | 2 |
| U.S. V. Moore, 159 F.3d 1154,1158 (9th Cir. 1998) | 3 |
| U.S.Moore, 846 F.2d 1163,1162 (8th Cir. 1988) | 33 |
| U.S.V. Musa, 220 F.3d 1096,1102 (9th Cir.2000) | 2 |
| U.S.Pamman, 462 F.2d 1203,1204 (D.C.Cir. 1971) | 33 |

U.S.V. Sturgis, 48 F.3d 784,788 (4th Cir. 1995) 33

U.S. V. Velazquez, 855 F.3d 1021,1033-34 (9th Cir.2017) 33

U.S.V. Young,482 F.2d 993,995 (5th Cir. 1973) 2

Wiggins V. Smith, 539 U.S.510 (2005) 20

Williams V. Beto, 354 F.2d 698, 705 (5th Cir. 1965) 34

STATE STATUTES

Texas Penal Code 9.22 36
Tex. Penal Code 9.31 33,36
Tex. Penal Code 9.32 33,36
Tex. Penal Code 1.07(a)(17)(B) 33
Tex. Penal Code 32.21 23
Tex Penal Code 37.09 23
Tex. Penal Code 37.10 23

Tex.Code Crim.Proc. 11.07 1
Tex.Code Crim.Proc 39.14 5,6,25,27
Tex.Code Crim.Proc. 36.01 4
Tex.Code Crim.Proc. 38.22 26,28
Tex.Code Crim.Proc. 38.23 28,29

Tex.R.Evid. 801 19
Tex.R.Evid. 802 19
Tex.R.Evid. 403 4

Tex.R.App.Proc. 44.2
Tex.R.App.Proc. 73 1

Tex. Const. Art.1 § 19

FERERAL STATUTE

28 U.S.C. § 2254

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEVEN KURT BAUGHMAN, #2180609, Petitioner, | § | |
| V. | § | |
| | § | Cause No.________________ (to be Supplied by Clerk) |
| BRYAN COLLIER, Exec. Director-TDCJ , Respondent. | § | |

PETITIONER'S MEMORANDUM OF LAW IN SUPPORT OF
PETITION FOR A WRIT OF HABEAS CORPUS

TO THE HONORABLE HABEAS COURT:

COMES NOW, STEVEN KURT BAUGHMAN, Petitioner a prisoner appearing pro se, and files this Memorandum Of Law in compliance with pursuant to Petition Instructions at paragraph 2.

I.

JURISDICTION

Jurisdiction is confired under 28 U.S.C.§§ 2241-2254.

II.

Ground ONE;

PETITIONER WAS CONSTRUCTIVELY DENIED HIS SIXTH AMENDMENT RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL WHERE THE TRIAL COURT REFUSED TO CONDUCT A HEARING UPON HIS PROPERLY SUBMITTED ORAL AND WRITTEN MOTION(S) TO CONDUCT A HEARING TO REPLACE (SUBSTITUTE) COUNSEL: AFTER COUNSEL MOVED TO WITHDRAWL DUE TO CONFLICT.

ARGUMENT AND AUTHORITIES

Prior to the commencement of the proceedings in this case, trial counsel filed a motion to withdraw. (2 RR 5). Trial counsel stated there existed a conflict with the Petitioner, in the manner in which his defense should be presented. Counsel stated that he carefully investigated the case and that the conflict required that he withdraw. Before ruling on the motion to withdraw, the trial court recited the history of Applicant's conflict with his prior attorneys. (2RR 6). Applicant presented to the trial court a Motion to Conduct a Hearing to Replace Counsel. (2 RR 7). Without a hearing, the trial cout denied the motion.

Applicant was appointed Terrance "Terry" A. Gaiser, on August 15,2017, for trial counsel, but Applicant did not see Mr. Gaiser until August 24,2017. Counsel stated he knew nothing about Applicant or the case, but that he would meet with him in a couple of weeks to discuss the case. (Mem. Appx. A, B, and D ). Applicant did not see counsel again until November 20,2017.(Mem. Appx D"Affidavit"; also Appx. C "Attorney Visitation Log"). On November 20, 2017, Counsel informed Applicant that the expert witnesses he had requested would not be presented, nor would any of the witnesses Applicant had requested be called to testify. (2 RR 10).Counsel had not interviewed Applicant to prepare him to testify at trial in his own defense, and he was advised trial was set for December 4,2017 (in 2 weeks). Applicant saw counsel

for approximately 30 minutes [from the time he was pulled from his cell and placed in the attorney visitation booth until counsel terminated the meeting]. Applicant saw counsel against on November 30, 2017 (5 days before trial) for approximately 15 minutes. (Mem Appx. C). In that meeting Applicant was told that it would probably be better if Applicant moved to represent himself.(Mem. Appx. D)

Applicant tried to read a 2 page presentation to the trial court that he had prepared after the November 30,2017 meeting with counsel, to let the trial court know there was a conflict between Applicant and counsel. (Mem. Appx.A). But as Applicant began to read this statement in open court, the trial court stopped him. (2 RR 10:25 -11:2).

Without a hearing, the trial court denied the Motion to Conduct a Hearing to Repalce [Substitute] Counsel, and denied trial counsel's motion to withdraw.

Admittedly, the Supreme Court has held that the Sixth Amendment right to counsel of choice does not extend to defendants who require counsel be appointed for them. United States V. Gonzalez-Lopez, 548 U.S. 140 (2006). Similarly the Texas court have determined that an indigent defendant does not have a right to counsel of his own choosing. See Dunn V. State, 819 S.W.2d 510,520 (Tex. Crim. App. 1991); Stearnes V. Clinton, 780 S.W.2d 216,221 (Tex. Crim. App. 1989).

This is not the case. Here, Applicant claimed that his court appointed attorney neither interviewed him in preparation for trial and did not prepare witnesses Appellant felt necessary to present a defense. Applicant advised the trial court that a conflict existed that undermined his constitutional right to present a defense. (Mem.Appx. B), also (CR 1532840 at 645-52).

When a defendant voices a seemingly substantial complaint about counsel [especially when counsel states there is a conflict and he feels it would not be in the defendant's best interest to have him as his attorney] the trial judge should make a thorough inquiry into the reasons for the defendant's dissatisfaction. Wilson V. Mintzes, 733 F.2d 424,428 (6th Cir.1984); United States V. Young, 482 F.2d 993,995 (5th Cir. 1973); Martel V. Clair, 565 U.S. 648,664 (2012)("courts cannot properly resolve substitution motions without probling why a defendant wants a new lawyer"); see also United States v. Musa, 220 F.3d 1096,1102 (9th Cir.2000)(finding error where the district court "made no inquiry at all" into the request to substitute); United States V. Gonzalez, 113 F.3d 1026,1028-29 (9th Cir. 1997) (holding that the trial court abused its discretion by refusing to hold a evidentiary hearing on the motion to substitute coulsel). Such an inquiry is necessary if the court is to determine whether good cause for substitution of counsle exists. Wilson, 733 F.2d at 428. Failing to conduct such an inquiry is normally reversable error. Young, 482 F.2d 995, also Melendez V. Salinas, 895 S.W.2d 714,715 (Tex.App.-Corpus Christi- 1994).

In this case, trial counsel asked to withdraw due to a conflict with Applicant concerning trial strategy. Applicant alleged that trial counsel did not prepare a defense and did not properly investigate the cases to present a defense. The trial court should have allowed Applicant to present evidence to show the existance of the conflict and why he had completely lost confidence in counsel. "Where a criminal defendant has, with legitimate reason, completely lost trust in his attorney, and

the trial court refuses to remove the attorney, the defendant is constructively denied counsel." Daniels v. Woodford, 428 F.3d 1181,1198 (9th Cir. 2005)(Citing United States V. Adelzo-Gonzalez, 268 F. 3d 772,779 (9th Cir.2005); also United States V. Velazquez, 855 F.3d 1021,1033-34 (9th Cir. 2017). "A defendant need not show prejudice when the breakdown of a relationship between attorney and client from irreconcilable differences results in the complete denial of counsel." United States V. Moore, 159 F.3d 1154,1158 (9th Cir. 1998); see also Perry V. Leeke, 488 U.S. 272,280 (1989)("[A]ctual or constructive denial of the assistance of counsel altogether" is not subject to...prejudice analysis." (quoating Strickland V. Washington, 466 U.S. 668, 692 (1984)). "Because the Sixth Amendment's gurantee of effective assistance of counsel applies even to plea-bargaining stage, Misouri V. Frye,566 U.s. 134 , 143-44 (2012), constructive denial of counsel can occur at that phase just as it can at trial." United States V. Velazquez, 855 F.3d at 1034 (citing Appel V. Horn, 250 F.3d 203, 212 (3d Cir. 2001). The harm caused by the trial court's failure to hold a hearing is best evidenced by trial counsel's omissions during the course of the proceedings. The failure of the trial court to conduct the requested hearing to allow substitution of counsel requires the Writ to issue, and order be issued to vacate the judgment convition while giving Applicant a New Trial with effective assistance of counsel.

GROUND TWO:

APPLICANT WAS DENIED CONSTITUTIONAL DUE PROCESS OF LAW, WHEN THE TRIAL COURT ABUSED ITS DISCRETION IN ORDERING THE STATE TO REREAD THE INDICTMENT WORD FOR WORD, AS WRITTEN, AND TO INCLUDE THE NAME AND NATURE OF APPLICANT'S PRIOR CONVICTIONS, AFTER HAVING ACCEPTED APPLICANT'S STIPULATION OF PRIOR FELONIES, FOR ATTEMPTED CAPITAL MURDER OF POLICE OFFICERS, IN THE INDICTMENT FOR FELON IN POSSESSION OF A FIREARM

The trial court abused its discretion and violated Applicant's rights to Due Process of Law, in violation of the Fifth, Sixth, and/or Fourteenth Amendments to the United States Constitution, through Ordering the State to "reread the indictment for felon in possession word for word as it's written, if you dont mind."(Trial 4 RR 12:24-13:2). Trial counsel objected and the State agreed with the objection, where Applicant had stipulated to being a felon to prevent the reading of the name and nature of his prior felonies to the jury at guilt or innocence phase of the trial; to prevent unfair prejudice and the possibility of a conviction tainted by improper consideration. The trial court accepted the Stipulation, (Trial 2 RR 15:9-14), but then ORDERED the State to read the indictment word for word.

During the Motion For New Trial the trial Court stated,"Because obviously, if there was error, this was my error and not Mr. Gaiser's...My recollection is Mr. Gaiser did object and the prosecutor obviously agreed that that portion of the indictment shouldn't be read during arraigment. I was under the impression that since he was pleading to the indictment that the whole thing should be read." (Motion for New Trial (hereinafter "Mtn") 2 RR 16:19 -17:3). At trial the court in its order to reread the indictment word for word as written stated,"I mean I understand that it's prejudicial, but its part of your proof. He has to plead to it, and the jury has to find it's true...I've never seen anybody not read the entire indictment."(Trial 4 RR 12:4-16). After which the State read the full indictment word for word including in pertenant part ," ...Steven Kurt Baughman, hereinafter styled

the Defendant, heretofore on or about April 2nd,2014, did then and there unlawfully, intentionally and knowingly possess a firearm at a location other than the premises at which the Defendant lived after being convicted of the felony offense of attempted to commit capital murder in the District Court — in the 179th Judicial District Court of Harris County, Texas,in Cause No. 0495549 on November 28th, 1989." (Trial 4 RR 13:11-20).

While art. 36.01 Tex. Code Crim. Proc. does mandate that the indictment be read the Texas Court Crim.App. has recognized that this statutory mandate must be balanced against Tex. R. Evid. Rule 403's proscription against placing a defendant's prior convictions before the jury at the guilt-innocence phase if there is strong likelihood that the jury may improperly use the prior conviction in reaching its present verdict. Tamez V. State, 11 S.W.3d 198,202,210 (Tex.Crim.App. 2000), also Tex.R.Evid. 403.

When a defendant's criminal history involves crimes similar to the charges in the pending case, the risk of unfair prejudice from providing the jury with information during the State's case-in-chief is especially obvious. Herring V. State, 147 S.W. 380,396 n. 21 (Tex.Crim.App.2004).

The United States Supreme Court's ruiling in Old Chief V. United States, 519 U.S. 172,174 (1997), likewise indicates that it is error to permit the State to read to the jury - over the defendant's objection [in the instant case also over the State's objection]- the type of prior felony conviction that the defendant committed to attain felon status in the prosecution for possession of a firearm by a felon. The Supreme Court in "old Chief" framed the issue presented to it as,"Whether a district court abuses its discretion if it spurns [defendant's offer to stipulate to prior felony conviction] and it admits the full record of a prior judgment, when the name and nature of the prior offense raises the risk of a verdict tainted by improper considerations." Old Chief, 519 U.S. at 174.

"Old Chief" is factually and legally indistinguishable from the instant case where "Old Chief was prosecuted in a joint trial for the offenses of assault and possession of, and violaence with a firearm. Id. at 175. Old Chief had been previously convicted of the felony offense of assault causing serious bodily injury [less serious to a jury that Attempted Capital Murder in the instant case] and prior to trial he requested the governemnt refrain fro mentioning, by reading the indictment or at anytime during trial, the nature of his prior felony conviction except to say that he had been convicted of a crime punishable by imprisonment exceeding one year. Id. at 175. Old Chief explained that he was concerned that he would be unfairly prejudiced and that the jury would not hold the government to its burden of proof concerning the present charges if it learned that he had been previously convicted of assault causing serious bodily injury. Id.at 175. After lengthy discussion, the Supreme Court agreed with Old Chief and held that the general rule when "proof of conviction status is an issue," such as in the prosecution for possession of a firearm by a felon, is that when the prior felony offense is an offense likely to support conviction on some improper ground and when the defendant agrees to stipulate to the prior offense, then the risk of unfair prejudice outweighs the probative value of disclosing the type of prior felony offense. Id. at 191-92. When prior conviction is for a gun crime or for acrime similar to other charges pending in the case, the risk

of unfair prejudice is especially obvious. Id. at 185. Therefore, the trial court abuses its discretion by placing such information before the jury in light of the defendant's stipulation. Id. at 191; also see McIllroy V. State, 188 S.W.3d 789,795 (Tex.App.-Ft.Worth 2006).

Where the trial court ordered the reading of the entire indictment, to include the fact Applicant was previously convicted of "ATTEMPTED CAPITAL MURDER in the 179th Judicial District Court, on November 28th, 1989," the court acted in a manner which constituted Judicial Misconduct and violated Applicant's rights under the Due Process Clause of the Fifth and Fourteenth Amendments to the United States Constitution.

The harm done was compounded when the prosecution read the stipulation into the record and included the reading and publishing to the jury,"..I am Steven Kurt Baughman [the same] convicted of the offense of attempted capital murder - police officer, in Criminal District Court No. 179 of Harris County, Texas, in Cause No. 0495549 on November 28,1989." (Trial 4 RR 45 -47)

The harm was further compounded when the Jury Charge was given for felon in possession of a firearm in Cause No. 1423421 which stated in pertenant part, "...did then and there unlawfully, intentionally or knowingly possess a firearm at a location other than the premises at which the defendant lived, after being convicted of the felony offense of attempt to commit capital murder in the District Court of the 179th Judicial District, Harris County, Texas, in Cause Number 0495549 on November 28th, 1989..." (emphasis added). (CR 1423421 at 353

The harm caused by the unfair prejudice, resulting from the trail court's abuse of discretion/ judicial misconduct so infected the entire trial as to make the resulting verdict/conviction a violation of Due Process of Law, in vioaltion of the Fifth, Sixth, and/or Fourteenth Amendment(s) to the Constitution of the United States.

WHEREFORE, PREMISES CONSIDERED, the Writ should issue and the judgemnt and conviction should be vacated and set for New Trial or dismissal of the charges.

GROUND THREE

PROSECUTORIAL MISCONDUCT UNDER "BRADY", WHERE SUPPRESSION OF EVIDENCE FAVORABLE TO THE APPLICANT VIOLATED DUE PROCESS OF LAW; WHERE THE SUPPRESSED EVIDENCE WAS MATERIAL TO GUILT OR PUNISHMENT; PARTICULARILY IN THE SUPPRESSION HEARING AND TRIAL; PRODUCING A WRONGFUL CONVICTION AND DENYING APPLICANT A FAIR TRIAL, IN VIOLATION OF THE FIFTH, SIXTH, AND/OR FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES

The prosecution failed to disclose favorable evidence to an accused in a criminal prosecution "violates [sic] the Due Process Clause, that was material either to either guilt or to sentencing." Brady V. Maryland, 373 U.S. 83,85-87 (1963); Bell V. Tibbals,2013 WL 128386 (N.D.OHio Mar. 26,2013); see also "The Michael Morton Act" Tex.Code Crim.Proc. art 39.14 which requires prosecutors and law enforcement officers to disclose to the defense counsel "any exculpatory, impeachment, or mitigating document, item or information in the possession, custody, or control of the State that tends to negate the guilt of the defendant or would tend to reduce the punishment for the offense charged." (Mem. Appx. V "Michael Morton Act Letter from Travis County District Attroney" noting the type of files/evidence that must be disclosed).

Through the "Michael Morton Act," Tex.Code Crim. Proc.39.14 and United States V. Bagley, 473 U.S. 667, 676 (1985) The Supreme Court of the United States and the Texas Legislature have expanded the duty to disclose to include impeachment evidence. This evidence includes both substative and impeachment evidence such as was not disclosed in the instant case.

At Applicant's "Suppression Hearing" ( Mem. Appx. T "Trial 2 RR") and "Trial On The Merits" (Mem.Appx. U "Trial 4 RR") on December 4,2017 and December 5,2017, the prosecution called Deputy Jackie Maxwell and Deputy Amy Benningfield to testify to the facts of the case as the State's Expert Witnesses.(CR 1423421 at 125-27). However, the prosecution suppressed evidence of these "Expert Witnesses' " misconduct in previous investigation, in violation of "Brady," "Michael Morton Act," and "Bagley," where the State's "Expert Witnesses," had been known by the Harris County Constable's Office, Precinct 4, to have mishandled evidence and had failed to complete forms and reports; which was exculpatory ann/or impeachment evidence that the trial attorney was not provided with. See (Mem. Appx. E "Disciplinary Reports filed on Deputy Maxwell," and F "Disciplinary Reports filed on Deputy Benningfield"):

a). Deputy Jackie Maxwell:

i. 10/12/2010 Case # 10000058 failed to properly complete investigation report in a kidnapping complaint.

ii. 07/07/2011 Case# 10000309 failed to enter vital information into suspect screen and failed to list vehicle information into the vehicle screen of this report.

iii. 05/21/2010 Case #999875 Violation of Harris County Pct.4 Policy and Ethic under section 2.12, Performance on Duty.

iv. 01/13/2012 Case# 10000599 Violation of several Departmental Policies...told Complaintant he had Bigger Fish to Fry, after Complaintant complained of a Breaking and Entering.

V. 01/15/2011 Evaluation Report @ 3 notes Deputy Maxwell, "Failed to conduct a good scene investigation" in a Burglary case where over $100,000.00 in property was stolen.

b). Deputy Amy Benningfield:

i. 04/29/2011 Case# 10000274 "Failed to follow Harris County Pct.4, Standard Operating Procedure for Evidence, under General Submission of Evidence Catagory...failed to seal evidence bag," in a Sexual Assault Case, prior to dropping it in the drop box of the Harris County Medical Examiner's Office. [the evidence was mishandled, was the case prosecuted?]

ii. 06/11/2012 Case# 10000759 Juvenile arrest paperwork under case #12-57862 was returned to Deputy Benningfiled for correction. Correction was not completed 21 days later, after several e-mails wre sent to her. Deputy Benningfield was cited for failing to meet Departmental Standards in accuracy and Completeness of Forms, violatin Departmental Policy and Ethics section 2.12 Performance of Duty.

In the instant case the above information would have been exculpatory and/or impeachment evidence in regard to the failure to follow standardized and valid departmental policy and procedure with regard to the "inventory search, where Benningfield testified at the "Suppression Hearing" that she performed the inventory search on Applicant's motorcycle.(2 RR 55). She did not recall if anyone assisted her. (2 RR 55). For the protocol she had to follow.(Mem. Appx. H " Harris County Pct.4, Search and Seizure, S.O.P."). Noting;inventory search must be conducted in accordance with Departmental Policy,at section II.; also note section V "DOCUMENTATION" "Properly document all actions relating to search and seizure

(warrant or warrantless) in a complete and detailed report."

Benningfiled testified, with regard to what I'm writting down during an inventory search, at the suppression hearing:

> Of course, I'm writing down the type of vehicle, the VIN number, license plate, anything that's inside the vehicle we write down, whether it be phone, wallets, anything that's in it, we write down.

(2 RR 57).

After being shown the "Tow Slip" (7 RR Defendant's Ex. 3) during the suppression hearing, Deputy Benningfield testified that she did not know why Deputy Maxwell's name was on the tow slip and that she just filled out the tow slip and gave it to Deputy Maxwell.(2 RR 57-58). Deputy Benningfield; however did not fill out the entirety of the tow slip.

Q. [State]: And do you recall - but everything else, that's your handwritting on that document?

A.[Benningfield]: Yes, I'm Sorry. As far as the property right here that's his handwriting it looks like; but the rest on top, the vehicle itself, is my handwritting.

Q. [State]: And when you say the property on Defendant's Exhibit 3, do you mean the items located under title, — Inventory of Vehicle Contents ?

A. [Benningfield]: Yes.

(2 RR 58).

Deputy Maxwell testified he had nothing to do with the inventory search and could not attest to whether the tow slip was accurate. (2 RR 37-38). Deputy Maxwell testifies that his name appears at the bottom of the tow slip, but that it was not his signature. (2 RR 37); also (7 RR Defendant's Ex.3).

During the inventory search, two weapons were recovered from the motorcycle's right-hand saddle-bags; one was a .32 cliber semiautomatic pistol and the other was a 1911 semiautomatic pistol with 3 clips, three argazines.(4 RR 35-37) The .32 had a clip/magazine in it and had 7 live rounds of ammunition in the magazine. (4 RR 43).

The weapons, magazines, and live rounds of ammunition were not on the tow slip inventroy, allegedly because they were automatically sent the the Harris County Institute of Forensic Science for testing and later were taken to storage. (4 RR 67, 72-73). Deputy Maxwell did not request testing on these items.(4 RR 68).

The weapons were not the only itms missing from the inventory slip; as pointed out in following grounds.

Deptuy Maxwell failed to testify about his filing the "Incident Report" (Mem. Appx. G) in this case, Case#1400-45589. Applicant wishes for the Court to examine (Mem.Appx.G). The Honorable Habeas Court will not the report is incomplete [just as the Tow Slip- Inventory of Vehicle Contents" was]. Now, if the Court will turn its attention to page 4 of Memorandum Appendix G,"Incident Report Related Property List," the magazine for the .32 is not listed, nor is 1 of the clips for the .45, and/or they are not listed seperately as they were at trial, and there is not an individual ammunition count from the (3) .45 caliber magazines and from the single .32 caliber magazine [as they should be listed]. This is vital evidence where each .45 cal. magazine contained 9 round,plus 1 in the chamber of the .45

and there were 7 rounds in the .32 caliber J.P. Sauer & Sohn 38H. Mem. Appx. G at 4)
The Court will also note that Deputy Maxwell and Deputy Benningfield have previously been disciplined, cited, and/or repremanded for mishandling evidence and failing to completely fill-out form and reports.

Had the Applicant been given the Officer's personnel files and notified of their previous misconduct he could have used this information to impeach the testimony of Deputies Benningfield and Maxwell at the suppression hearing and/or at trial. Furthermore, had trial counsel been provided this informaion he may have filed his own motion for suppression of illegally discovered evidence and based it on violation of Departmental Policy regarding inventory searches.

Neither Deputy Benningfiled or Maxwell filled out the "Ineventory of Vehicle Contents" portion of the TOW Slip and there is no showing as to whether the inventory was accurate [in fact it is not and there are items of property missing that Applicant knows to have been in the motorcycle saddlebags, e.g. his diabetic kit, glucose meter, insulin, $500.00 cash that was in the diabetic kit for emergencies, a 3 battery Mag-Lite flashlight, a pair of leather chaps with sterling silver conchos worth approx. $800.00, etc..], there is no testimony as to who filled out the "Inventory of Vehicle Contents" portion of the Two Slip, or when it was filled out. Neither Deputy Maxwell or Benningfield could identify the property taken out of the saddlebags; aside from the .32 caliber pistol, the .45 caliber pistol, the magazines [filled with ammunition] and a pouch the magazines were found in.

The State withheld critical evidence in violation of "Brady," "Bagley," and the "Michael Morton Act." To show this was a conscious decision to exclude "Brady" materials see the State's Brady Notice/ Mnt. in Limine regarding the State's firearms expert witness, Bradley Brun (CR 1532840 at 442).

Had it not been for the suppression of Deputy Maxwell and Deputy Benningfield's disciplinary records for mishadling evidence and not completing reports/forms there exists a reasonable probability the suppression hearing would have had a different result and the weapons found in Applicnat's motorcycle saddle bags would have been suppressed, where the inventroy search was not done in accordance with any valid, established Departmental Policy and/or Proceedure; and where the purpose of an inventory search is to complete an inventory list. Aitch V. State, 879 S.W.2d 167,172 (Tex.App.-Houston[14thDist] 1994, pet.ref'd); Florida V. Wells, 495 U.S. 1, 110 S.Ct. 1632, 1636 (1990)( The State failed to introduce testimony "that the officer actually inventoried the items found in respondent's car...Rather the testimony at the suppression hearing suggests that the officer(S) used the need to 'inventory' as an excuse to search for drugs.").

Had it not been for the prosecutorial misconduct, in suppressing Deputy Maxwell and Benningfield's disciplinary records regarding failure to complete reports, seeking person glorification, and mishandling of evidence [evidence favorable to the Applicant] there is a reasonable probability the results of the trial would have been different. Thus, the Prosecutorial Misconduct under "Brady", "Bagely", and the "Michael Morton Act" so infected the suppression hearing and trial with unfair prejudice as to make the resulting conviction a Denial of Due Process, in violation of the Fifth, Sixth and/or Fourteenth Amendments to the Constitution of the United States.

WHEREFORE, PREMISES CONSIDERED, the Writ should issue and the judgment and conviction should be vacated, set-aside and a new trial ordered.

GROUND FOUR

APPLICANT WAS DENIED CONSTITUTIONAL, DUE PROCESS OF LAW, WHEN THE PROSECUTOR USED INADVERTENTLY FALSE, MISLEADING AND/OR PERJUROUS TESTIMONY AT THE SUPPRESSION HEARING AND TRIAL: RESULTING IN PROSECUTORIAL MISCONDUCT AND PRODUCING A WRONGFUL CONVICTION AND DENYING APPLICANT HIS RIGHT TO A FAIR TRIAL, IN VIOLATION OF THE FIFTH, SIXTH AND/OR FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES

The fabricated testimony of Deputy Jackie Maxwell, can only be attributed to Prosecutorial Misconduct, where the State elicited and lead Maxwell to render intentionaly/inadvertently materially false, misleading and/or perjurous testimony. Newly discovered evidence from outside the record,and unavailabe to Applicant until very recently,reveals that the State engaged in prosecutorial misconduct and utilized materially false, misleading and/or perjurous testimony to support the arrest, acceptance of charges, and was used at the Suppression Hearing and Trial before a jury to condem Applicant in a fashion which violated the Due Process Clause of the Fourteenth Amendment of the United States Constitution. Error compounded into more error, in the instant case, until the due process guaranteed by the Fourteenth Amendemnt was lost in corruption.

But for suppressed call logs, disciplinary reports had against the officers who testified in this case, forensic reports that were not disclosed, and photographs taken with a digital camera and then omitted the date and time stamps from them, and the State's utilization of materially false, misleading and or perjurous testimony there exists a reasonable probability Applicant's Motion For Suppression of Illegally Seized Evidence and Trial on the Merits would have resulted in a different outcome and it is more likely than not that no reasonable jury would have found Applicant guilty beyond a reasonable doubt of Aggravated Assault with a Deadly Weapon or Felon in Possession of a Firearm, had it not been for the prosecutorial misconduct and due process violations.

Applicant now presents newly discovered evidence that was undiscoverable at the time of the Suppression Hearing, on December 4,2017, or prior to Trial, on December 5,2017. The evidence is highly reliable, where it consists of police records, records of dispatch logs, Harris County Institute of Forensic Science firearms labratory reports, and eye-witness affidavits; which prove the State of Texas, the Harris County District Attorney's Office, and the Precinct 4 Constable's Office engaged in Prosecutorial Misconduct and utilized materially false, misleading and/or perjurous testimony of Deputy Jackie Maxwell during the suppression hearing and trial of cause numbers 1423420, 1423421, and 1532840.

Deputy Maxwell testified that on April 2,2014, he was dispatched to 25410 Pepper Ridge Lane, in response to a weapons disturbance, where a gun had been discharged into the ground three times. (2 RR 20-21); also (4 RR 51). Deputy Maxwell went on to testify that the complaintant, Machell Spear, told him that she had been struck in the head with a weapon and that the weapon had been discharged three times and pointed at the ground. (2 RR 21). Maxwell testified that Machell Spear identified Applicant as the peron who struck her with the weapon and shot the weapon. (2 RR 21).

On Cross Examination the following exchang takes place at trial:

(Gaiser) Q. "So, there had been a discharge of a firearm at this —"

(Maxwell) A. "Yes."

Q. "You were dispatched to that location, someone had reported a weapon discharging at that location?"

A. "Yes, sir."

Q. "All right. And you learned that through radio communication ?"

A. "Yes,sir."

(4 RR 52).

Applicant now submits evidence from outside the record,that is newly discovered; which shows Deputy Maxwell gave materially false, misleading and/or perjurous testimony,in the forementioned statements. This such false, misleading and/or perjurous testimony was elicited by the State to bolster its case against Applicant for Aggravated Assault with a Deadly Weapon and Felon in Possession of a Firearm, in cause numbers 1423420,1423421 and 1532840.

Deputy Maxwell was dispatched to 25410 Pepper Ridge Lane, at 06:33:41, on April 2,2014, for a weapons disturbance; but there was no mention of a weapon being discharged. (Mem. Appx. I, "Precinct 4, Call For Service Report"), also see (7 RR States Ex. 44,45, "911 Recordings"). This evidence absolutely refutes the false, misleading testimony of Deputy Maxwell, where the evidence within and outside the record affirmatively establish Maxwell was not dispatched to a call in which there was a report of a weapon being discharged.

Futhermore on Cross Examination Deputy Maxwell testifies as follows:

(Gaiser) Q. "Did Machell Spear say which weapon or what kind of weapon she saw being — [discharged]?"

(Maxwell) A. "She indicated it was a .32."

Q. "She knew it was a .32 pistol?"

A. "She indicated to me that it was, yes sir."

(4 RR 77).

Now see the testimony of Machell Spear:

(Gaiser) Q. "would you know the difference between say a .45 and a .32 pistol?"

(Mrs. Spear) A. "No."

Q. "You wouldn't. So, if someone said you had mentioned a .32 pistol to them, that wouldn't correct, would it ?"

A. "Not me. I don't know one gun from another."

(4 RR 158).

Applicant submits newly discovered evidence from outside the record that gives furtner proof to the fact Deputy Maxwell and the State presented testimony at the Supression Hearing and at Trial with regard to the .32 Sauer & Sohn 38H pistol being fired"three time"into the ground, and that the prosecution lead Deputy Maxwell into giving materially false, misleading and/or perjurous testimony before the court at the suppression hearing and at trial. See the "Incident Report Related Property List," (Mem. Appx. G at 4). Noting at the bottom of item 4 which shows "..Seven .32 Cal. Live" rounds of ammunition recovered fro the magazine of the .32 Sauer & Sohn 38H semiautomatic pistol. Now see "Harris County Institute of Forensic Science Report" (Mem.Appx.J) and the Court will note the maximum number of rounds of ammunition the Sauer & Sohn 38H can hold is (8) Eight rounds. Demonstrating the pistol

could not have been fired three times, where there were 7 rounds of ammunition found in the pistol. Now, looking at the firearms report on the .32 (Mem. Appx. J at 3) "Firearms Worksheet" under "Bore Residue: Clean " which indicate the weapon had not been fired. See also (4 RR 76-77) what takes place when a semiautomatic pistol is fired, but no shell casing were found. (2 RR 30),(4 RR 68-69) and there was no testimony or evidence given to indicate any shots were fired. The State, Steven Belt (prosecutor) and Deputy Maxwell utilized materially false, misleading and/or perjurous testimony to inflame the trial court and jury and utilized materially false, misleading and/or perjurous testimony of shots fired to bolster the State's charge that Applicant had committed Aggravated Assault with a Deadly Weapon and Applicant was guilty of Felon in Possession of a Firearm.

If the Honorable Habeas Court will examine the record it will see that the State made this false claim central to its case-in-chief, when in fact the State knew there were no shots fired and the prosecution engaged in prosecutorial misconduct in knowingly utilizing Deputy Maxwell to render materially false misleading and/or perjurous testimony of three shots being fired from the .32 Sauer & Sohn 38H. See (2 RR 20,21,23,30,31,43 and 44), also (4 RR 51,52,68,69,76,77,180,190,206) in which weapon discharge, or shots fire, or three shots fired is brought before the trial court at suppression and before the trial court and jury. The prosecution knew there were no shot fired, where they had the "Harris County Institute of Forensic Science, Firearms Worksheet," and the "Incident Related Property List", but did not tender this information to Applicant, in violation of Brady V. Maryland, 373 U.S. 83(1963).

The State had in its possession the "Call For Service Report" (Mem.Appx.I), the 911 recordings (7 RR States Ex. 44,45), the "Firearms Worksheet" Mem.Appx. J at 3) and the "Incident Related Property List" (Mem.Appx. G), but failed to tender this exculpatory evidence to Applicant; because the State thought it could pursue a course of utilizing materially false, misleading and perjurous testimony with Deputy Maxwell that would go unchallenged; in order to gain a conviction for Steven Belt and his team; especially with the help of Judge Yates and her inflaming the jury by having them informed that on November 28,1989 Applicant was convicted of Attmepted Capital Murder of Police Officer. Error was compounded by more error; and the State utilized materially false, misleading and perjurous testimony to bolster the unfair prejudice in the juror's minds, until any and all symbolance of Due Process of Law, guranteed by the Fourteenth Amendment was lsot in the instant case.

Steven Belt, the prosecutor in this case, was a Army Vetran who served 2 years in Iraq (3 RR 24-25) and was thus a firearms expert, who with the forementioned reports knew there were no shots fired, and the evidence (exculpatory evidence) on his desk,and not tendered to defense counsel,deffenatively proved there were no shots fired, and particulary no shots fired from the Sauer & Sohn 38H .32 pistol. But yet he consciously chose toutilize perjured testimony to bolster his case and gain a wrongful conviction. The prosecutor engaged in prosecutorial misconduct; utilizing materially false, misleading and perjurous testimony of Deputy Jackie Maxwell to gain a conviction of Applicant, while violating Applicant's rights to Due Process under the Fourteenth Amendment to the United States Constitution.

The Due Process Clause of the Fourteeth Amendment forbids the knowing use by the State of perjured testimony. Giglio V. U.S., 405 U.S. 150,153 (1972). Yet "[t]he same result obtains when the State,

although not soliciting false evidence, allows it to go uncorrected.'Naupe V. Illinois, 360 U.S. 264, 269 (1959). For obvious reasons, a conviction obtained through the use of false evidence, known to be false by the prosecutor, denies a defendant liberty without due process of law. Giglio, at 153.

Thus, it follows that a defendant's due process rights can be violated even when the prosecutor was not, but should have been, aware that the State's witness was lying. Buitrago V.Scully, 705 F.Supp. 952 (S.D.N.Y. 1989); Bragg V. Norris, 128 F. Supp.2d 587,604-05 (E.D.Ark.2000). It also follows that, when considering "knowing" use of perjured testimony, court may decline to draw a distinction between the police agents and prosecutors and focus instead upon the "Prosecution team" which includes both the investigative and prosecutorial arms. United States V. Antone, 603 F.2d 566,569 (5th Cir.1979); United States V. Meros, 866 F.2d 1304(11th Cir.1989): Ex parte Fierro, 934 S.W.2d 370 (Tex.Crim.App. 1996), cert. denied, 521 U.S.1122 (1979)(Due Process prohibits prosecutors from presenting testimony that any member of the prosecution team, including investigating and prosecutorial personnel, knows to be false).

The duty to correct known false evidence is not only a prosecutorial ethic, cut a constitutional requirement. ~~Mooney~~ Miller V. Pate, 386 U.S. 1 (1967); Duggan V. State, 778 S.W.2d 465, 468 (Tex.Crim. App.1989); Ex parte Castellano, 863 S.W.2d 476,480-86(Tex.Crim.App. 1993); also Alcorta V.Texas, 355 U.S. 28,31 (1957).

Applicant has clearly shown that Deputy Maxwell rendered materially false, misleading and perjurous testimony, including the testimony Applicant fired three shots into the gound from a .32 Sauer & Sohn 38H pistol, on the morning of April 2, 2014, and that Applicant further used the .32 Sauer & Sohn 38H to strike the Complaintant in the head. Deputy Maxwell clearly "knowingly" gave false, misleading and perjurous testimony at the Suppression Hearing, on December 4,2017, and at Trial, on December 5,2017.

Because false evidence corrupts the truth seeking function of a trial, a new trial will be necessary, where the false testimony of Deputy Maxwell was the cornerstone of the State's case-in-chief and the prosecutorial misconduct of the State "so infacted the trial with unfairness as to make the resulting conviction a denial of due process." Darden V. Wainright, 477 U.S. 168,181 (1986).

WHEREFORE, PREMISES CONSIDERED, the Writ of Habeas Corpus should issue and orders given to vacate the judgment and conviction.

GROUND FIVE

APPLICANT WAS DENIED CONSTITUTIONAL DUE PROCESS OF LAW WHEN THE PROSECUTOR (STEVEN BLET) VIOLATED THE " RULE " AND COACHED WITNESSES, IN THE COURTROOM HALLWAY, IN VIEW AND WITHIN HEARING OF OTHER WITNESSES, WHILE INSTRUCTING JOHN AND MACHELL SPEAR TO RENDER IN ADVERTENTLY FALSE, MISLEADING AND/OR PERJUROUS TESTIMONY: DURING TRIAL ON THE MERITS: AND PRODUCING A WRONGFUL CONVICTION: WHILE DENYNING APPLICANT A FAIR TRIAL, IN VIOLATION OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

At trial on the Merits, December 5, 2017, the " Rule " was invoked and witnesses were sent out of the courtroom. (4RR 8). On December 4,2017, the trial court invoked the "Rule" with the prosecutors, Defense, and all potential witnesses stating"...the Rule has been invoked, which means you cannot be in the courtroom when another witnessess is testifying. You also cannot discuss your testimony in the presence of that witness."(2RR 17-18), also (4 RR 94-95).

After the " Rule " was invoked the Prosecutor, Steven Belt, went into the courtroom hallway, on December 5,2017, during a recess or recesses and gathered togather the Complaintants John Spear and Machell Spear and told them what to say on the witnessess stand, how to say it and what emotions to portray, even telling them what hand gestures to make. This is attested to by eye-witnesses Linda Heughan (CR 1423421 at 371-72), hereinafter in ( Mem.Appx.N )and affidavit of Linda Pugh (CR 1423421 at 374-76) hereinafter ( Mem. Appx. O ) which is outside the record, but tendered to the Public Defender's Officer prior to the motion for new trial and was filed with the Harris County Court Clerk's Office immediately after trial, on December 8,2017. (CR 1423421 at 371-72 and 374-76). The Public Defender's Office Investigator was also potentially a wittness to Prosecutor Belt's violation of the " Rule ", Investigator Russell Bliese.

According to the affidavits of Mrs. Heughan and Mrs. Pugh; Prosecutor (Steven Belt) exited the courtroom and entered the courtroom hallway and gathered together John Spear and Machell Spear and began discussing testimony with Machell and John Spear. Mr. Belt was telling them what to say, how to say it, how Machell should hold her hands and make her hand into a fake gun and hold it up to her forehead, while telling of how scared she was and how cold the steel of the gun felt on her forehead. He instructed her on when to appear emotional and when to cry, etc... See the Affidavits of Linda Heughan (Mem. Appx. N) and linda Pugh (Mem.Appx. O). Prosecutor Belt also coached Deputy Benningfield after suppression was denied; threatening her and telling her not to mess the case up after the prosecution team got the weapons admitted as evidence. (Mem. Appx. N, O ). One of the Prosecutor's Investigators entered the hallway and told Prosecutor Belt that he was violating the "Rule" by speaking to Machell and John Spear together; especially when doing this infront of other witnesses, in the courtroom hallway. Again see (Mem.Appx. N, O).

Applicant, Steven Kurt Baughman, never struck Machell Spear with a firearm and never discharged the firearm, nor did he ever point the firearm at John Spear or Machell Spear. Applicant had a black Mag-Lite, police flashlight in his left-hand (it was dark in the rear of 25410 Pepper Ridge Lane;as is attested to by both complaintants (4 RR 100,101,106,134168,173,175) John and Machell Spear were known methamphetamine addicts and were using methamphetamine on the morniig of April 2,2014. When confronted about the theft of the Rolex and Applicant being called by Manuel Cruz telling Applicant Machell and John Spear had the Rolex Applicnat had stolen from his home and were trying to sell it, Machell Spear gave Applicant the same cock-and-bull story she gave to the trial court and jury about her finding a Rolex in a purse that had been thrown into the ditch over on Airline Drive and Aldine Mail Route. (4 RR 147-148), also (Mem. Appx. L "Affidavit of Steven Kurt Baughman:).[As for Machell and John Spear being methamphetamine addicts <u>see Outside the Record</u> (Mtn. 2 RR Defendant's Ex.5,"Affidavit of Russell Bliese"), also (Mem. Appx. P "Incident/Investigation Report#1601-80969" John Spear arrested for out-standing warrants and possession of methamphetamine and other drugs), also(CR 1423421 at 178-79 "State's Brady Notice"),also (CR 1423421 at 180-81 State's Motion In Limine"), also (State of Texas V. John Spear, Cause No. 1530469, in the 262nd District Court of Harris County). The Honorable Habeas Court will will also note Mr. Spear has been convicted of theft, and Mrs.Spear arrested on moral interpretude charges.]

After confronting Machell about the theft of the Rolex and her admitting to having it through this cock-and-bull story, Applicant stuck an accusing finger in her face, telling her she had some nerve in coming to his home and stealing the watch, and Applicant looked at her son John and said, John your mother just admitted to having my watch and I want it back, but I am sure that people throw purses out their car window, with Rolex watches in them all the time, over there on Airline Dirve and Aldine Mail Route, where meth-whores like your mom apply their trade, all the time. John Spear attacked Applicant and took a swing at him, Applicant's right hand was grabbed by Machell Spear at that instant and Machell bit down on Applicant's right index finger. Applicant struck Machell Spear on the right-side of the face/head with his left-hand, in order to free his right-index finger from Machell Spear's teeth. See Outside the Record (Mem. Appx. L) also (Mem.Appx. R "Harris County Jail, Medical Records" showing Applicant was received into the county jail with a human bite to his right index finger and had to be given wound care for several days), also (Mtn. DX-6 Medical Records, 3 RR 7-9 and 12 showing human bite to index finger and wound care ordered). John Spear testifies that Applicant hit his mother on the right-side of the face/head.(7 RR States Ex.45 "911 Recording of John Spear"), also (4 RR 199:25 -200:11)

The State, prosecutor Steven Belt, had John Spear to change his testimony from what was given on the 911 recording, and John Spear changed his testimony to fit the prosecutor's narative, on information and belief,for lieancy in the July 7,2015 theft case,and the felony arrest for possession of methamphetamine, in cause 1530469, in the 262nd District Court of Harris County, where Mr. Spear was given a 4 yr. deferred adjudication.

The State, prosecutor Steven Belt, suborned perjury from John Spear to render materially false, misleading and/or perjurous testimony from John Spear, where Spear testifies to Applicant showing Spear two guns, for no reason, the first time he met Spear, (4 RR 169) , and then has Spears testify that on the morning of April 2,2014, Spear saw Applicant pulled a pistol with brown handles from his right-side waistband and put it to his mom's head. (4 RR 175). Again the Honorable Habeas Court will note that it was so dark all John Spear could see of Applicant was his outline, so even if for argument sake Applicant had a gun in his hand (1) it was dark, therefore one could not tell if the handles on a pistol were black, brown, green, purple, blue, or any other color, and (2) if a gun were in a person's hands, the handles would be covered by the person's palm and fingers. Thus, the testimony of John Spear was created by the State, to tie Applicant to possession of the weapons found by the illegal search and seizure [the "ruse" of an "inventory search"]. This testimony is further proven to be materially false, misleading and/or perjurous, and coached to meet the prosecution's narrative where Spear testifies it was dark on the scene on 4/2/2014 and he "could barely see anything before daylight."(4 RR 168,173). He also testifies he has vision problems and can only see out of one eye.(4 RR 203). Thus, it would have been impossible to have seen a "brown handle" of a "small pistol," alleged to have been in Applicant's hand,"in the dark".

John and Machell Spear gave false, misleading and/or perjurous statements to Je'Rell Rogers, Assistant District Attorney, on or about November 23,2016 [Just 12 days after John Spear's arrest

in the case for possession of methamphetamine, Case #1530469]. Je'Rell Rogers states,"Furthermore, in the conversations with the prosecuting attorney in preparation for trial, potential witnesses for the State John Lee Spear IV and Machell Spear, in seperate meetings on seperate days, advised that they had overheard one of the on scene officers state that a gun had been recovered from a ditch. Machell Spear further advised that she remembered being told and shown of a knife that was recovered." (CR 1423421 at 184, "State's Brady Notice," dated November 23,2016.)

Upon information and belief, and the affidavits of Linda Pugh and Linda Haughan (Mem.Appx N, O) the prosecutor, Steven Belt, violated the "Rule" in coaching John and Machell Spear, in the courtroom hallway, on December 5,2017; thereby violating the Due Process rights of Applicant Baughman; while knowingly suborning materially false, misleading and perjurous testimony from the witnesses; within the sight and hearing of other witnesses,who submitted their affidavits to the Court Clerk and the Public Defender's Office (where at the end of trial Mr. Gaiser no longer represented Applicant), with regard to what they had seen and heard.

It is further believed that the prosecution stagged the inflamitory and unduly prejudicial outburst of John Spear; where John Spear rose from the witness stand and acted as if he were going to attack Applicant at the defense table while shouting [in front of the jury], "Fucking piece of shit...You're a piece of shit, loser, and made a stagged charge for Applicant, sitting in a wheelchair at the deefense table, while calling Applicant a "Mother-Fucker," in front of the jury. (4 RR 183-88).

John Spear's outburst is exactly the kind of outburst of violence John Spear exhibited toward Applicant on April 2,2014, when Applicant confronted John Spear and Machell Spear about the theft of the Rolex.

Upon information and belief, John Spear, was given a deal by the prosecution in case #1530469, in the 262nd District Court of Harris County; (Mem. Appx. P), also (CR 1423421 at 178-84); a deal which was not fully disclosed to defense counsel; a deal cut in exchange for his testimony against Applicant in Cause # 1423420, 1423421, and 1532840, a deal in which John Spear agreed to give false, misleading and perjurous testimony in exchange for a deferred adjudication in his methamphetamine case.

John Spear's inflamitory, prejudicial, theatrical outburts in front of the jury (4 RR 183-88) is an example of the violance John and Machell Spear exhibited on the morning of 4/2/2014. when Applicant was attacked by John Spear and bitten by Machell Spear; after being confronted about burglarizing Applicant's home and stealing his mother's Rolex watch. Outside the record (Mem.Appx.L), also (Mem. Appx. Q, "Harris County Incident/Investigation Report #14-48355 regarding Grand Theft/Burglary).

After John Spear's inflamitory outburst trial counsel moved for MISTRIAL, as the outburst was inflamitory and unduly prejudicial, in the presence of the jury; (4 RR 183). The theatrical outburst of John Spear resulted in materially unfair prejudice to Applicant's defense. (4 RR 183). The outburst was so shocking that the trial court became so rattled that she forgot whetehr the case was on direct or cross examination of the witness, John Spear.(4RR 188:8-9). See affidavits of witnesses in the courtroom hallway, as to what they saw and heard as baififfs came bursting out of the courtroom shoving John Spear before them. They stated the event was shocking to them (Mem.App. N, O), so without a doubt it was shocking and

prejudicial to members of the jury, who got to see the full theatrical display from John Spear's outburst. A fair and impartial trial was not possible once the jury had witnessed the State witnessess' violent outburst that was directed at Applicant.

The Sixth Amendment to the United States Constitution gurantees an accused the right to trial by an impartial jury. Franklin V. State, 138 S.W.3d 351,356 (Tex.Crim.App.2004); U.S. Const. amend VI. A verdict rendered by a jury influenced by prejudice or bias; whether by theatrical outburst of a State's witness or by placing before the jury the name and nature of previous (extraneous) offenses/ convictions violates that Sixth Amendment right.

Prosecutor, Steven Belt violated the " Rule " and coached John Spear and Machell Spear together, in the hallway of the courtroom, in full view and hearing of other witnesses and potential witnessess, telling John and Machell Spear what to say, how to say it, when to place emphasis on something, what hand gestures to make, and what emotions to portray. Upon information and belief, John Spear's outburst was associated with this coaching., and the prosecutions actions in violating the " Rule " violated Applicant's rights to Due Process of Law, guranteed by the Fourteenth Amendment to the United States Constitution, and Applicant's Sixth Amendment rights to trial by an impartial jury. (Mem.Appx. N, O witness affidavits).

Where the State, through Prosecutor Steven Belt, knowingly coached the witnesses to render to the jury false misleading and/or perjurous testimony the State and prosecution team violated Applicant's right to Due Process of Law guranteed by the Fourteenth Amendamt to the Constitution of the United States.

A prosecutor's knowing use of false testimony violates a defendant's right to due process, Naupe V. Illinois, 360 U.S. 264,269 (1959). For obvious reasons, a conviction obtained through the use of false evidence known to be false by the prosecutor, denies a defendant liberty without due process of law. Giglio V United States, 405 U.S. 150,153(1972);Naupe, supra, at 269 . Yet "[t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected." Nuape, supra, 360 U.S. at 269; see also Giglio, supra, 405 U.S. at 153. Thus, it follows that a defendant's due process rights can be violated when the prosecutor was not, but should have been aware, that the State's witness was lying. Buitrago V. Scully, 705 F. Supp. 952 (S.D.N.Y.1989). It follows, that, when considering "knowing" use of perjured testimony, courts may decline to draw a distinction between the police agents and prosecutors and focus instead on the "prosecution team" which includes the investigative [illegible] United States V. Antone, 603 F.2d 566,569 (5th Cir. 1979); United States V.

is false; it is enough that he or she should have recognized the misleading nature of the evidence." Dugan, supra, 778 S.W.2d at 468-69.

"The prosecutor's constitutional duty to correct known false evidence is well established both in law and in the professional regulations which govern prosecutorial conduct...'It shall be the primary duty of all prosecutors...not to vonvict, but to see that justice is done.' Art. 2.01 V.A.C.C.R. This overridding duty falls upon the prosecutor in his capacity as the State's representative in criminal matters. As a trustee of the State's interest in providing fair trials, the prosecutor is obliged to illuminate the court with the truth of the couse, so that the judge and jury may properly render justice. Thus the prosecutor is more than a mere advocate, but a fiduciary to fundamental principles of fairness." Dugan, supra. 778 S.W.2d at 468 (citing Berger V. United States, 295 U.S. 78,88 (1935)).

The Prosecutor, Steven Belt, and the prosecution team violated the duty enposed upon them by both constitutional law and professional regulations which govern prosecutorial conduct, in the prosecution of the instant case. The District Attorney's investigator even warned Prosecutor Steven Belt that he was committing a violation of the 'Rule" by coaching witnesses in the courtroom hallway; even though he may have been unaware of the fact Mr. Belt was coaching the witnessess to render false, misleading and/or perjurous testimony. Mr. Belt lead witnesses to give "false evidence" left false evidence uncorrected, and 'mislead the factfinder, thereby misdirecting the due course of law, and diverting due process from its intended progression toward a just and fair trial." Dugan, supra. 778 S.W.2d 469 (citing Burkhalter V. State, 493 S.W.2d 214,218 (Tex.Crim.App. 1973).

Because false evidence corrupts the truth seeking function of trial, and because prosecutorial misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process,"Dardin V. Wainright, 477 U.S. 168,181 (1986),

WHEREFORE, PREMISES CONSIDERED, the Writ should issue and the judgment and conviction should be vacated, and order for new trial issued or order that the charges be permanently dismissed with prejudice.

GROUND SIX

JUDICIAL MISCONDUCT, IN ALLOWING HEARSAY OF HEARSAY (DOUBLE HEARSAY) WITHIN A 911 RECORDING TO BE ALLOWED INTO EVIDENCE AND PLAYED TO THE JURY; DURING GUILT OR INNOCENCE, IN VIOLATION OF HEARSAY RULE AND IN VIOLATION OF THE SIXTH AMENDMENT. THEN FURTHER ALLOWED THE JURY TO HEAR THE HEARSAY OF HEARSAY DURING DELIBERATIONS, IN VIOLATION OF APPLICANT'S RIGHT TO DUE PROCESS OF LAW, RESULTING IN UNFAIR PREJUDICE AND WRONGFUL CONVICTION, IN VIOLATION OF THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION

At trial on the merits, on December 5,2017, the trial court allowed the jury to hear a 911 recording that contained hearsay of hearsay (double hearsay) in violation of the hearsay Rule and in violation of Applicant's right to confront, under the Sixth Amendment. (4 RR 191-193 and 128-32).

The trial court allowed the State to present to the jury a 911 recording which contained all hearsay of hearsay, over the objections of trial counsel; where trial counsel objected to the playing of the 911 recording on the grounds of hearsay of hearsay and on Sixth Amendment grounds of inability to confront; where the persons who made the 911 recording were not called as witnessess and denied Applicant's right to confront and cross examine the witnesses against him. (4 RR 128-32).

The 911 recording was that of a man on the phone, his mother relaying information to him of

allegedly what a woman (complaintant Macheil Spear) was telling her through the door of their home, on the morning of April 2,2014, at approximately 6:15 a.m.. This constitutes not only hearsay, but hearsay of hearsay (double hearsay), where hearsay is a statement, other than one made by the declarantwhile testifying at trial, offered into evidence to prove the truth of a matter asserted. Tex.R.Evid 801. Pursuant to Tex.R.Evid. 802 Hearsay is not admissible except as provided by the Rules of evidence or by other rules prescribed by the legislature, pursuant to statutory authority, by the Supreme Court of the United States or by an Act of Congress. Extending what an unidentified party hears another party say to another party, to a 911 operator raises serious due process issues, and denies Applicant the right to confront the witnesses against him in violation of the Sixth Amendment to the United States Constitution.

The Confrontation Clause of the Sixth Amendment to the United States Constitution states "[i]n all criminal prosecutions, the accused shall enjoy the right...to be confronted with the witness against him," U.S. Const. amend. VI. This right applies to state as well as federal criminal prosecutions. Pointer V. Texas, 380 U.S. 400, 406 (1965). The Supreme Court recently interpreted the Confrontation Clause to "demand" that out-of-court testimonial statements by witnesses are barred unless (1) the witnesses are unavailable to testify and (2) defendants had a prior opportunity to cross examine the witnesses regardless of whether such statements are deemed reliable by the court. Crawford V. Washington, 541 U.S. 36,68 (2004).

The hearsay of hearsay 911 recording (7 RR States Ex.44) was submitted for no other reason than to inflame the jury with undue and unfair prejudice, where it contained no information of probative value,Other than to create unfair prejudice, in violation of Tex.R.Evid. where Rule 403 prohibits the use of any evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.."

The playing of the 911 recording (7 RR 44) to the jury, where the recording contained hearsay of hearsay, and resulted in unfair prejudice in violation of Tex.R.Evid. 802 and Rule 403, violated Applicant's right to confront, under Crawford, 541 U.S. at 68, and violated Applicants rights under the Sixth Amendment to the United States Constitution, where it gurantees Applicant the right to trial by and impartial jury, Franklin V. State 138 S.W.3d 351,356 (Tex.Crim.App.2004); U.S.Const.amend. VI, and violated Applicant's right to Due Process, guranteed by the Fourteenth Amendment to the united States Constitution where the unfair prejudice likely contributed to or caused a verdict to be rendered by the jury influenced by prejudice or bias, in violation of the Sixth and Fourteenth Amendments to the United States Constitution; especially where the jury requested to hear the 911 recording again during deliberations of guilt or innocence and the court gave the 911 recording to the jury to listen to a second time. (CR 1423420 at 364).

Such unfair prejudice in the instant case was cumlative, in the totality of Judicial Misconduct and Prosecutorial Misconduct, and Applicant was denied any symbolance of a fair trial. The trial of causes 1423420, 1423421 and 1532840 were a mockery of justice and Due process.

WHEREFORE, PREMISES CONSIDERED, the Writ should issue withorder to vacate the judgment and conviction.

GROUND SEVEN

APPLICANT WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL, WHERE TRIAL COUNSEL FAILED TO INVESTIGATE THE UNDERLYING FACTS OF THE CASED AND FAILED TO FILE HIS OWN PRE TRIAL MOTION TO SUPPRESS ILLEGALLY SEIZED EVIDENCE: RESULTING IN COUNSEL WAIVING APPLICANT'S RIGHT TO SUPPRESS ILLEGALLY SEIZED EVIDENCE, WHERE COUNSEL FAILED TO ARGUE TO THE TRIAL COURT THAT THE POLICE DID NOT FOLLOW DEPARTMENTAL POLICY IN CONDUCTING AN INVENTORY SEARCH, AND FAILED TO URGE ARGUMENT FOR SUPPRESSION AFTER TESTIMONY PROVED THE INVENTORY SEARCH WAS NOT CONDUCTED IN ACCORDANCE WITH ANY VALID AND ESTABLISHED DEPARTMENTAL POLICY FOR INVENTORY SEARCHES, RESULTING IN VIOLATION OF THE FOURTH AMENDMENT AND A WRONGFUL CONVICTION

The threhold determination by the Tex.Crim. App. that Applicant was not denied effective assistance of counsel failed to consider two important factors. First, this Court held that Applicant waived any claim that the search resulting in the possession charge was based on an inventory search and that trial counsel did not request or present evidence to support the submission of jury instructions regarding the validity of that search required by Tex.Code Cri.Proc. art 38.23. (Mem.Appx. S at 5-8).

Where trial counsel failed to investigate the facts of the case and failed to file his own pretrial motion, based on police misconduct and failure to follow valid and established departmental policy in conducting an inventory search, and instead addopted the suppression motion of previous counsel, who had failed to investigate the facts of the case and whose motion to suppress was besed on ,"Motion To Suppress Evidence Obtained By Illegal Detention Of The Defendant," (CR 1423421 at 343),and trial counsel failed to file a motion to suppress evidence obtained through police misconduct,in failing to abide by established departmental inventory policy.Where trial counsel failed to interview Applicant and conduct an investigation into the "inventory search," which resulted in trial counsel's waiving [Applicant's]rights to challenge the denial of his motion to suppress[(Tex.Code Crim.Pro. art 38.22), and] (Tex.R.App.P 33.1) because he failed to argue to the trial court that the police inventory search included irregularities" Baughman V. State, 2019 Tex.App. LEXIS 5265 (Tex.Crim.App.June 25,2019).

Where trial counsel faied to conduct an independent investigation into the facts of the case and failed to make the correct argument for suppression of evidence seized in an inventory search,which was not conducted in accordance with a valid and established departmental policy, trial counsel violated Applicant's right guranteed by the Sixth Amendment to the United States Constitution, to be given the effective assistance of counsel. See Wiggins V. Smith, 539 U.S. 510 (2003)(Counsel cannot make a sound decision not to present evidence he did not know about due to an indeqate investigation).

Had trial counsel investigated the facts and interviewed Applicant, and submitted a Motion For Suppression based on Poilce Misconduct, Failing To Follow Departmental Inventory Search Policies and Proceedures and discovering that Officers Maxwell and Benningfield utilized "Inventory Search" as a ruse for general rummaging to find criminal evidence, in violation of established law.[See Florida V. Wells, 495 U.S. 1, 110 S.Ct. 1632, 1635 (1990)("...an inventory search must not be a ruse for general rummaging in order to discover incriminating evidence. The policy or practice governing inventory searches should be designed to produce an inventory. The individual officer must not be allowed so much lattitude that inventory searches are turned into 'a purposeful and general means of discovering a crime.' ") (citing Colorado V. Bettine, 479 U.S. 367,376 (1987))], the results of the suppression

hearing and trial would have resulted in a different outcome. Especially had counsel subpeoned the personnel record of Deputy Maxwell and Deputy Benningfield; as the Public Defender's Office did; and discovered that both Deputies had been disciplined for mishandling evidence and failing to complete departmental forms and reports (i.e.,Incident/Investigation Report of Case 1400-45589,(Mem. Appx. G , filed by Deputy Jackie Maxwell) and (Tow Slip,(7 RR Defendant's Ex.3)). See Ground Three, incorporated herein by reference, showing the disciplinary offenses committed by Deputy Maxwell and Deputy Benningfield and the fact the Deputies were known to mishandle evidence and failed to complete departmental form and reports. "[C]ounsel must make an independent investigation of the evidence and cannot entirely place his reliance on the district attorney's office or his client's versions of the facts." Taylor V. State, No. 01--6-00971- CR, 2008 Tex.App. LEXIS 1597 at*8(Tex.App.-Houston [1st Dist.] March 6, 2008, pet. ref'd)(mem.op.,not desiganted for publication), citing McFarland V. State, 928 S.W.2d 482,500 (Tex. Crim.App.1996). "it well settled that an attorney has a professional duty to present all available testimony and other evidence to support the defense of the client." Ex parte Ybarra, 629 S.W.2d 943, 948 (Tex.Crim.App. 1982) citing Ex parte Duffy, 607 S.W.2d 507 (Tex.Crim.App. 1980) and Thomas V. State, 550 S.W.2d 64,68 (Tex.Crim.App.1977).

"[A]n inventory search must not deviate from police department policy,'a burdan which the State may satisfy by showing that an inventory policy existed and was followed." Marcopoulos, 2018 Tex.App. LEXIS 2351 at *14, citing Moberg, 810 S.W.2d at 193-94; also see Florida V. Wells, 495 U.S. 1, 110 S.Ct. 1632 (1990)("The facts of this case demonstrate a prime danger of insufficently regulated inventory searches: police may use the excuse of an "inventory search" as a pretext for broad searches of vehicles and their contents. In this case, there was no evidence that the inventory search was done in accordance with any standardized inventory procedure...The State did not offer any evidence at the suppression hearing to support a finding that [Deputy Benningfield or Deputy Maxwell] performed the inventory according to a standardized opperating procedure." Id. Florida V. Wells, 110 S.Ct. at 1636.

When examining the record the Honorable Habeas Court will see there is no evidence that an inventory was actually done in this case. "The State introduced neither an [admissible] inventory sheet nor testimony that [either] officer at the suppression hearing actually inventoried the items found in [Applicant's motorcycle]..Rather testimony at the suppression hearing[and at trial]suggest that the officer[s] used the need to "inventory" as an excuse to search for [weapons]" and forgot to complete the Inventory of Vehicle Contents List on the Tow Slip. Id. 1636.

Trial counsel did not mention the legality of the inventory search, but instead focused on what he believed to be inconsistencies and ommissions in the case that would prevent the jury from finding the State met its burden of proof.

Deputy Maxwell testified during the suppression hearing, and at trial, that he did not perform the inventory of Applicant's motorcycle and that it was Deputy Benningfield who performed the inventory. (2 RR 36-37; 4 RR 35). At the suppression hearing, Deputy Maxwell testified Deputy Benningfield filled out the inventory slip. (2 RR 37). During trial, Deputy Maxwell testified he was not sure who prepared the inventory list. (4 RR 67). Although the signature block on the tow slip had Deputy Maxwell's

on it. Deputy Maxwell did not sign it and thought either Deputy Benningfield did or potentiall a trainee.(2 RR 37-38; 4 RR 66-67) Deputy Maxwell also could not attest to whether the tow slip as accurate.(2 Rr 38).

Deputy Benningfield testified at both the suppression hearing and during trial that she performed the inventory search oa Applicant's motorcycle. (2 RR 55; 4 RR 83). At the suppression hearing, she did not recall if anyone assisted her with the inventory.(2 RR 55). For the protocol she had to follow, Deputy Benningfield testified:

> We have to make sure that the vehicle is going to be towed, that we have the charges accepted. Once the charges are accepted, then we go ahead and do the inventory of the vehicle.

(2 RR 56)

With regard to what she is writing down during the inventory, Deputy Benningfield testified during the suppression hearing:

> Of course, Im writing down the type of vehicle, the VIN number, license plates, anything that's inside the vehicle we write down, whether it be phone wallets, anything that's in it, we write it down.

After being shown the tow slip (7 RR Defendnat's Ex. 3) during the suppression hearing, Deputy Benningfield changed her testimony and testified that she did not know why Deputy Maxwell's name was on the tow slip and that she just filled ot the tow slip and gave it to Deputy Maxwell.(2 RR 57-58). Deputy Benningfield; however did not fill out the entirety of the tow slip.:

> Q.[State]: And do you recall -but everything else, that's your handwriting on that document ?
>
> A.[Benningfield]: Yes. I'm sorry. As far as the property right here that's his handwritting it looks like, but the reset on top, the vehicle itself, is my handwritting.
>
> Q. [State]: And when you say the property on Defendant's Exhibit 3, do you mean the items located under title, "inventory of Vehicle Contents"?
>
> A.[Benningfield]: Yes

At trial, Deputy Benningfield testified similarly as she had done during the suppression hearing: "I did look through the saddlebags. I did help withthe inventory, but I was not the one who srote those items down."(4 RR 89-90) She also could not remember for sure if Deputy Maxwell was the one who itemized the items on the tow slip. (4 RR 90). No other officer testified regarding the inventory search of Applicant's motorcycle.

Now see Gound Three, supra, and the disciplinary record of Deputies Benningfield and Maxwell with failure to complete reports and forms, and mishandling evidence.

When being questioned about the inventory search protocol Deputy Benningfield testifies:

> Q.[State]: Okay. Do you recall what charges were accepted at the time?
>
> A.[Benningfield]: Yes
>
> Q. [State]: What were they ?
>
> A. [Benningfield]: It was the aggravated assault with a deadly weapon and felon in possession.

(2 RR 56).

[Benningfield's response indicates the search was conducted first, then once the weapons were found "inventory"was alleged to cover for the illegal search and seizure of evidence. How could Applicnat

be charged with possession of the weapon without the search having already been conducted ? Deputy Benningfield's testimony show's that once the weapons were found charges were accepted, then the Deputies alleged an "inventory seah" was conducted after the fact, to cover for the illegal search and seizure, and but for their excitement in making a case they forgot to fill out the "Inventory Of Vehicle Contents" portion of the tow slip.

The State bears the burden to establish that the police conducted a lawful inventory search and "[t]he State meets its burden by demonstrating an inventory policy exists and that the officer followed the policy." Jackson V. State. 468 S.W.3d 189(Tex.App.-Houston [14th Dist.] 2015. no pet.); Florida V. Wells 110 S.Ct. 1632 (1990). The evidence adduced at trial and the suppression hearing reveals that the State did not meet its burden in demonstrating that the officers followed policy when conducting the inventory search of Applicant's motorcycle. Not only were the weapons supposedly found during the inventrcy search omitted from the tow slip. but other property was, and neither Deputy Benningfield nor Deputy Maxwell could testify as to whom actually created the inventory list. or when it was ceated. Deputy Maxwell testified that he did not know who prepared the inventory list and that the signature purporting to be his on the tow slip was in fact not his.(2 RR 37-38; 4 RR 66-67). [Constituting violation of the Texas Penal Code §§ 32.21"Forgery." 37.09 "Tampering With or Fabricating Evidence," and 37.10 "Tampering With Governmental Records".thereby rendering the "inventory search" was illegal. where a police procedure. protocol. or policy cannot provide for allowing officer to violate the State Penal Code. to fabricate documentary evidence; and the tow slip is a government record; which testimony proves to contain a forged signature. Thereby. rendering the document to have been manufacured in violation of departmental policy.]

Because. trial counsel did not investigate the facts and law of the case, did not confir with Applicant. and merely addopted the suppression motion of another attorney who had failed to investigate the facts of the case, counsel failed to file a proper motion for suppression of the evidence and waived Applicants right to challenge the denial of the motion to suppress, because he failed to argue to the trial court that the police inventory search was not conducted in compliance with valid and established departmental policy and that the search includded irregualraties; and one all the irregularities were discovered counsel failed to re-urge the motion to suppress on the proper grounds.Thereby. Applicant was denied constitutionally effective assistance of counsel. as guranteed by the Sixth Amendment to the United States Constitution. which resulted in denial of suppression of illegally obtained evidence; obtained in violation of Art. I § 19 of the Texas Constitution and in violation of the Fourth Amendment to the United States Constitution.

HARM

Because the warrentless search violated Applicant's rights under the Fourth Amendment. a judgment must be reveresed when it is determined beyond a reasonable doubt that the error contributed to the conviction or punishment. Weems V. State. 434 S.W.3d 655. 667 (Tex.App.-San Antonio 2014). affirmed 493 S.W.3d 57 (Tex.CRim.App. 2016)."If the appellate record in a criminal case reveals constitutional that is subject to harmless error review. the court of appeals must reverse a judgment of conviction

or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment."

TEX R. APP.P. 44.2(a). "A search that offends the Fourth Amendment renders the subsequently discovered evidence inadmissible as a 'fruit of the poisonous tree.' " McQuarters V. State. 58 S.W.3d 250.258 (Tex.App.-Ft.Worth 2001. pet. ref'd). citing Segura V. United States. 468 U.S. 796.804 (1984). "The question is is whether the trial court's denial of allellant's motion to suppress was hameless beyond a reasonable doubt." Id.

Here the unlawful search produced two weapons that were found in the saddlebags of the motorcycle that Applicant was ridding; a .32 caliber semiautomatic pistol and a 1911 semiautomatic pistol with three clips or magazines. (4 RR 35-37). The .32 had (7) Seven bullets in the magazine. (Mem. Appx. G at 4). As previously shown Deputy Maxwell was suborned into giving false misleading and/or perjurous testimony (GRound Five) in testifying that Ms. Spear indicated to him that she saw a .32 pistol with brown handles being discharged into the ground three times, although Ms. Spear testified at trial that she sould know a .45 from a .32 pistol. (4 RR 169-171) The .32 caliber pistol found in the saddlebag also matched the description of the weapon Mr. Spear testified the Applicant drew on his mother. (4 RR 175-76). Mr. Spear also rendered false misleading, and/or perjurous testimony when he identified a photo of one of the weapons found in the saddlebag as the gun that he said Applicant drew at his mother. (4 RR 176-78, and States Ex. 29). Finally, the State emphasized Mr. Spear's testimony about having seen the same brown handled gun that was used on the day of the incident a month earlier when Applicant showed them to him for no reason, upon their first meeting. (5 RR 15). Clearly, the discovery of the two guns in the saddlebags of the Applicant's motorcycle were a key piece of evidence that was used against Applicant at trial and the failure to suppress the fruits of the unlawful inventory search was not harmless error beyond a reasonable doubt.

Where, but for the ineffective assistance of trial counsel, in failing to conduct a thorough investigation of the facts of the case, and his addopting the suppression motion of previous counsel, the weapons found in the saddlebags of the motorcycle Applicant was ridding would have been suppressed and there is a reasonable "probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland V. Washington, 466 U.S. 668,688 (1984). "Reasonable probability means a probability sufficient to undermine confidence in the outcome," but "[a] Applicant need not show...that counsel's deficient preformance more likely than not altered the out come of the case." Id. The instant case meets the high bar of the Strickland analysis where (1) counsel's performance fell below an objective standard of reasonableness, and (2) but for counsel's unprofessional errors, there is reasonable probability the the result of the proceedings would have been different. Strickland, 466 Us. at 687.

WHEREFORE, PREMISES CONSIDERED, The Writ should issue and an order vacating the judgment and conviciton shuld be issued.

GROUND EIGHT

PROSECUTORAIL MISCONDUCT-BRADY VIOLATION- VIOLATION OF DUE PROCESS OF LAW, UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION, WHERE THE PROSECUTION HID EXCULPATORY EVIDENCE THROUGH WITHHOLDING THE TIME AND DATE STAMP FROM THE CRIME SCENE PHOTOS, SUBMITTED A STATE's EXHIBITS AND TENDERED TO DEFENDNAT'S COUNSEL.

The prosecution failed to disclose favorable evidence to Applicant,in a criminal proceeding in violation of the Due Process Clause , where the material withhead was material to guilt and suppression of illegally seized evidence. Brady V. Maryland, 373 U.S.87 (1963), the Michael Morton Act, Tex.Code Crim.Proc. art. 39.14 (eff. date January 1, 2014) and Bell V. Tibbals, 2013 WL 128386 (N.D. Ohio March 26,2013). The Michael Morton Act requires prosecutors and law enforcement officers to disclose to the defendants counsel "any exculpatory, impeachment, or mitigating document, item or information in the possession, custody, or control of the State that tends to negate guilt of the defendant or would tend to reduce the punishment for the offenses charged." see (Mem. Appx. V "Michael Morton Act Letter from the Travis County District Attorney" noting the types of files/ evidence that must be disclosed by the prosecution team, prosecutors and law enforcement/investigators.). Both the Michael Morton Act and the United States Supreme Court have expanded "Brady Materials" to the duty to disclose to include impeachment evidence. United States V. Bagley, 473 U.S. 667,676 (1985). This evidence includes both substantive and impeachment evidence. This would include the date and time stamps of digital photographs taken at the "crime scene" on April 2,2014, by Sgt. Walker. see (Mem.Appx. V at 2).

Where the Precinct 4 Constable's Office and/or the prosecution team withheld the digital date and time stamp from the crime scene photos the prosecution withheld exculpatory, impeachment and substantivie evidence in violation of "Brady," "Michael Morton Act," and "Bagley" in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, where the prosecution tendered altered photographs to the Trial Court and Applicant's Counsel. Had the evidence not been tampered with it would have proven that Deputies Jackie Maxwell and Deputy Amy Benningfield gave materially false, misleading and/or perjurous testimony to the trial court at the suppression hearing on December 2,2017, and to the trial court and jury on December 5,2017.

The crime scene photos were taken by Sgt. R. Walker, on 4/2/2014, of the "crime scene" located at 25410 Pepper Ridge Lane, in Spring, Texas. Sgt.Walker took these photographs with a digital camera, so they could be downloaded to the Precinct 4 Computer, as JPG images. When photos are taken with a digital camera they are produced with a date and time stamp, on each photo taken. Vital exculpatory, substantive, or impeachment evidence; as was proven in the George Floyd murder trial.

The date and time stamps in the instant case will prove the following:

1). Applicant was placed in handcuffs as soon as he was taken off his motorcycle, immediately after his arrival at 25410 Pepper Ridge Lane, on 04/02/2014, at approx. 8:04 a.m.. (Mem. Appx. I "Call For Service Report")

Deputy Maxwell gave materially false, misleading and/or perjurous testimony at the suppression hearing, on December 4,2017, After being lead by Prosecutor Steven Belt (2 RR 19)

[Mr. Belt/State]:"Your Honor, as far as -- just so that the Court is aware, when Deputy Maxwell first came to the scene and appraoched the Defendant, he was not immediately arrested. He was not put into handcuff's: he was detained for wuestioning about the gun because the call was a weaponss disturbance call."

[The Court]: "Perhaps we need to establish that through the witness rather than through a statement of counsel. " (2 RR 19)

Afterwhich Deputy Maxwell testifies and renders materially false, misleading and/or perjurous testimony to the court as follows:

[State]: "When you first came in contact with the Defendant, did you or other officers arrest Defendant immediatly ?"

[[Maxwell]: "No, sir, we detained him."

[State]: "Was he handcuffed at that time ?"

[Maxwell]: "No, not to my knowledge."

(2 RR 22)

The State's Exhibit 37 and Defendants Exhibit 1 show Applicant in handcuffs and being placed into the cage in Deputy Maxwell's patrol car. (7 RR States Ex. 37; Defendants Ex. 1) The date and time stamp on the photos (intentionally deleted by the State) will show Applicant was immediately arrested when he arrived at 25410 Pepper Ridge Lane.

Deputy Maxwell testifies at trial that Applicant was placed in the rear of his patrol car without handcuffs. (4 RR 34) This was materially false, misleading and/or perjurous and the date and time stamps on (7 RR States Ex. 37 , Defendant's Ex. 1) would prove this to be false.

Deputy Maxwell testifies that Applicant was removed from his patrol car and handcuffed after charges were accepted by the District Attorney's Office. (4 RR 70, 72). Deputy Maxwell goes further to state that he violated Precinct 4 Policy by placing Applicnat into his patrol car without handcuffs. (4 RR 70), also see Precinct 4 Policy (Mem. Appx. M, at 16.04).

Deputy Maxwell's testimony is proven to be false, misleading and/or perjurous through the testimony of the Complaintant, Machell Spear,who testifies Applicat was immedictely arrested and immediately upon his arrival at 25410 Pepper Ridege Lane. (4 RR 140). Through the Call For Service Report it shows that charges were accepted and "In Custody" at 09:03:46 a.m. , but the photos of Applicant being in handcuffs was taken around 08:04 a.m., where Applicant was placed into handcuffs, patted-down and placed in the cage of Maxwell's patrol car and was never let out of the patrol car. (Mem. Appx.L), (7 RR States Ex. 37, Defendant's Ex.1). The date and time stamp on the digital camera photos is critical evidence that Deputy Maxwell gavematerially false, misleading and or perjurous testimony before the Court at the suppression hearing, on December 4,2017, and before the trial Court and Jury, on December 5,2017. The State supressed the date and time stamps in the photographs intentionally, to support Deputy Maxwell's materially false, misleading and/or perjurous testimony; which Prosecutor Steven Belt lead him to give. This was done to prevent the alleged confession of Applicant (that he had thrown a .32 in a ditch) from being supressed as a "custodial statement" under Tex.Code Crim. Proc. art. 38.22.

Thus, the suppression of the date and time stamps from the digital photos of the crime scene on Aprial 2,2014, was an intentional act, which altered the photos in a manner to bennifit the State, and suppress evidence bennificial to the Applicant, in violation of the Michael Morton Act, T.C.C.P. art 39.14, "Brady," and "Bagley" and thereby violated the Due Process Clause of the Fourteenth Amendment.

2). The Date and time stamp on the photos (7 RR States Ex. 1-35 and Defendant's Ex. 1-12 would show the search of Applicant's motorcycle saddlebags was done prior to 9:03 a.m., thus was an illegal search and seizure, which was later termed a "inventory search" as a ruse for the general rummaging through the saddlebags to find the evidence of a crime in violation of T.C.P. art. 38.23, Article I § 19 of the Texas Constitution, and the Fourth Amendment of the Constitution of the United States. see (2 RR 56) where Deputy Benningfield stated that the charge that were accepted were Aggravated Assault and Felon in Possession. Applicant could not have been charged with Felon in Possession, unless the motorcycle had already been search and the .32 caliber Sauer and Sohn and the .45 cl. Desert Eagle had already been found. The "inventory search" was a cover-up for the illegal search and seizure. Once the weapons were found both Deputy Benningfield and Deputy Maxwell forgot to complete the "Inventory Of Vehicle Contents" portion of the Tow Slip . (7 RR Defendant's Ex.3) And there is no testimony or evidence to show this was an "inventory search" conducted pursuant to a valid or established inventory policy or procedure of the Precinct 4 Constable's Office. (Mem. Appx.H). There is no evidence given by the State as to who forged Deputy Maxwell's name to the bottom of the Tow Slip, who fabricated the evidence, falsified the government document, or when it was fabricated and falsified. But it cannot be argued that the "inventory search" was conducted in accordance with valid and established departmental policy, protocol, or procedure. (Mem.Appx. H). Therefore to suppress the date and time stamp from the digital photos is to suppress critical exculpatory, impeachment, and substantive evidence from the defense, in violation of the Due Process Clause of the Fourteenth Amendment of the United States Constitution, where an "inventory search" is only legal "if" the State can prove that the "inventory search" was conducted pursuant to and in compliance with a valid and established departmental policy and the burden is on the State to prove this. Thus, the State suppressed the date and time stamps from the photos, where the prosecution team knew the "inventory search" was a ruse for general rummaging to find evidence of a crime. See Florida V. Wells, 495 U.S. 1, 110 S.C.t.1632,1636 (1990) ("the facts of this case demonstrate a prime danger of insufficiently regulated inventory searches: police may use the excuse of an "inventory search" as a pretext for broad searches of vehicles and their contents. In this case, there was no evidence that the inventory search was done in accordance with any standardized inventory procecure.." "The State did not offer any evidence at the suppression hearing to support a finding that [Deputy Maxwell of Deputy Benningfiled] performed the inventory according to a standardized procedure.") And to prevent Applicant from further proving Officers Maxwell and Benningfield violated departmental policy as they have been known to do (Mem. Appx. E,F) the State suppressed the date and time stamps from the photos.

Where the suppression of exculpatory, impeachment, or substantive evidence violates the Due Process Clause of the Fourteenth Amendment the Writ should issue.and the judgment and conviction should be vacated.

GROUND NINE

APPLICANT WAS DENIED CONSTITUTIONALLY EFFECTIVE ASSISTANCE OF COUNSEL, WHERE COUNSEL FAILED TO INVESTIGATE THE FACTS OF THE CASE AND THERBY FAILED TO PROVE THE PROSECUTION SUBORNED MATERIALLY FALSE, MISLEADING AND/OR PERJUROUS TESTIMONY, WHICH RESULTED IN A CONVICTION THAT WAS HAD IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION

In the instant case "the inadequacy of the appellate record ...is due to the inherent nature of the ineffective assistance of counsel claims." Ex parte Torres, 943 S.W.2d 469,475 (Tex.Crim.App. 1997). "The very ineffectiveness claimed... prevent[ed] the record from containing the information necessary to substantiate such a claim." Id. (citing Ex parte Duffy, 607 S.W.2d 507,513 (TexCrimApp. 1980). "Moreover, the trial record ordinarily does not reflect counsel's reasons for doing or failing to do actions of which defendant complains "Id. (Citing Vasquez V. State, 830 S.W.2d 948,951 (Tex.Crim.App. 1992). While expansion of the record may be accomplished in a motion for new trial, that vehicle is often inadequate, because of time constraints and because the trial record has generally not been transcribed at this point...Hence, in most ineffective assistance claims, a writ of habeas corpus is essential to gathering the facts necessary to adequately elevate such claims." Id. Ex parte Torres 943 S.W.2d at 475.

The instant case is an example of the inadequacies of direct appeal in elevating ineffective assistance claims where Applicant was denied the effective assistance guranteed by the Sixth Amendment to the United States Constitution, where trial counsel failed to conduct an independent investigation into the facts of the case, and thus failed to discover exculpatory evidence to argue for suppression of custodial statements, attributed to Applicant, pursuant to T.C.C.P. atr. 38.22, and failed to gather evidence for the suppression of illegally seized evidence, pursuant to T.C.C.P. art 38.23. It is clearly established that Deputy Benningfield and Deputy Maxwell did not conduct an "inventory search" in accordance with a valid and established Departmental Policy, Protocol, or Procedure. The State presented "neither an inventory sheet nor any testimony that the officers actually inventoried the items found in [Applicant's motorcycle saddlebags]...Rather, the testimony at the suppression hearing suggests that the officers used the need to inventory as an excuse to search for [weapons]." Florida V. Wells, 110 S.Ct. 1632, 1636 (1990). Deputy Benningfield who alleged to have done the inventory search and changed her testimony when confronted with the Tow Slip (7 RR Defendant's 3) and decided she did not do the "Inventory of Vehicle Contents" portion of the Tow Slip, it was not her handwriting (4 RR 84-92). She then attested to giving the Tow Slip to Deputy Maxwell to complete, after the 2 firearm and 4 magazines were found. (4 RR 84-92). Deputy Maxwell testified he thought Deputy Benningfield put his name on the Tow Slip, because he was the primary Officer on the scene. (2 RR 38). Deputy Maxwell further testified he did not fill out the Tow Slip or "inventory sheet." (4 RR 57,66).

Had counsel conducted his own investigation into the facts of the case and requested Deputy Maxwell's Personnel files and Deputy Benningfiled's personnel files; as the Public Defender's Office did, he would have known that both the officer had disciplinary cases in their files for mishandling evidence and failing to

complete departmental forms,or reports, and for failing to obey departmental policy, which would have provided impeachment evidence for cross examination. Furthermore, had counsel confirmed with Applicant, he would have known the photographs taken, at 25410 were taken with a digital camera, on the morning of April 2,2014, and that digital cameras record the date and time on each photo taken. . see (7 RR States Ex. 1-37, and Defendant's Ex. 1-12 ) The Court will note at the bottom of the photos tendered to trial counsel they are computer files noted at the bottom of each photo, but there are no date and time stamps. Sgt Ronald Walker took the photos with a digital camera. (2 RR 39; tells who took the photos) The photos were loaded into Precinct 4's computer as JPG images. (7 RR Defendant's Ex.1-12) As explained in Ground Eight supra.. The date and time stamps, ~~which~~ are exculpatory, impeachment and substantive evidence . Had trial counsel conducted his own investigation of the fact and gotten a copy of the "Call For Service Report" and requested the date and time stamped (unaltered photos) taken by Sgt. Walker, he would have had the evidence to prove that (a) Applicant was placed into handcuffs around 8:03 am. ~~a.m.~~,when Applicant firsrt arrived at 25410 Pepper Ridge Lane, and that Applicant was never let out of Deputy Maxwell's patrol car. It would have proven Deputy Maxwell was giving the Court intnetionally false, misleading and/or perjurous testimony and violating Applicant's Due Process rights in doing so. Prosecutor Steven Belt lead Deputy Maxwell to give this false, misleading and/or perjurous testimony (2 RR 19) for the same reason the date and time stamps were suppressed from the photos: to get the State out of a Suppression of Custodial Statement hearing; as explained in Ground Eight supra., where Applicant was alleged to have told Deputy Maxwell that Applicant threw a .32 pistol in a ditch. Proof of the time at which Applicant was placed into the patrol car of Deputy Maxwell, in hand cuffs, and placed into the cage in the back-seat, where there are no door handles with which to exit, gives rise to the argument that the alleged statement, attributed to Applicant was a "custodial statement" and was subject to suppression under T.C.C.P. art. 38.22. see State V. Ortiz, 346 S.W.3d 127 (Tex.App.-Amarillo 2011).

Where trial counsel failed to conduct an independent investigation into the facts of the case, failed to acquire the photos whith the date and time stamps on them, and failed to acquire the "Call for Service Report" and waived Applicant's rights to a Suppression Of Custodial Statements Hearing, "because police will lie" counsel's performance fell below an objective standard of reasonableness, and but for counsel's unprofessional errors, there is a reasonable probability that the result of the proceedings would have been different. Strickland V. Washington, 466 U.S. 668, 687 (1984)

Date and time stamps on the photos; excluded by the prosecution; would have been exculpatory in proving the search of Applicant's motorcycle saddlebags was done before the charges were accepted and thereby the inventory search was not conducted in accordance with a valid and established departmental policy. (Mem. Appx.I "Call For Service Report") Applicant was not 'Officially' placed into custody until 9:03:46, but charges were not accepted until 9:36:52 and wrecker towed Applicants motorcycle at 09:47, to the Humble Towing yard, 7821 Rankin Rd. Humble,Texas. Had trial counsel conducted an independent investigation of the facts counsel would have known this, and there exists a reasonable probability the illegally seized evidence would have been suppressed. Again, counsel's performance fell below

an an objective standard of reasonableness, and but for counsel's unprofessional errors, there is a reasonable probability that the result of the proceedings would have been different. Strickland, 466 U.S. 687. Deputy Benningfield testified that charges had been accepted before the "inventory search" had begun(2 RR 56),(Mem.Appx T at 56)

[State]: Q. "Okay. Do you recal what charges were accepted at at that time?"

[Benningfield] A. "Yes."

[State]: Q. "What were they?"

[Benningfield]: A. "It was aggrivated assault with a deadly weapon and felon in possession."

(2 RR 56), (Mem.Appx. T at 56)

Applicant could not have been charged with felon in possession until the weapons were found, which indicates the search of the motorcycle saddlebags was conducted before the District Attorney was called. The only way to clear the issue up is to have the State produce the SIMM Card from the camera, and/or unaltered photos of the crime scene, 25410 Pepper Ridge Lane, taken on April 2,2014, complete with the original date and time stamps; and Applicant will need a computer expert and digital media expert to verify, whether there has been alterations made; due to the State already having been proven to have used fabricated evidence, altered and forged state documents,(namely the Tow Slip), and intentionally lead and suborned materially false, misleading, and/or perjurous testimony, to gain a wrongful and constitutionally violative conviction of the Applicant.

Furthermore, trial counsel failed to acquire the Call For Service Report" (Mem.Appx.I) which are exculpatory, impeachment, or substantive evidence in regard to Deputy Maxwell's giving materially and intentionally false, misleading and/or perjurous testimony; lead and suborned by Prosecutor Steven Belt:

[Mr. Belt]: "Your honor, as far as -- just so that the Court is aware, when Deputy Maxwell first came to the scene and approached the Defendant, he was not immediately arrested. He was not put into handcuffs, he was detained for questioning about the gun because the call was a weapons disturbance call."

(2 RR 19)

Trial counsel failed to object, constituting defficient performance, but the trial Court objected, where counsel failed to:

[Court]: "Perhaps we need to establish that through the witness rather than through a statement of counsel."

(2 RR 19)

[Mr.Belt]: Q ."Can you tell the Judge what happened that day as far as Mr.Baughman is concerned?"

[Deputy Maxwell]: A. "I was dispatched to a call at 24403 or 410 Pepper Ridge in reference to a Weapons call, which we ended up changing to assault family member aggravated."

[Mr. Belt]: Q. "And what type of weapons call, what details do you remember of what type of weapons call it was ?"

[Maxwell]: A. "It was a weapons call where a weapon had been discharged."

(2 RR 20)

This testimony lead by Prosecutor Belt was materially and intentionally flase, misleading and/or perjurous and had trial counsel conducted his own independent investigation and acquired the Call For Service Report (Mem. Appx. I) and the Harris County Institute of Forensic Science, Firearms Worksheet (Mem. Appx. J)

counsel would have been prepared to impeach Deputy Maxwell's materially false, misleading, and/or perjurous testimony. Deputy Maxwell further perjurors himself and gives intentionally and materially, false, misleading, and/or perjurous testimony before the trial court and jury where he testifies:

[Gaiser]: Q. "Did Machell Spear say which weapon or what kind of weapon she saw being--[fired]?

[Maxwell] A. "She indicated it was a .32."

[Gaiser] Q. "She knew it was a .32 pistol ?"

[Maxwell]:A."She indicated to me that it was, yes,sir."
(4 RR 77)

Counsel failed to conduct and independent investigation of the facts of the instant case. Had he investigated he would have found the Harris County Institute of Forensic Science, Firearms Worksheet (Mem.Appx J) [outside the record], the make and model of the .32 as being a J.P. Sauer & Sohn 38H, that the pistol hold a maximum of 8 rounds, and that the bore was clean and had no residue in it from being fired (Mem. Appx.J); counsel would have found Incident/Investigation Report #1400-45589 filed by Deputy Maxwell [outside the record](Mem.Appx.G) in which counsel would have seen Maxwell pulled 7 live rounds of ammunition from the magazine of the Sauer & Sohn model 38H .32 caliber semiautomatic pistol; counsel would have noted the Incident/Investigation Report was not complete and was missing information, including the serial number of the .45 Desert Eagle 1911; and had counsel investigated he would have known that both Deputy Maxwell and Deputy Benningfield were known to:1) violate departmental policy; 2) not completely fill out departmental forms (i.e. "Inventory of Vehicle Contents" portion of the Tow Slip, and the Incident/Investigation Report) , 3) mishandle evidence, and 4) that Precinct 4 would allow its Deputies to fabricate governmantal records quite sometime after the Incident/Investigation Report was due.[Outside the Record](Mem. Appx. E,F,G,K). The information outside the record should have been discoverd by trial counsel, but was not where he failed to conduct an independent investigation. "[C]ounsel must make an independent investigation of the evidence and cannot entirely place his reliance on the district attorney's office or his client's versions of the facts."Taylor V. State, 2008 Tex.App. LEXIS 1597 at *8 (Tex.App.-Houston [1st Dist.] March 6,2008)(citing McFarland V.State, 928 S.W.2d 482, 500 (Tex.Crim.App.1996)"it is well settled that an attorney has a professional duty to present all available testimony and other evidence to support the defense of the client." Ex parte Ybarra, 629 S.W.2d 943,948 (Tex.Crim.App.1982)(citing Ex parte Duffy, 607 S.W.2d 507 (Tex.Crim.App.1980).

It is axiomaticthat an accused has a right to counsel pursuant to the Sixth Amendment of the United States Constitution.An accused also has a right to have an attorney who will diligently investigate all possible defenses and prepare a case for presentation at both guilt and punishment. That was not done in this case and the trial court was advised of this before trial began, by both Applicant and counsel; who advised the trial court, "I don't believe it's in his best interest to have me as his attorney. For that reason, I would move the Court to withdraw." (2 RR 5), Mem.Appx.t at 5). Applicant gave the trial court a written motion to conduct a hearing to replace counsel in which Applicant gave written reasons as to why he knew counsel to be ineffective, before trial began. "So, this case is far removed from most; where the complaint of ineffective assistance of counsel is not one of hindsight, but is one in which the trial court was advised of ineffective assistancebefore trial started."

(Mem.Appx. A, B, D)

The search of the motorcycle was the cornerstone of Applicant's defense, as was the suppression of the custodial statement, proving there were no shots fired, and that Applicant acted in self-defense when attacked by John Spear and bitten by Machell Spear. The Inventory search was the alleged basis for the search, yet trial counsel failed to challenge the manner in which the inventory was conducted, failed to acquire the Call For Service Report (Mem.Appx.I), failed to acquire non-altered photos of the scene at 25410 Pepper Ridge Lane, which contained the date and time stamps from the origianl digital photographs, failed to acquire the disciplinary records of Deputy Maxwell and Deputy Benningfield (Mem.Appx.E,F), and failed to challenge the manner in which the inventory was conducted, and waived any objection for the purposes of appellate review on direct appleal; where counsel didn't file his own motion for suppression and merely addopted the motion of a previous attorny who had not investigated the case and whose motion was not based on violation of departmental inventory search policy and police misconduct. And even though the search was the essence of his defense, trial counsel failed to request or develop the record, re-urge the motion to suppress, or present a fact question concerning the search to the jury. If trial counsel had met with Applicant in preparation for trial, counsel might have been better prepared to present a defense, and the State would not have entered false testimony of shots fired. The record is clear, and the evidence from outside the record makes it certain. Tial counsel had a conflict with Applicant, based on counsel's failure to investigate the facts of the case, the evidence available that was exculpatory, impeachment, or substantive, and he failed to investigate the defenses suggested by Applicant. Based on Strickland and its progeny,"counsel's performance fell below an objective standard of reasonableness, and but for counsel's unprofessional errors, there is a reasonable probalility that the results of the proceedings would have been different." Strickland, 466 U.S. at 687. Applicant was denied the effective assistance of counsel gurananteed by the Sixth Amendment of the United States Constitution, and/or Applicant was constructively deined counsel pursuant to the Supreme Court's holding in United States V. Cronic, 466 U.S. 648 (1984) where the trial court knew irreconcilable conflict existed between counsel and Applicant and the trial court refused to hold a hearing withregard to the conflcit and forced Applicant to go to trial with a trial counsel who had not investigated the facts of the case or even filed his own pretrial motions. Counsel had no defense theory and was not prepared to try the case.

WHEREFORE PREMISES CONSIDERED, the writ should issue and the judgment and conviction should be vacated.

GROUND TEN

APPLICANT WAS DENIED HIS SIXTH AMENDMENT RIGHT TO CONSTITUTIONALLY EFFECTIVE ASSISTANCE OF COUNSEL WHERE TRIAL COUNSEL FAILED TOCONDUCT INDEPENDENT INVESTIGATION INTO THE FACTS OF THE CASE AND TO DISCOVER EVIDENCE TO PROVE THE PROSECUTION INTENTIONALLY OR INADVERTENTLY ELICITED MATERIALLY FALSE, MISLEADING, AND/OR PERJUROUS TESTIMONY, WHICH VIOLATED APPLICANT'S RIGHTS TO A FAIR TRIAL AND DUE PROCESS OF LAW, PURSUANT TO THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION

Applicant was denied effective assistance of counsel at the Suppression Hearing, on December 4,2017, and at Trial on the Merits, on December 5,2017, where tiral counsel stated to Applicant it was not his duty to prove Applicant innocent of Aggravated Assault or Felon In Possession of a Firearm; it was the

it was the State's burden to prove Applicant guilty beyond a reasonable doubt; and they would do that. (Cr 1532840 at 645-52), also [outside the record](Mem. Appx. A,B,D). See Texas Disciplinary Rules of Professional Conduct, Rule 1.01(b & c) and Comment: (6)" Having accepted employment, a lawyer should act with competence, commitment and dedication to the interest of the client and with zeal in advocacy upon the client's behalf...."and (7) "...Under paragraph (b), a lawyer is subject to professional discipline for neglecting a particular legal matter as well as for frequent failures to carry out fully the obligations owed to one or more clients..,"see also Summerlin V. Schriro, 427 F.3d 623,629 (9th Cir. 2005)("The Sixth Amendment right to counsel in a criminal trial includes 'the right to effective assistance of counsel.'")(citing McMann V Richardson, 397 U.S. 759, 771 n.14(1970)."This right extends to all critical stages of the criminal process." Iowa V. Tovar, 541 U.S. 77,80-81 (2004).

Trial counsel refused to present self-defense, pursuant to Tex.Penal Code §§ 9.31 and 9.32, where Applicant was attacked by John Spear and bitten on his right-index finger by Machell Spear, when Applicant confronted the two of them about entering Applicant's residence and stealing a Rolex watch belonging to Applicant's mother.[Outside the Record](Mem.Appx. L "Affidavit of Steven Kurt Baughman"; Q "Harris County Sherrif's Department Incident Report, Grand Theft, Incident #14-48355"), also see (Mem.Appx. R, "Harris County Jail Medical Records, showing Applicant entered the jail with a human bite to his right index finger and had to recieve wound care and a tetnis shot.")

1). A human bite on the finger is considered aggravated assault with a deadly weapon. Appleby V. Butler 2004 WL 502310 (N.D.Cal., March 9,2004), Degrate V. State, 2005 WL 165182 (Tex.App.-Dallas, January 26,2005),(holding that pursuant to Tex.Pen. Code Ann. § 1.07(a)(17)(B)(Vernon Supp.2004-05) "We conclude this evidence is sufficient to show appellant's mouth was a deadly weapon."),Clark V.State, 461 S.W.3d 244, 249 (Tex.App.-Eastland 2015)(holding that by bitting an officer's finger and that the bite broke the skin on his index finger adduced sufficient evidence that Appellant knowingly and intentionally caused bodily injury..),United States V. Sturgis, 48 F.3d 784,788 (4th Cir.1995)(holding "[i]n terms of the statutory language, teeth may also be a dangerous weapon if they are employed as such...The Moore Court noted that the potential for serious infection resulting from a human bite is a form of'serious bodily harm'sufficient, without more, to render teeth a dangerous weapon.)(citing United States V. Moore, 846 F.2d 1163,1167 (8th Cir.1988)),see also United States V. Parman, 462 F.2d 1203,1204 n.1(D.C.Cir. 1971)("bitting with teeth" charged as assault with a deadly weapon").

2). John Spear verbally attacked Applicant in the trial court in front of the jury, on December 5, 2017, and rose from the witness stand acting as if he were going to attack Applicant, who was sitting at the defense table in a wheelchair. (4 RR 183-88). The theatrical outburst in the court is similar, but toned-down from what Applicant was confronted with on April 2,2014, at 25410 Pepperridge Lane, but demonstrates the violent and radical nature of John Spear. On April 2,2014, John Spear and Machell Spear were high on methamphetamine and use of methamphetamine causes burst of outrage and aggression. see Melendez V. Scribner, 2006 WL 2520301 *9 (E.D.Cal. Aug. 30,2006)("...Dr. Globus described the common side effects of methamphetamine of even therapeutic doses as hyperalertness, euphoria, irritability, confusion, assaultiveness or aggression, paranoid delusions, and panic states with homocidal tendencies...

Date Mailed: July 30, 2021

Date Posted: August 3, 2021

# NOTICE

## THIS AGENCY IS AN APPLICANT FOR ACCREDITATION

- The Commission on Accreditation of Corrections and the American Correctional Association are private, non-profit organizations directing the accreditation of correctional programs in the United States and other countries.
- The **Powledge Unit** is voluntarily seeking accreditation by the Commission on Accreditation for Corrections by demonstrating its compliance with nationally established standards.
- The Commission on Accreditation for Corrections will conduct a standards compliance audit of this unit on **September 13-15, 2021.**
- Information relevant to this unit's compliance with standards should be submitted in writing to the American Correctional Association, Division of Standards and Accreditation, at least 10 working days prior to the audit. Please send all materials or comments to the address below.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

# AVISO

## ESTA AGENCIA ES UN ASPIRANTE PARA LA ACREDITACIÓN

- La comisión en la acreditación para las correcciones y la asociación correccional americana son organizaciones privadas, no lucrativas que dirigen la acreditación de programas correccionales en los Estados Unidos y otros países.
- La **Unidad de Powledge** está buscando voluntariamente la acreditación de la comisión en la acreditación demostrando conformidad con estándares nacionalmente establecidos.
- La comisión en la acreditación para las correcciones conducirá una intervención de la conformidad de los estándares de esta unidad **el 13-15 de septiembre del 2021.**
- La información relevante a la conformidad de esta unidad con estándares debe ser sometida escrito a la asociación correccional americana, a la división de estándares y a la acreditación, por lo menos diez días laborables antes de la intervención. Envíe por favor todas las materiales o los comentarios a:

**American Correctional Association**
**Standards and Accreditation Department**
**206 North Washington Street, Suite 200**
**Alexandria, VA. 22314**
**(703) 224-0083**



# APPENDIX:

# "A"

Statement To Read Onto
The Record 12/4/2017

December 4, 2017
Speech For Record
To Hold Hearing To Replace Counsel
Stopped and prevented from reading by Judge Yates

Your Honor

On August 24, 2017 Terrence A. Gaiser was appointed to Defendant to represent him after Defendant waived his right to self-representation.

Upon our first meeting Counsel announced he knew nothing about Defendant Baughman or the cases pending against him. Counsel did not even have the Court Order appointing him to the case with him to acquire Defendant's signature.

Defendant handed Counsel a packet of notes on the case with the things that needed to be done to prepare the case for Trial. Defendant requested that counsel read the packet and arrange for a contact legal visit with the Defendant, so Counsel could make comments, relay investigative reports, and things done to prepare a defense. Such meeting was to map-out the defense and prepare the case for trial. Counsel agreed to do so, and agreed to have Defendant contacted to let him know in advance when the meeting was to be so Defendant could prepare for it. Counsel stated he would send his investigator to see the Defendant, with some questions and he would arrange a meeting with Defendant 2-3 weeks later.

Hurricane Harvey hit and turned the legal community and courts upside down and there wasn't even postal service for almost two weeks.

Defendant mailed correspondence to Counsel stating he hoped counsel was not adversely affected and requested response to know when we would begin the defense.

On October 10, 2017, Counsel filed 2 Motions with the Court (1) to appoint an investigator and (1) Appearance of Counsel. These were the only Motions filed by Counsel as of November 24, 2017 (per Atty Blayne Thompson of Hogan Lovells U.S.).

In the instant case Counsel has presented no defense theory to the Defendant; other than, "The State Has To Prove It's Case" and you will be found guilty.

In our adversarial system of jurisprudence one accused of a crime is entitled to representation by counsel; both pursuant to the United States Constitution and the Texas Constitution.

Pursuant to Texas Disciplinary Rules of Professional Conduct Rule 1.01 comment 6.

"a lawyer should act with competence, commitment and dedication to the interest of the client and with zeal in advocacy upon the client's behalf."

The State has that in this case "but" the indigent defense system of Harris County has not appointed an attorney to Defendant Baughman who meets the standards of being an adversary to the State of Texas but instead works hand-in-hand with the State.

As an indigent Defendant Baughman realizes he is not allowed an attorney of his chosing but pursuant to the laws of this State, the United States and the Constitutions of both he is entitled to effective representation.

For that reason Defendant Baughman has filed a Motion To Replace or Substitute Terrence A. Gaiser with Counsel that will communicate with the Defendant, present pretrial and defensive motions, discuss defense theory with Defendant, and prepare these cases for jury trial.

ES-085

# APPENDIX

# "B"

## MOTION For Hearing To Replace Counsel

Cause No. 1532840

| | | |
|---|---|---|
| STATE OF TEXAS | § | District Court |
| V. | § | 174th Judicial District |
| STEVEN KURT BAUGHMAN | § | Harris County, Texas |

MOTION TO CONDCT HEARING TO REPLACE COURT APPOINTED COUNSEL

To The Honorable Judge of Said Court:

COMES NOW, Steven Kurt Baughman, Defendant in the above entitled and numbered causes and moves the Court to conduct a pretrial hearing on Defendant's Motion to Replace/Substitute Court Appointed Counsel for good cause shown:

I.

Defendant is presently represented by Terrence A. Gaiser, Attorney at Law, whom the Court appointed to represent the Defendant on August 24, 2017.

II

Defendant moves to Replace/Substitute appointed counsel, Terrence A. Gaiser, for good cause pursuant to the Texas Fair Defense Act ("TFDA") and Local Rule 23(N)(2)-(3) where Terrence A. Gaiser has violated his professional responsibilities and counsel has had a persistent and prolonged failure to communicate with the Defendant.

III

The aforementioned Court Appointed Counsel, Terrence A. Gaiser, has failed to provide Defendant Baughman with reasonably effective assistance of counsel, which Defendant is entitled to pursuant to T.C.C.P. Art. 1.051, "TFDA", Local Rule 23, Tex. Const. Art. 1 §10 and Sixth Amendment to the United States Constitution. See Gideon v. Wainwright, 372 U.S. 335 (1963); Mempa v. Rhay, 389 U.S. (1967)("[A]ppointment of Counsel is required at every stage of a criminal proceeding, where substantial rights of a criminal accused may

be affected). Counsel has advised Defendant to move for self-representation where:

A. Counsel has taken no affirmative action to preserve and protect valuable rights of the Defendant; that Defendant is aware of, where cousel has presented no pretrial motions nor conducted hearings.

B. Defendant by way of and because of counsel's lack of action has no faith or confidence in Terrence A. Gaiser, where:

1) Counsel was assigned to represent Defendant on August 24, 2017, replacing Defendant as self-represented and previously Ricardo N. Gonzalez.

2) Counsel, Terrence A Gaiser, after being appointed to represent Defendant on August 24, 2017, announced he knew nothing of Defendant or Defendant's case, but stated he would send his investigator to see Defendant and he would be to see Defendant the following week.

3) Counsel never even presented Defendant with the "ORDER APPOINTING COUNSEL" for Defendant's signature requesting the appointment of Terrence A. Gaiser to Defend Defendant.

4). Despite written communication mailed from Defendant to Terrence A. Gaiser requesting defense information about the case Cousel refused to communicate with the Defendant from August 24, 2017 until November 20, 2017 when Counsel came to the jail and announced the case ready for jury trial on December 4, 2017.

5) Counsel had not located necessary defense witnesses, refused to discuss defense strategy, stating only "its up to the state to prove its case."

6) Refused to discuss the need for scientific tests, need for expert testimony to assist in preparing defense, presenting

exculpatory or mitigating evidence or to assist in cross-examination, rebut, and/or impeach prosecutorial evidence.

7) Has not conducted thurough investigation of the case.

8) Has not submitted motions for suppression of custodial statements made in violation of T.C.C.P., Art. 38.22, Sec. 3;

9) Has not submitted motions for suppression of evidence had in violation of T.C.C.P., Art. 38.23;

10) Has not submitted motions in liminie.

11) Has not conducted a thurough background and "JIMS"/NCIC search into Prosecutions witnesses which can be used to impeach their credibility under Rule 609

12) Has not submitted motion to conduct forensic tests of the clothing worn by Defendant on the date of the alleged offense to impeach Prosecutorial testimony

13) Has told Defendant "You will be found GUILTY," at meeting on November 30, 2017, November 30, 2017.

IV

Defendant has received no information from Terrence A. Gaiser beyond his stating it is not up to us to state a defense, it is up to The State to prove its case and you will be found guilty. Terrence A. Gaiser has neglected the legal matters entrusted to him and has failed to carry out completely the obligations owed to Defendant in violation of Rule 1.01(b) of the Texas Disciplinary Rules of Professional Conduct, and such "neglect sinifies inattentiveness involving a conscious disregard for the responsibilities owed to a client or clients." Rule 1.01(c) See Texas Disciplinary Rules of Professional Conduct ("Rule") 1.01 comment (6)

"Having accepted employment, a lawyer should act with competence, commitment and dedication to the interest of the client and with zeal in advocacy upon the client's behalf. A lawyer should feel a moral or professional obligation to pursue a matter on behalf of a client with reasonable diligence and promptness despite opposition, obstruction or personal inconvenience to the lawyer. A lawyer's workload should be controlled so that each matter can be handled with diligence and competence. As provided in paragraph (a), an incompetent lawyer is subject to discipline." (emphasis added).

See also Rule 1.01, Comment (7), "... Because delay can cause a client needless anxiety and undermine confidence in a lawyer's trustworthiness, there is a duty to communicate reasonably with clients; see Rule 1.03." This is also evident in Local Rule 23 "Fair Defense Act Amended Interim Alternative Plain" Section/item "N. REPLACEMENT OF APPOINTED COUNSEL" where it states that the appointing judge may substitute counsel if the defendant shows good cause for replacing appointed counsel, including counsel's persistent or prolonged failure to communicate with the defendant, as complained of herein and in past motions to replace/substitute court appointed Counsel ~~Ricardo N. Gonzalez~~, Terrence A. Gaiser.

Lastly see Rule 1.03 (a)-(b), "A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information." "A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding

the representation." and in Rule 603, Comment (4) it states in part that a lawyer may not withhold information to serve the lawyer's own interest or convenience. This such rule of professional conduct is embodied in the United States Supreme Court's reasoning in Faretta V. California, 422 U.S. 806, 819-20, 95 S.Ct. 2525, 2533-34 (1975) in stating that the "Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants the accused personally the right to make his defense... for it is he who suffers the consequences if the defense fails.." The Honorable Court went on to say, "The counsel provision supplements this design. It speaks of the 'assistance' of counsel, and an assistant, however expert, is still an assistant." Id. How can counsel assist the accused if there is no communication? Without communication "[T]he language and spirit of the Sixth Amendment" become void and counsel is no longer a "defense tool" he is an "organ of the State." Id. "In such case [as the instant case], counsel is not an assistant, but a master, and the right to make a defense is stripped of the personal character upon which the Amendment insists. It is true that when a defendant chooses to have a lawyer manage and present his case, law and tradition may allocate to the counsel the power to make binding decisions of trial strategy in many areas... This allocation can only be justified, however, by the defendant's consent." Id. (internal citations omitted). But, consent entails communication and Defendant Baughman has had no communication with Court appointed Counsel ~~[illegible]~~ Terrence A. Gaiser.

V.

The Honorable Court should replace/substitute ~~[illegible]~~ Terrence A Gaiser with

competent trial counsel to act on behalf of Defendant Baughman, where Defendant Baughman is entitled; under the Sixth Amendment to the United States Constitution; Tex. Const. Art. I §10, Local Rule 23 "Fair Defense Act Amended Interim Alternative Plan" and the Supreme Court cases of Giddeon V. Wainwright, 372 U.S. 335 (1963); Mempa V Rhay, 389 U.S. 128 (1967); Strickland V. Washington, 466 U.S. 668 (1984), and Wiggins V. Smith, 539 U.S. 510 (2003).

VI

The Honorable Court should conduct a pre-trial hearing on Defendant's Motion to replace/substitute counsel where Defendant Baughman has submitted a substantial complaint regarding ineffective assistance of counsel so the Court may "make a thorough inquiry into the reasons for the defendant's dissatisfaction." Melendez V. Salinas, 895 S.W.2d 714 (Tex. App.-Corpus Christi 1994)(citing Wilson V. Mintzes, 733 F.2d 424, 428 (6th Cir. 1984); United States V. Young, 482 F.2d 993, 995 (5th Cir 1973)). "Such inquiry is necessary if the Court is to determine whether good cause for substitution of counsel exists. Failing to conduct such an inquiry is normally reversible error." Melendez V. Salinas, 895 S.W.2d 714 (Tex App.-Corpus Christi 1994)(Citing Wilson, 733 F.2d at 428 and Young, 482 F.2d at 995), U.S. V. Velazquez, 855 F.3d 1021 (9th Cir 2017).

To assist the Defendant and the Honorable Court with such inquiry Defendant would like to request the Court Subpeona Attorney Andrew Joseph Willey of the Non-profit Organization Restoring Justice as an expert witness who has investigated Terrence

A. Goiser for ineffective assistance of counsel.

VII

WHEREFORE, PREMISES CONSIDERED, Defendant prays that the Honorable Court replace/substitute Court appointed counsel Terrence A. Goiser and/or conduct a pretrial hearing and inquiry into the reasons for defendant's dissatisfaction with counsel.

Respectfully submitted this 4 day of December, 2017

[signature]
Steven Kurt Baughman
SPN 00505318 Cell: 2J1-1B
1200 Baker Street
Houston, TX 77002

"I, Steven Kurt Baughman (SPN 00505318), being presently detained in the Harris County Jail, in Harris County, Texas, declare under penalty of perjury that the foregoing is true and correct.

Executed on December 4, 2017. [signature]
STEVEN KURT BAUGHMAN

DECLARATION OF STEVEN BAUGHMAN

My name is Steven Baughman; my inmate identification number (SPN) is 00505318, and my date of birth is 02/05/1960. I am presently incarcerated in the Harris County Jail in Houston, Harris County, Texas. I certify under penalty of perjury that the following is true and correct:

1. I am the defendant in State v. Baughman, Cause No 1532840, 1423420, 1423421 District Court of Harris County, Texas

2. Terrence A Gaiser was assigned to represent me.

3. The defense I wish to present in this case is: [1] all the actions I took were specifically authorized by article 18.16 of the Code of Criminal Procedure; [2] the only force I used against Mechell Speer was striking her one time in self-defense when she bit my finger and refused to release it; [3] I never possessed, displayed, held, or even mentioned a firearm; and [4] the firearm now in police custody was never in my care, custody, or control, and I did not know of its existence, furthermore they may have been destroyed or lost by Harris County Constables, Precent 4, property room.

4. In very brief conversations on (dates from your notes) August 24, 2017, ~~and~~ November 29, 2017, Mr. ~~Terrence Gaiser~~ represented to me that we would present a ~~thorough~~ NO defence that included all of the elements in paragraph 3 above. ~~On ____, he instructed me to write a detailed statement that included my proposed testimony, so that we could go over it together and he could prepare me for direct and cross-examination~~ That the State had to prove its case and I would be found guilty,

5. I prepared ~~the~~ statement for defense ~~Mr. ... requested~~. I also identified the experts and other witnesses I thought we needed, including [1] a technician to conduct forensic testing on the firearm [or clothing, or anything else] and establish that there were no [finger prints, residue, etc.]; [2] a physician or drug expert to testify about the effects of methamphetamine use, including paranoia, violence, and distortion of reality, because Machell Spear admitted to the police in her interview that she was using methamphetamine at the time of my alleged crime. ~~[3] [any other specifics you want to include]~~

6. On November 20, ~~May 17,~~ 2017, Mr Terrence Gaiser visited me at the jail for about 20-30 minutes. He refused to accept my written statement, ~~even though he himself had requested~~ it. He refused to discuss my testimony or prepare me for cross-examination. He refused to even discuss experts or witnesses we needed. ~~When I protested that he wasn't listening to what I wanted to do, and that he had~~ When I protested that he'd been saying for months that we'd get together on this stuff, and now he wasn't even listening to me. ~~he snapped: "I'm in charge of this case, and I'll decide what to do."~~

7. The last straw, however, was when I protested that we hadn't ~~he had~~ even discussed a defensive theory. He said, "What's to discuss? ~~You hit her with the gun in self-defense.~~ The State has to prove its case."

8. This statement filled me with alarm because [1] it demonstrated that Mr. Gaiser was completely unprepared to establish that I NEVER HAD A FIREARM, and [2] a "defensive theory" that concedes I had a firearm does me no good whatsoever, given that I would still face

a minimum of 25 years for unlawful possession.

9. I insist that my chosen defense be presented to the jury. Therefore, I assert my right to represent myself in this proceeding.

10 I would have insisted on representing myself sooner if Mr. Geiser had informed me ~~earlier~~ sooner of the things he said this morning.

11. I will be giving ~~the~~ my motion ~~[illegible]~~ to represent myself to ~~jail officials~~ the Court ~~for mailing, in accordance with jail procedures, tonight~~ ~~[illegible] 2017~~ on December 4, 2017

Executed this 17th day of ~~May~~ December 4, 2017.

[signature]
Steve Baughman
SPN 00505318 Cell 2J1-1B
1200 Baker Street
Houston, TX 77002

Case No. 1423420
1423421
1532840

| | | |
|---|---|---|
| State of Texas | § | District Court of Texas |
| | § | |
| Vs | § | 174th Judicial District |
| | § | |
| Steven Kurt Boughman | § | Harris County, Texas |

# ORDER

On this the ______ day of ________, 2017, come on to be heard the Defendant's Motion For Hearing To Replace/Substitute Court Appointed Counsel, and said Motion having been properly presented to the Court, the Court is of the opinion that the Motion should be (GRANTED) (DENIED to which action of the Court Defendant hereby excepts).

Signed and Entered this ______ day of ________, 2017.

______________________________
Hon. Hazel B. Jones, Presiding

# APPENDIX:

# C

Harris County Jail, Attorney Visitation Log

HARRIS COUNTY HCSO SHERIFF'S OFFICE

SHERIFF ED GONZALEZ

1200 Baker Street, Houston, Texas 77002 ★ (713) 755-6044 ★ www.sheriff.hctx.net

December 28, 2017

HARRIS COUNTY PUBLIC DEFENDERS' OFFICE
Scott C. Pope, PDO
1201 Franklin Street, 13th Floor
Houston, Texas 77002

*Via Certified Mail 7017 1070 0000 0152 3770*
*(No Return Receipt Requested)*

RE: Subpoena(s) pertaining to Cause No. 1423240; State of Texas vs Steven Kurt Baughman; In the 174th Judicial District Court of Harris County, Texas.

To Whom It May Concern:

Enclosed is a *Harris County Sheriff's Office Business Record Affidavit* with the requested Jail Visitation History Log, in response to a subpoena(s) received on December 18, 2017, relating to the above-referenced cause number.

*PLEASE BE INFORMED THAT THE HARRIS COUNTY SHERIFF'S OFFICE DOES NOT KEEP ANY RECORDS FOR ANY CIVILIAN VISTORS OTHER THAN PAROLE OFFICERS, PROBATION OFFICERS, ATTORNEYS, PRIVATE INVESTIGATORS, LAW ENFORCEMENT, LEGAL ASSISTANTS, CPS, PROCESS SERVERS, MEXICAN OR OTHER CONSULATES, MITIHATION SPECIALIST, INTERPRETERS, TEXAS YOUTH COMMISSION OR ANY GOVERNMENT OFFICIAL.*

**As a reminder please follow the Rules Pursuant to Code of Criminal Procedure Chapter 39.14 (e ) and (f).**

(e) Except as provided by Subsection (f), the defendant, the attorney representing the defendant, or an investigator, expert, consulting legal counsel, or other agent of the attorney representing the defendant may not disclose to a third party any documents, evidence, materials, or witness statements received from the state under this article unless: (1) a court orders the disclosure upon a showing of good cause after notice and hearing after considering the security and privacy interests of any victim or witness; or (2) the documents, evidence, materials, or witness statements have already been publicly disclosed. (f) The attorney representing the defendant, or an investigator, expert, consulting legal counsel, or agent for the attorney representing the defendant, may allow a defendant, witness, or prospective witness to view the information provided under this article, but may not allow that person to have copies of the information provided, other than a copy of the witness's own statement. Before allowing that person to view a document or the witness statement of another under this subsection, the person possessing the information shall redact the address, telephone number, driver's license number, social security number, date of birth, and any bank account or other identifying numbers contained in the document or witness statement. For purposes of this article, the defendant may not be the agent for the attorney representing the defendant.

***Please note:*** All records requests pertaining to 911 calls, dispatch records, radio transmissions, or other records pertaining to communications, if any, are to be submitted directly to our Communications Division, as well as status inquiries regarding such records. You may do so by submitting said request/inquiry via email to 911records@sheriff.hctx.net. Also, all medical records, if any, are to be submitted directly to our Medical Division, as well as status inquiries regarding such records.

Any other records will be sent at a later date, if any. Should you have any questions, comments, or concerns, please do not hesitate to contact me.

Sincerely,

Joan Benford, Custodian of Record
Harris County Sheriff's Office

PrintVisitorHistory

<< Return to Previous Screen

**Jail Visitation**

Sort Display By: ⦿Visitor Last Name ○Visitor First Name ○Check In Time ○Check Out Time GO

| Visitor Last Name | Visitor First Name | Inmate SPN# | Inmate Last Name | Inmate First Name | Jail | Tag | Checked In | Checked Out | Signed In By | Signed Out By | Visitor ID# |
|---|---|---|---|---|---|---|---|---|---|---|---|
| GONZALEZ | RICARDO NOE | 00505318 | AUGHMAN | TEVEN KURT | JA09 | A-005 | 8/18/2014 11:32:51 AM | 8/18/2014 1:29:27 PM | HCSO\JDSantamaria | HCSO\JVines | 074892355 |
| GONZALEZ | RICARDO NOE | 00505318 | BAUGHMAN, | STEVEN KURT | JA09 | A-001 | 5/25/2015 10:17:22 AM | 5/25/2015 11:03:40 AM | HCSO\PAbbott | HCSO\PAbbott | 074892355 |
| Gillie | Kerry | 00505318 | BAUGHMAN | STEVEN KURT | JA09 | V-002 | 12/16/2014 1:39:17 PM | 12/16/2014 6:32:04 PM | HCSO\CTDriver | HCSO\JSBarnes | 088986422 |
| Acosta | Alan Joseph | 00505318 | BAUGHMAN | STEVEN KURT | JA09 | V-004 | 4/1/2015 9:03:44 AM | 4/1/2015 11:29:32 AM | HCSO\ADBates | HCSO\ADBates | 054480865 |
| Beck | Jillian | 00505318 | BAUGHMAN | STEVEN KURT | JA09 | V-018 | 6/3/2016 3:37:05 PM | 6/3/2016 5:15:49 PM | HCSO\ADavis | HCSO\SAGalvan | 15729170 |
| Beck | Jillian | 00505318 | BAUGHMAN | STEVEN KURT | JA09 | A-008 | 6/29/2016 2:40:58 PM | 6/29/2016 4:44:53 PM | HCSO\GFDefelippo | HCSO\AContreras | 15729170 |
| Welch | Russell | 00505318 | BAUGHMAN | STEVEN | JA09 | A-007 | 11/22/2016 2:37:47 PM | 11/22/2016 3:44:55 PM | HCSO\JRLehmiller | HCSO\JRLehmiller | 04740902 |
| Welch | Russell | 00505318 | BAUGHMAN | STEVEN | JA09 | A-003 | 2/1/2017 5:12:58 PM | 2/1/2017 6:06:24 PM | HCSO\BSerrano | HCSO\BSerrano | 04740902 |
| Welch | Russell | 00505318 | BAUGHMAN | STEVEN | JA09 | A-001 | 2/28/2017 6:29:13 PM | 2/28/2017 6:36:20 PM | HCSO\BSerrano | HCSO\BSerrano | 04740902 |
| Thompson | Blayne | 00505318 | BAUGHMAN | STEVEN | JA09 | A-010 | 6/1/2017 4:44:56 PM | 6/1/2017 6:23:30 PM | HCSO\JRLehmiller | HCSO\JRLehmiller | 21067816 |
| Thompson | Blayne | 00505318 | BAUGHMAN | STEVEN | JA09 | A-001 | 7/12/2017 5:27:53 PM | 7/12/2017 6:04:36 PM | HCSO\JRLehmiller | HCSO\JRLehmiller | 21067816 |
| Welch | Russell | 00505318 | BAUGHMAN | STEVEN | JA09 | A-001 | 8/24/2017 11:43:31 PM | 8/24/2017 11:52:44 PM | HCSO\LADavalos | HCSO\LADavalos | 04740902 |
| Steinle | Mollie | 00505318 | BAUGHMAN | STEVEN | JA09 | V-021 | 11/29/2017 11:22:46 AM | 11/29/2017 12:19:14 PM | HCSO\PAbbott | HCSO\RMBarker | 12925259 |
| Ceja | Maria | 00505318 | BAUGHMAN | STEVEN | JA09 | V-009 | 12/6/2017 2:04:28 PM | 12/6/2017 2:16:10 PM | HCSO\BSerrano | HCSO\BSerrano | 08933549 |
| Uzuegbunam | Ukamaka ozioma | 00505318 | BAUGHMAN | STEVEN | JA09 | P-011 | 12/14/2017 1:53:37 PM | 12/14/2017 2:36:28 PM | HCSO\ECasas | HCSO\ECasas | 17330711 |
| GONZALEZ | RICARDO NOE | 00505318, | BAUGHMAN | STEVEN KURT | JA09 | A-002 | 1/24/2015 8:31:37 AM | 1/24/2015 9:11:36 AM | HCSO\JADavis | HCSO\ADBates | 07489235 |
| Gonzalez | Ricardo noe | 00505318 | BAUGHMAN, | STEVEN | JA09 | A-007 | 5/17/2017 6:47:21 AM | 5/17/2017 9:01:03 AM | HCSO\JADavis | HCSO\CRSokoloski | 07489235 |
| GONZALEZ | RICARDO | | BAUGHMAN, | STEVEN KURT | JA09 | A-003 | 9/14/2015 12:40:56 PM | 9/14/2015 3:56:49 PM | HCSO\BDumas | HCSO\RJEsquivel | 07489235 |
| Gonzalez | Ricardo noe | 00505318 | BAUGHMAN | TEVEN | JA09 | A-008 | 5/16/2017 1:32:13 PM | 5/16/2017 3:05:32 PM | HCSO\PAbbott | HCSO\JMcCauley | 07489235 |
| Bliese | Russell | 00505318 | BAUGHMAN | STEVEN KURT | JA09 | V-012 | 4/28/2014 1:28:12 PM | 4/28/2014 2:32:59 PM | HCSO\CRSokoloski | HCSO\JMJameson | 00767874 |
| Broderick | Thomas | 00505318 | BAUGHMAN | STEVEN KURT | JA09 | L-002 | 2/16/2015 1:21:12 PM | 2/16/2015 1:37:35 PM | HCSO\CTDriver | HCSO\CTDriver | 26762925 |
| Beck | Jillian | 00505318 | BAUGHMAN | STEVEN KURT | JA09 | A-006 | 5/6/2016 3:41:01 PM | 5/6/2016 4:34:04 PM | HCSO\VQVu | HCSO\VQVu | 15729170 |
| Whitesell | S.lee | 00505318 | BAUGHMAN | STEVEN KURT | JA09 | A-006 | 6/29/2016 2:42:25 PM | 6/29/2016 4:44:43 PM | HCSO\GFDefelippo | HCSO\AContreras | 26709521 |
| Thompson | Blayne | 00505318 | BAUGHMAN | STEVEN | JA09 | A-006 | 11/22/2016 2:35:28 PM | 11/22/2016 3:44:50 PM | HCSO\JRLehmiller | HCSO\JRLehmiller | 21067816 |
| Welch | Russell | 00505318 | BAUGHMAN | STEVEN | JA09 | A-006 | 1/12/2017 3:47:26 PM | 1/12/2017 4:34:36 PM | HCSO\TGBoothe | HCSO\JRLehmiller | 04740902 |
| Welch | Russell | 00505318 | BAUGHMAN | STEVEN | JA09 | A-001 | 2/17/2017 6:18:13 PM | 2/17/2017 7:09:31 PM | HCSO\TGBoothe | HCSO\TGBoothe | 04740902 |
| Thompson | Blayne | 00505318 | BAUGHMAN | STEVEN | JA09 | A-014 | 5/19/2017 12:26:02 PM | 5/19/2017 1:50:33 PM | HCSO\RMBarker | HCSO\RMBarker | 21067816 |
| Welch | Russell | 00505318 | BAUGHMAN | STEVEN | JA09 | A-006 | 6/30/2017 10:14:18 AM | 6/30/2017 1:26:13 PM | HCSO\WHicks | HCSO\WHicks | 04740902 |
| Uzuegbunam | Ukamaka ozioma | 00505318 | BAUGHMAN | STEVEN | JA09 | P-001 | 8/11/2017 3:28:20 PM | 8/11/2017 3:46:37 PM | HCSO\JRLehmiller | HCSO\JRLehmiller | 17330711 |
| Gaiser | Terrence | 00505318 | BAUGHMAN | STEVEN | JA09 | A-004 | 11/20/2017 10:42:35 AM | 11/20/2017 11:53:28 AM | HCSO\PAbbott | HCSO\PAbbott | 14633831 |
| Thompson | Blayne | 00505318 | BAUGHMAN | STEVEN | JA09 | A-010 | 12/4/2017 6:28:47 PM | 12/4/2017 10:01:45 PM | HCSO\VRMurray | HCSO\LADavalos | 21067816 |
| Pope | Scott | 00505318 | BAUGHMAN | STEVEN | JA09 | A-010 | 12/13/2017 1:11:15 PM | 12/13/2017 2:08:04 PM | HCSO\RMBarker | HCSO\GFDefelippo | 10822305 |

'rintVisitorHistory

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gonzalez | Ricardo noe | 00505318 | BAUGHMAN, | STEVEN | JA09 | A-001 | 4/25/2017 7:00:43 AM | 4/25/2017 9:07:43 AM | HCSO\DPineda | HCSO\DPineda | 07489235 | attorom |
| Gonzalez | Ricardo noe | 00505318 | BAUGHMAN | STEVEN | JA09 | A-015 | 10/10/2016 11:35:52 AM | 10/10/2016 12:58:42 PM | HCSO\AContreras | HCSO\BSerrano | 07489235 | attorom |
| GONZALEZ | RICARDO NOE | ,00505318 | BAUGHMAN | TEVEN KURT | JA09 | A-001 | 9/20/2015 6:35:02 AM | 9/20/2015 9:10:15 AM | HCSO\KDLoftin | HCSO\PAbbott | 07489235 | Attorn |
| GONZALEZ | RICARDO NOE | 0505318, | AUGHMAN, | TEVEN KURT, | JA09 | A-008 | 3/19/2016 9:19:21 AM | 3/19/2016 12:37:31 PM | HCSO\JRLowery | HCSO\PAbbott | 07489235 | ATTORN |
| ACOSTA | ALAN JOSEPH | 00505318 | BAUGHMAN | STEVEN KURT | JA09 | V-014 | 1/22/2015 10:24:50 AM | 1/22/2015 11:18:21 AM | HCSO\SThames | HCSO\CRSokoloski | 05448086 | Privat Investig |
| Beck | Jillian | 00505318 | BAUGHMAN | STEVEN KURT | JA09 | A-004 | 4/15/2016 2:37:49 PM | 4/15/2016 3:32:26 PM | HCSO\JRLehmiller | HCSO\TGBoothe | 15729170 | attorn |
| Thompson | Blayne | 00505318 | BAUGHMAN | STEVEN KURT | JA09 | V-019 | 6/3/2016 3:41:37 PM | 6/3/2016 5:15:56 PM | HCSO\JADavis | HCSO\SAGalvan | 21067816 | State of Texas |
| Beck | Jillian | 00505318 | BAUGHMAN | STEVEN | JA09 | A-014 | 9/27/2016 2:59:31 PM | 9/27/2016 3:57:53 PM | HCSO\TYDarden | HCSO\JRLehmiller | 15729170 | Attorn |
| Thompson | Blayne | 00505318 | BAUGHMAN | STEVEN | JA09 | A-004 | 12/29/2016 1:59:57 PM | 12/29/2016 4:23:22 PM | HCSO\TGBoothe | HCSO\CRSokoloski | 21067816 | Attorne |
| Thompson | Blayne | 00505318 | BAUGHMAN | STEVEN | JA09 | A-001 | 2/1/2017 5:14:30 PM | 2/1/2017 6:06:31 PM | HCSO\BSerrano | HCSO\BSerrano | 21067816 | ATT |
| Welch | Russell | 00505318 | BAUGHMAN | STEVEN | JA09 | A-006 | 4/7/2017 10:14:12 AM | 4/7/2017 11:04:13 AM | HCSO\CRSokoloski | HCSO\JADavis | 04740902 | atty / |
| Welch | Russell | 00505318 | BAUGHMAN | STEVEN | JA09 | A-011 | 6/1/2017 4:46:17 PM | 6/1/2017 6:23:37 PM | HCSO\JRLehmiller | HCSO\JRLehmiller | 04740902 | atty |
| Burke | Alexandra | 00505318 | BAUGHMAN | STEVEN | JA09 | V-007 | 7/12/2017 5:30:00 PM | 7/12/2017 6:04:48 PM | HCSO\JRLehmiller | HCSO\JRLehmiller | 27655810 | legal assis |
| Welch | Russell | 00505318 | BAUGHMAN | STEVEN | JA09 | A-004 | 9/13/2017 7:21:49 AM | 9/13/2017 8:02:02 AM | HCSO\PAbbott | HCSO\PAbbott | 04740902 | Atty |
| Gaiser | Terrence | 00505318 | BAUGHMAN | STEVEN | JA09 | A-006 | 11/30/2017 [illegible] AM | 11/30/2017 [illegible] AM | HCSO\MHoughland | HCSO\MHoughland | 14633831 | ATTORN |
| Steuart | William | 00505318 | BAUGHMAN | STEVEN | JA09 | V-010 | 12/6/2017 2:02:58 PM | 12/6/2017 2:16:17 PM | HCSO\BSerrano | HCSO\BSerrano | 09854610 | priv inv |
| Tanner | Allen | 00505318 | BAUGHMAN | STEVEN | JA09 | A-010 | 12/15/2017 10:37:57 PM | 12/15/2017 11:22:05 PM | HCSO\JRLowery | HCSO\JRLowery | 10726147 | ATTORNE |
| Gonzalez | Ricardo noe | 00505318 | BAUGHMAN | STEVEN | JA09 | A-001 | 5/1/2017 7:12:43 AM | 5/1/2017 7:26:18 AM | HCSO\DPineda | HCSO\DBilderbac | 07489235 | attorney |
| GONZALEZ | RICARDO NOE | 505318 | BAUGHMAN | EVEN KURT | JA09 | A-010 | 10/5/2015 1:22:38 PM | 10/5/2015 9:42:47 PM | HCSO\TYDarden | HCSO\DPineda | 07489235 | Attorney |
| Gonzalez | Ricardo noe | 0505318 | BAUGHMAN | TEVEN | JA09 | A-001 | 5/4/2017 6:36:49 AM | 5/4/2017 8:44:02 AM | HCSO\TYDarden | HCSO\TYDarden | 07489235 | Attorney |
| GONZALEZ | RICARDO NOE | 00505318 | ,BAUGHMAN | STEVEN KURT | JA09 | A-006 | 5/26/2015 1:33:52 PM | 5/27/2015 12:12:19 PM | HCSO\CLRich | HCSO\SThames | 07489235 | Atty |
| Uzuegbunam | Ukamaka ozioma | 00505318 | BAUGHMAN | STEVEN KURT | JA09 | P-008 | 4/25/2014 2:58:39 PM | 4/25/2014 3:21:54 PM | HCSO\MSMcShan | HCSO\CTyler | 17330711 | parole |
| Gillie | Kerry | 00505318 | BAUGHMAN | STEVEN KURT | JA09 | L-001 | 2/16/2015 1:20:10 PM | 2/16/2015 1:37:29 PM | HCSO\CTDriver | HCSO\CTDriver | 08809642 | District Attorneys Office |
| Risi | Jennifer | 00505318 | BAUGHMAN | STEVEN KURT | JA09 | A-006 | 4/15/2016 2:40:11 PM | 4/15/2016 3:32:36 PM | HCSO\JRLehmiller | HCSO\TGBoothe | 14276211 | atty |
| Whitesell | S.lee | 00505318 | BAUGHMAN | STEVEN KURT | JA09 | A-004 | 6/15/2016 4:08:40 PM | 6/15/2016 5:45:12 PM | HCSO\VRMurray | HCSO\VRMurray | 26709521 | attorney |
| Thompson | Blayne | 00505318 | BAUGHMAN | STEVEN | JA09 | A-016 | 9/27/2016 3:01:14 PM | 9/27/2016 3:57:59 PM | HCSO\TYDarden | HCSO\JRLehmiller | 21067816 | Attorney |
| Welch | Russell | 00505318 | BAUGHMAN | STEVEN | JA09 | A-003 | 12/29/2016 2:00:35 PM | 12/29/2016 10:58:34 PM | HCSO\TGBoothe | HCSO\LADavalos | 04740902 | Attorney |
| Welch | Russell | 00505318 | BAUGHMAN | STEVEN | JA09 | A-007 | 2/11/2017 2:54:52 PM | 2/11/2017 4:22:38 PM | HCSO\TGBoothe | HCSO\TGBoothe | 04740902 | Attorney |
| Welch | Russell | 00505318 | BAUGHMAN | STEVEN | JA09 | A-010 | 5/19/2017 12:22:50 PM | 5/19/2017 1:50:23 PM | HCSO\RMBarker | HCSO\RMBarker | 04740902 | Attorney |
| Adame | Allyson | 00505318 | BAUGHMAN | STEVEN | JA09 | V-004 | 6/30/2017 10:12:00 AM | 6/30/2017 11:33:16 AM | HCSO\WHicks | HCSO\GFDefelippo | 513739753 | notary-atty |
| Thompson | Blayne | 00505318 | BAUGHMAN | STEVEN | JA09 | A-001 | 7/21/2017 6:37:15 PM | 7/21/2017 7:04:51 PM | HCSO\JRLehmiller | HCSO\JRLehmiller | 21067816 | atty |
| Steinle | Mollie | 00505318 | BAUGHMAN | STEVEN | JA09 | V-021 | 10/12/2017 12:56:38 PM | 10/12/2017 1:35:49 PM | HCSO\JRLowery | HCSO\RMBarker | 12925259 | PRIVATE INVESTIGATO |
| Steinle | Mollie | 00505318 | BAUGHMAN | STEVEN | JA09 | V-004 | 11/30/2017 [illegible] AM | 11/30/2017 [illegible] AM | HCSO\MHoughland | HCSO\MHoughland | 12925259 | P.I. |
| Pope | Scott | 00505318 | BAUGHMAN | STEVEN | JA09 | A-011 | 12/8/2017 1:31:20 PM | 12/8/2017 3:28:37 PM | HCSO\AFlores1 | HCSO\GFDefelippo | 10822305 | STATE OF TEXAS |
| Thompson | Blayne | 00505318 | BAUGHMAN | STEVEN | JA09 | A-018 | 12/22/2017 2:40:43 PM | 12/22/2017 3:11:34 PM | HCSO\EHenriquez | HCSO\ECasas | 21067816 | ATTORNEY |
| Gonzalez | Ricardo noe | 00505318, | BAUGHMAN | STEVEN | JA09 | A-006 | 4/27/2017 7:25:04 AM | 4/27/2017 8:22:32 AM | HCSO\JADavis | HCSO\RMBarker | 07489235 | STATE OF TEXAS |
| | Ricardo | | | | | A- | 11/3/2016 | 11/3/2016 | | | | |

# APPENDIX:

# "D"

Affidavit of Steven Kurt Baughman

Meetings W/ Mr. Gaiser

Case Nos. 1532840-A
1423421-A
1423420-A

| | | |
|---|---|---|
| EX PARTE | § | IN THE 174TH DISTRICT COURT |
| STEVEN KURT BAUGHMAN | § | OF |
| Applicant | § | HARRIS COUNTY, TEXAS |

AFFIDAVIT

"My name is Steven Kurt Baughman, I am over the age of Twenty-One and am competent to make this affidavit in support of my Application For Issuance Of Habeas Corpus, Tex. Code Crim.Proc. art. 11.07, and I make this affidavit in accordance with the facts as personally known to me."

"On August 24,2017, I met Terrance "Terry" A. Gaiser for the first time, after he was appointed to represent me in Case Nos. 1532840, 1423421, and 1423420, that were pending in the 174th District Court of Harris County, Texas."

"At that meeting Mr. Gaiser stated he had been appointed to represent me, but that he did not know me or anything about my case."

"I handed Mr. Gaiser a statement as to what happened leading up to my arrest on April 2,2014. I gave him a packet I had prepared regarding the facts of the case, the research I had done, as to the law that applied to the case and requested to have a contact visit with him to discuss defenses, suppression of the evidence due to an illegal inventory search, suppression of custodial statements that had been attributed to me, investigations that needed to be completed, some of the witnesses I needed to call, and evidence I felt needed to be presented."

"Mr.Gaiser agreed to have a meeting with me in a few weeks and stated he would go over the packet I had handed to him. He stated that he would have his investigator Molli Stenlie visit me first; within a couple of weeks and that he would then arrange a contact visit for us. "

"The meeting on August 24,2017, was the first and last time I would see Mr. Gaiser, until November 20,2017 [two weeks before trial]."

"At the November 20,2017, meeting Mr. Gaiser informed me that my case was going to trial on December 4,2017, and he told me that he had not gotten ahold of any of the witnesses I wanted to call (Cheryl Songer, Paul Plummer, Juan Perez, Gerald Bush, David Eldon Pyron, Jr., Penny Pyron, Manuel Cruz, Allen Acosta (Investigator for Ricardo Gonzalez), Russell Bliese (Investigator for the Public Defender's Office)), and he had not requested any of the expert witnesses I had requested, had not acquired the Precinct 4 Call Logs, Inventory Search Policies/Procedures, Incident/Complaint regarding the burglary of my mother's home and the theft of her Rolex, had not requested Forensic Reports on the weapons, nor done anything else I had requested that he do, to prepare the case for trial. We discussed the need for suppression of custodial statements; to which he replied there was no need to do that, because the cops would lie on the stand. Our meeting lasted about 30 minutes from the time I was pulled

my cell and got into the Non-Contact attorney visitation booth, until Mr. Gaiser left."

"My next meeting was with Mr. Gaiser on November 30,2017, and only lasted about 10-15 minutes; from the time I was pulled from my cell and placed into the Non-Contact Attorney Visitation, until Mr. Gaiser left. During this meeting Mr. Gaiser told me I would be better off representing myself, due to the fact he would not represent me the way I wanted to be represented. He stated that the Court would not continue the case, unless I moved for self-representation, because the County Attorney's Office wanted me out of the Harris County Jail. Mr. Gaiser said the Court was under pressure to get me out of the jail, due to my successful litigation against the County for deliberate indifference to serious medical and dental needs and that my civil litigation and medical expenses were such that the Sheriff and County Judge/Commissioner wanted me out of there."

"Mr. Gaiser told me that it was not up to him to prove my innocence, but that it was the State's burden to prove that I was guilty. He said that the State would prove their case and that I should just take the plea they were offering."

"After Mr. Gaiser left, I returned to my cell and drafted a Motion To Conduct A Hearing to Replace, to where I could submit it to the trial judge in an open hearing; since I did not have time to mail the motion and have it filed; due to the short notice Mr. Gaiser had given me."

"The trial of my cases were not a case of claiming ineffective assistance of counsel in hind sight. The trial court was made aware of the ineffective assistance of Terrance "Terry"A. Gaiser before the suppression hearing and during the suppression hearing."

UNSWORN DECLARATION

"I, Steven Kurt Baughman, TDCJ #2180609, being presently incarcerated in the Powledge Unit of the Texas Department of Criminal Justice, in Anderson County, Texas, declare under the penalty of perjury that the foregoing is true and correct."

Executed on the 9th Day of April, 2021.

Steven Kurt Baughman #2180609
Powledge Unit, 15-15
1400 FM 3452
Palestine, TX 75803

# APPENDIX:

# "E"

Precinct 4 - Disciplinary Reports

Filed Against: Deputy Maxwell

# Harris County Precinct four Constable's Office

## Employee Personnel Action Notice

This form may be issued at any time when an employee's work performance remains below acceptable standards and a "Work Improvement Notice" has been issued informing the employee of sub-standard performance, or the severity of an employee's action dictates that immediate and appropriate disciplinary action is taken.

Employee: MAXWELL, JACKIE    Rank Level: DEPUTY

Action Type: C (V = Verbal / C = Counseling / D = Disciplinary Action / O = Commendation)  Case #: 10000058

Date: 10/12/2010    Supervisor: SERGEANT WALTER STENSLAND  Duty Status: On-Duty

You have failed to meet the previously stated requirements of your job in the following way(s), or your actions as listed below, have demonstrated the need for a direct response by this department

Complaint Nature: On 9/30/2010 at 1135 hrs Dep. Jackie Maxwell was dispatched to Spring High School on a Kidnapping call. The Complainant reported that she had been in a physical altercation with her Boyfriend, who refused to allow her to leave during the altercation. The Complainant made the allegation to Spring Independent School District Police who then requested that Precinct 4 Constable's take over the investigation because the offense occurred in a Contract. Dep. Maxwell conducted the investigation and filed charges related to this offense but several things were left out of the report. The Complainant advised that she was held against her own free will in a vehicle but the report did not indicate the type of vehicle nor did the scene summary contain the vehicle information. The address where the Offense took place was described as Pundt Park in the back of the Lexington Woods Contract but on the first page of the report indicated the offense took place at 19428 North Freeway which is the address of the Spring High School where the report was generated. I ask Dep. Maxwell why did he not put in the vehicle information in the report and he advised that he did not ask the Complainant about the vehicle to get that information during the initial on scene interview. This Report had to be unapproved for corrections so that this pertinent information could be added to the report. Dep. Maxwell went on a weeks vacation starting the next day after this arrest was made. Dep. Maxwell was instructed to get the vehicle information as soon as he returned to work so that the Arrest Report could be completed. Dep. Maxwell advised that he can not locate the Complainant or the Defendant in this case to get the vehicle information entered into the report. I explained to Dep. Maxwell that it is his responsibility to make sure that he ask all the questions related to an offense so that all the pertinent information is documented in the offense report so that if the case goes to Court he could read over the report and recall all the information.

Comments or Remarks: I am requesting that Dep. Maxwell have an Employee Couseling placed in his Employee file due to Defective and Improper Work. This work product could have jeapordized the case due to not putting the proper information into the Offense Report.

Action Taken: A Counseling be placed in his Employee File

Action Started: 10/12/2010 Action Ended: 10/12/2010 ☐ Check if Review Required Review Date:

Acknowledged by: MAXWELL, JACKIE Acknowledgment Date:

The details indicated above are brought to your attention to advise you of the specifics of this action and any subsequent departmental requirements of you part. Failure to meet any of the requirements outlined in this action may result in a response by the Department up to and including termination.

Signature of Supervisor: [signature]
Date: 10/15/10

Signature of Employee: [signature]
Date: 10/15/10

# Harris County Precinct four Constable's Office

## Employee Personnel Action Notice

This form may be issued at any time when an employee's work performance remains below acceptable standards and a "Work Improvement Notice" has been issued informing the employee of sub-standard performance, or the severity of an employee's action dictates that immediate and appropriate disciplinary action is taken.

Employee: MAXWELL, JACKIE Rank Level: DEPUTY

Action Type: D (V = Verbal / C = Counseling / D = Disciplinary Action / O = Commendation) Case #: 10000309

Date: 06/07/2011 Supervisor: SERGEANT WALTER STENSLAND Duty Status: On-Duty

You have failed to meet the previously stated requirements of your job in the following way(s), or your actions as listed below, have demonstrated the need for a direct response by this department

**Complaint Nature:** Defective Work: On 05/26/2011 Deputy Jackie Maxwell responded to a Burglary of a Habitation call at 23802 Sawmill Pass Dr, (11-69325) and took a report from an adult male complainant. While on scene Deputy Maxwell collected some information regarding the case. The Complainant related to Deputy Maxwell that he saw 2 B/M Suspects inside his residence and then advised that he ran to the neighbor's residence located at 23806 Sawmill Pass Ln to get help he witnessed. The Complainant advised that while he was waiting at the front door for his neighbor to answer the door that the 2 B/M Suspects ran by him with his stolen xbox 360 and his father's laptop computer. The Suspects then got into a Blue Vehicle bearing Texas License plate PZT-974 and exited the neighborhood toward Cypresswood Dr. Deputy Maxwell failed to enter vital information into the Suspect screens and he also failed to list the vehicle information into the vehicle screen of this report. Deputy Maxwell upon receiving this information should have ran the vehicle through NCIC/TCIC and he would have discovered that the vehicle was registered just a few houses away from the Burglary scene and a follow-up could have been made at that address before he cleared the scene. The information that was left out of the Suspect screen and the Vehicle information could have helped move this investigation forward faster if the initial report would have been entered with all the information when the report was generated. Deputy Maxwell received an Employee Action on 6/21/10 for the same violation under Case#9999875 for violating Harris County Pct. 4 Constable Department Policy and Ethics under section 2.12, Performance of Duty: Members shall perform all lawful duties as may be required of them by competent authority, whether or not such duties are specifically assigned to them in any rules or duty manual.

**Comments or Remarks:** After review of this incident it was learned Deputy Maxwell received an Employee Counseling for the same Policy Violation on 6/21/10 and for that reason I am recommending the he receive a written Disciplinary be placed in his Employee File.

**Action Taken:** A written Disciplinary be placed in his Employee File.

Action Started: 06/07/2011 Action Ended: 06/07/2011 ☐ Check if Review Required Review Date:

Acknowledged by: MAXWELL, JACKIE Acknowledgment Date:

The details indicated above are brought to your attention to advise you of the specifics of this action and any subsequent departmental requirements of you part. Failure to meet any of the requirements outlined in this action may result in a response by the Department up to and including termination.

Signature of Supervisor: ____________________
Date: 6/14/11

Signature of Employee: ____________________
Date: 06/14/2011

# Harris County Precinct Four Constable's Office

## Employee Evaluation Report

**Maxwell Jackie** Rank: I Division:

Evaluated by [redacted] Sgt. Stensland, W Evaluation Date - 1/15/2012 Next Evaluation Due: 1/15/2013

Reviewed by [redacted] Lt. F. Escobar Date of Review: 1/15/2012

## Scores

### Appearance
- **Grooming:** 3
- **Dress:** 3
- **Work Station /Area:** 3

### Relationships
- **Public / Employee Contacts:** 3
- **Contacts with Suspects:** 3

### Orientation
- **Initiative:** 3
- **Dependability:** 3
- **Attendance:** 3
- **Career Development:** 2
- **Acceptance of Change:** 3
- **Ability to Perform without Supervision:** 3

### Care of Vehicle / Equipment
- **County Equipment:** 3
- **Vehicle:** 3
- **Personal Equipment:** 3
- **Weapons:** 3

### Knowledge
- **Penal Code / Code of Criminal Procedure:** 3
- **Department Policy and Procedures:** 2
- **Traffic Code:** 3
- **Family Code and Civil Process:** 3

### Safety
- **Driving Skills:** 3
- **Handling Prisoners / Attachments:** 3
- **Vehicle Stops:** 3
- **Use of Radio:** 3
- **Conducting Searches:** 3
- **Building Approach:** 3

### Performance
- **Orientation / Response to Calls:** 3
- **Listens and Comprehends:** 3
- **Work Judgements:** 3
- **Performance under Stress:** 3
- **Accuracy and Completeness of Forms:** 3
- **Report s: Grammar/Spelling/Neatness:** 3
- **Reports: Organization and Details:** 3
- **Completes Assignments in a Timely Manner:** 3

Employee Signature [signature] Date: 01/13/12 ● Agree ○ Disagree ○ Appeal

Evaluator Signature [signature] Date: 1/13/12

# Harris County Precinct Four Constable's Office

## Employee Evaluation Report

| Maxwell Jackie | Rank: I | Division: |
|---|---|---|

Evaluated by [redacted] Sgt. Stensland, W    Evaluation Date - 1/15/2012    Next Evaluation Due: 1/15/2013

Reviewed by [redacted] Lt. F. Escobar    Date of Review: 1/15/2012

## Evaluators Comments

**Appearance:**
**Grooming: Deputy Maxwell maintains himself in such a physical condition as to be able to handle strenuous physical contacts or demands required of the active law enforcement officer. He has neatly groomed hair and excellent personal hygiene.**

**Dress:**
**Deputy Maxwell uniforms are always neat and pressed. His leather is shined.**

**Work station/vehicle:**
**Deputy Maxwell keeps his vehicle washed, clean interior/exterior and his work area well organized, orderly and the interior is clean.**

**Relationships:**
**Public, phone and employee contacts: Deputy Maxwell is courteous, friendly and empathetic. He communicates in a professional and unbiased manner.**

**Suspect contacts:**
**Deputy Maxwell maintains a courteous, but firm posture when dealing with or confronting suspect/s or prisoner/s.**

**Orientation:**
**Initiative: Deputy Maxwell makes excellent use of time between assignments and conducts thorough follow-up investigations. Enforces traffic laws and maintains citizen contacts.**

**Dependability:**
**Deputy Maxwell readily responds to radio transmissions or instructions to respond to calls and / or provide assistance.**

**Attendance:**
**Deputy Maxwell seldom reports for duty hours late and is conservative with compensatory time.**

**Career development:**
**Deputy Maxwell only attended 2 hours of training since his last evaluation period which is below the Departmental standards for this evaluation period for career development. For the 2011 evaluation period Deputy Maxwell attended 50 hours of training therefore he is still in compliance with the TCLEOSE Standards for training that require at least 20 hours of training a year. Deputy Maxwell was instructed that he needs to attend more training in order to expand his knowledge and further add to his Career Development. This is the new training cycle so he will be able to get the required hours need to satisfy the TCLEOSE requirements of 40 hours of training every 2 years. This caused Deputy Maxwell to receive a score of 2 for Career Development.**

**Acceptance of change:**
**Deputy Maxwell understands and adheres to the chain of command. Respects command authority. Routinely accepts constructive criticism.**

**Ability to perform without supervision:**
**Deputy Maxwell is able to perform duties by the guidelines established for his duties, with little supervision.**

**Care of equipment / vehicle:**
**County equipment: Deputy Maxwell properly maintains all departmental equipment required to perform all duty assignments.**

**Vehicle:**
**Deputy Maxwell completes pre-duty check of vehicle and secures all loose interior items. Removes all debris and unnecessary items from his county vehicle's interior.**

**Personal:**
**Deputy Maxwell keeps his personal equipment properly maintained and in good working order.**

**Weapon:**
**Deputy Maxwell keeps his firearm clean and in good working order.**

# Harris County Precinct Four Constable's Office

## Employee Evaluation Report

| *Maxwell Jackie* | Rank: I | Division: |
|---|---|---|

Evaluated by [redacted] Sgt. Stensland, W — Evaluation Date - 1/15/2012 — Next Evaluation Due: 1/15/2013

Reviewed by [redacted] Lt. F. Escobar — Date of Review: 1/15/2012

**Knowledge:**
**Penal code / C.P.: Deputy Maxwell has a good working knowledge of commonly used sections of the penal code as well as with the code of criminal procedure.**

**Department policies and procedures:**
**Deputy Maxwell received an Employee Disciplinary(Case#10000309) for Violating Department Policy and Ethics under section 2.12 Performance of Duty. Deputy Maxwell was investigating a Burglary and failed to conduct a follow up regarding the Suspect vehicle after the Complainant saw the Suspect's exited his residence with his stolen property and get into a getaway vehicle just before fleeing the scene. Deputy Maxwell also failed to enter the Suspect vehicle information into the report. This information was brought to light after CSU Detectives began investigating this case. Deputy Maxwell has learned from this incident and understands that by him leaving out the vital information concerning the Suspect vehicle description and license plate that it delayed this case from being solved by a few days.**

**Traffic code:**
**Deputy Maxwell has an outstanding working knowledge of the traffic code and can easily apply the code to his day-to-day patrol duties. Deputy Maxwell is readily able to recall parts of the traffic code that are not normally used.**

**Family code / civil process:**
**Deputy Maxwell has a working knowledge of commonly used sections and is able to find sections seldom used.**

**Safety:**
**Driving skills: Deputy Maxwell maintains control of his vehicle while being alert to activity outside the vehicle, and practices good defensive driving techniques.**

**Handling prisoners:**
**Deputy Maxwell generally displays awareness of potential danger from prisoner/s, maintains position of advantage and reacts to forestall hazardous situations.**

**Vehicle stops:**
**Deputy Maxwell uses the "7 step" violator contact and understands general rules of officer safety.**

**Radio use:**
**Deputy Maxwell has good working knowledge of radio use, and seldom misinterprets transmissions.**

**Conducting searches:**
**Deputy Maxwell uses general rules of officer safety and searches prisoner/s vehicle/s or structure/s when applicable.**

**Building approach:**
**Deputy Maxwell generally displays awareness to potentially dangerous areas before, during and after approach.**

**Performance:**
**Orientation / response time: Deputy Maxwell is familiar with the geographical area where he is assigned, and responds to calls in a timely manner.**

**Listens and comprehends:**
**Deputy Maxwell copies radio transmissions or verbal instructions and takes appropriate action.**

**Work judgments: Deputy Maxwell is able to make routine decisions based on knowledge and requires little or no assistance in making decisions.**

**Performance under stress: Deputy Maxwell exhibits calm and controlled attitude, does not allow situations to further deteriorate.**

**Accuracy and completeness of forms: Deputy Maxwell knows most standard forms and understands format, completes forms with reasonable accuracy and thoroughness.**

**Report writing grammar/spelling/neatness: Deputy Maxwell needs to slow down and take the time to proof read his reports to in order to catch spelling errors. Deputy Maxwell has been advised that a Dictionary would be a good tool to carry in his car so that it can be used to look up words that he does not commonly use.**

**Report writing organization and details: Deputy Maxwell reports are well organized and in chronological sequence.**

# Harris County Precinct Four Constable's Office

## Employee Evaluation Report

| Maxwell Jackie | Rank: I | Division: |
|---|---|---|

Evaluated by [redacted] Sgt. Stensland, W    Evaluation Date - 1/15/2012    Next Evaluation Due: 1/15/2013

Reviewed by [redacted] Lt. F. Escobar    Date of Review: 1/15/2012

**Timely completion of assignments: Deputy Maxwell turns in reports and routine paperwork daily and completes all assignments by the deadline.**

**Over all view - Deputy Maxwell is assigned to the Lexington Woods Contract. His attitude and demeanor is good. Deputy Maxwell needs to take the time and concentrate on his report writing skills paying close attention to his spelling. Deputy Maxwell is improving in this area but it is at a slow pace.**

## Reviewer Comments

**01/15/2012- I, Lt. F. Escobar reviewed Deputy Maxwell's evaluation for this reporting period and I will agree with Sgt. Stensland's comments and scores.**

# Harris County Precinct four Constable's Office
## Employee Personnel Action Notice

This form may be issued at any time when an employee's work performance remains below acceptable standards and a "Work Improvement Notice" has been issued informing the employee of sub-standard performance, or the severity of an employee's action dictates that immediate and appropriate disciplinary action is taken.

Employee:  MAXWELL, JACKIE     Rank Level:  DEPUTY

Action Type: D (V = Verbal / C = Counseling / D = Disciplinary Action / O = Commendation)  Case #: 10000599

Date: 01/13/2012     Supervisor:  SERGEANT WALTER STENSLAND   Duty Status: On-Duty

You have failed to meet the previously stated requirements of your job in the following way(s), or your actions as listed below, have demonstrated the need for a direct response by this department

**Complaint Nature:** Complaint Nature: On 01/10/12 I, Sgt. Stensland, received a complaint from Capt. Wieghat in reference to an incident involving Deputy Maxwell on 01/08/12 (Complainant Case# 12011000009). During the Internal Investigation I discovered that Deputy Maxwell violated several Departmental Policies while performing his duties on his approved extra job in the North Belt Forest Subdivision. Deputy Maxwell Conducted a traffic stop in the 9300 Block of Greens Rd on 01/08/12 at 1303 hrs(call slip#CD120108760). Deputy Maxwell upon making the traffic stop made contact with the Violator and upon getting back to his vehicle then called out on the traffic stop. Deputy Maxwell violated SOP 5.001 Patrol Radio Procedures section IV. Responding to calls and traffic. His actions placed himself in danger due to the fact that no Police personal/Dispatch knew that Deputy Maxwell had conducted the traffic stop if something bad would have occurred delaying an emergency response to his location. Shortly after this traffic stop was concluded Deputy Maxwell observed a Suspect that he knew had several outstanding arrest warrants out of various Police Agencies in Harris County and the City of Humble. The Suspect ran as soon as he saw Deputy Maxwell's Patrol vehicle and at that time Deputy Maxwell began to search the area for the Suspect. After getting information that the Suspect was staying a 9239 Vascaro Ln. Deputy Maxwell went to that residence searching for the Suspect. Deputy Maxwell again did not call out on the radio nor did he let an on Duty Supervisor know what he was involved in. Deputy Maxwell's investigation led him to 9203 Kens Run which is a street away from the Vascaro Ln address. Upon meeting with the resident at 9203 Kens Run the Homeowner advised that the same Suspect that fled from Deputy Maxwell broke into his residence by prying the back door open. At first Deputy Maxwell advised the Complainant that he had bigger fish to fry and had the Complainant call the Harris County Sheriff's Department so that they could take the report. Eventually when it was brought to his attention that the Homeowner wanted to see a Supervisor and file a Complaint. After Deputy Maxwell advised a Supervisor of what all had transpired a call slip was generated along with a case number. Upon completing the Investigation Charges were accepted on the Suspect for Criminal Trespass of a Habitation. Deputy Maxwell violated the following Departmental Polices during this incident. 4.02 Required to Take Action: Members are required to take prompt and effective police action conforming to Departmental policy with respect to violations of laws and



Office of
**Ron Hickman, Constable**
Precinct 4, Harris County
6831 Cypresswood Drive
Spring, Texas 77379

February 8, 2012

To:    Deputy Maxwell File

From:  Chief Sumner

I received this update disciplinary action from Captain Wieghat. Captain Wieghat has explained that Deputy Maxwell has completed his remedial training rides. He yet needs to complete a building search school which is scheduled in April 2012.

ordinances coming to their attention or of which they have knowledge. Members shall promptly and punctually perform all official duties. 4.09 Maintaining Communications: Members on duty, or when officially on call, shall be directly available by normal communications, or shall keep their office or supervisor informed of the means by which they may be reached by pager or by public service. Members sent on a call shall immediately, upon completion of the task, notify the dispatcher of their return to service. 4.12 Duty to Report All Crimes and Incidents: Members shall report all crimes, violations, emergencies, incidents, and other information of concern to the Department that comes to their attention. Members shall not conceal, ignore, or distort the facts of any such incident. Members receiving or possessing facts or information relative to a criminal offense shall not retain such facts or information through ulterior motives, or desire for personal credit or glorification, but shall report the facts through official channels. 4.28 Duty to Act Promptly and Decisively: Members shall act promptly and with energy, firmness, and decision at the scene of crimes, disorders, accidents, disasters, or other situations that require police attention, and in dealing with suspects and in disposing of their assignments. When the police purpose might be jeopardized by delay, immediate action shall be taken even though the incident would ordinarily be dealt with by some other officer or division. Members shall not give evidence of indecision or lack of confidence by their actions, facial expressions, words, or tone of voice. SOP 5.001 Patrol Radio Procedures section IV. Responding to calls and traffic section A and B which states, "Under normal conditions, all deputies are to notify communications when responding to any call for service." And section B. states, "Under normal conditions, all deputies are to notify communications when making any type of vehicle stop." Deputy Maxwell not only placed himself in a situation by not calling out on the radio during this incident that could have delayed an emergency response to his location and by not taking the appropriate action on the call could have brought reproach to himself and or the Department. I, Sgt. Stensland am recommending a written reprimand be placed in Deputy Maxwell's Employee File. Also remedial training with a Department recognized Field Training Officer Cpl. John Hecker for at least one week to train on Officer Safety issues to begin on January 30, 31 February 1, 4 and 5th. 2012. Upon successful completion of his remedial training, evaluation and review of the field training will be completed by Lieutenant Escobar and submitted to your personnel file. Further training is scheduled for your remedial and safety is Low Risk Traffic Stops 01/24/12 and High Risk Traffic Stops 01/25/12. Also Deputy Maxwell has been scheduled for Lasershot One and Two on 01/26/12 and final attendance in a one week Building Search School tentatively scheduled by the training division for sometime in the month of April must be satisfactorily completed.

**Comments or Remarks:**

**Action Taken:** Written Reprimand

Action Started: 01/13/2012 Action Ended: 01/13/2012 ☐ Check if Review Required Review Date:

Acknowledged by: MAXWELL, JACKIE Acknowledgment Date:

The details indicated above are brought to your attention to advise you of the specifics of this action and any subsequent departmental requirements of you part. Failure to meet any of the requirements outlined in this action may result in a response by the Department up to and including termination.

Signature of Supervisor: [signature]
Date: 1/13/12

Signature of Employee: [signature]
Date: 01-13-2012

February 7, 2012


To:     Captain Henry "Wally" Wieghat

From:  Lieutenant F. David Escobar


Reference:     Review of Deputy Jackie Maxwell's Remedial Officer Safety Training


On 02/07/2012, I, Lieutenant Escobar have reviewed Deputy Maxwell's written summaries for each of the five instructional duty rides conducted by field training officer and supervisor Corporal John "Toby" Hecker.  The written summaries submitted were signed by Corporal Hecker and Deputy Maxwell verifying the content of this information.  The five written summaries starting from 01/30/2012 to 02/05/2012 detailed the officer safety issues that needed improvement as per Deputy Maxwell's Employee Personnel Action Notice #10000599 dated on 01/13/2012.

After reviewing this documentation, I also met with Corporal Hecker who conducted Deputy Maxwell's remedial training.  Corporal Hecker indicated that Maxwell had been very attentive and appeared to absorb all instruction in a very positive manner.  Corporal Hecker affirmed that Deputy Maxwell's training had been successfully completed.

After meeting with Corporal Hecker, I was able to interview Deputy Maxwell.  Deputy Maxwell stated that during his training he was able to learn and refresh his knowledge pertaining to officer safety.  Deputy Maxwell stated he received both theory and hands on instruction in warrant service scenes, searches, escape routes, field inventories, obtaining written consents while in the field, perimeter safety, felony arrests, prisoner searches, line of fire and crossfire hazards, communicating locations via radio during active scenes requiring vehicle and foot pursuits, providing safety information to other officers via radio, body armor and seat belt use, vehicle priority one criteria and approval, the priority of citizen safety, personal officer safety including stances and proximities to suspects or citizen contacts, suspect body language, and safety issues as they relate to traffic stops including an explicit instruction on how to properly conduct a "7" step violator contact.  Deputy Maxwell affirmed that he clearly understood his trainer's instructions and felt confident in the above mentioned topics.

During my assessment and interview with Deputy Maxwell, I also agree with Corporal Hecker in affirming that he has successfully completed this remedial training.


Lieutenant F. David Escobar



Deputy Jackie Maxwell

# Harris County Precinct Four Constable's Office

## Employee Evaluation Report

| *Maxwell Jackie* | Rank: 1 | Division: |
|---|---|---|

Evaluated by [redacted] Sgt. W. Stensland Evaluation Date - 1/15/2011 Next Evaluation Due: 1/15/2012

Reviewed by [redacted] Lt. F. Escobar Date of Review: 1/15/2011

## Scores

### Appearance
- Grooming: 3
- Dress: 3
- Work Station /Area: 3

### Relationships
- Public / Employee Contacts: 3
- Contacts with Suspects: 3

### Orientation
- Initiative: 3
- Dependability: 3
- Attendance: 3
- Career Development: 3
- Acceptance of Change: 3
- Ability to Perform without Supervision: 3

### Care of Vehicle / Equipment
- County Equipment: 3
- Vehicle: 3
- Personal Equipment: 3
- Weapons: 3

### Knowledge
- Penal Code / Code of Criminal Procedure: 3
- Department Policy and Procedures: 2
- Traffic Code: 3
- Family Code and Civil Process: 3

### Safety
- Driving Skills: 3
- Handling Prisoners / Attachments: 3
- Vehicle Stops: 3
- Use of Radio: 3
- Conducting Searches: 3
- Building Approach: 3

### Performance
- Orientation / Response to Calls: 3
- Listens and Comprehends: 3
- Work Judgements: 3
- Performance under Stress: 3
- Accuracy and Completeness of Forms: 3
- Report s: Grammar/Spelling/Neatness: 3
- Reports: Organization and Details: 2
- Completes Assignments in a Timely Manner: 3

Employee Signature [signature] Date: 01-21-11 ☒ Agree ○ Disagree ○ Appeal

Evaluator Signature [signature] Date: 1-21-11

# Harris County Precinct Four Constable's Office

## Employee Evaluation Report

| *Maxwell Jackie* | Rank: 1 | Division: |
|---|---|---|

Evaluated by [redacted] Sgt. W. Stensland    Evaluation Date - 1/15/2011    Next Evaluation Due: 1/15/2012

Reviewed by [redacted] Lt. F. Escobar    Date of Review: 1/15/2011

## Evaluators Comments

**Appearance:**
**Grooming: Deputy Maxwell maintains himself in such a physical condition as to be able to handle strenuous physical contacts or demands required of the active law enforcement officer. He has neatly groomed hair and excellent personal hygiene.**

**Dress:**
**Deputy Maxwell uniforms are always neat and pressed. His leather is shined.**

**Work station/vehicle:**
**Deputy Maxwell keeps his vehicle washed, clean interior/exterior and his work area well organized, orderly and the interior is clean.**

**Relationships:**
**Public, phone and employee contacts: Deputy Maxwell is courteous, friendly and empathetic. He communicates in a professional and unbiased manner.**

**Suspect contacts:**
**Deputy Maxwell maintains a courteous, but firm posture when dealing with or confronting suspect/s or prisoner/s.**

**Orientation:**
**Initiative: Deputy Maxwell makes excellent use of time between assignments and conducts thorough follow-up investigations. Enforces traffic laws and maintains citizen contacts.**

**Dependability:**
**Deputy Maxwell readily responds to radio transmissions or instructions to respond to calls and / or provide assistance.**

**Attendance:**
**Deputy Maxwell seldom reports for duty hours late and is conservative with compensatory time.**

**Career development:**
**Deputy Maxwell meets Departmental standards for this evaluation period for career development. Deputy Maxwell attended 50 hours of in-service Training within this evaluation period. The Department and TCLEOSE only require 20 hours of Training a year.**

**Acceptance of change:**
**Deputy Maxwell understands and adheres to the chain of command. Respects command authority. Routinely accepts constructive criticism.**

**Ability to perform without supervision:**
**Deputy Maxwell is able to perform duties by the guidelines established for his duties, with little supervision.**

**Care of equipment / vehicle:**
**County equipment: Deputy Maxwell properly maintains all departmental equipment required to perform all duty assignments.**

**Vehicle:**
**Deputy Maxwell completes pre-duty check of vehicle and secures all loose interior items. Removes all debris and unnecessary items from his county vehicle's interior.**

**Personal:**
**Deputy Maxwell keeps his personal equipment properly maintained and in good working order.**

**Weapon:**
**Deputy Maxwell keeps his firearm clean and in good working order.**

**Knowledge:**
**Penal code / C.P.: Deputy Maxwell has a good working knowledge of commonly used sections of the penal code as well as with the code of criminal procedure.**

# Harris County Precinct Four Constable's Office

## Employee Evaluation Report

| *Maxwell Jackie* | Rank: 1 | Division: |
|---|---|---|

Evaluated by [redacted] Sgt. W. Stensland Evaluation Date - 1/15/2011 Next Evaluation Due: 1/15/2012

Reviewed by [redacted] Lt. F. Escobar Date of Review: 1/15/2011

---

**Department policies and procedures:**
**Deputy Maxwell received an Employee Counseling (Case#9999875) for Violating Department Policy and Ethics under section 2.12 Performance of Duty. Deputy Maxwell was investigating a Burglary and failed to conduct a good scene investigation because he advised the Complainant that he was sick and was about to go home. Another Deputy had to be dispatched to the scene and conduct the scene investigation which revealed that over $ 100,000.00 in property had been stolen from the Complainant. Deputy Maxwell was advised that in the future he needs to contact a Supervisor and let them know that he was not feeling well so that he could be sent home and another Deputy could dispatched to the scene to conduct the investigation. Deputy Maxwell is fully aware of this and in the future this will not happen again.**

**Traffic code:**
**Deputy Maxwell has an outstanding working knowledge of the traffic code and can easily apply the code to his day-to-day patrol duties. Deputy Maxwell is readily able to recall parts of the traffic code that are not normally used.**

**Family code / civil process:**
**Deputy Maxwell has a working knowledge of commonly used sections and is able to find sections seldom used.**

**Safety:**
**Driving skills: Deputy Maxwell maintains control of his vehicle while being alert to activity outside the vehicle, and practices good defensive driving techniques.**

**Handling prisoners:**
**Deputy Maxwell generally displays awareness of potential danger from prisoner/s, maintains position of advantage and reacts to forestall hazardous situations.**

**Vehicle stops:**
**Deputy Maxwell uses the "7 step" violator contact and understands general rules of officer safety.**

**Radio use:**
**Deputy Maxwell has good working knowledge of radio use, and seldom misinterprets transmissions.**

**Conducting searches:**
**Deputy Maxwell uses general rules of officer safety and searches prisoner/s vehicle/s or structure/s when applicable.**

**Building approach:**
**Deputy Maxwell generally displays awareness to potentially dangerous areas before, during and after approach.**

**Performance:**
**Orientation / response time: Deputy Maxwell is familiar with the geographical area where he is assigned, and responds to calls in a timely manner.**

**Listens and comprehends:**
**Deputy Maxwell copies radio transmissions or verbal instructions and takes appropriate action.**

**Work judgments: Deputy Maxwell is able to make routine decisions based on knowledge and requires little or no assistance in making decisions.**

**Performance under stress: Deputy Maxwell exhibits calm and controlled attitude, does not allow situations to further deteriorate.**

**Accuracy and completeness of forms: Deputy Maxwell knows most standard forms and understands format, completes forms with reasonable accuracy and thoroughness.**

**Report writing grammar/spelling/neatness: Deputy Maxwell needs to slow down and take the time to proof read his reports to in order to catch spelling errors. Deputy Maxwell has been advised that a Dictionary would be a good tool to carry in his car so that it can be used to look up words that he does not commonly use.**

**Report writing organization and details: Deputy Maxwell received a written counseling (case#10000058) for Defective and Improper work because he left out pertinent information regarding a Kidnapping/Assault case in which he filed a Felony Warrant for the Defendant's arrest. This could have jeopardized the case due him not putting the proper information into the Offense Report meeting the Elements of the Offense. Dep. Maxwell has learned from this and has improved his work product.**

# Harris County Precinct Four Constable's Office

## Employee Evaluation Report

| *Maxwell Jackie* | Rank: 1 | Division: |
|---|---|---|

Evaluated by [redacted] Sgt. W. Stensland    Evaluation Date - 1/15/2011    Next Evaluation Due:1/15/2012

Reviewed by [redacted] Lt. F. Escobar    Date of Review: 1/15/2011

**Timely completion of assignments: Deputy Maxwell turns in reports and routine paperwork daily and completes all assignments by the deadline.**

**Over all view - Deputy Maxwell is assigned to the Lexington Woods Contract. His attitude and demeanor is good. Deputy Maxwell can perform his duties with little supervision and progressing in most areas.**

## Reviewer Comments

**On 01/15/2011, I, Lt. Escobar have reviewed Deputy Maxwell's evaluation as prepared by Sgt. Stensland for this reporting period. I will agree with all it's scores and comments.**

# Harris County Precinct Four Constable's Office

## Employee Evaluation Report

*Benningfield Amy* Rank: 1 Division:

Evaluated by [redacted] Sgt. S. Jolly Evaluation Date - 11/15/2011 Next Evaluation Due: 11/15/2012

Reviewed by [redacted] Lt. F. Escobasr Date of Review: 11/15/2011

AND COMPLETES THEM.

WORK JUDGEMENTS: DEPUTY A. BENNINGFIELD IS ABLE TO MAKE ROUTINE DECISIONS BASED ON KNOWLEDGE AND REQUIRES LITTLE ASSISTANCE IN MAKING DECISIONS.

ROUTINE FORMS / ACCURACY AND COMPLETENESS: DEPUTY A. BENNINGFIELD KNOWS MOST OF THE STANDARD FORMS AND UNDERSTANDS THEIR FORMAT. SHE COMPLETES THE FORMS WITH REASONABLE ACCURACY AND THOROUGHNESS.

ON 4/28/2011 DEPUTY A. BENNINGFIELD RECEIVED A DISCIPLINARY ACTION #10000274 FOR FAILING TO PROPERLY SEAL EVIDENCE BAGS PRIOR TO SUBMISSION TO THE HARRIS COUNTY MEDICAL EXAMINER OFFICE IN A SEXUAL ASSAULT CASE. DEPUTY A. BENNINGFIELD VIOLATED THE HARRIS COUNTY CONSTABLE PCT. 4 STANDARD OPERATING PROCEDURE FOR EVIDENCE UNDER THE GENERAL SUBMISSION OF EVIDENCE CATEGORY 21.03 I EVIDENCE BAG (C).

REPORT WRITING / ORGANIZATION AND DETAILS:
DEPUTY A. BENNINGFIELD INCLUDES ALL ELEMENTS OF THE SITUATION AND REDUCES THAT INFORMATION INTO WHAT IS NEEDED IN EACH REPORT. DEPUTY A. BENNINGFIELD IS ABLE TO WRITE A REPORT WITH VERY LITTLE GRAMER OR SPELLING ERRORS.

TIMELY COMPLETION OF ASSIGNMENTS: DEPUTY A. BENNINGFIELD TURNS IN HER REPORTS AND ROUTINE PAPERWORK DAILY AND COMPLETES ALL ASSIGNMENTS BY THE DEADLINE.

CARE OF VEHICLE
CARE OF EQUIPMENT / VEHICLE: DEPUTY A. BENNINGFIELD CONSISTENTLY CLEANS THE INTERIOR OF DEBRIS AND UNNECESSARY ITEMS BEFORE AND AFTER TOUR OF DUTY. SHE SECURES LOOSE ITEMS IN THE INTERIOR OF HER VEHICLE. HER VEHICLE IS WELL ORGANIZED.

CARE OF EQUIPMENT / WEAPONS: DEPUTY A. BENNINGFIELD KEEPS HER FIREARM CLEAN AND PROPERLY MAINTAINS DEPARTMENTAL EQUIPMENT REQUIRED PERFORMING DUTY ASSIGNMENTS.

## Reviewer Comments

On 11/15/2011, I, Lt. F. Escobar reviewed Deputy Benningfield's evaluation for this reporting period. I will agree with all it's scores and comments as noted by Sergeant S. Jolly.

# Harris County Precinct Four Constable's Office

## Employee Evaluation Report

| *Benningfield Amy* | Rank: 1 | Division: |
|---|---|---|

Evaluated by [redacted] Sgt. S. Jolly  Evaluation Date - 11/15/2011  Next Evaluation Due: 11/15/2012

Reviewed by [redacted] Lt. F. Escobasr  Date of Review: 11/15/2011

ASSIST IN COMPLETING HER ASSIGNMENTS. DEPUTY A. BENNINGFIELD RESPONDS TO ASSIGNMENTS IN A TIMELY MANNER AND COMPLETES THEM.

WORK JUDGEMENTS: DEPUTY A. BENNINGFIELD IS ABLE TO MAKE ROUTINE DECISIONS BASED ON KNOWLEDGE AND REQUIRES LITTLE ASSISTANCE IN MAKING DECISIONS.

ROUTINE FORMS / ACCURACY AND COMPLETENESS: DEPUTY A. BENNINGFIELD KNOWS MOST OF THE STANDARD FORMS AND UNDERSTANDS THEIR FORMAT. SHE COMPLETES THE FORMS WITH REASONABLE ACCURACY AND THOROUGHNESS.

ON 4/28/2011 DEPUTY A. BENNINGFIELD RECEIVED A DISCIPLINARY ACTION #10000274 FOR FAILING TO PROPERLY SEAL EVIDENCE BAGS PRIOR TO SUBMISSION TO THE HARRIS COUNTY MEDICAL EXAMINER OFFICE IN A SEXUAL ASSULT CASE. DEPUTY A. BENNINGFIELD VIOLATED THE HARRIS COUNTY CONSTABLE PCT. 4 STANDARD OPEERATING PROCEDURE FOR EVIDENCE UNDER THE GENERAL SUBMISSION OF EVIDENCE CATEGORY 21.03 I EVIDENCE BAG (C).

REPORT WRITING / ORGANIZATION AND DETAILS:
DEPUTY A. BENNINGFIELD INCLUDES ALL ELEMENTS OF THE SITUATION AND REDUCES THAT INFORMATION INTO WHAT IS NEEDED IN EACH REPORT. DEPUTY A. BENNINGFIELD IS ABLE TO WRITE A REPORT WITH VERY LITTLE GRAMER OR SPELLING ERRORS.

TIMELY COMPLETION OF ASSIGNMENTS: DEPUTY A. BENNINGFIELD TURNS IN HER REPORTS AND ROUTINE PAPERWORK DAILY AND COMPLETES ALL ASSIGNMENTS BY THE DEADLINE.

CARE OF VEHICLE
CARE OF EQUIPMENT / VEHICLE; DEPUTY A. BENNINGFIELD CONSISTENTLY CLEANS THE INTERIOR OF DEBRIS AND UNNECESSARY ITEMS BEFORE AND AFTER TOUR OF DUTY. SHE SECURES LOOSE ITEMS IN THE INTERIOR OF HER VEHICLE. HER VEHICLE IS WELL ORGANIZED.

CARE OF EQUIPMENT / WEAPONS; DEPUTY A. BENNINGFIELD KEEPS HER FIREARM CLEAN AND PROPERLY MAINTAINS DEPARTMENTAL EQUIPMENT REQUIRED PERFORMING DUTY ASSIGNMENTS.

## Reviewer Comments

On 11/15/2011, I, Lt. F. Escobar reviewed Deputy Benningfield's evaluation for this reporting period. I will agree with all it's scores and comments as noted by Sergeant S. Jolly.

# Harris County Precinct four Constable's Office

## Employee Personnel Action Notice

This form may be issued at any time when an employee's work performance remains below acceptable standards and a "Work Improvement Notice" has been issued informing the employee of sub-standard performance, or the severity of an employee's action dictates that immediate and appropriate disciplinary action is taken.

Employee: BENNINGFIELD, AMY Rank Level: DEPUTY

Action Type: C (V = Verbal / C = Counseling / D = Disciplinary Action / O = Commendation) Case #: 10000759

Date: 06/11/2012 Supervisor: SERGEANT CHARLES BLOOMFIELD Duty Status: On-Duty

You have failed to meet the previously stated requirements of your job in the following way(s), or your actions as listed below, have demonstrated the need for a direct response by this department

**Comments or Remarks:** Deputy Benningfield was returned a Juvenile arrest paperwork under case # 12-57862 for corrections on 05/07/12 with instructions to complete the corrections and re submit the paperwork by the end of her next scheduled shift. On 05/20/2012 Deputy Benningfield upon questioning concerning the status of the paperwork advised that she was unsure of which particular form to complete and was at that time given further instructions on how to complete the forms and advised to complete the needed corrections by the end of her next assigned shift. By 05/28/2012 Deputy Benningfield had neglected to resubmit the requested paperwork with the indicated corrections and a 3rd notice for return of the paperwork was sent via email. See attached email;

" Deputy Benningfield, I returned the below indicated juvenile paperwork back to you for corrections on 05/07/12 with instructions to complete the corrections and re submit it to the juvenile box. On 05/20/12 I again advised you to complete the corrections and provided you with additional instructions on how to complete the paperwork. To date this packet has yet to be re submitted to the juvenile box. You will complete the Juvenile investigation forms for this case as indicated on 05/07 and 05/12 for both juvenile defendants and submit them, with the original school notification forms returned to you, by the end of your next assigned shift."

Deputy Benningfield has been advised that it is her responsibility to ensure that the all standardized patrol forms completed by her are not only correct and accurate but submitted in a timely manner. Deputy Benningfield violated Harris County Pct. 4 Constable Department Policy and Ethics under section 2.12, Performance of Duty: Members shall perform all lawful duties as may be required of them by competent authority, whether or not such duties are specifically assigned to them in any rules or duty manual.

**Action Taken:** Counseling only, no further action

Action Started: 06/11/2012 Action Ended: 06/11/2012 Check if Review Required Review Date:

Acknowledged by: BENNINGFIELD, AMY Acknowledgment Date:

The details indicated above are brought to your attention to advise you of the specifics of this action

and any subsequent departmental requirements of you part. Failure to meet any of the requirements outlined in this action may result in a response by the Department up to and including termination.

Signature of Supervisor:___________________________________ Date:_______________

Signature of Employee:_____________________________________ Date:_______________

# Harris County Precinct Four Constable's Office

## Employee Evaluation Report

| *Benningfield Amy* | Rank: 1 | Division: |
|---|---|---|

Evaluated by [redacted] SGT FRAGKIAS — Evaluation Date - 11/7/2012 — Next Evaluation Due: 11/7/2013

Reviewed by [redacted] Lt. F. Escobar — Date of Review: 11/23/2012

---

Personal Equipment: Deputy Benningfield meets departmental standards in this area and maintains his personal equipment in good working order.

Weapons: Deputy Benningfield meets departmental standards and maintains his weapon in a clean, good working order.

PERFORMANCE:

Orientation / Response to Calls: Deputy Benningfield meets departmental standards and has a good working knowledge of his patrol area and responds to calls in a timely manner.

Listens and Comprehends: Deputy Benningfield meets departmental standards and attentively listens and comprehends instructions and or orders given in respect to the performance of his duties.

Work Judgments: Deputy Benningfield meets departmental standards and displays the ability to make judgments with regards to his duties allowing him to complete work in a timely and efficient manner.

Performance under Stress: Deputy Benningfield meets departmental standards and displays the ability to handle himself in a calm and efficient manner during situations which are time sensitive such as the ability to clear the roadway quickly after responding to an accident blocking moving lanes of traffic.

Accuracy and Completeness of Forms: Deputy Benningfield did not meets departmental standards on this section. Deputy Bennigfield you have received a score 2 in this evaluation period because you received a written counseling under employee action #1000759 in reference to not turning in paperwork correctly and submiting it in a timely manner.

Reports: Organization and Details: Deputy Benningfield meets departmental standards and completes his reports in a clear and correct fashion.

Complete Assignments in a Timely Manner: Deputy Benningfield meets departmental standards and utilizes his time well allowing him to complete his assignments in a timely manner.

ORIENTATION:

Initiative: Deputy Benningfield meets departmental standards in this area and displays initiative in the performance of his duties and enforcing laws.

Dependability: Deputy Benningfield meets departmental standards and conducts himself in a dependable manner in following orders and completing assignments.

Attendance: Deputy Benningfield meets departmental standards in this area.

Career Development: Deputy Benningfield was given two in this area. Deputy Benningfield did not meet departmental standards in this area she has attended 18 hours of training during this evaluation period.

Acceptance of Change: Deputy Benningfield meets departmental standards and accepts change without complainant.

Ability to Perform without Supervision: Deputy Benningfield meets departmental standards and is able to perform his duties without direct supervision when necessary.

CARE OF VEHICLE / EQUIPMENT:

County equipment: Deputy Benningfield properly maintains all departmental equipment required to perform all duty assignments.

Vehicle: Deputy Benningfield operates his county assigned patrol car while on duty and keeps in a clean and orderly fashion.

Personal: Deputy Benningfield keeps his personal equipment properly maintained and in good working order.

Weapon: Deputy Benningfield keeps his firearm clean and in good working order.

OVER ALL VIEW:

# Harris County Precinct Four Constable's Office

## Employee Evaluation Report

| *Benningfield Amy* | Rank: 1 | Division: |
|---|---|---|

Evaluated by [redacted] SGT FRAGKIAS    Evaluation Date - 11/7/2012    Next Evaluation Due: 11/7/2013

Reviewed by [redacted] Lt. F. Escobar    Date of Review: 11/23/2012

**Deputy Benningfield received a written counseling from Lt. Combest on 11-05-2011, case #10000588. Deputy Benningfield was fueling her patrol vehicle and she forgot to remove the nozzle from her vehicle and when she drove off it caused the fuel nozzle and hose to break away from pump. Deputy Benningfield received a written disciplinary action from Lt. Combest on 04-25-2012, case #10000714 in reference to a fleet accident, and on 06-11-2012 Deputy Bennigfield received a written counseling from Sgt. Bloomfield case #10000759, in reference to not turning in paperwork not correctly and submitted in a timely manner.**
**Deputy Benningfield is assigned to the North Gate MUD 1 and MUD 2 contract. She is very proactive in her traffic contacts and this has made her familiar with the issues within the contract. Deputy Benningfield shows willingness to learn, listen and to be a team member.**

## Reviewer Comments

**On 11/23/2012, I, Lieutenant Escobar have reviewed Deputy Benningfield's evaluation for this reporting period, along with the attached improvment letter. I will agree with the scores, comments and recommendations.**

# APPENDIX:

# G

## Incident Report Related Property List

# INCIDENT REPORT

**PUBLIC COPY**

| Field | Value |
|---|---|
| Agency Name | *Harris County Sheriff's Office* |
| ORI | *TX1010000* |
| Case# | *1400-45589* |
| Date / Time Reported | *04/02/2014 06:37 Wed* |
| Last Known Secure | *04/02/2014 06:33 Wed* |
| At Found | *04/02/2014 06:53 Wed* |
| Location of Incident | *25400-BLK Pepper Ridge Ln, Spring TX* |
| Premise Type | *Other/unknown* |
| Zone/Tract | |

INCIDENT DATA

| # | Crime Incident | | Weapon / Tools | Activity | Entry | Exit | Security |
|---|---|---|---|---|---|---|---|
| #1 | *Agg Assault Causes Serious Bodily Inj PC 22.02(A)(1)* | (Com) | | | | | |
| #2 | *Unl Poss Firearm By Felon PC 46.04 (A)* | (Com) | | | | | |
| #3 | | ( ) | | | | | |

MO

VICTIM

# of Victims: Type: Injury:

| | Victim/Business Name (Last, First, Middle) | Victim of Crime # | DOB / Age | Race | Sex | Relationship To Offender | Resident Status | Military Branch/Status |
|---|---|---|---|---|---|---|---|---|
| V1 | | | | | | | | |

| Home Address | Home Phone |
|---|---|
| | |

| Employer Name/Address | Business Phone | Mobile Phone |
|---|---|---|
| | | |

| VYR | Make | Model | Style | Color | Lic/Lis | VIN |
|---|---|---|---|---|---|---|
| | | | | | | |

OTHERS INVOLVED

CODES: V- Victim (Denote V2, V3) O = Owner (if other than victim) R = Reporting Person (if other than victim)

Type: INDIVIDUAL Injury: None

| Code | Name (Last, First, Middle) | Victim of Crime # | DOB / Age | Race | Sex | Relationship To Offender | Resident Status | Military Branch/Status |
|---|---|---|---|---|---|---|---|---|
| *V2* | *SPEAR, JOHN IV* | | Age *27* | *W* | *M* | | | |

| Home Address | Home Phone |
|---|---|
| | |

| Employer Name/Address | Business Phone | Mobile Phone |
|---|---|---|
| | | |

Type: Injury:

| Code | Name (Last, First, Middle) | Victim of Crime # | DOB / Age | Race | Sex | Relationship To Offender | Resident Status | Military Branch/Status |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

| Home Address | Home Phone |
|---|---|
| | |

| Employer Name/Address | Business Phone | Mobile Phone |
|---|---|---|
| | | |

PROPERTY

1 = None 2 = Burned 3 = Counterfeit / Forged 4 = Damaged / Vandalized 5 = Recovered 6 = Seized 7 = Stolen 8 = Unknown ("OJ" = Recovered for Other Jurisdiction)

| VI # | Code | Status Frm/To | Value | OJ | QTY | Property Description | Make/Model | Serial Number |
|---|---|---|---|---|---|---|---|---|
| | *06* | *TOW* | *$0.00* | | *1* | *2013 BLK ,* | *HD Cyl* | |

| Field | Value |
|---|---|
| Officer/ID# | *MAXWELL, J. (C40505)* |
| Invest ID# | *MAXWELL, J. (C40505)* |
| Supervisor | *(0)* |
| Complainant Signature | |
| Case Status | *Closed* *04/02/2014* |
| Case Disposition: | |

Page 1

# INCIDENT/INVESTIGATION REPORT

*Harris County Sheriff's Office*

Case # *1400-45589*

Status Codes 1 = None 2 = Burned 3 = Counterfeit / Forged 4 = Damaged / Vandalized 5 = Recovered 6 = Seized 7 = Stolen 8 = Unknown

| DRUGS | IBR | Status | Quantity | Type Measure | Suspected Type | Up to 3 types of activity |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Assisting Officers

Suspect Hate / Bias Motivated:

NARRATIVE

LEGACY PUBLIC SUMMARY

==========================

SUMMARY NUMBER: 0000

The Defendant was arrested for threatening two Complainants with a handgun and striking one Complainant with the handgun.

SUMMARY NUMBER: 0001

Supervisors response.

SUMMARY NUMBER: 0002

Supplement to case.

SUMMARY NUMBER: 0003

Supplement report for scene photos and supervisor actions.

SUMMARY NUMBER: 0004

Supplement.

SUMMARY NUMBER: 0005

Supplement Investigator D.L. Felan Domestic Violence Unit

SUMMARY NUMBER: 0006

FIREARMS LAB NUMBER: 14-0798 IFS14-05448 SEE E-FILES FOR REPORT OF FORENSIC LABORATORY EXAMINATION

SUMMARY NUMBER: 0007

Supplement to case.

# Incident Report Related Vehicle List

*Harris County Sheriff's Office*

OCA: *1400-45589*

1

| VehYr/Make/Model | Style | Color | Lic/Lis | VIN |
|---|---|---|---|---|
| *2013 HD, Cyl* | *MC* | *BLK* | *4RE587 TX 2014* | *1HD1FBM14DB666496* |

| IBR Status | Date | Location |
|---|---|---|
| *Tow* | *04/02/2014* | |

| Condition | Value | Offense Code | Jurisdiction | State # | NIC # |
|---|---|---|---|---|---|
| | *$0.00* | | *Locally* | | |

| Name (Last, First, Middle) | Also Known As | Home Address |
|---|---|---|
| ** No name ** | | |

| Business Address |
|---|
| |

| DOB | Age | Race | Sex | Hgt | Wgt | Scars, Marks, Tattoos, or other distinguishing features |
|---|---|---|---|---|---|---|
| | | | | | | |

Notes

# Incident Report Related Property List

Harris County Sheriff's Office

OCA: 1400-45589

**1**

| Property Description | Make | Model | Caliber |
|---|---|---|---|
| BLACK 45 CALIBER ISRAEL MILITARY IND W/ | ISI | DESERT EA | 45 |

| Color | Serial No. | Value | Qty | Unit | Jurisdiction |
|---|---|---|---|---|---|
| | | $0.00 | 0.000 | | Locally |

| Status | Date | NIC # | State # | Local # | OAN |
|---|---|---|---|---|---|
| Evidence-not Ibr | 04/02/2014 | | | | |

| Name (Last, First, Middle) | DOB | Age | Race | Sex |
|---|---|---|---|---|
| * No name * | | | | |

Notes

Full Item Description: BLACK 45 CALIBER ISRAEL MILITARY IND W/ MAGAZINE
Gun Finish: BLK
Gun Type/Category: PI

**2**

| Property Description | Make | Model | Caliber |
|---|---|---|---|
| UNKNOWN MAKE OR MODEL 32 CAL SEMI AUTO W | ZZZ | UNKNOWN | 32 |

| Color | Serial No. | Value | Qty | Unit | Jurisdiction |
|---|---|---|---|---|---|
| | 467350 | $0.00 | 0.000 | | Locally |

| Status | Date | NIC # | State # | Local # | OAN |
|---|---|---|---|---|---|
| Evidence-not Ibr | 04/02/2014 | | | | |

| Name (Last, First, Middle) | DOB | Age | Race | Sex |
|---|---|---|---|---|
| * No name * | | | | |

Notes

Full Item Description: UNKNOWN MAKE OR MODEL 32 CAL SEMI AUTO W/ MAGAZINE
Gun Finish: BLK
Gun Type/Category: PI

**3**

| Property Description | Make | Model | Caliber |
|---|---|---|---|
| 2 45 CALIBER MAGAZINES | | | |

| Color | Serial No. | Value | Qty | Unit | Jurisdiction |
|---|---|---|---|---|---|
| | | $0.00 | 0.000 | | Locally |

| Status | Date | NIC # | State # | Local # | OAN |
|---|---|---|---|---|---|
| Evidence-not Ibr | 04/02/2014 | | | | |

| Name (Last, First, Middle) | DOB | Age | Race | Sex. |
|---|---|---|---|---|
| * No name * | | | | |

Notes

Full Item Description: 2 45 CALIBER MAGAZINES

Incomplete Report

**4**

| Property Description | Make | Model | Caliber |
|---|---|---|---|
| TWENTY-EIGHT 45 CAL LIVE BULLETS/SEVEN 3 | | | |

| Color | Serial No. | Value | Qty | Unit | Jurisdiction |
|---|---|---|---|---|---|
| | | $0.00 | 0.000 | | Locally |

| Status | Date | NIC # | State # | Local # | OAN |
|---|---|---|---|---|---|
| Evidence-not Ibr | 04/02/2014 | | | | |

| Name (Last, First, Middle) | DOB | Age | Race | Sex |
|---|---|---|---|---|
| * No name * | | | | |

Notes

Full Item Description: TWENTY EIGHT 45 CAL LIVE BULLETS/SEVEN 32 CAL LIVE

# APPENDIX:

# "H"

## Precinct 4 Constable OFFice

## S.O.P

## Search & Seizure

CONSTABLE HARRIS COUNTY PRECINCT 4

Patrol Division S.O.P.

| Category: **Field Operations** | Section: **Arrest, Search & Seizure** | Date Issued: **05/01/2005** | Effective Date: **05/01/2005** |
|---|---|---|---|
| Revision #: **001** | Revision Date: **11/23/2014** | Procedure #: **2.003** | Number of Pages: **2** |
| Subject: **Searches and Seizures.** | | | |
| Purpose: **To establish a standard procedure for officers to conduct legal searches and seizures.** | | | |

I. **GENERAL STATEMENT**

The Fourth Amendment to the U.S. Constitution guarantees all citizens the right to be secure in their persons, house, papers and effects against unreasonable searches and seizures. The Supreme Court decision regarding searches and seizures place the responsibility on law enforcement to ensure that citizen's rights are protected. Deputies shall scrupulously observe Constitutional guidelines when conducting searches and always be mindful of their lawful propose. Deputies shall have a firm understanding of reasonable suspicion and probable cause.

II. **WARRANTLESS SEARCHES**

A. Consent to Search: A search may be conducted after receiving a "Consent to Search" in lieu of a search warrant. Deputies utilizing a "Consent to Search" are to ensure;

1. The person giving consent has the authority to do so;
2. The person gave the consent voluntarily;
3. The consent was obtained in writing (Department form)
4. The person giving the consent is present (on location) during search and;
5. The search is terminated immediately if person (authority) giving consent withdraws consent.

B. A search may be conducted without a warrant, if it is justified under emergency or exigent conditions and in compliance with the Texas Code of Criminal Procedures.

C. An officer may seize contraband, fruits or instruments of the crime under the "Plain View Doctrine".

D. A deputy may seize property that is voluntarily abandoned and in a location where no one has a reasonable expectation of privacy.

E. During the service of an arrest warrant (at the defendant's home) deputies may conduct a warrantless protective sweep.

III. **WARRANTLESS SEARCHES OF VEHICLES**

A. If circumstances dictate, a deputy may be directed to enter a vehicle with the sole purpose of examining the VIN to determine ownership.

B. A deputy may search a vehicle that lawfully is in police custody and/or conduct an inventory pursuant to Department Policy.

C.  An operable vehicle may be searched:

1.  Under probable cause. Note that the initial search of a vehicle under reasonable suspicion or consent (see item #2) may give rise to probable cause that evidence, contraband, fruits or instruments of the crime might be found within the vehicle, thus justifying a full-scale search.
2.  With Consent to Search from owner in writing.
3.  Incident to arrest of the driver / occupant (Inventory)

D.  If checking a vehicle for weapons, confine it to the passenger area and any other immediate accessible location within the vehicle (not locked).
E.  May conduct an emergency search of the vehicle (exigent circumstances). Limit the search to whatever is necessary to respond to the emergency.

## IV.  WARRANTLESS SEARCH OF PERSON(S)

A.  All suspect(s) are to be searched incident to arrest to include;

1.  Any articles carried by the suspect(s) (i.e.: backpack, bag and etc.)
2.  Suspect's immediate surroundings.

B.  Suspect(s) being searched incident to arrest are to be searched as soon as practical after the arrest and at/or near the place of arrest.
C.  Deputies conducting searches incident to arrest are to use appropriate and reasonable force if the suspect resist.
D.  Deputies preparing to execute a search warrant are to;

1.  Meet with a patrol supervisor prior to the service of the warrant to plan actions to be taken (manpower, officer safety issues, layout, entry methods assignments and etc.);
2.  Execute the warrant within the time constraints imposed by law;
3.  Confirm that the place, thing and/or person to be searched is as named in the warrant;
4.  Serve the warrant with a copy of the affidavit attached.

E.  In serving the warrant, announce your presence and purpose, await a reasonable interval before entry.

1.  If entry is refused, follow pre-established plans;
2.  Find and seize all property listed in the warrant;
3.  Seize any other evidence reasonably related to the listed warrant;
4.  Based on the "plain View Doctrine" seize any contraband, fruits or instrument of a crime;
5.  Frisk any person at the scene of the warrant execution.
6.  If the object of the search is contraband, detain and search any occupant of the place searched.
7.  In situations where the warrant requires the search of a person, properly limit the search as required by law.
8.  Properly inventory all property seized.
9.  Leave a copy of the warrant and inventory seized at the location.
10. Return the warrant, affidavit and inventory to the court within the time constraints imposed (72 hours less date of issuance and return).

## V.  DOCUMENTATION

Properly document all actions relating to search and seizures (warrant or warrantless) in a complete and detailed offense report.

# APPENDIX:

# "I"

## Calls For Service Report

*Printed: October 26, 2020*

| Calls For Service Report | | | |
|---|---|---|---|
| **Call ID:** ***CD140401384*** | | **Case #:** ***1400-45589*** | |
| Agency<br>**HARRIS COUNTY CONSTABLE PRECINCT 4** | | Person Received Complaint | |
| Date / Time Received<br>**04/02/2014 06:37** | Time Dispatched<br>**06:39** | Time Arrived<br>**06:46** | Time Complete<br>**17:16** |
| Nature of Incident<br>**407** | | | |
| Location of Incident<br>**25410 PEPPER RIDGE LN, HARRIS COUNTY** | | | |
| Victim or Caller | | | |
| Classification<br>**HCC4** | How Received<br>**PHON** | Disposition<br>**REPORT WRITTEN** | |
| Officer | | Date Submitted | |
| Assisting Officers | | | |

**Notes:** *** Converted CAD Record *** / Record # 728B010A53
Call Number: CD140401384
Case Number: HC140045589
CFS Description: Assault/Agg
Priority: 2
Location Desc: 25410 PEPPER RIDGE LN, HA
========================
CALL HISTORY SUMMARY:
NAME: CREATE, SEQ_CTRL: 1
OPERATOR: S17325
TERMINAL: EDCP04
DATE: Apr-02-2014
TIME: 06:33:41
INT: 1396420421
OVERRIDE: N
GEN_SYSTEM: N
LOCATION: 25410 PEPPER RIDGE LN, HA
CALLTYPE: 606
CALLDESC: Dist/Weapon
RP_NAME: JOHN
PHONE: 281/253-8189
GROUP: C4
AREA: 4LWE10
PRIORITY: 1
RESPONSE: 2DEP
AGENCY: C4
INT_AREA: 4LWE10
INT_GROUP: C4
INT_AGENCY: C4
SERVICE: P
XCOORDINATE: -95.398868

No Shts fired reported

YCOORDINATE: 30.075709
MAPPAGE: 293N
CROSS_STS: btwn DEER VALLEY DR and BELLCHASE DR
GEOXCOORD: -95.398868
GEOYCOORD: 30.075709
ALIPHASE: 2

NAME: ALI, SEQ_CTRL: 2
OPERATOR: S17325
TERMINAL: EDCP04
DATE: Apr 02, 2014
TIME: 06:33:41
INT: 1396420421
OVERRIDE: N
GEN_SYSTEM: N
911_PHONE: 281/253-8189
911_TRUNK: 511-1612
911_LOCATION: 3010 SPRING CREEK DR - SW, HA
911_CALLER: VERIZON WIRELESS
911_SOURCE: WPH2
911_LATITUDE: -95.397892
911_LONGITUDE: 30.075223
911_CONFIDENCE: 95
ALIPHASE: 2

NAME: ALIGEO, SEQ_CTRL: 3
OPERATOR: S17325
TERMINAL: EDCP04
DATE: Apr 02, 2014
TIME: 06:33:41
INT: 1396420421
OVERRIDE: N
GEN_SYSTEM: N
GEOXCOORD: -95.397892
GEOYCOORD: 30.075223

NAME: ALIGEO, SEQ_CTRL: 4
OPERATOR: S17325
TERMINAL: EDCP04
DATE: Apr 02, 2014
TIME: 06:33:43
INT: 1396420423
OVERRIDE: N
GEN_SYSTEM: N
GEOXCOORD: -95.397892
GEOYCOORD: 30.075223

NAME: ALI, SEQ_CTRL: 5
OPERATOR: S17325
TERMINAL: EDCP04
DATE: Apr 02, 2014
TIME: 06:34:44
INT: 1396420484
OVERRIDE: N
GEN_SYSTEM: N
911_PHONE: 281/253-8189
911_TRUNK: 511-1612
911_LOCATION: 3010 SPRING CREEK DR - SW, HA
911_CALLER: VERIZON WIRELESS
911_SOURCE: WPH2
911_LATITUDE: -95.397827
911_LONGITUDE: 30.075019

911_CONFIDENCE: 95
ALIPHASE: 2

NAME: ALIGEO, SEQ_CTRL: 6
OPERATOR: S17325
TERMINAL: EDCP04
DATE: Apr 02, 2014
TIME: 06:34:44
INT: 1396420484
OVERRIDE: N
GEN_SYSTEM: N
GEOXCOORD: -95.397827
GEOYCOORD: 30.075019

NAME: ALIGEO, SEQ_CTRL: 7
OPERATOR: S17325
TERMINAL: EDCP04
DATE: Apr 02, 2014
TIME: 06:34:45
INT: 1396420485
OVERRIDE: N
GEN_SYSTEM: N
GEOXCOORD: -95.397827
GEOYCOORD: 30.075019

NAME: ALI, SEQ_CTRL: 8
OPERATOR: S17325
TERMINAL: EDCP04
DATE: Apr 02, 2014
TIME: 06:35:17
INT: 1396420517
OVERRIDE: N
GEN_SYSTEM: N
911_PHONE: 281/253-8189
911_TRUNK: 511-1612
911_LOCATION: 3010 SPRING CREEK DR - SW, HA
911_CALLER: VERIZON WIRELESS
911_SOURCE: WPH2
911_LATITUDE: -95.397849
911_LONGITUDE: 30.074869
911_CONFIDENCE: 95
ALIPHASE: 2

NAME: ALIGEO, SEQ_CTRL: 9
OPERATOR: S17325
TERMINAL: EDCP04
DATE: Apr 02, 2014
TIME: 06:35:17
INT: 1396420517
OVERRIDE: N
GEN_SYSTEM: N
GEOXCOORD: -95.397849
GEOYCOORD: 30.074869

NAME: ALIGEO, SEQ_CTRL: 10
OPERATOR: S17325
TERMINAL: EDCP04
DATE: Apr 02, 2014
TIME: 06:35:18
INT: 1396420518
OVERRIDE: N
GEN_SYSTEM: N

GEOXCOORD: -95.397849
GEOYCOORD: 30.074869

NAME: TEMPNO, SEQ_CTRL: 11
OPERATOR: S17325
TERMINAL: EDCP04
DATE: Apr 02, 2014
TIME: 06:33:41
INT: 1396420421
OVERRIDE: N
GEN_SYSTEM: Y
CALL_NO: CD140401384

NAME: ENTRY, SEQ_CTRL: 12
OPERATOR: S17325
TERMINAL: EDCP04
DATE: Apr 02, 2014
TIME: 06:37:26
INT: 1396420646
OVERRIDE: N
GEN_SYSTEM: N
CALL_NO: CD140401384
LOCATION: 25410 PEPPER RIDGE LN, HA
CALLTYPE: 606
CALLDESC: Dist/Weapon
RP_NAME: JOHN
PHONE: 281/253-8189
GROUP: C4
AREA: 4LWE10
PRIORITY: 1
RESPONSE: 2DEP
AGENCY: C4
INT_AREA: 4LWE10
INT_GROUP: C4
INT_AGENCY: C4
SERVICE: P
XCOORDINATE: -95.398868
YCOORDINATE: 30.075709
MAPPAGE: 293N
CROSS_STS: btwn DEER VALLEY DR and BELLCHASE DR
GEOXCOORD: -95.398868
GEOYCOORD: 30.075709
ALIPHASE: 2
NARRATIVE: REP ADV AN UNK WM/BLK LEATHER JACKET PUCHED HIS MOM IN THE FACE & HE HAS A GUN

No shots fired

No shots fired

NAME: INVH, SEQ_CTRL: 13
OPERATOR: S17325
TERMINAL: EDCP04
DATE: Apr 02, 2014
TIME: 06:37:26
INT: 1396420646
OVERRIDE: N
GEN_SYSTEM: Y
CALL_NO: CD140401384
PHONE: 281/253-8189
INT_AREA: 4LWE10
SUBJ_NAME: JOHN
INV_TYPE: INVP
INV_PRIO: 1

NAME: PREMIS, SEQ_CTRL: 14

OPERATOR: PCT4
TERMINAL: PCT4
DATE: Apr 02, 2014
TIME: 06:37:26
INT: 1396420646
OVERRIDE: N
GEN_SYSTEM: Y
CALL_NO: CD140401384
NARRATIVE: GAT

NAME: RMSNO, SEQ_CTRL: 15
    OPERATOR: PCT4
    TERMINAL: PCT4
    DATE: Apr 02, 2014
    TIME: 06:37:27
    INT: 1396420647
    OVERRIDE: N
    GEN_SYSTEM: Y
    CALL_NO: CD140401384

NAME: PERMNO, SEQ_CTRL: 16
    OPERATOR: PCT4
    TERMINAL: PCT4
    DATE: Apr 02, 2014
    TIME: 06:37:28
    INT: 1396420648
    OVERRIDE: N
    GEN_SYSTEM: Y
    CALL_NO: CD140401384

NAME: INFO, SEQ_CTRL: 17
    OPERATOR: S17325
    TERMINAL: EDCP04
    DATE: Apr 02, 2014
    TIME: 06:37:43
    INT: 1396420663
    OVERRIDE: N
    GEN_SYSTEM: N
    CALL_NO: CD140401384
    NARRATIVE: REP ADV HE IS 2 HOUSES TO LEFT OF THE ABOVE LOC AT THIS TIME

NAME: SELECT, SEQ_CTRL: 18
    OPERATOR: C40255
    TERMINAL: C4CD07
    DATE: Apr 02, 2014
    TIME: 06:37:51
    INT: 1396420671
    OVERRIDE: N
    GEN_SYSTEM: N
    CALL_NO: CD140401384

NAME: INFO, SEQ_CTRL: 19
    OPERATOR: S17325
    TERMINAL: EDCP04
    DATE: Apr 02, 2014
    TIME: 06:38:11
    INT: 1396420691
    OVERRIDE: N
    GEN_SYSTEM: N
    CALL_NO: CD140401384
    NARRATIVE: SUSP ON A MOTORCYCLE DRIVING AROUND THE AREA

NAME: HOLD, SEQ_CTRL: 20
OPERATOR: C40255
TERMINAL: C4CD07
DATE: Apr 02, 2014
TIME: 06:38:28
INT: 1396420708
OVERRIDE: N
GEN_SYSTEM: Y
CALL_NO: CD140401384

NAME: INFO, SEQ_CTRL: 21
OPERATOR: S17325
TERMINAL: EDCP04
DATE: Apr 02, 2014
TIME: 06:38:36
INT: 1396420716
OVERRIDE: N
GEN_SYSTEM: N
CALL_NO: CD140401384
NARRATIVE: UNK WHERE HIS MOTHER IS AT THIS TIME

NAME: HOLD, SEQ_CTRL: 22
OPERATOR: C40255
TERMINAL: C4CD07
DATE: Apr 02, 2014
TIME: 06:39:07
INT: 1396420747
OVERRIDE: N
GEN_SYSTEM: Y
CALL_NO: CD140401384

Maxwell on Scene 1 hr. 25 min. before A

NAME: DISPER, SEQ_CTRL: 23
OPERATOR: C40255
TERMINAL: C4CD07
OPERID1: C40505
OPERID_LIST: C40505
OPERNAMES: MAXWELL, JACKIE
DATE: Apr 02, 2014
TIME: 06:39:22
INT: 1396420762
OVERRIDE: N
GEN_SYSTEM: N
CALL_NO: CD140401384
UNIT: 4E51
CALLTYPE: 606
DISTRICT: C4

NAME: PRIU, SEQ_CTRL: 24
OPERATOR: C40255
TERMINAL: C4CD07
DATE: Apr 02, 2014
TIME: 06:39:22
INT: 1396420762
OVERRIDE: N
GEN_SYSTEM: Y
CALL_NO: CD140401384
UNIT: 4E51

NAME: BACKER, SEQ_CTRL: 25
OPERATOR: C40090
TERMINAL: C4396
OPERID1: C40090

OPERID_LIST: C40090
OPERNAMES: BENNINGFIELD,AMY
DATE: Apr 02, 2014
TIME: 06:39:22
INT: 1396420762
OVERRIDE: N
GEN_SYSTEM: N
CALL_NO: CD140401384
UNIT: 4E55
LOCATION: 25410 PEPPER RIDGE LN, HA
CALLTYPE: 606
DISTRICT: C4

NAME: HOLD, SEQ_CTRL: 26
OPERATOR: C40255
TERMINAL: C4CD07
DATE: Apr 02, 2014
TIME: 06:39:23
INT: 1396420763
OVERRIDE: N
GEN_SYSTEM: Y
CALL_NO: CD140401384

NAME: BACKER, SEQ_CTRL: 27
OPERATOR: C40255
TERMINAL: C4CD07
OPERID1: C40506
OPERID2: C40759
OPERID_LIST: C40506 C40759
OPERNAMES: FLORES, JUAN; ANDRADE,NORMA
DATE: Apr 02, 2014
TIME: 06:40:16
INT: 1396420816
OVERRIDE: N
GEN_SYSTEM: N
CALL_NO: CD140401384
UNIT: 8476
LOCATION: 25410 PEPPER RIDGE LN, HA
CALLTYPE: 606
DISTRICT: C4

NAME: BACKER, SEQ_CTRL: 28
OPERATOR: C40255
TERMINAL: C4CD07
OPERID1: C40525
OPERID_LIST: C40525
OPERNAMES: WINSTON, ANDREW
DATE: Apr 02, 2014
TIME: 06:40:16
INT: 1396420816
OVERRIDE: N
GEN_SYSTEM: N
CALL_NO: CD140401384
UNIT: 4E42
LOCATION: 25410 PEPPER RIDGE LN, HA
CALLTYPE: 606
DISTRICT: C4

NAME: COMBIN, SEQ_CTRL: 29
OPERATOR: C40255
TERMINAL: C4CD07
DATE: Apr 02, 2014

TIME: 06:41:21
INT: 1396420881
OVERRIDE: N
GEN_SYSTEM: N
CALL_NO: CD140401384
CALLTYPE: 001
AGENCY: C4
SERVICE: P
LINC_CALL: CD140401385

NAME: NOMORE, SEQ_CTRL: 30
OPERATOR: S17325
TERMINAL: EDCP04
DATE: Apr 02, 2014
TIME: 06:42:39
INT: 1396420959
OVERRIDE: N
GEN_SYSTEM: N
CALL_NO: CD140401384

NAME: MISC, SEQ_CTRL: 31
OPERATOR: C40350
TERMINAL: C4CD05
DATE: Apr 02, 2014
TIME: 06:42:40
INT: 1396420960
OVERRIDE: N
GEN_SYSTEM: N
CALL_NO: CD140401384
NARRATIVE: SHE IS STILL RINGING THE DOOR BELL

NAME: MISC, SEQ_CTRL: 32
OPERATOR: C40350
TERMINAL: C4CD05
DATE: Apr 02, 2014
TIME: 06:43:05
INT: 1396420985
OVERRIDE: N
GEN_SYSTEM: N
CALL_NO: CD140401384
NARRATIVE: SAYS HE IS 1 STREET OVER FROM PEPPER RIDGE

NAME: MISC, SEQ_CTRL: 33
OPERATOR: C40349
TERMINAL: C4CD03
DATE: Apr 02, 2014
TIME: 06:43:39
INT: 1396421019
OVERRIDE: N
GEN_SYSTEM: N
CALL_NO: CD140401384
NARRATIVE: MALE JUST DROVE PAST ON PEPPER RIDGE, HE IS POSSIBLY AN X BOYFRIEND

NAME: MISC, SEQ_CTRL: 34
OPERATOR: C40350
TERMINAL: C4CD05
DATE: Apr 02, 2014
TIME: 06:43:58
INT: 1396421038
OVERRIDE: N
GEN_SYSTEM: N
CALL_NO: CD140401384

Flashlight Not Gun

Face Not Head

No Shots reported

NARRATIVE: SUSP SAID SHE WAS HIT N THE FACE W A GUN BY HER SON

NAME: MISC, SEQ_CTRL: 35
OPERATOR: C40350
TERMINAL: C4CD05
DATE: Apr 02, 2014
TIME: 06:45:40
INT: 1396421140
OVERRIDE: N
GEN_SYSTEM: N
CALL_NO: CD140401384
NARRATIVE: DISPATCH CAN HEAR DOOR BELL AND SHE IS NOW YELLING

NAME: MISC, SEQ_CTRL: 36
OPERATOR: C40349
TERMINAL: C4CD03
DATE: Apr 02, 2014
TIME: 06:46:07
INT: 1396421167
OVERRIDE: N
GEN_SYSTEM: N
CALL_NO: CD140401384
NARRATIVE: MALE IS STEVEN,

NAME: MISC, SEQ_CTRL: 37
OPERATOR: C40255
TERMINAL: C4CD07
DATE: Apr 02, 2014
TIME: 06:46:13
INT: 1396421173
OVERRIDE: N
GEN_SYSTEM: N
CALL_NO: CD140401384
NARRATIVE: MALE NAME IS POSS STEVE

NAME: MISC, SEQ_CTRL: 38
OPERATOR: C40350
TERMINAL: C4CD05
DATE: Apr 02, 2014
TIME: 06:46:14
INT: 1396421174
OVERRIDE: N
GEN_SYSTEM: N
CALL_NO: CD140401384
NARRATIVE: FEMALE IS NOW HIDING BHIND THE HEDGE

NAME: ONSCN, SEQ_CTRL: 39
OPERATOR: C40090
TERMINAL: C4396
DATE: Apr 02, 2014
TIME: 06:46:53
INT: 1396421213
OVERRIDE: N
GEN_SYSTEM: N
CALL_NO: CD140401384
UNIT: 4E55

NAME: MISC, SEQ_CTRL: 40
OPERATOR: C40255
TERMINAL: C4CD07
DATE: Apr 02, 2014
TIME: 06:47:27

INT: 1396421247
OVERRIDE: N
GEN_SYSTEM: N
CALL_NO: CD140401384
NARRATIVE: FAMLE IS HIDING BEHIND THE BUSHES ON LONG HILL LN

NAME: CLOS, SEQ_CTRL: 41
OPERATOR: C40459
TERMINAL: C4CD01
DATE: Apr 02, 2014
TIME: 06:47:29
INT: 1396421249
OVERRIDE: N
GEN_SYSTEM: N
CALL_NO: CD140401384
UNIT: 4E55
LOCATION: 25410 LONG HILL LN, HA
CROSS_STS: btwn DEER VALLEY DR and BELLCHASE DR

NAME: MISC, SEQ_CTRL: 42
OPERATOR: C40459
TERMINAL: C4CD01
DATE: Apr 02, 2014
TIME: 06:47:50
INT: 1396421270
OVERRIDE: N
GEN_SYSTEM: N
CALL_NO: CD140401384
UNIT: 4E55
NARRATIVE: INJURY ON THE LEG

NAME: MISC, SEQ_CTRL: 43
OPERATOR: C40255
TERMINAL: C4CD07
DATE: Apr 02, 2014
TIME: 06:49:08
INT: 1396421348
OVERRIDE: N
GEN_SYSTEM: N
CALL_NO: CD140401384
UNIT: 4E55
NARRATIVE: FEMALE HAS BEEN HIT N THE HEAD WITH A GUN AND IS NOW GOING BACK TO THE 25410 PEPPER RIDGE LN

Report: shots fired

NAME: MISC, SEQ_CTRL: 44
OPERATOR: C40255
TERMINAL: C4CD07
DATE: Apr 02, 2014
TIME: 06:49:24
INT: 1396421364
OVERRIDE: N
GEN_SYSTEM: N
CALL_NO: CD140401384
UNIT: 4E55
NARRATIVE: FEMALE IS 46YR

NAME: ONSCN, SEQ_CTRL: 45
OPERATOR: C40506
TERMINAL: C4384
DATE: Apr 02, 2014
TIME: 06:49:27
INT: 1396421367

NAME: CLEAR, SEQ_CTRL: 100
OPERATOR: C40506
TERMINAL: C4HP05
DATE: Apr 02, 2014
TIME: 13:24:20
INT: 1396445060
OVERRIDE: N
GEN_SYSTEM: N
CALL_NO: CD140401384
UNIT: 8476
CALLTYPE: 407
DISPOSITION: SPL

NAME: BACKOS, SEQ_CTRL: 101
OPERATOR: C40349
TERMINAL: C4CD03
OPERID1: C40740
OPERID_LIST: C40740
OPERNAMES: HOLLOWAY,JIMMIE
DATE: Apr 02, 2014
TIME: 14:21:43
INT: 1396448503
OVERRIDE: N
GEN_SYSTEM: N
CALL_NO: CD140401384
UNIT: 4D10
LOCATION: OUT ST2
CALLTYPE: 407
DISTRICT: C4

NAME: TRANSP, SEQ_CTRL: 102
OPERATOR: C40349
TERMINAL: C4CD03
DATE: Apr 02, 2014
TIME: 14:22:31
INT: 1396448551
OVERRIDE: N
GEN_SYSTEM: N
CALL_NO: CD140401384
UNIT: 4D10
LOCATION: CWC
MILEAGE: 081

NAME: CLEAR, SEQ_CTRL: 103
OPERATOR: C40349
TERMINAL: C4CD03
DATE: Apr 02, 2014
TIME: 14:24:02
INT: 1396448642
OVERRIDE: N
GEN_SYSTEM: N
CALL_NO: CD140401384
UNIT: 4E51
CALLTYPE: 407
DISPOSITION: REP

NAME: CMPLT, SEQ_CTRL: 104
OPERATOR: C40396
TERMINAL: C4CD01
DATE: Apr 02, 2014
TIME: 14:37:00
INT: 1396449420

# APPENDIX:

 J

Specifications on Sauer & Sohn 38H
Serial #467350
Harris County Institute Forensic Science

Harris County Institute of Forensic Sciences
1885 Old Spanish Trail
Houston, TX 77054
Ph: 713-796-6820/6816

IFS14-05448 HC1445589
ZCYOS4230TCMTL
Harris County Constable, Pct. 4-W

# EVIDENCE SUBMISSION

14-0798

**OFFENSE REPORT #:** HC14-45589

**ML/OC #:**

Has prior evidence been submitted on this case? [ ] Yes [✓] No

**SUBMITTED TO LABORATORY:** 05/01/14 (Date) 1256 (Time Submitted) L.M. Burk (Submitting Officer)

**Offense Type:** AGG ASSAULT **Offense Date:** 04/02/14 **Case Officer:** J. MAXWELL

**Agency:** CD4 **Agency Address:** 7900 WILL CLAYTON PW

**City:** HUMBLE **County:** HARRIS **State:** TX **Zip:** 77338

**Phone:** 281-446-1916 **E-Mail:**

| Name | Role | DOB | RACE | SEX |
|---|---|---|---|---|
| SPEAR, MACHELL | COMPLAINANT/ ~~SUSPECT/ OTHER~~ | [redacted] | W | F |
| BAUGHMAN, STEVEN KURT | ~~COMPLAINANT~~/ SUSPECT/ ~~OTHER~~ | [redacted] | W | ~~F~~ M |
| | COMPLAINANT/ SUSPECT/ OTHER | / / | | |

Outside Evidence Container (s)

| ITEM # | QTY | DESCRIPTION OF EVIDENCE |
|---|---|---|
| 1 | 1 | UNK MAKE 32 CAL PISTOL w/mag |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

TYPE OF ANALYSIS: [✓] as appropriate

- Drug Chem.- Chemical Analysis [ ]
- Toxicology- DWI / DUI [ ]
- Toxicology – DFSA (Drug Facilitated Sexual Assault) [ ]
- Trace – Gunshot Residue [ ]
- Trace – Fire Debris [ ]
- Firearms I.B.I.S. [✓]
- Forensic Genetics – DNA* [ ]

*If requesting DNA analysis, is Latent Print analysis: [ ] completed, [ ] not required, [ ] unknown

*DO NOT WRITE BELOW THIS LINE - LABORATORY USE ONLY*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | DROP BOX | SEALED BY: | ✓ | CASE OFFICER | | LABORATORY | |
| | REFRIGERATOR | | | SUBMITTING OFFICER | | OTHER: | |
| ✓ | HAND DELIVERED | | Comments: | | | | |

DATE/TIME RECEIVED: 5/01/14 1256 RECEIVED BY: [signature]

DATE/TIME RELEASED: 12/22/14 1234 BY: SK RELEASED TO: JMB

DATE/TIME RELEASED: BY: RELEASED TO:

*THIS EVIDENCE IS BEING SUBMITTED IN CONNECTION WITH A CRIMINAL INVESTIGATION AND HAS NOT BEEN EXAMINED BY ANOTHER LABORATORY.*

# HARRIS COUNTY INSTITUTE OF FORENSIC SCIENCES

1885 Old Spanish Trail
Houston, Texas 77054-2001
Phone: 713-796-6830 Fax: 713-796-6838

## LABORATORY REPORT

September 19, 2014

**LABORATORY NUMBER:** IFS14-05448 / 14-0798

**REQUESTING OFFICER:**

J. Maxwell
Harris County Constable, Pct. 4-W
7900 Will Clayton
Humble, TX 77338

**AGENCY NUMBER:** HC1445589

**MATERIAL SUBMITTED:**

**On 5/1/2014, L.M. BURKE delivered the following evidence:**

Submission # 001 - Plastic Bag
Submission # 002 - Plastic Bag

**INVENTORY OF ITEMS RECEIVED:**

**Item 1** – One (1) Sauer & Sohn brand 32 Auto semiautomatic pistol (with magazine) serial number 467350.

**Item L1** – One (1) Israel Military Industries brand 45 Auto semiautomatic pistol, (with magazine) serial number 34315875.

**EXAMINATION REQUESTED:**

IBIS Entry

**RESULTS OF EXAMINATION:**

The conclusions in this section are the opinions of the undersigned examiner. When a conclusion is verified, it is also the opinion of the verifier.

Item 1 was found to function properly when test fired under laboratory conditions when using the submitted magazine.

Item L1 was found to function properly when test fired under laboratory conditions when using the submitted magazine.

Test fires from Items 1 and L1 were imaged into the Integrated Ballistics Identification System (IBIS) / BrassTRAX database. A review of the correlation results did not indicate any high confidence candidates from this search. Any future identification made from this entry will be supplemented.

**End of Report**

09/19/2014

**Date Examination Completed**

Bradley E. Bruns

**CSI / Firearms Examiner**
**Bradley Bruns, BS**

*The Harris County Institute of Forensic Sciences is recognized as an accredited laboratory by the Texas Department of Public Safety and ASCLD/LAB-International.*

**HARRIS COUNTY INSTITUTE OF FORENSIC SCIENCES**
1885 Old Spanish Trail
Houston, Texas 77054-2001
Phone: 713-796-6830 Fax: 713-796-6838

# LABORATORY WORKSHEET REPORT

***Laboratory No*** IFS14-05448
***Case No*** HC1445589
***Examiner*** Bruns, BS

## *FIREARM WORKSHEET*

***Item No:*** 1 ***Make:*** SAUER & SOHN ***Model:*** 38(H)
***Caliber/Gauge:*** 32 AUTO ***Action Type:*** Blowback Semi-Auto ***Firearm Type:*** Pistol
***Serial Number:*** 467350 ***Country of Origin:*** Germany
***Importer Markings:*** None noted
***Add. Man. Markings:*** None noted

***Finish:*** Blue Steel ***Grip / Stock:*** Checked Wood Grip
***Condition:*** Finish worn

***Barrel Length:*** 3.5" ***Overall Length:*** N/A ***Rifling:*** 4R ***Land:*** 0.055" ***Groove:*** 0.171"
***Bore Residue:*** Clean ***Bore Condition:*** OK
***Extractor Position:*** 3:00 ***Ejector Position:*** 9:00 ***Choke:*** N/A
***Firing Pin Type:*** Hemispherical ***Firing Pin Cond.:*** Good

***Magazine Type:*** Single Stack ***Cylinder Type:*** N/A ***Cylinder Rotation:*** N/A
***Magazine Capacity:*** 8 ***Cylinder Capacity:*** N/A ***Cyl Cap Residue:*** N/A
***Accessories:*** None noted

***Trigger Pull:*** ***Single Action:*** 5.0 - 5.5 Lbs. ***Eject Direction:*** Right
***Double Action:*** N/A ***Safety Recall:*** No
***Manual Safety:*** Thumb Safety ***Passive Safety:*** Slide Disconnect
***Safety Cond / Operation:*** Appears to function as designed ***Breechface:*** Irregular
***Overall Operation:*** Test fired 3 times, gun functioned properly
***Number of Test Fires:*** 3 ***Ammo Used for Test Fires:*** F.C. 71 Gm. FMJ

***Packaging as Rec:*** ETSPB
***Packaging Marks:*** Bar Code
***Marked (direct):*** BSB #1 14-0798
***Re-Packaging:*** Inside same original packaging
***Other Markings:*** CAL 7.65

***Comparisons:*** None

***Result of Comparison:*** N/A
☑ IBISEntered

***Comments:*** No visable manufacturer marks. Used FA LAB trigger pull gauge.

Note: The measurement devices used by the examiner are those assigned to them unless otherwise noted.

*Admin Review* DL *Technical Review* DL *Examiner Review* BSB
*Date* 9/12/14 *Date* 9/12/14 *Date* 9/11/14



***Harris County Institute of Forensic Sciences***
***Firearms Identification Laboratory***

| | |
|---|---|
| ***Laboratory No.*** | IFS14-05448 |
| ***FA Lab No.*** | 14-0798 |
| ***Agency Case No.*** | 140045589 |
| ***Examiner:*** | Bruns |

## *GENERAL IMAGES/NOTES*

467350

Item 1 SN / 467350

***Administrative Review*** DL
***Date*** 9/10/14

***Technical Review*** DL
***Date*** 9/10/14

***Examiner Review*** BB
***Date*** 8-1-14

Form #: FAF.028
Date: 03/14

Rev. 0

Procedure #:FTP.0031
Approved by: Robert Baldwin

10/09/14 14-0798 PAGE 3



# Sauer 38H

From Wikipedia, the free encyclopedia

The **Sauer 38H** or often just **H** was a small semi-automatic pistol made in Nazi Germany from 1938 until just after the end of World War II by J. P. Sauer & Sohn, then based in Suhl, Germany. The "H" in the model number denotes "hammerless"—the pistol uses an internal hammer.

## Sauer 38H

Sauer 38H (second version)

| | |
|---|---|
| **Type** | Semi-automatic pistol |
| **Place of origin** | Nazi Germany |
| **Service history** | |
| **In service** | 1939–45 |
| **Used by** | Nazi Germany |
| **Wars** | World War II |
| **Production history** | |
| **Designer** | J. P. Sauer & Sohn |
| **Designed** | 1938 |
| **Manufacturer** | J. P. Sauer & Sohn |
| **Produced** | 1938–1945 |
| **Number built** | ~200,000 |
| **Specifications** | |
| **Weight** | 705 g (24.9 oz) |
| **Length** | 171 mm (6.7 in) |
| **Barrel length** | 83 mm (3.3 in) (SP 2340, SP 2009, SP 2022)<br>91 mm (3.6 in) (SPC 2009) |
| **Cartridge** | .32 ACP (7.65x17mm Browning SR) |
| **Action** | Straight blowback |
| **Feed system** | 8-round detachable box magazine |

## Development

Sauer developed the model 38H from their earlier semi-automatic handguns. It was necessary to compete with companies such as Mauser and Walther in the commercial market. However, with the outbreak of the war, most pistols went to various German police agencies. These pistols were stamped by those agencies and some can still be found with the holster and additional magazine with which they were distributed. Sauer 38H pistols presented to Nazi officials often featured custom engraving, ivory grips, and often gold inlay as well. For example, in September 2004, the Rock Island Auction Company sold a Sauer 38H, serial number 363573, that belonged to Sepp Dietrich for $43,125.00.

The Sauer 38H was produced in three basic models. Generally, the slide of the first model says "JP Sauer und Sohn" on the left. The second version says only "CAL 7.65", and the third version omits the safety and the cocking/decocking lever. Towards the end of the war, weapons produced were simplified for quicker, cheaper production. For the 38H, this meant simpler markings, rough finish, and the elimination of features like the slide-mounted safety. Much more rarely, some late production examples retained the safety but omitted the cocking/decocking lever. So-called "late-war" models were still fully functional though. Final examples, produced until April 1945 when the factory was overrun by the Allies, feature mismatched serial numbers and poor fit and finish.

The spirit of the Sauer 38H lives on in the SIG Sauer P232 and its predecessor the P230, which also feature a fixed barrel, decocking lever, and similar internal

design. As a testament to their fine design, many Sauer 38Hs are regularly used by owners to this day, albeit usually with replacement grips.

| Sights | Fixed iron sights, front—blade, rear—notch |
|---|---|

# Design details

The "H" in the model number indicates this pistol uses a shrouded hammer as opposed to striker style firing of earlier Sauer models. Other features included a traditional double action trigger, single-column magazine and an action spring surrounding a fixed barrel. A revolutionary feature was the first use of a lever that either cocked or decocked the hammer safely. The hammer on the Sauer 38H could be lowered for safe carry at any time. The cocking feature was necessary due to the shrouded hammer and the decocking mechanism was a safety feature. A hollow space on the trigger indicated if the concealed hammer was cocked; if completely exposed, the hammer was lowered. A small pin protruded at the rear of the slide as a loaded chamber indicator. Another advanced feature for its time was the magazine safety, a device that deactivates the trigger when the magazine is removed from the pistol. Almost all modern pistols manufactured by SIG Sauer today feature a decocking lever, including the highly successful SIG P226 family. Most modern SIG Sauer pistols feature controls in almost the same place as on the Sauer 38H, though as these modern designs have exposed hammers the cocking feature is omitted from the lever. The Heckler & Koch P9 also utilizes a cocking/decocking lever based on the Sauer 38H.

The grips of the pistol were constructed of Bakelite. Age often results in the cracking and crumbling of the grips on surviving examples. All original grips featured "SUS" lettering standing for "Sauer und Sohn" which could be found on the same side of the pistol as the magazine release though many reproduction grips have copied this logo. It is unusual for a present-day example to have original, undamaged grips.

The Sauer 38H was produced mainly for the .32 ACP cartridge, however some rare examples were also made in .380 ACP and .22 LR. The model 38H was used by German armed forces such as the Luftwaffe, as well as police forces in numbers nearly equal to the Walther PPK. The Sauer 38H was produced for military, police, and the commercial market.

# External links

Wikimedia Commons has media related to ***Sauer 38H***.

- An article (http://www.handgunsmag.com/featured_handguns/sauer38_082306/index.html) at Guns & Ammo Magazine
- Sauer 38H pistol (http://world.guns.ru/handguns/hg192-e.htm) at guns.ru
- Sauer's Weapons Homepage (http://www.sauer-waffen.de)
- J.P. Sauer und Sohn Homepage (http://www.sauersohn.de)

Retrieved from "http://en.wikipedia.org/w/index.php?title=Sauer_38H&oldid=607402481"

Categories: Semi-automatic pistols | World War II infantry weapons of Germany | Semi-automatic pistols of Germany

**HARRIS COUNTY INSTITUTE OF FORENSIC SCIENCES**
1885 Old Spanish Trail
Houston, Texas 77054-2001
Phone: 713-796-6830 Fax: 713-796-6838

# LABORATORY REPORT

**LABORATORY NUMBER:** IFS14-05448 / 14-0798

**REQUESTING OFFICER:**

J. Maxwell
Harris County Constable, Pct. 4-W
7900 Will Clayton
Humble, TX 77338

**AGENCY NUMBER:** HC1445589

**MATERIAL SUBMITTED:**

**On 5/1/2014, L.M. BURKE delivered the following evidence:**

Submission # 001 - Plastic Bag
Submission # 002 - Plastic Bag

**INVENTORY OF ITEMS RECEIVED:**

**Item 1** – One (1) Sauer & Sohn brand 32 Auto semiautomatic pistol (with magazine) serial number 467350.
**Item L1** – One (1) Israel Military Industries brand 45 Auto semiautomatic pistol, (with magazine) serial number 34315875.

**EXAMINATION REQUESTED:**

IBIS Entry

**RESULTS OF EXAMINATION:**

The conclusions in this section are the opinions of the undersigned examiner. When a conclusion is verified, it is also the opinion of the verifier.

Item 1 was found to function properly when test fired under laboratory conditions when using the submitted magazine.

Item L1 was found to function properly when test fired under laboratory conditions when using the submitted magazine.

Test fires from Items 1 and L1 were imaged into the Integrated Ballistics Identification System (IBIS) / BrassTRAX database. A review of the correlation results did not indicate any high confidence candidates from this search. Any future identification made from this entry will be supplemented.

**End of Report**

Bradley E. Bruns

**Date Examination Completed**

**CSI / Firearms Examiner**
**Bradley Bruns, BS**

*The Harris County Institute of Forensic Sciences is recognized as an accredited laboratory by the Texas Department of Public Safety and ASCLD/LAB-International.*



*Harris County Institute of Forensic Sciences*
*Firearms Identification Laboratory*

| | |
|---|---|
| *Laboratory No.* | IFS14-05448 |
| *FA Lab No.* | 14-0798 |
| *Agency Case No.* | 140045589 |
| *Examiner:* | Bruns |

## GENERAL IMAGES/NOTES

Item L1 SN / 34315875

*Administrative Review* DL
*Date* 9/10/14

*Technical Review* DL
*Date* 9/10/14

*Examiner Review* BB
*Date* 8-1-14

Form #: FAF.028
Date: 03/14

Rev. 0

Procedure #:FTP.0031
Approved by: Robert Baldwin

Case Nos. 1532840-A
1423420-A
1423421-A

| | | |
|---|---|---|
| EX PARTE | § | IN THE 174th DISTRICT COURT |
| STEVEN KURT BAUGHMAN | § | OF |
| Applicant | § | HARRIS COUNTY, TEXAS |

AFFIDAVIT

"My name is Steven Kurt Baughman, I am over the age of Twenty-One and am competent to make this affidavit in support of my Application For Issuance of Habeas Corpus, Texas Code of Criminal Procedure, Article 11.07, and I make this affidavit in accordance with the facts as personally known to me."

"On or about March 22,2014, Linda Pugh and I returned home and upon entering my bedroom I noticed someone had been in my room rummaging around and left things pulled out of drawers and my closet. Upon closer inspection I found several items missing, including my mother's Rolex, Datejust watch."

"I told my mother, Linda Pugh, that someone had been in my room and had stolen several things, including her Rolex, and told her to call the Harris County Sheriff's Office or Constables Office and report the burglary and report her watch had been stolen."

"The Sheriff's Office/ Constable's Office didn't show up, but told her to come down to the Clay Road sub-station to make a report." They were not interested in investigating the case.

"On April 1, 2014, we received a phone call from an acquaitence of mine, nmaed Manuel "Manny" Cruz, who told me that Machell Rene Spear and John Spear (Machell's son) had a Rolex for sale, and "Manny" described the Rolex to me as a Rolex, Datejust,with a blue dial and 10 diamond hour marks, and it was made of either stainless steel or white gold."

"I told Manny that I would be right over to talk to him, because Machell knew where I lived, I knew she was a thief from personally witnessing her shop-lifting, and that she had bragged about being a thief, and that my home had been burglarized and I was missing my mother's Rolex from my bedroom closet." I also told Manny that Machell's drug use was why I didn't talk to her anymore.

"I left my home at 14930 Mesita Drive, Houston, Texas 77083 and went to the plumbing warehouse that Manny lived in;at approximately 14209 or 14211 Lillija, Houston, Texas, arriving at Manny's around 2:00 a.m. on April 2,2014."

"Manny described the watch to me again and I called my mother, Linda Pugh, and put Manny on the phone with her, David Elden Pyron, Jr. and Penny (David's wife) and Manny told them that Machell Spear had told him that she had a Rolex, Datejust, watch for sale, and I had Manny describe the watch to Linda Pugh, David Pyron, and Penny Pyron; confirming the Rolex Machell had contacted Manny about was the 18Ky White-Gold, Rolex, Datejust, with the blue dial and 10 diamond hour marks that had been stolen from our house a few days prior."

"I knew Machell's father, Arvil Randall, lived only a block from Manuel Cruz's living quarters; Mr. Randall lived at 14210, Sunwick, Houston, Texas; and I had been told Mr. Randall was a Christian-man who attended the Lakewood Church in Houston. I told Manuel that I would like to visit with Mr. Randall, but would like to give him time to wake-up and start his day before I went to his house to talk to him about his daughter and the stolen Rolex. So, I stayed with Manuel for a few hours instead of driving back to my house in West Houston, approximately 40 miles away."

"At approximately 4:30-5:00 a.m. I left 14209/14211 Lillija (Manuel Cruz's sleeping quarter) and went to 14210 Sunwick; knocking on the kitchen door by the carport; and Mr. Randall answered the door. I introduced myself and told Mr. Randall that I had received a phone-call from a man who told me that his daughter Machell had a Rolex watch that she was trying to sell. I told Mr. Randall that I knew Machell and that she knew where I lived and that my home had been burglarized and that a Rolex watch had been stolen from my home. I told Mr. Randall I had reason to believe Machell and her son John had my missing watch and that I wanted it back. Mr. Randall, told me that Machell was not there and that she was helping her son John move to a new residence. I ask Mr. Randall if he knew anything about the watch and he said he had no knowledge of it. I ask him if he would call Machell and John for me and I was told that they changed phones every few days and that he could not keep up with all the different numbers. I ask Mr. Randall if he knew where John was moving to and he said he had no idea.Mr. Randall stated that he would tell Machell I had been by when he saw her."

"I had reason to believe Machell Rene Spear and possibly her son John were the ones who burglarized my home and were in possession of the stolen Rolex where: 1) Manuel called me telling me that Machell had a white-gold or stainless steel Rolex Datejust watch with a blue dial and 10 diamond hours marks that she and her son John were trying to sell; 2) I had witnessed Machell shoplifting and had seen her unloading her bra and pockets after we had left a jewelry supply that I did business at; 3) I had witnessed Machell and John Spear doing methamphetamine at John's house; 4) I knew Machell was unemployed; and 5) Machell had bragged about being a thief; lastly Machell had been to my house and knew where I lived."

"I quit going to the North-side of Houston to get Machell and take her places and quit associating with her because of 1) her being a thief, and 2) because of her drug use."

"After talking to Arvil Randall, I went to see if I could find John Spear's house. I didn't know the address, but I had taken Machell there once before when she said her son was having a bi-polar episode and she needed someone to take her over there. I found the house by looking for landmarks that I noticed the time I took Machell to John's house. When I arrived there was noone there and the house was empty, except for a few boxes that I could see through the kitchen door and window. After seeing that, and knowing this was the right house, but noone was there I got back on my motorcycle started it up and had started to ride off when I saw lights comming up the driveway. So, I shut my motorcycle off and waited for them to come up the dirveway and to the back of the house."

"A van pulled to the back of the house and John got out of the driver's side and Machell was getting out of the passanger's side of the van, as I was getting back off my motorcycle. As they approached me I told Machell and John that I needed to talk to them. Machell said she needed to use the restroom and went into the house. When she came back from the restroom I told them that I had gotten a call telling me that they had my mother's (Linda Pugh's) Rolex and I was there to get the watch back."

"John Spear pretended he didn't know what I was talking about and so did Machell."

"I told them, Look I got a call from a witness that said you two showed him a stainless-steel or white-gold Rolex Datejust watch with a bllue face and ten diamond hour marks and were trying to sell the watch to him. He told you that he would call around and see if anyone he knew would like to buy the Rolex."

"John Spear was standing about 3 feet from me, facing me, and Machell was just a little to his left."

"Machell said that she did have a Rolex for sale, but it was not on her at the moment. She told me that she had found the Rolex in a purse that someone had thrown into a ditch on Airline Drive and Aldine Mail Route."

"I looked at John and told him his mother just admitted to having the Rolex and her cock-and-bull story didn't wash; although I was sure that people are well know to discard unwanted Rolex watches by throwing the out their car windows in purses, in the ditch on Airline Drive and Aldine Mail Route where meth-whores like his mother applied their trade."

"At my having said that John blew-up, took a lunge toward me and took a swing at me; which I blocked with the Mag-lite/K-Lite flashlight I had in my left hand. As I did so Machell Spear attacked me, grabbed my right-hand and index-finger; which I had been pointing at her while accusing her of stealing the watch; and she bit-down on my right-index-finger. To get her teeth loose from my finger I hit her with my left hand on what would have been the right-side of her face/head and she let go of my finger and turned to run off; leaving me with John Spear."

"I acted in self-defense to an aggravated assault with a deadly weapon (human teeth on my index- finger)."

"I did not pull a gun on Machell or John Spear. I had a black flashlight in my left hand."

"John Spear remained in the driveway with me for several minutes after Machell had run-off and we had a talk. John told me he didn't know what his mother had done with the Rolex, but he said that if I would let him go find his mother that he would find-out what she had done with the watch and he would let me know where it was at. He said if she had sold it already he would let me know who she had sold it to and let me go deal with that person to get the watch back, but that he needed a little-while to find his mother, calm har down, and find out what she had done with the Rolex."

"I agreed to let him have a couple of hours to find out, but that I wanted my watch back."

"I guess I arrived at 25410 Pepper Ridge Lane around 6:00 a.m. on April 2, 2014, and I left at around 6:15 a.m.. And at around 7:30 a.m. I texted a message to Machell Spear's Facebook page that

said, 'Look, I don't want any trouble. All I want is my Mom's watch. If you have it give it back. If you don't, tell me who you sold it to and I'll deal with them. Have your son John call me.'"

"The message was sent pursuant to,and in furtherance of,my conversation with John Spear, after Machell Spear had run-off to hide from me. Russell Bliese; the Investigator with the Public Defender's Office of Harris County; pulled a copy of that message from my cell phone/Facebook page/Machell Spear's Facebook page."

"After sending the Facebook Message, I waited a while and didn't hear anything from John Spear; He and Machell had my cell-phone number and I had been awaiting his call. When I didn't hear anything from them I went back to 25410 Pepper Ridge Lane to talk to John; arriving at approximately 8:00 a.m. and was confronted by 4 Harris County Precinct 4 patrol cars and 5 Deputy Constables; 3 of whom stepped into the middle of the street and flagged me down. Immediately upon getting off my motocycle I was placed into handcuffs and frisked, and my motorcycle was searched. I was then placed into the back-seat of Deputy Constable Jackie Maxwell's patrol car."

"Deputy Maxwell was so excited I thought he was going to pee on himslef, and he began saying,'I caught a Bandido, I caught a Bandido.' I told Maxwell that I was not a Bandido #1 I couldn't afford their club dues. Maxwell then said,Where's the gun at ? I said what gun? He said,'Look, we're goiing to find it so you might as well tell me where it is at.' I told him I did't know what he was talking about. Maxwell said,'We didn't find one on you and it's not on your motorcycle so you must have thrown it away. Where did you go when you left here a-while-ago ? I said, ' I left here and went back the way I just came from, went past the school and took a left to go to the store on the corner. I got something to eat there, and then went ridding around for a while.' He said,'You threw the gun in the ditch or the woods over by the school. We have to find it before some kid finds it." He then told the other Deputies that I had admitted to having a gun and to throwing it away over by the school." He started up the patrol car and headed toward the school about 4 blocks away, parked the car and left me handcuffed in the back seat, while he walked up and down the ditch looking to see if I had thrown a gun in the ditch. When he didn't find on, after walking in the ditch for about 20 minutes he took me back to 25410 Pepper Ridge."

"Upon arriving back at 25410 Pepper Ridge Lane, I saw Deputy Constables had taken the ignition keys from my motorcycle and used them to unlock the locked saddle-bags; which they were tearing things out of and scattering them on the ground as Maxwell's patrol car pulled back-up on the scene."

"After finding two pistols in the right-side, passanger's saddle-bag, Maxwell shouted, 'We found the guns. I told you we would find them. Now, I'm calling the District Attorney's Office and you're going to jail.'"

"About an hour after I arrived back at 25410 Pepper Ridege Lane I was read my Miranda Warning; after I had been in custody for an hour, had been falsely imprisoned and removed from the site by Deputy Maxwell, against my will, had my cell-phone taken from me, been denied the ability to use it, and was denied the ability to get out of the patrol car."

"The forgoing statements were given to Terrance A. Gaiser, who stated,"It is not my job to prove you did'nt do what you are accused of. It's up to the State to prove the elements of their case and they are going to do just that. I suggest you take the twenty-years Judge Yates is willing to give you; which is 30 years less than the State is requesting you be given. If you don't want to do that, I suggest you represent yourself, because I am not going to bring your defense and you are not going to like what I do." This conversation took place on November 20, 2017; just 2 weeks before trial and was the first time I had seen Mr. Gaiser since he was assigned to the case on August 15, 2017.

"December 4,2017, was the first opportunity I had to inform the trial court of the conflict that existed between Terrence A. Gaiser and myself. I requested a Hearing to Replace or Supstitute Counsel, in open court and upon the record prior to the Suppression Hearing. When Judge Yates denied Terrance A Gaiser's Motion To Withdraw and my Oral Motion For a Hearing To Replace or Substitute Counsel, I submitted a Written Motion To Conduct A Hearing To Replace or Substitute Counsel, setting forth the fact there was a irreconsilable conflict between trial counsel and myself. Thus, my claim of constructive denial of counsel and ineffective assistance of counsel is not a case of a false claim made in hind-sight."

"At no time did I have a pistol/firearm in my hand during the course of this incident, nor were there shots fired. Had Terrence A. Gaiser had DNA tests, finger-prints, or examination to see if hair, blood, or tissue samples of Machell Rene Spear on the firearms found, there would have been no positive test results returned. Had Terrance A. Gaiser requested Gun Shot residue on the clothing I was wearing on April 2, 2014, no GSR would have been present. Had he acquired the forensic reposrts of the guns he would have found they were fully loaded, and the clips/magazines were fully loaded, and there was no spare ammunition found on my person or in the saddle-bags (no shots were fired, no shell casings were found, no spare ammunition was found and the guns were fully loaded with no room in the clips/magazines for 2-3 shots to have been fired from them)."

"There were no reports of shots fired on the 911 Recordings, and there were no "Shots Fired report" in the"Calls For Service Report," had trial counsel investigated the case to find out."

UNSWORN DECLARATION

"I Steven Kurt Baughman, TDCJ #2180609, being presently incarcerated in the Powledge Unit of the Texas Department of Criminal Justice, in Anderson County, Texas, declare under the penalty of perjury that the foregoing is true and correct."

Executed on the 19 th day of March 2021.

Steven Kurt Baughman #2180609
Powledge Unit, 15-15
1400 FM 3452
Palestine, TX 75803

Facebook User
things could of been better
i wish it could of gone bdetter,,
love ya keep in touch
Michael, I don't care who you
sold my moms watch to. I just
want it back
I'll go to who ever has it and
persuade to give it up
You have nerve. Ill give you
that . Have john call me

Later
Burned House
Markell's Dad's
Sugar Daddy / Trick
Cleaned House For
Gravel Driveway
White House
Fence & Gate
Plumbing Co.
Where Manny Lives
Metal Bldg
TRAILER HOUSE
SHELL STATION
1st intersection
PAWN STORE
AIRLINE DR
From W. Mount Houston
W. Mount Houston
Valero
W. Mount Houston Exit
I-45
W. Mount Houston

# APPENDIX:

# "M"

Harris County Pct. 4 Policy 16.04



| Category: **Policy and Ethics Manual** | Policy Title: **Arrests and Prisoners** | Date Issued: | Effective Date: |
|---|---|---|---|
| Revision #: **001** | Revision Date: **01/09/2017** | Policy #: **16** | Number of Pages: **5** |

**16.01 Necessary Force in Making Arrests**

Members, when making an arrest, shall not use more force than necessary in making the arrest or in dealing with a prisoner or any person and shall not subject such a person to more restraint than is reasonably necessary for his/her arrest and /or detention and for the safety and protection of the arresting officer.

**16.02 Treatment of Suspects and Prisoners**

Prisoners and/or suspects shall be treated in a fair and humane manner. They shall not be humiliated, ridiculed, taunted or embarrassed. Members shall not strike or use any other forms of physical force on a prisoner except that which is reasonably necessary to prevent an escape, in self defense, in the prevention of violence to another person or to prevent a self inflicted injury by the suspect and/or prisoner. Should a prisoner be held in custody of this Department in excess of four (4) hours and feeding is required, food may be obtained from a County facility and the prisoner fed in the approved holding facility. When at all possible, all food products are to be obtained from an approved jail facility unless otherwise approved by a staff member.

**16.03 Safeguarding Prisoners**

Members shall be responsible for the safe custody of a prisoner until the prisoner is released to the booking officer, he/she is released by a Court or he/she is transferred to the custody of another City, County, State or Federal representative having legal authority to accept custody. All officers having prisoners in custody for any offense will maintain custody of their prisoner from the time of arrest until the subject is remanded to the custody of the Harris County Jail and/or released by the Court. At no time will handcuffs be removed from any prisoner while in custody, unless for reason of medical or age infirmity or they are placed in the holding cell. In certain instances where the Deputy is required to be absent from their prisoner, they may transfer physical custody to another specified Deputy; however, responsibility for the security and/or welfare of the prisoner will remain with the arresting officer. The prisoner, if placed in the holding cell, must be electronically monitored at all times for health and security purposes by the arresting deputy or the arresting deputy may transfer monitoring responsibilities to another specified Department employee if the deputy is required to be absent from a monitoring area.

**16.04 Handcuffing Prisoners**

All prisoners will be handcuffed behind their back, except in cases where an injury or physical condition prohibits or a transport belt is utilized. Handcuffs shall be checked to insure that they are not too tight and must be double locked.

**16.05 Search of Prisoners for Weapons**

When making an arrest, officers shall handcuff the prisoner and search the prisoner carefully. He/she shall immediately take possession of all weapons and evidence. If for any reason a prisoner has not been searched

before being turned over to other officers, the arresting officer shall without fail notify the officer receiving the prisoner. If any prisoner is released to another officer for the purpose of transport, the transporting officer shall search the prisoner regardless of any previous search conducted prior to the transport.

**16.06 Handling Prisoners of the Opposite Sex**

Prisoner(s) and/or suspect(s) of the opposite sex of the arresting officer shall be handled only as is necessary to take them into custody and determine that weapons and/or illegal contraband are not being concealed. Deputies arresting a suspect of the opposite sex shall utilize the services of a deputy of the same sex as the suspect to assist in processing those prisoner(s) and/or suspect(s) whenever possible.

**16.07 Search of Female Prisoners**

Women and girls who are in the custody or under the care of the Department, should only be searched by male officers at a scene to determine possible possession of a weapon, unless an immediate search under one of the following conditions appears to be necessary and there is no police woman available at that time and place.

A. When there is a good reason to believe that the person has in her possession a poison, drug, gun or other like means of causing death or injury to herself or to another.
B. When there is a good reason to believe that stolen property is hidden about the prisoner and there is imminent danger that it may be thrown away or destroyed.

Searches in such emergencies should be made with all possible regard for decency under the direction of a ranking officer.

**16.08 Conveying Prisoners to Harris County Jail**

Deputies making an arrest shall convey the prisoner or cause him/her to be conveyed to the nearest appropriate Harris County Jail or other law enforcement agency holding a warrant/capias for arrest without delay. No other arrests shall be made, except in extreme emergencies, while carrying out this procedure.

**16.09 Transporting of Prisoners**

Whenever a prisoner (male, female or juvenile) is to be transported in a police vehicle, the officer in charge of the police unit shall notify the radio dispatcher by radio. The officer shall use the phrase; in transit, "from" (the location of departure), "to" (the location of the destination), the prisoner's arrest status as well as any special problems (belligerent, mentally incompetent, etc.) will be noted and give the beginning mileage. The dispatcher shall acknowledge and provide a time check. Upon arrival at the given destination the officer shall advise the dispatcher by radio using the phrase; arrived at (the location of destination) with prisoner (designate male, female or juvenile) and the ending mileage. The dispatcher shall again acknowledge and provide a time check. The most direct route from the location of departure to the destination will be taken.

When a deputy has need to move a prisoner from one location to another, he/she must do so by escorting the prisoner personally or by requesting another peace officer to do so on their behalf. While being escorted, the prisoner is to walk slightly in front of the deputy and off to one side, or directly in front of the deputy. A prisoner should never be allowed to walk behind a deputy at any time. The deputy should maintain visual contact of the prisoner at all times, or assign another deputy to do so on their behalf. The deputy will maintain physical contact with the prisoner while escorting by grasping ahold of the handcuffs or the prisoners arm to prevent escape.

No prisoner shall be transported for investigative purposes without the express consent of the division supervisor and a well defined operations plan which:

A. May include approval of the appropriate District Attorney's Office representative or prosecutor handling the case.
B. Shall include notification of the ranking supervisor and review of the case.
C. Shall include transportation by a minimum of two deputies in a standard patrol vehicle with appropriately installed prisoner restraint devices and cage.
D. Shall include a time line for use of a prisoner. The time line shall not exceed six (6) hours for a juvenile.
E. Shall include use of radio notification of locations, times, and mileage.
F. A copy of the final operations plan will be forwarded to the Administrative Office prior to implementation.

No arrangements or "deals" will be made with suspects without the express consent of the District Attorney's Office during the investigative process.

## 16.09.01 Transporting of Violent and/ or Combative Prisoners

### DEFINITIONS

A. **HOBBLE** - a restraining device used primarily to secure legs and ankles of a subject.
B. **"T.A.R.P." – Total Appendage Restraint Position** – The method employed by officers to restrain handcuffed suspects in a seated position using a Hobble of similar type equipment.

### POLICY

A. While transporting prisoners the officer should expect the unexpected. The unpredictable nature of the arrestee creates a serious threat to officers removing a suspect from the scene of an arrest. The fact that an arrestee submits peacefully will not guarantee that they will not resort to violence or trickery to escape custody. Any arrestee may be an escape risk or a potential threat. Officer safety and the safety or the prisoner being transported should be considered during any prisoner transport.
B. Officers transporting violent or combative prisoners when hobbled SHALL be accompanied by at least one other officer. These prisoners shall be watched at all times.
C. Good judgment must be exercised in controlling a prisoner who continues to resist, (e.g., yelling, spitting, banging his/her head on cage, or attempting to kick out vehicle windows).
D. Placing adhesive tape or any other type of restraint over or across a prisoner's mouth to prevent yelling or spitting is prohibited however this does not preclude the use of approved spit shields or surgical masks if necessary.
E. **Any use of force upon a prisoner shall be reasonable and comply with the departments Use of Force Guidelines.**
F. When a leg restraint is used in conjunction with handcuffs, the prisoner should be placed on his/her side on the back seat, with face pointing toward the screen. A second officer will ride in the front passenger seat and will be responsible for watching the prisoner at all times. Frequent checks should be made to insure adequate breathing and unrestricted circulation to the prisoner's hands and feet.
G. Officers SHALL NOT restrain or transport suspects in a "Hog-Tied" position. For the purpose of this policy, Hog-Tied refers to the method of restraining the hands and feet together behind the suspects back while the suspect is lying in a face down position. If it is necessary to control and restrain a suspect by the use of two or more officers transferring their body weight onto the suspect while the suspect is positioned face down on the ground, officers shall immediately, upon restraining the suspect, reposition the suspect into a sitting or face-up position. Officers shall continually monitor the suspect for signs of Cocaine Psychosis and/or Excited Delirium. **If in doubt, officers should arrange to have the suspect transported to the hospital prior to booking**.
H. When available, use of approved Hobbles or other restraining devices should only be used when absolutely necessary to control violent or unruly prisoners as follows:

    1. To secure the feet and legs of a suspect, to control running, kicking, and fighting.

A. May include approval of the appropriate District Attorney's Office representative or prosecutor handling the case.
B. Shall include notification of the ranking supervisor and review of the case.
C. Shall include transportation by a minimum of two deputies in a standard patrol vehicle with appropriately installed prisoner restraint devices and cage.
D. Shall include a time line for use of a prisoner. The time line shall not exceed six (6) hours for a juvenile.
E. Shall include use of radio notification of locations, times, and mileage.
F. A copy of the final operations plan will be forwarded to the Administrative Office prior to implementation.

No arrangements or "deals" will be made with suspects without the express consent of the District Attorney's Office during the investigative process.


## 16.09.01 Transporting of Violent and/ or Combative Prisoners

### DEFINITIONS

A. **HOBBLE** - a restraining device used primarily to secure legs and ankles of a subject.
B. **"T.A.R.P." – Total Appendage Restraint Position** – The method employed by officers to restrain handcuffed suspects in a seated position using a Hobble of similar type equipment.

### POLICY

A. While transporting prisoners the officer should expect the unexpected. The unpredictable nature of the arrestee creates a serious threat to officers removing a suspect from the scene of an arrest. The fact that an arrestee submits peacefully will not guarantee that they will not resort to violence or trickery to escape custody. Any arrestee may be an escape risk or a potential threat. Officer safety and the safety or the prisoner being transported should be considered during any prisoner transport.
B. Officers transporting violent or combative prisoners when hobbled SHALL be accompanied by at least one other officer. These prisoners shall be watched at all times.
C. Good judgment must be exercised in controlling a prisoner who continues to resist, (e.g., yelling, spitting, banging his/her head on cage, or attempting to kick out vehicle windows).
D. Placing adhesive tape or any other type of restraint over or across a prisoner's mouth to prevent yelling or spitting is prohibited however this does not preclude the use of approved spit shields or surgical masks if necessary.
E. **Any use of force upon a prisoner shall be reasonable and comply with the departments Use of Force Guidelines.**
F. When a leg restraint is used in conjunction with handcuffs, the prisoner should be placed on his/her side on the back seat, with face pointing toward the screen. A second officer will ride in the front passenger seat and will be responsible for watching the prisoner at all times. Frequent checks should be made to insure adequate breathing and unrestricted circulation to the prisoner's hands and feet.
G. Officers SHALL NOT restrain or transport suspects in a "Hog-Tied" position. For the purpose of this policy, Hog-Tied refers to the method of restraining the hands and feet together behind the suspects back while the suspect is lying in a face down position. If it is necessary to control and restrain a suspect by the use of two or more officers transferring their body weight onto the suspect while the suspect is positioned face down on the ground, officers shall immediately, upon restraining the suspect, reposition the suspect into a sitting or face-up position. Officers shall continually monitor the suspect for signs of Cocaine Psychosis and/or Excited Delirium. **If in doubt, officers should arrange to have the suspect transported to the hospital prior to booking**.
H. When available, use of approved Hobbles or other restraining devices should only be used when absolutely necessary to control violent or unruly prisoners as follows:

1. To secure the feet and legs of a suspect, to control running, kicking, and fighting.

2. To prevent a suspect from standing
3. To secure a violent and/or uncooperative suspect into a "Total Appendage Restraint Position". Note: A T.A.R.P. position is NOT a "Hog-Tie" position. (see attached hobble procedure)
4. To secure a suspects feet in the police unit to prevent self injury, injury to officers, and or damage o police units.
5. The prisoner has a known history of evading or escape.
6. As approved by a supervisory officer.

**16.10 Availability of Weapons**

Members shall not place weapons or objects adaptable for use as weapons and capable of inflicting serious bodily injury where it may be accessible to a prisoner and or suspect. Members shall not permit such weapons or objects to remain unattended unless they are secured in a locked area not accessible to a prisoner and/or suspect.

**16.11 Safeguarding Property**

Members shall be responsible for safely guarding such personal property as a prisoner may have in his possession or under his control at the time of arrest or detention.

**16.12 Traffic Arrests, Officer Not In Uniform**

Members not in uniform or not in marked cars shall not arrest traffic violators on sight except when the violation is especially flagrant such as, but not limited to, driving while intoxicated or felony failure to stop and render aid. This should be done only if a marked unit is not readily available. The reasonableness of the decision to stop/arrest when not in uniform/marked unit will be decided by the Division Supervisor. Any action to be taken will be completed by an on-duty unit (citation, arrest, etc.). In making the decision to take official action, the officer shall take into consideration whether he/she is in uniform in the unmarked car and other factors including risk to the public and the officer's safety.

**16.13 Arrests in Personal Quarrels**

Members shall not make arrests in their own quarrels or those of their families except under grave circumstances such as would justify them using measures of self defense.

**16.14 Sick or Injured Prisoner**

At time of arrest, the prisoner will be checked by EMS service. If hospital treatment is determined to be needed, the prisoner will be transported to a hospital by E.M.S.. When the prisoner is released he/she will be transported to Harris County Jail.

**16.15 Prisoner Claim of Injury**

If a prisoner claims injury and is transported to a hospital, it will be the responsibility of the arresting officer to see that proper charges are filed and a "To-Be Warrant" obtained. If the offense is a felony, the prisoner will remain in custody of the arresting officer until such time he/she is released from the hospital or remanded to the custody of the Sheriff's Department unless otherwise directed by a Divisional Supervisor.

**16.16 Adult Prisoners**

All adult prisoners shall be detained in the holdover cell area. All adult prisoner processing shall be conducted in a designated secure area or at the Sheriff's Department jail facilities. The ranking on-duty supervisor may make exceptions to this policy as necessary to handle unforeseen situations. Under no circumstances are adult prisoners to be processed within the same area as juvenile prisoners.

### 16.17 Juvenile Prisoners

All juvenile prisoners shall be detained and processed in an approved Juvenile Processing Center only. All State and County procedures are to be followed regarding the detention and processing of juvenile prisoners. **NO JUVENILE PRISONER SHALL BE DETAINED OR PROCESSED IN A NON-APPROVED FACILITY OR IN THE PRESENCE OF ADULT PRISONERS.**

# APPENDIX:

# "N"

## Affidavits of: Linda Heughan

~~Linda Heughan~~

STATE OF TEXAS | IN THE 174th
VS | JUDICIAL DISTRICT COURT
STEVEN KURT BAUGHMAN | of HARRIS COUNTY, TEXAS

**STATE OF TEXAS**

**VS**

**STEVEN KURT BAUGHMAN**

**IN THE 174th JUDICIAL DISTRICT COURT of HARRIS COUNTY, TEXAS**

**Case No. 1423420**

**Case No. 1423421**

**Case No. 1532840**

**December 5, 2017**

**Affidavit of Fact Witness**

I, Linda Hueghan, and over the age of 21 and of sound mind do say that on Tuesday, December 5, 2017,I was sting outside the 174th Judicial District Court alongside Linda Pugh when an officer came out of the court pushing a young man and shouting. You idiot, you can't talk that way in Court, you f___ing idiot. You could get jail time for this. You disrespected the Judge by your outburst. I was shocked that this scene took place in public.

Throughout the day the DA came out several times and talked to a female officer that we have this one so don't mess it up.

The DA told Ms. Speer what to say. For example, how to point her finger like a gun to her head and tell how frightened she was and that she feared for her life. I was interested that the case was being

FILED
Chris Daniel
District Clerk
DEC 08 2017
Time: ____
Harris County, Texas
By ____
Deputy

**discussed when I was told that the case was not to be discussed with anyone and the DA did not follow these instructions at all.**

**This Affidavit is true and correct to the best of my knowledge.**

**Respectfully,**

Linda Hughan

**Linda Hueghan**

**Date 12-5-2017**

Nancy Barber

**Notary**

**Date** 12/05/2017

**Expiration of Notary** 2/02/2018

# APPENDIX:

# "O"

Affidavit of Linda Pugh

**STATE OF TEXAS**

**VS**

**STEVEN KURT BAUGHMAN**

**IN THE 174th**

**JUDICIAL DISTRICT COURT**

**of HARRIS COUNTY, TEXAS**

**Case No. 1423420**

**Case No. 1423421**

**Case No. 1532840**

**December 5, 2017**

**AFFIDAVIT OF FACT WITNESS**

**I, Linda Pugh, am over the age of 21 and of sound mind and hereby do swear that on Tuesday, December 5, 2017 was sitting outside the 174th Judicial District Court in the hallway awaiting time for me to testify, after being instructed to not talk to anyone about the case. When the District Attorney Belt came out of the courtroom and said to the uniformed female officer sitting across from me, "we've got this one, we got the guns in." Then he pointed to the officer and said, "don't mess it up." He went back into the courtroom.**

**The same DA Belt came back in the hallway and turned away from where I was sitting and joined**

FILED
Chris Daniel
District Clerk

DEC 08 2017

Time: ____________
Harris County, Texas
By ____________
Deputy

Machell and John Speer. He sat down in front of Machell and John Speer and began telling them what to say when they went on the witness stand. He told them to be assertive and to say that Steven Kurt Baughman attacked them and showed 2 guns pointed at them amd to say they were afraid and feared for their lives. He used his right hand and pointed his right index finger with his thumb raised upward as if it were a gun and put it to Machell's forehead and for her to be sure to use that jester on the witness stand. He continued talking and then focused on John Speer and told him to stay focused. I could not hear some of the conversation.

Another man came out of the courtroom dressed in a checked jacket, brown in hue, and solid colored pants. H was portly built and wore glasses. This man went to the end of the hallway and spoke to DA Belt and told him that he couldn't be talking about the case there in the hallway and then he left and went towards the elevators. DA Belt, Machell and John Speer got up in a few minutes and walked in the same direction. After a while I went to the bathroom which is located in the same direction as the elevators and when I got to the turn in the hallway towards the bathroom and elevators I saw DA Belt, Machell and John Speer sanding in from of the entrance of the women's bathroom and as I opened the bathroom door I heard Machell say that she didn't want to be near me so as the door was closing DA Belt said, well, let's go over here.

After coming out of the bathroom and taking my original seat DA Belt came out of a room near my seat and went back into the courtroom.

After I sat there for quite some time The courtroom doors made a terrible noise and someone was screaming "you idiot, you f- ing idiot. Just then I could see a baliff with John Speer's arm captured in his hand and he was jerking him around and saying that he was going to wrap one of the walls around his head and asked if Speer didn't know that he could be taken directly to jail. He then said that Speer couldn't treat her like that and that she deserved respect. The baliff told Speer to get in there as he was opening a door close to where I was seated. The baliff came out and shut the door and went back into the 174th Courtroom.

This affidavit was made voluntarily and under the threat of perjury is true and correct to the best of my knowledge.

Respectfully,

Linda Pugh

Linda Pugh

12-5-2017

Date

Nancy Barber

Notary

Commission Expires 2/02/2018

Date 12/05/2017

# APPENDIX:

# "P"

Possible Arrests/Convictions of

John Spear

# INCIDENT/INVESTIGATION REPORT

Agency Name: *Harris County Sheriff's Office*

ORI: *TX1010000*

Case#: *1601-80969*

Date / Time Reported: *11/11/2016 11:39 Fri*

Last Known Secure: *11/11/2016 11:39 Fri*

At Found: *11/11/2016 00:00 Fri*

INCIDENT DATA

Location of Incident: *20131 North Fw, Harris Co TX*

Premise Type: *Other/unknown*

Zone/Tract:

| # | Crime Incident(s) | (Co ) | Weapon / Tools | Activity |
|---|---|---|---|---|
| #1 | Crime Incident(s) | (Co ) | Entry / Exit / Security | |
| #2 | Crime Incident: *Charge Not In Code T XXXX* | (Co ) | Entry / Exit / Security | |
| #3 | Crime Incident: *Warrant Arrest (desc 930W* | (Co ) | Entry / Exit / Security | |

MO

VICTIM

# of Victims: *1* Type: SOCIETY/PUBLIC Injury:

| | Victim/Business Name (Last, First, Middle) | Victim of Crime # | DOB / Age | Race | Sex | Relationship To Offender | Resident Status | Military Branch/Status |
|---|---|---|---|---|---|---|---|---|
| V1 | *State Of Texas* | | | | | | | |

Home Address | Home Phone

Employer Name/Address | Business Phone | Mobile Phone

| VYR | Make | Model | Style | Color | Lic/Lis | VIN |
|---|---|---|---|---|---|---|
| | | | | | | |

OTHERS INVOLVED

CODES: V- Victim (Denote V2, V3) O = Owner (if other than victim) R = Reporting Person (if other than victim)

Type: INDIVIDUAL Injury:

| Code | Name (Last, First, Middle) | Victim of Crime # | DOB / Age | Race | Sex | Relationship To Offender | Resident Status | Military Branch/Status |
|---|---|---|---|---|---|---|---|---|
| *IO* | *JUVENILE* | | */ /* | *W* | | | | |

Home Address | Home Phone

Employer Name/Address | Business Phone | Mobile Phone

Type: INDIVIDUAL Injury:

| Code | Name (Last, First, Middle) | Victim of Crime # | DOB / Age | Race | Sex | Relationship To Offender | Resident Status | Military Branch/Status |
|---|---|---|---|---|---|---|---|---|
| *PG* | *HAMPTON, KRISTAL BREEZE* | | [redacted] Age *33* | *W* | *F* | | | |

Home Address: *23326 Goodfellow Spring, TX 77373* | Home Phone

Employer Name/Address | Business Phone | Mobile Phone: *770-718-8840*

PROPERTY

1 = None 2 = Burned 3 = Counterfeit / Forged 4 = Damaged / Vandalized 5 = Recovered 6 = Seized 7 = Stolen 8 = Unknown ("OJ" = Recovered for Other Jurisdiction)

| VI # | Code | Status Frm/To | Value | OJ | QTY | Property Description | Make/Model | Serial Number |
|---|---|---|---|---|---|---|---|---|
| | *37* | *TOW* | *$0.00* | | *1* | *2006 WHI.* [redacted] | *CHEV Slv* | [redacted] |

Officer/ID#: *LOUCKS, J. J. (PAT. K9) (C40653)*

Invest ID#: *(0)* Supervisor: *(0)*

Status | Complainant Signature | Case Status: *Closed* *02/01/2017* | Case Disposition:

# REPORTING OFFICER NARRATIVE

| *Harris County Sheriff's Office* | | OCA *1601-80969* |
|---|---|---|
| Victim *Society* | Offense | Date / Time Reported *Fri 11/11/2016 11:39* |

LEGACY OFFICER NARRATIVE

LEGACY NARR_REL VALUE: 678902923043C40653

Scene Summary: 20131 North Fwy. is the location of the `Home Depot` that sits on the west side of the North Fwy. and faces north. More specific scene on the west end of the parking lot by the lumber department. The additional scene is a 2006, 4 Door, White, Chevy Silverado Bearing LP: which was parked backward facing west. Lighting was good due to daytime hours. Narrative: On 11/11/2016 I, Deputy Loucks, was dispatched as well as 84216 Cpl. Magee ( Trainee: J. Villa) as my backup unit to 20131 North Fwy regarding a White male suspect wearing a red shirt/ white pants later identified as John Spear (DOB: DL: ), and a white female Kristal Hampton (DOB: D: ) wearing a plad shirt a dark yoga pants possibly shop lifting with a young child. Upon arrival both suspects were meet at a 2006, 4 Door, White, Chevy Silverado Bearing LP: where all items were verified as being purchase. After providing dispatch with the vehicle plate all units was informed the vehicle to be reported stolen. Both Kristal/John were immediately detained. A search was conducted on John and upon completion of the search 3.0 Gm (9 pills) of Xanax, 2.0 Gm of meth, and a glass pipe containing meth residue was retrieved from Johns front pants pocket. John was placed into the back of my patrol vehicle until further investigation was completed regarding the stolen vehicle. John said the vehicle was his but his wife got mad at him for taking the vehicle so she reported it stolen. John said he doesnt have any property due to his wife not letting him pick up any of his belongings. John said he / his wife had been going through a divorce for the past few year, and she got mad at him for dating another women. John said they have been married for 5 years and he has papers to prove it at his house. Cpl. Magee contacted the reportee regarding stolen vehicle. (see supplement) Cpl. Magee advised me when speaking to the reportee she didnt seem to be a credible person. After searching John an inventory was conducted on the vehicle, and upon completion of the search 0.15 oz. of marijuana was retrieved from the ash tray. When John was asked about the marijuana he said it was his friends from last night, and he doesnt smoke marijuana. ADA Liu was contacted and accepted charges for Possession of Synthetic Narcotic. ADA Liu was notified about the stolen vehicle and due to the reportee not being credible charges were declined for the stolen vehicle, and the vehicle was removed from TCIC/ NCIC. 84506 Deputy Cummings arrived on scene to conduct a female search. Kristal was released in good health due to not having contraband on her person. John also showed to have 2 open warrants through Harris County Precinct 4 which were confirmed though dispatch. Deputy Cummings completed all tow forms (Tow Notification, Wrecker slip), and placed the vehicle into the tow menu. (See Supplement). After charges were accepted John was transported to 6831 Cypresswood Dr. (station 1) where charges were filed, AFIS was completed, booking form, and DIMS worksheet were also completed. All evidence was sealed, tagged, and dropped into the station 1 lock box. All forms were scanned and uploaded to the e-files tab of this report. CPS was contacted by Cpl. Magee due to the young child being present during the crime. End of Report.

# INCIDENT/INVESTIGATION REPORT

*Harris County Sheriff's Office*

Case # *1601-80969*

Status Codes 1 = None 2 = Burned 3 = Counterfeit / Forged 4 = Damaged / Vandalized 5 = Recovered 6 = Seized 7 = Stolen 8 = Unknown

| DRUGS | IBR | Status | Quantity | Type Measure | Suspected Type | Up to 3 types of activity |
|---|---|---|---|---|---|---|
| | *D* | *EVI* | *1.000* | *GM* | *crystal type substance* | |
| | *D* | *EVI* | *0.000* | *DU* | *plastic bag containing xanax* | |
| | *D* | *EVI* | *0.000* | *OZ* | *green leafy substance* | |
| | *D* | *EVI* | *1.000* | *GM* | *glass pipe containing meth residue* | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Assisting Officers

Suspect Hate / Bias Motivated:

INCIDENT/INVESTIGATION REPORT

Narr. (cont.) OCA: 1601-80969 *Harris County Sheriff's Office*

NARRATIVE

LEGACY PUBLIC SUMMARY

SUMMARY NUMBER: 0000

PCS



# Incident Report Suspect List

*Harris County Sheriff's Office*

OCA: *1601-80969*

| 1 | Name (Last, First, Middle) | Also Known As | Home Address |
|---|---|---|---|
| | *SPEAR, JOHN LEE* | | *25044 THRUSHWOOD SPRING, TX* |
| | Business Address | | |

| DOB | Age | Race | Sex | Eth | Hgt | Wgt | Hair | Eye | Skin | Driver's License / State. |
|---|---|---|---|---|---|---|---|---|---|---|
| [redacted] | *30* | *W* | *M* | *N* | *600* | *180* | *BR* | *BL* | *LG* | [redacted] |

Scars, Marks, Tattoos, or other distinguishing features

| *Reported Suspect Detail* | Suspect Age | Race | Sex | Eth | Height | Weight | SSN |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| Weapon, Type | Feature | Make | Model | Color | Caliber | Dir of Travel / Mode of Travel |
|---|---|---|---|---|---|---|
| | | | | | | |

| VehYr/Make/Model | Drs | Style | Color | Lic/St | VIN |
|---|---|---|---|---|---|
| | | | | | |

Notes

Physical Char

# Incident Report Related Vehicle List

*Harris County Sheriff's Office*

OCA: *1601-80969*

1

| VehYr/Make/Model | Style | Color | Lic/Lis | VIN |
|---|---|---|---|---|
| *2006 CHEV, Slv* | *PK* | *WHI* | [redacted] | [redacted] |

| IBR Status | Date | Location |
|---|---|---|
| *Tow* | *11/11/2016* | |

| Condition | Value | Offense Code | Jurisdiction | State # | NIC # |
|---|---|---|---|---|---|
| | *$0.00* | | *Locally* | | |

| Name (Last, First, Middle) | Also Known As | Home Address |
|---|---|---|
| ** No name ** | | |

| Business Address |
|---|
| |

| DOB | Age | Race | Sex | Hgt | Wgt | Scars, Marks, Tattoos, or other distinguishing features |
|---|---|---|---|---|---|---|
| | | | | | | |

Notes

**CASE SUPPLEMENTAL REPORT** Printed: 10/19/2018 11:42

*Harris County Sheriff's Office* OCA: ***160180969***

**Case Status:** *CLOSED* **Case Mng Status:** *NA* **Occurred:** *11/11/2016*

**Offense:**

**Investigator:** *CUMMINGS, C. (C40568)* **Date / Time:** *11/11/2016 00:00:00, Friday*

**Supervisor:** *CUMMINGS, C. (C40568)* **Supervisor Review Date / Time:** *02/01/2017 00:00:00, Wednesday*

**Contact:** **Reference:** *Follow Up Supplement*

Deputy Christine G. Cummings 84536 / C40568 Harris County Precinct 4 Constable's Office North Central Patrol - Station 5 Narrative: Supplement generated for documents scanned into e-files, originals placed in Cpl. Magee's box for review: Wrecker Slip; Tow Notification Letter. Following Supplement was added to case number HC16-176781 cases cross-referenced: Deputy Christine G. Cummings 84536 / C40568 Harris County Precinct 4 Constable's Office North Central Patrol - Station 5 Supplement: On November 11, 2016 at approximately 1300 hours, I, Deputy Christine G. Cummings, Unit 84536 was dispatched as back up on a suspicious person call at 20131 North Freeway at the Home Depot. The suspect on the call had driven to the location in a 2006, white, Chevrolet, Silverado, 4-door pick up truck bearing [redacted] License Plates [redacted] and a VIN of [redacted] When the LP was run, it came back with a HIT CHECK. The vehicle showed to be stolen out of HCCO 4 under case number HC16-176781 and NIC V448748100. The original suspicious person report was cleared by arrest for PCS and open warrants by Deputy J. Louckes, Unit 84540 under case number HC16-180969 (see original report HC16-180969). The vehicle was inventoried and entered into the tow menu. Cpl. Magee notified the reportee/owner of the vehicle via phone and advised her of the storage location address and phone number. The vehicle was removed from TCIC/NCIC by LaShonda in HCCO 4 Dispatch Division on 11/11/2016 at 1156 hours. Wrecker Slip and Tow Notification Letter were scanned into case numbers HC16-176781 and HC16-180969, originals were placed into Cpl. Magee's box for review. End of Supplement. End of Supplement.

Corporal P. Magee Unit 84219 (05018) Precinct 4 Constables Office North Central Patrol Supplement: On 11/11/2016 I, Corporal Magee responded to this call as a back up unit to Deputy Loucks. Due to the Methamphetamine being located on the defendants person, within the vehicle, and her son, Kaleb Hampton also being in the vehicle, I advised parent, Kristal Hampton that I would have to notify CPS about this case. Parent Hampton said multiple times she did not know the defendant had Meth in his possession, and told the defendant she was through with him due to him being in possession of the Meth and CPS getting involved in her and her childs life again. I contacted CPS and spoke with operator Shirley, 1032, who advised she would not be recommending an investigator to follow up on this case and provided reference # - 68230541. End of supplement.

Narrative: This supplement is for e-files purposes only. End of Supplement.

Investigator Signature Supervisor Signature

count

940 941 9729

P. 2

Cause Number 1423420/1423421/1532840

FILED
Chris Daniel
District Clerk
MAY - 2 2017
Time: 5-2-17
By Harris County, Texas
Deputy

| The State of Texas | § | In the 174th Criminal |
|---|---|---|
| | § | |
| vs. | § | District Court of |
| | § | |
| STEVEN BAUGHMAN | § | Harris County, Texas |

## State's Motion For a Keep Separate Order

Comes now the State of Texas by and through its Assistant District Attorney, Je'Rell Rogers, and would respectfully ask this Honorable Court to order the Harris County Sheriff's Department to keep inmate STEVEN BAUGHMAN apart from inmate JOHN SPEAR at all times while the two inmates are in the custody of the said department. The State of Texas would show this Honorable Court the following:

1. Inmate STEVEN BAUGHMAN (SPN 00505318) is currently incarcerated in the Harris County Jail charged with two offenses of Aggravated Assault with a Deadly Weapon and Felon in Possession of a Weapon in Cause Numbers 1423420 and 1423421 and 1532840 in this Court.
2. Inmate JOHN SPEAR (SPN 02053244) is currently incarcerated in the Harris County Jail and is charged with the offense of PCS 1-4 grams, currently pending in the 262nd District Court of Harris County, Texas in Cause #1530469.
3. Inmate JOHN SPEAR is the complainant in the pending cases against STEVEN BAUGHMAN out of this court, in Cause #1423420, which is currently set for trial on May 22, 2017.

The State respectfully requests that this Court order the Harris County Sheriff's Department to keep the inmates separate at all times, including in the jail, in processing, in any holdover cell, during all transports, during dressouts, or any where that inmates may be together. The State further requests that both defendants be housed in different jails.

Respectfully Submitted,

Je'Rell Rogers
Assistant District Attorney
Harris County, Texas

Unofficial Copy Office of Chris Daniel District Clerk

RECORDER'S MEMORANDUM
This instrument is of poor quality at the time of imaging.

**Order to Keep Inmates Separate**

Having heard the State's Motion to Keep Inmates Separate, the Court hereby makes the following rulings:

1. It is ordered that the inmates, Inmate STEVEN BAUGHMAN (SPN 00[illegible]318) and Inmate JOHN SPEAR (SPN 02053244) be kept separate and apart from at each other at all times while incarcerated in the Harris County Jail.
2. It is ordered that the inmates be housed separately in the jail.
3. It is ordered that the inmates be housed in different jail complexes.
4. It is ordered that the inmates be transported separately (not on the same chain or together).
5. It is ordered that the inmates be processed for court separately.
6. It is ordered that the inmates be housed in separate holding facilities.
7. It is ordered that the inmates be dressed for court in separate areas.
8. It is ordered that the Harris County Sheriff's Department enter this record into all databases so that the presence of this order is known to all person's handling or who may handle the two inmates.

Signed and entered on the 2 day of May, 2017.

Honorable Hazel B. Jones
174th District Court
Harris County, Texas

Unofficial Copy Office of Chris Daniel District Clerk

# Important:

**Data is entered poorly, processed incorrectly and generally not free from defect. Any data supplied by this system must be independently verified.**

**This is NOT a CONSUMER REPORT and does not constitute a "consumer report" under the Fair Credit Reporting Act ("FCRA"). This report may not be used to determine the eligibility for credit, insurance, employment or any other purpose regulated under the FCRA.**

**This system may be used only in accordance with your Subscriber Agreement, the Gramm-Leach-Bliley Act ("GLBA"), the Driver's Privacy Protection Act ("DPPA") and all other applicable laws. User agrees to having knowledge of all applicable laws pertaining to the usage of data. User accepts all responsibility civilly and criminally for any use of this system.**

**Violations of these restrictions or misuse of this system will cause your access to be terminated and will cause an immediate investigation.**

## Comprehensive Report

**Comprehensive Report**
**Date:** 04/25/2014

Reference ID: **NONE**

**Report Legend**

- Confirmed Address
- Deceased Person
- View Address Map
- View Social Network(s)

**Relatives**

S > - 1st Degree of Separation
S >> - 2nd Degree of Separation
S >>> - 3rd Degree of Separation

## Subject Information

(Best Information for Subject)

Name: JOHN LEE SPEAR IV (12/01/2004 to 12/16/2013)
Name: JOHN SPEAR (12/01/1999 to 01/01/2013)
Date of Birth [redacted] Born 27 years ago
SSN [redacted] issued in **TEXAS** in [redacted]

Other Individuals Observed with shared SSN:

**Other Names Associated with Subject**
JOHN L SPEARS (12/01/1999 to 12/01/2013)
JOHN QUAIL IV (09/15/2009)
JOHN LEE SPEARS IV

**Other DOBs Associated with Subject**
None found

**Other Possible Phones Associated with Subject** [ Show Carriers ]:

## Indicators

Bankruptcies: **No**
Liens: **No**
Judgments: **Yes**
Property: **Yes**
Corporate Affiliations: **No**
Criminal/Traffic: **Yes**

**Email Addresses Associated with Subject**
None found

## Table of Contents

Subject Information
Potential Subject Photos (None Found)
Comprehensive Report Summary
Possible Criminal Records (6 Found)
Possible Employers (None Found)
Address Summary (9 Found)
Address Details (9 Found)
Cities History (3 Found)
Counties History (1 Found)
Driver's License Information (1 Found)
Utilities (5 Found)
Professional Affiliations (None Found)
Professional Licenses (None Found)
Bankruptcy Records (None Found)
Liens (None Found)
Judgments (1 Found)
Current Property Deeds (1 Found)
Past Property Deeds (None Found)
Property Foreclosures (None Found)
Property Assessments (1 Found)
Evictions (None Found)
Current Vehicle Information (1 Found)
Past Vehicle Information (7 Found)
FL Accidents (None Found)
US Business Affiliations (None Found)
UCC Filings (None Found)
US Corporate Affiliations (None Found)
Aircraft Records (None Found)
Pilot Licenses (None Found)
Voter Registrations (None Found)
Hunting Permits (None Found)
Weapon Permits (None Found)
Possible Relatives - Summary (26 Found)
Likely Associates - Summary (9 Found)
Possible Associates - Summary (16 Found)
Neighbor Phones (23 Found)

## Potential Subject Photos (None Found)

## Comprehensive Report Summary

Bankruptcies:   **None found**
Possible Phones:   **19 found**
Driver's License:   **1 found**
Address(es) found:   **9 found**
Motor Vehicles Registered:   **8 found**
Criminal History Records:   **6 found**

## Possible Criminal Records (6 Found)

**WARNING - Due to the quality of Criminal data entry - Data displayed may not pertain to your Subject.**
**Separate Criminal Search is highly suggested as well as independent verification of anything displayed on this system.**

Name: **JOHN SPEARS**
DOB: [redacted] Born **27** Years Ago
Address: [redacted]
Gender: **M**
Ethnicity: **WHITE**
Source Name: **HARRIS COUNTY - INTRANET**
Source State: **TX**

**Match Indicators**

| | | |
|---|---|---|
| First Name: | ☐ | **Exact Match** |
| Middle Name: | ☐ | **Not Available On Record** |
| Last Name: | ☐ | **Close Match (SPEAR - SPEARS)** |
| Date Of Birth: | ☐ | **Exact Match** [redacted] |
| Age: | ☐ | **Not Provided** |
| Address: | ☐ | **Exact Match** [redacted] |
| Height: | ☐ | **Not Provided** |
| Ethnicity: | ☐ | **Not Provided** |

Arrest Details - **TX**

| | |
|---|---|
| Charge Class: **356210**<br>Source State: **TX**<br>Case Number: **002684262** | |

**WARNING - Due to the quality of Criminal data entry - Data displayed may not pertain to your Subject.**
**Separate Criminal Search is highly suggested as well as independent verification of anything displayed on this system.**

Name: **JOHN L SPEAR**
DOB: [redacted], Born **27** Years Ago
Gender: **M**
Hair: **BROWN**
Height: **74**
Weight: **160**
Ethnicity: **WHITE**
Eyes: **BLUE**
Is Sex Offender: **No**
Source Name: **TX DEPT OF PUBLIC SAFETY**
Source State: **TX**

**Match Indicators**

| | | |
|---|---|---|
| First Name: | ☐ | **Exact Match** |
| Middle Name: | ☐ | **Middle Initial Matched** [redacted] |
| Last Name: | ☐ | **Exact Match** |
| Date Of Birth: | ☐ | **Exact Match** [redacted] |
| Age: | ☐ | **Not Provided** |
| Address: | ☐ | **Crime County Matched (HARRIS, TX)** |
| Height: | ☐ | **Not Provided** |
| Ethnicity: | ☐ | **Not Provided** |

Crime Details - **06/17/2006 - HARRIS, TX**

| | |
|---|---|
| OffenseDescription1: **POSS MARIJ < 2OZ**<br>Case Number: **6650530**<br>Arresting Agency: **HARRIS CO SO HOUSTON**<br>Crime County: **HARRIS**<br>Crime Type: **MISDEMEANOR**<br>OffenseCode: **481.121(B)(1)**<br>NCICCode: **1609** | Case Type: **MISDEMEANOR - CLASS B**<br>Court: **COUNTY CRIMINAL COURT AT LAW NO 6 HOUSTON**<br>Fines: **100**<br>Plea: **UNREPORTED/OR UN**<br>Probation: **6M**<br>Disposition: **COMMUNITY SUPERVISION EXPIRED**<br>Offense Date: **06/17/2006**<br>Disposition Date: **02/16/2007** |

**WARNING - Due to the quality of Criminal data entry - Data displayed may not pertain to your Subject.**
**Separate Criminal Search is highly suggested as well as independent verification of anything displayed on this system.**

Name: **JOHN SPEARS**
DOB: [redacted] Born 27 Years Ago
Gender: **M**
Birth Address: **TX**
Ethnicity: **WHITE**
Is Sex Offender: **No**
Source Name: **TX DEPT OF CORRECTIONS (PROBATION)**
Source State: **TX**

**Match Indicators**

First Name: ☐ **Exact Match**
Middle Name: ☐ **Not Available On Record**
Last Name: ☐ **Close Match ([redacted] - SPEARS)**
Date Of Birth: ☐ **Exact Match [redacted]**
Age: ☐ **Not Provided**
Address: ☐ **Crime County Matched (HARRIS, TX)**
Height: ☐ **Not Provided**
Ethnicity: ☐ **Not Provided**

Crime Details - **06/17/2006 - HARRIS, TX**

| | |
|---|---|
| OffenseDescription1: **POSS MARIJ <2OZ**<br>Case Number: **07098545SPEJOH19860719**<br>Crime County: **HARRIS**<br>OffenseCode: **35620008**<br>NCICCode: **35620008** | Case Type: **MIDEMEANOR**<br>Court: **HARRIS**<br>Sentence: **00Y 06M 00D**<br>Disposition: **SENTENCED**<br>Offense Date: **06/17/2006** |

**WARNING - Due to the quality of Criminal data entry - Data displayed may not pertain to your Subject.**
**Separate Criminal Search is highly suggested as well as independent verification of anything displayed on this system.**

Name: **JOHN L SPEAR**
AKAs: **JOHN SPEARS**
DOB: [redacted]5, Born 27 Years Ago
Gender: **M**
Hair: **BROWN**
Height: **74**
Weight: **160**
Ethnicity: **WHITE**
Eyes: **BLUE**
Is Sex Offender: **No**
Source Name: **TEXAS DEPT OF PUBLIC SAFETY**
Source State: **TX**

**Match Indicators**

First Name: ☐ **Exact Match**
Middle Name: ☐ **Middle Initial Matched (LEE - JOHN L SPEAR)**
Last Name: ☐ **Exact Match**
Date Of Birth: ☐ **Exact Match [redacted]**
Age: ☐ **Not Provided**
Address: ☐ **Crime State Matched (TX)**
Height: ☐ **Not Provided**
Ethnicity: ☐ **Not Provided**

Crime Details - **02/16/2007 - TX**

| | |
|---|---|
| OffenseDescription1: **POSS MARIJ < 2OZ**<br>Case Number: **138412201010**<br>DegreeOfOffense: **MB** | Plea: **U**<br>Disposition: **400**<br>Arrest Date: **06/17/2006** |

| | Disposition Date: **02/16/2007** |
|---|---|

**WARNING - Due to the quality of Criminal data entry - Data displayed may not pertain to your Subject.**
**Separate Criminal Search is highly suggested as well as independent verification of anything displayed on this system.**

Name: **JOHN LEE SPEAR III**
DOB: **Unavailable**
Address: [redacted]
**77060-5806 (HARRIS COUNTY)**
Is Sex Offender: **No**
Source Name: **HARRIS COUNTY**
Source State: **TX**

**Match Indicators**

| | | |
|---|---|---|
| First Name: | ☐ | **Exact Match** |
| Middle Name: | ☐ | **Exact Match** |
| Last Name: | ☐ | **Exact Match** |
| Date Of Birth: | ☐ | **Not Available On Record** |
| Age: | ☐ | **Not Provided** |
| Address: | ☐ | **Exact Match** [redacted] |
| Height: | ☐ | **Not Provided** |
| Ethnicity: | ☐ | **Not Provided** |

Crime Details - **HARRIS, TX**

| | |
|---|---|
| OffenseDescription1: **DRIVING WHILE LICENSE SUSP.**<br>Case Number: **084458401010**<br>Crime County: **HARRIS**<br>Crime Type: **TRAFFIC**<br>DegreeOfOffense: **M** | |

Crime Details - **HARRIS, TX**

| | |
|---|---|
| OffenseDescription1: **POSS CS PG 3 <28 GRAMS**<br>Case Number: **121333601010**<br>Crime County: **HARRIS**<br>DegreeOfOffense: **M** | |

Crime Details - **HARRIS, TX**

| | |
|---|---|
| OffenseDescription1: **POSS DANGEROUS DRUG**<br>Case Number: **127288801010**<br>Crime County: **HARRIS**<br>DegreeOfOffense: **M** | |

Crime Details - **HARRIS, TX**

| | |
|---|---|
| OffenseDescription1: **RESIST ARR-SEARCH**<br>Case Number: **074245701010**<br>Crime County: **HARRIS**<br>DegreeOfOffense: **M** | |

Crime Details - **HARRIS, TX**

| | |
|---|---|
| | |

| OffenseDescription1: **UNAUTH USE OF VEHICLE**<br>Case Number: **069023401010**<br>Crime County: **HARRIS**<br>DegreeOfOffense: **F** | |
|---|---|

Crime Details - **HARRIS, TX**

| OffenseDescription1: **AGG ASSAULT W/DEADLY WEAPON**<br>Case Number: **069261001010**<br>Crime County: **HARRIS**<br>DegreeOfOffense: **F** | |
|---|---|

Crime Details - **HARRIS, TX**

| OffenseDescription1: **ASSAULT-BODILY INJURY**<br>Case Number: **942231301010**<br>Crime County: **HARRIS**<br>DegreeOfOffense: **M** | |
|---|---|

**WARNING - Due to the quality of Criminal data entry - Data displayed may not pertain to your Subject.**
**Separate Criminal Search is highly suggested as well as independent verification of anything displayed on this system.**

Name: **JOHN LEE SPEAR**
DOB: **Unavailable**
Is Sex Offender: **No**
Source Name: **HARRIS COUNTY**
Source State: **TX**

**Match Indicators**

| | | |
|---|---|---|
| First Name: | ☐ | **Exact Match** |
| Middle Name: | ☐ | **Exact Match** |
| Last Name: | ☐ | **Exact Match** |
| Date Of Birth: | ☐ | **Not Available On Record** |
| Age: | ☐ | **Not Provided** |
| Address: **(HARRIS, TX)** | ☐ | **Crime County Matched** |
| Height: | ☐ | **Not Provided** |
| Ethnicity: | ☐ | **Not Provided** |

Crime Details - **07/24/1990 - HARRIS, TX**

| OffenseDescription1: **DWI 1ST**<br>Case Number: **891870701010**<br>Crime County: **HARRIS**<br>Crime Type: **TRAFFIC**<br>DegreeOfOffense: **M** | Disposition Date: **07/24/1990** |
|---|---|

## Possible Employers (None Found)

## Address Summary 



APPENDIX:

Q

Harris County Constable's Office

Incident Report

# Harris County Public Release

## Incident Report

 6/6/2017

 4:26 pm

**Details of Incident 14-48355** — **Theft - Grand and Larceny**

Reported on 4/7/2014 at 1:40:00PM — Reporting Officer: UNG, P.

Location: 14930 MESITA DR, HOUSTON, 77083 — Zone: SMBW60

Occurred between 2/16/2014 at 12:01:00AM and 2/22/2014 at 11:59:00PM — S4

### Involved Persons

| How Involved | Name | Sex | Race |
|---|---|---|---|
| Complainant or victim | PUGH,LINDA PLUMMER | Female | White |

### Involved Property

| How Involved | Brand | Model | Serial No | Description | Value |
|---|---|---|---|---|---|
| Stolen | | | | stainless steel Rolex watch blue fac | 3,200.00 |

### Involved Vehicles

None Reported

### Synopsis

Complainant advised that she has learned that a former girlfriend of her adult son had stolen a Rolex watch from her home and had tried to sell the watch to an acquaintance of Complainant's son.

### End of Report

# Harris County Public Release

## Incident Report

**11/11/2016** **12:00 pm**

**Details of Incident 14-45589** **Aggravated Assault-Family**

Reported on 4/2/2014 at 6:37:00AM
Reporting Officer: MAXWELL, JACKIE

Location: 25410 PEPPER RIDGE LN, SPRING, 77373
Zone: 4LWE10

Occurred between 4/2/2014 at 6:33:00AM and 4/2/2014 at 6:53:00AM
C4

**Involved Persons**

| How Involved | Name | Sex | Race |
|---|---|---|---|
| Complainant or victim | SPEAR,MACHELL | Female | White |
| Complainant or victim | SPEAR,JOHN IV | Male | White |

**Involved Property** **None Reported**

**Involved Vehicles** **None Reported**

**Synopsis**

The Defendant was arrested for threatening two Complainants with a handgun and striking one Complainant with the handgun.

**End of Report**



SHERIFF ED GONZALEZ

1200 Baker Street, Houston, Texas 77002 ★ (346) 286-1600 ★ www.sheriff.hctx.net

Date: April 7, 2021

Requestor: Linda Snyder

Records Requested: Your Texas Public Information Act request received for records pertaining to: Incident Report No. 140048355

The Harris County Sheriff's Office received the above-mentioned request on April 6, 2021. Attached is a copy of responsive documents that we have found pertaining to your request. Additionally, the information you requested may contain:

- social security number – (552.147(b)); or
- email address – (552.137); or
- date of birth – (552.101 in conjunction with common-law privacy); or
- motor vehicle operator's or driver's license or permit issued by an agency of this state or another state or country; motor vehicle title or registration issued by an agency of this state or another state or country; personal identification document issued by an agency of this state or another state or country or a local agency authorized to issue an identification document – (552.130); or
- credit card, debit card, charge card, or access device number – (552.136); or
- fingerprint - 552.101 in conjunction with section (560.003); or
- public employee's personal information held by governmental body in its capacity as employer – (552.024)
- certain addresses, telephone numbers, social security numbers, and personal family information – (552.117)
- public employee's personal information held by governmental body in non-employment capacity – (552.1175)

This information is confidential under the above-outlined sections of the Texas Government Code. Our office is prohibited by law from releasing this personal information to you, and therefore we have removed this information from the enclosed information we are providing to you.

Normally, we must request a ruling from the Texas Attorney General before we can withhold any of the information you requested. However, a governmental body need not request an attorney general decision if it is redacting information pursuant to any of the above-outlined sections of the Public Information Act that gives a governmental body explicit permission to redact information without requesting an attorney general decision.

You have the right to appeal our decision to withhold this information from you. Instructions for appeal are at the end of this letter. If you do not want to appeal, you do not need to do anything else. Please note that we are only withholding the specific categories of information that are confidential under the above-outlined sections. We will process the rest of your request for information in accordance with the terms of the Public Information Act.

Please be advised that we are closing our file on this matter.

Sincerely,
*Office of Legal Services* / TPIA Section

How to appeal the withholding of information under Gov't Code section 552.024

If you wish to appeal the withholding of information discussed on the previous page, you must send the following to the attorney general:

1) a signed, written statement indicating your wish to appeal the withholding of information;

2) the name of the governmental body that withheld information from you;

3) the date you made your original request for information; and

4) a copy of your original request for information, or if you are unable to provide a copy, a description of your original request for information.

You may also submit written comments stating why you think the information should be released to you, but you are not required to do so.

Send your appeal by mail to the attorney general at:

        Open Records Division
        P.O. Box 12548
        Austin, Texas 78711-2548

Within forty-five business days after receiving all of the above-listed items necessary to file your appeal, the attorney general will issue a written ruling on the matter.  You will receive a copy of this ruling in the mail.

Linda Snyder
10318 Brighten Lane
Houston, TX 77031

RECEIVED
APR 06 2021
LEGAL SERVICES

March 29,2021

Public Records/Information
Harris County Sherrif's Office
1200 Baker Street
Houston, TX 77002

Public Records/Information Officer:

This request is made under the Texas Public Information Act, Chapter 552, Texas Government Code, which gurantees the public's access to information in the custody of governmental agencies. I respectfully request copies of the following information:

Incident Report and Investigation Report #14-48355, burglary/theft; Date: April 2014
Complaintant/Victim: Linda Pugh
14930 Mesita Dr.
Houston, TX 77083

Would like to get a copy of the Incident Report and Investigation Report to find out what,if any investigation was done in the case.

Disclosure of this information is in the public interest;because providing a copy of the information primarily benefits the general public. I therefore request a waiver of all fees and charges pursuant to section 552.267 of the act.

Thank you for your cooperation and assistance. I look forward to hearing from you promptly, as provided and specified in the law.

Sincerely,

Linda Snyder
Linda Snyder

# INCIDENT/INVESTIGATION REPORT

| | |
|---|---|
| Agency Name: *Harris County* | Case#: *1400-48355* |
| ORI: *TX1010000* | Date / Time Reported: *04/07/2014  13:40  Mon* |
| | Last Known Secure: *02/16/2014  00:01  Sun* |

**INCIDENT DATA**

| | | |
|---|---|---|
| Location of Incident: *14930 MESITA DR, Houston TX* | Gang Relat: UNK / Premise Type: *Other/unknown* | Beat/ConstDist: — / At Found: *02/22/2014  23:59  Sat* |

**#1** Crime Incident(s): *Theft <$50 Pub Serv/govt Contractor PC 31.03(F)*  (Com)

| Weapon / Tools | | | Activity |
|---|---|---|---|
| Entry | Exit | Security | |

**#2** Crime Incident  ( )

| Weapon / Tools | | | Activity |
|---|---|---|---|
| Entry | Exit | Security | |

**#3** Crime Incident  ( )

| Weapon / Tools | | | Activity |
|---|---|---|---|
| Entry | Exit | Security | |

**MO**: *Property Attacked/Jewelry/precious metals, Premise Type/Residential house and driveway, Theft Type/Other, Property Attacked/Jewelry/precious metals, Premise Type/Residential house and driveway, Theft Type/Other*

**VICTIM**

# of Victims: *1*  Type: INDIVIDUAL  Injury:

| V1 | Victim/Business Name (Last, First, Middle): *PUGH, LINDA PLUMMER* | Victim of Crime # | DOB: ■■■■  Age *72* | Race *W* | Sex *F* | Relationship To Offender | Resident Status | Military Branch/Status |
|---|---|---|---|---|---|---|---|---|

| Home Address: *14930 MESITA , Houston, TX 77083-* | | Home Phone: *281-575-8342* |
|---|---|---|

| Employer Name/Address | Business Phone | Mobile Phone: *281-575-8342* |
|---|---|---|

| VYR | Make | Model | Style | Color | Lic/Lis | VIN |
|---|---|---|---|---|---|---|

**OTHERS INVOLVED**

CODES:  V- Victim (Denote V2, V3)   O = Owner (if other than victim)   R = Reporting Person (if other than victim)

Type:  Injury:

| Code | Name (Last, First, Middle) | Victim of Crime # | DOB / Age | Race | Sex | Relationship To Offender | Resident Status | Military Branch/Status |
|---|---|---|---|---|---|---|---|---|

| Home Address | | | Home Phone |
|---|---|---|---|

| Employer Name/Address | Business Phone | Mobile Phone |
|---|---|---|

Type:  Injury:

| Code | Name (Last, First, Middle) | Victim of Crime # | DOB / Age | Race | Sex | Relationship To Offender | Resident Status | Military Branch/Status |
|---|---|---|---|---|---|---|---|---|

| Home Address | | | Home Phone |
|---|---|---|---|

| Employer Name/Address | Business Phone | Mobile Phone |
|---|---|---|

**PROPERTY**

1 = None   2 = Burned   3 = Counterfeit / Forged   4 = Damaged / Vandalized   5 = Recovered   6 = Seized   7 = Stolen   8 = Unknown
("OJ") = Recovered for Other Jurisdiction)

| VI # | Code | Status Frm/To | Value | OJ | QTY | Property Description | Make/Model | Serial Number |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

| Officer/ID# | *UNG, P.  (D4PT, DAYS) (S16947)* | | |
|---|---|---|---|
| Invest ID# | *FRAZEE, D. J. (DAYS) (S13117)* | Supervisor | *(0)* |

| Status | Complainant Signature | Case Status: *Closed*   *05/14/2014* | Case Disposition: | Page 1 |
|---|---|---|---|---|

# INCIDENT/INVESTIGATION REPORT

*Harris County*

Case # *1400-48355*

Status Codes 1 = None 2 = Burned 3 = Counterfeit / Forged 4 = Damaged / Vandalized 5 = Recovered 6 = Seized 7 = Stolen 8 = Unknown

| DRUGS | IBR | Status | Quantity | Type Measure | Suspected Type | Up to 3 types of activity |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Assisting Officers

Suspect Hate / Bias Motivated:

## INCIDENT/INVESTIGATION REPORT

Narr. (cont.) OCA: 1400-48355 *Harris County Sheriff's Office*

NARRATIVE

LEGACY PUBLIC SUMMARY

========================

SUMMARY NUMBER: 0000

Complainant advised that she has learned that a former girlfriend of her adult son had stolen a Rolex watch from her home and had tried to sell the watch to an acquaintance of Complainants son.

# REPORTING OFFICER NARRATIVE

| *Harris County* | | OCA *1400-48355* |
|---|---|---|
| Victim *PUGH, LINDA PLUMMER* | Offense *THEFT <$50 PUB SERV/GOVT CONTRACTOR* | Date / Time Reported *Mon 04/07/2014 13:40* |

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

LEGACY OFFICER NARRATIVE

LEGACY NARR_REL VALUE: 596982145055S16947

Scene Summary I found the scene to be the residence at 14930 Mesita Drive in southwest Harris County, Texas. The residence is a two-story beige brick and yellow and dark-brown wood house located on the north side of an east-west roadway. The houses front door is centrally located on its south side. The missing watch had reportedly been stolen from the second floor north central bedroom. Interior lighting was good from artificial means. Weather during the incident time window is unknown. Investigative Narrative On Monday, 04/07/14, at 1339 hours, I, Deputy P. Ung, Unit 44D72, wa dispatched to the residence at 14930 Mesita Drive in reference to a theft. After arrival at 1341 hours I met the Complainant (Ms. Linda Plummer Pugh) who advised approximately a Sunday, 02/16/14, at an unknown time and a Saturday, 02/22/14, at an unknown time her Rolex watch had been stolen from her home at 14930 Mesita Drive by the Suspect (known as a Machell Spears, white female, about 55 years of age) when Ms. Spears had stayed for two days as a guest of Ms. Pughs adult son, Steven Baughman, during the incident time window. The Complainant, Ms. Linda P. Pugh, advised the following. Ms. Pugh lives in her home at 14930 Mesita Drive with her son, Steven Baughman, and with other friends whom she trusts and who help around the house. During the middle of February of 2014 Ms. Pugh had been away from her home on a hospital stay, and her son, Steven Baughman, had invited a former girlfriend of his named Machell Spears to stay at the house for two days, but Ms. Pugh is currently not certain which two days. Ms. Pugh learned from Steven that Machell Spears had stayed at the house during the week from 02/16/14 to 02/22/14. Ms. Pugh owns a Rolex brand stainless steel watch with a blue face and 11 diamonds around each number of the watch face except the `12` position. There might be a crown symbol by the `12` position on the watch face. The Rolex watch had been given to her long ago as a gift, and she learned the watch is valued at about $3,200.00. On this date, 04/07/14, Ms. Pugh learned her Rolex watch was missing from her upstairs north central bedroom, and her son, Steven Baughman, had explained that he discovered that Machell Spears had stolen the watch after her former stay at the house. Mr. Baughman explained to Ms. Pugh that he had learned Ms. Spears had tried to sell a Rolex watch to an acquaintance of Mr. Baughmans known only as Manny (last name currently unknown). Manny had reportedly called Mr. Baughman on Tuesday, 04/01/14, or Wednesday, 04/02/14, and asked if he or his mother might be missing a Rolex watch. Mr. Baughman had asked Manny to describe the Rolex watch Ms. Spears was trying to sell to Manny, and Mannys description matched that of Ms. Pughs missing watch. Manny had further advised Mr. Baughman that when Manny told Ms. Spears he did not have the money to buy the Rolex from Ms. Spears, she even asked Manny if he knew of a `fence` to whom she could sell the Rolex, but Manny reportedly stated he did not know of a `fence`. On the following day after 04/01/14 or the day after 04/02/14 Mr. Baughman had gone to Ms. Spearss fathers home to try to get the watch back from her, but her father advised Ms. Spears was at her son Johns home on Pepperidge Drive. Mr. Baughman reportedly had then gone to Johns home on that day by 1830 hours, and John reportedly told Mr. Baughman to come back in one hour, and John would get back the watch from Ms. Spears. On that unknown day, at about 1930 hours when Mr. Baughman returned in an hour to Johns home, John and Ms. Spears both accused Mr. Baughman of having assaulted them, and Mr. Baughman was then arrested by Houston Police Department. The watch was never recovered. Ms. Pugh would have reported the theft of the watch sooner, but she had just learned of it on 04/07/14. Ms. Pugh does not know Machell Spears home address but has heard her son John lives on a street called Pepperidge. Ms. Pugh does not have any information on Manny. Ms. Pugh learned from Steven Baughman that Ms. Spears had broken up with him shortly after her stay at Ms. Pughs home, but she had pursued Mr. Baughman aggressively on Facebook before they had a relationship, so Ms. Pugh believes Ms. Spears was playing a con game. Ms. Pugh is willing to press charges when possible. Ms. Pugh was given a case number. Note: When I was entering Machell Spearss name in the persons page, the ARS system displayed a possible `Machell R. Spears` with an address of 14210 Sunwick and a `Machell Ranec Spears` with an address of 14214 Burtcliff. A possible drivers license number shown for both names was [redacted] Case open, referred to detectives.

# Incident Report Suspect List

*Harris County*

OCA: *1400-48355*

**1**

| Name (Last, First, Middle) | Also Known As | Home Address |
|---|---|---|
| *SPEARS, MACHELL* | | |

Business Address

| DOB | Age | Race | Sex | Eth | Hgt | Wgt | Hair | Eye | Skin | Driver's License / State. |
|---|---|---|---|---|---|---|---|---|---|---|
| / / | | *W* | *F* | *N* | *507* | *170* | *BLN* | *XXX* | *LGT* | |

Scars, Marks, Tattoos, or other distinguishing features

| *Reported Suspect Detail* Suspect Age | Race | Sex | Eth | Height | Weight | SSN |
|---|---|---|---|---|---|---|
| | | | | | | |

| Weapon, Type | Feature | Make | Model | Color | Caliber | Dir of Travel<br>Mode of Travel |
|---|---|---|---|---|---|---|
| | | | | | | |

| VehYr/Make/Model | Drs | Style | Color | Lic/St | VIN |
|---|---|---|---|---|---|
| | | | | | |

Notes

Physical Char

EXHIBIT

R

HCSO MEDICAL RECORDS

# Patient Profile - By Location

Harris County Sheriffs Clinic Pharmacy
1200 Baker St. Houston, Texas 77002

***Name:*** BAUGHMAN, STEVEN KURT ***Location:*** FAC JA092 J1 01B ***Service:*** GP
***Physician:*** ***SPN:*** 00505318 ***Booking#:*** 003719594
***Birth Date:*** 2/5/1960 ***Age:*** 55 yrs ***Sex:*** M ***Height:*** 0 ***Weight:*** 0 ***CrCl:*** N/A ***BSA:*** 0
***Allergies:*** Nifedipine
***Diagnosis:*** Hypertension(H T N ), Human Bite, Diabetes Mellitus( I D D M ), Substance Abuse, Dry Skin, Kidney Disease(C K D), Peripheral Neuropathy
***Comments:***

| Ord # | Item Description / Physician / Directions | Dose / Vol / Route | Sched | Status | Start / Stop |
|---|---|---|---|---|---|
| | ***** ORDERS STOPPING BEFORE 00:00 ***** | | | | |
| | ***** **Current Orders** ***** | | | | |
| 51 | ASPIRIN EC 81mg<br>Anand, Jatin(M)<br>Take 1 tablet(s) by mouth daily fro 30 days | 81MG<br>by mouth | Daily | A | 09:00 12/23/2014<br>09:00 12/22/2015 |
| 57 | Lisinopril Tab 10 MG<br>Holihan, Julie(M)<br>Take 1 tablet(s) by mouth two times daily for 30 days | 10MG<br>by mouth | bid | A | 22:35 1/13/2015<br>21:00 1/13/2016 |
| 58 | Simvastatin Tab 20 MG<br>Holihan, Julie(M)<br>Take 1 tablet(s) by mouth daily for 30 days | 20MG<br>by mouth | daily | A | 09:00 1/14/2015<br>09:00 1/13/2016 |
| 61 | Thera-Derm Lotion<br>Howard, Beverly(M)<br>Apply 1 dose externally TO DIABETIC FEET daily for 30 days. | 1Appl<br>External | daily | A | 16:44 1/22/2015<br>09:00 1/22/2016 |
| 62 | Emollient Top Oint 106GM(Dermaphor)<br>Howard, Beverly(M)<br>Apply 1 dose externally TO AFFECTED AREAS ON DIABETIC FEET two times daily for 30 days. | 1Appl<br>External | bid | A | 16:45 1/22/2015<br>09:00 1/22/2016 |
| 68 | Metoprolol Tartrate Tab 25 MG<br>Guice, Marcus(M)<br>Take 1 tablet(s) by mouth two times daily FOR 30 DAYS. | 25MG<br>by mouth | BID | A | 11:28 6/15/2015<br>09:00 6/14/2016 |
| 77 | Insulin Regular (Human) Inj 100UNIT/ML 10ml<br>ONI, PETER(M)<br>Inject 10 Unit(s) Subcutaneous two times a day for 365 days | 10UNIT<br>Subcutaneou | insbid | A | 04:59 10/25/2015<br>03:00 10/24/2016 |

Profiles Continues

# Patient Profile - By Location

Harris County Sheriffs Clinic Pharmacy
1200 Baker St. Houston, Texas 77002

*Name:* BAUGHMAN, STEVEN KURT *Location:* FAC JA092 J1 01B *Service:* GP
*Physician:* *SPN:* 00505318 *Booking#:* 003719594
*Birth Date:* 2/5/1960 *Age:* 55 yrs *Sex:* M *Height:* 0 *Weight:* 0 *CrCl:* N/A *BSA:* 0
*Allergies:* Nifedipine
*Diagnosis:* Hypertension(H T N ), Human Bite, Diabetes Mellitus( I D D M ), Substance Abuse, Dry Skin, Kidney Disease(C K D), Peripheral Neuropathy
*Comments:*

| Ord # | Item Description / Physician / Directions | Dose / Vol / Route | Sched | Status | Start / Stop |
|---|---|---|---|---|---|
| 78 | Insulin Glargine(Lantus) Inj 100UNIT/ML 10ML<br>Howard, Beverly(M)<br>Inject 30 Unit(s) Subcutaneous two times a day for 365 days. | 30UNIT<br>Subcutaneou | insbid | A | 14:51 10/30/2015<br>03:00 10/29/2016 |
| 80 | Baclofen Tab 10 MG<br>Kloeber, Sandra(M)<br>Take 2 tablet(s) by mouth two times daily for 30 days. | 20MG<br>by mouth | bid | A | 21:00 11/13/2015<br>09:00 12/13/2015 |

**End of Report**

**Harris County Sheriff's Office**
Health Services
1200 Baker St.
Houston, TX 77002

*June 4, 2015*
Page 1
Chart Document

**BAUGHMAN, STEVEN KURT** JA092J1 01B JA09
**SPN#:**00505318 **Sex:** Male **DOB:** 02/05/1960

**04/04/2014 - Infirmary: Infirmary Nurse Note**
**Provider: Natalie Christoff, RN**
**Location of Care: JA09 Infirmary**

54 year old white male admitted to inf for opiate detox, DM, HTN, Asthma and wound to right foot. Pt AA&Ox4 with steady gait. NA. Pt states he takes Noco 6 pills daily. Pt denies any other drugs or ETOH use. Pt with h/o DM/HTN since 2009 and Asthma x 2 years. Pt states last astma attack x 2 weeks ago. Pt with extensive medical hx. Pt with wound to right foot 2nd digit and right hand 2nd digit wound dry with no drainage. Wounds open to air. Pt denies any N/V/D, chest pain, SOB, palpitaions or headache. Pt denies any SI/HI or AH/VH. Pt denies any c/o at this time. Pt able to make needs known. Continue to monitor. FS 213mg/dl. Peek flow 400.VS 134/85 P65 R18 T98.0 SpO2 99% RA Ht76" Wt 376.

**Electronically Signed by Natalie Christoff, RN on 04/04/2014 at 6:15 AM**

---

**Harris County Sheriff's Office**
Health Services
1200 Baker St.
Houston, TX 77002

**BAUGHMAN, STEVEN KURT** JA092J1 01B JA09
**SPN#:**00505318 **Sex:** Male **DOB:** 02/05/1960

**04/04/2014 - HCSO Tx Wound Care: HCSO Tx Wound Care**
**Provider: Likesha Harris, LVN**
**Location of Care: JA09 Infirmary**

## Wound #1

**Location and treatment of wound #1** r finger **Wound type:** Other **Sutures/Staples:** No **Site Assessment:** Clean, Dry, Intact **Edema:** Absent **Wound Drain:** No **Wound Drainage present:** No **Degree of pain:** 5 **Tissue color:** closed **Wound Care performed:** Yes **Irrigation solution:** NS **Applied/Packed:** Dry Dressing **Covered with:** 4x4 **Secured with:** Tape **Technique Used:** Non Sterile

## Wound #2

**Location and treatment of wound #2** r toe **Wound type:** Other **Sutures/Staples:** No **Site Assessment:** Clean, Dry, Intact **Edema:** Absent **Wound Drain:** No **Wound Drainage present:** No **Degree of pain:** 5 **Tissue color:** closed **Wound Care performed:** Yes **Irrigation solution:** NS **Applied/Packed:** Dry Dressing **Covered with:** 4x4 **Secured with:** Tape **Technique Used:** Non Sterile

**Electronically Signed by Likesha Harris, LVN on 04/04/2014 at 7:04 PM**

---

**BAUGHMAN, STEVEN KURT** JA092J1 01B JA09
**SPN#:**00505318 **Sex:** Male **DOB:** 02/05/1960

**4. Were you in special classes? : Pt states -** No
**5. Have you ever been called SLOW? : Pt states -** No

**Additional Comments:** Pt denies any psych hx at this time. Pt denies any SI/HI or AH/VH

**HCSO Health Assessment**

**1. Appearance:-** Obese **Ambulatory:** Yes **Wheelchair:** No
**2. Skin:-Icterus:** No **Turgor:** recoil **Sores or Lesions:** No **Rash:** No **Other/Comments:** Yes
**Comments:** Pt with right foot wound to 2nd digit and right hand wound to 2nd digit. Both area dry with no drainage.
**3. Eyes:-Conjunctivae:**moist **Red:** No **Pale:** No **Sclerae:** normal **Glasses / Contacts:** No **Cataract / Glaucoma:** No **Icteric:** No **PERRLA:** Yes
**4. Ears:-Discharges:** No **Infected:** No **Lesions:** No
**5. Nose:-Deviated:** No **Mucosal edema:** No
**6. Throat:-Inflamed:** No **Enlarged tonsils:** No
**7. Neck:-Stiff:** No **Enlarged Thyroid:** No **Palpable Lymph Nodes:** No **Mass:** No
**8. Mouth:-Caries:** No **Gingivae:** No **Teeth present:** Yes **Lesions:** No
**9. Heart:-Murmur:** No **Irregular:** No
**10. Lungs:-Rales:** No **Wheezes:** No
**11. Abdomen:-Tender:** No **Hard:** No **Bowel Sounds:** Yes **Enlarged Liver:** No **Mass:** No **Lesions:** No **Ostomy:** No
**Ostomy Type:** No

**12. Genitourinary:-Burning:** No **Difficulty starting:** No **Urgency:** No **Incontinence:** No **Itching:** No **Nocturia:** No **Urostomy:** No **Flank Pain:** No **Foley:** No
**13. Extremities:-Varicosities:** No **Extremities Full ROM:** Yes
**14. Breast:-**

## Physical Findings:

Does patient have any of the following...
**1. Bruises:** No
**2. Lacerations:** No
**3. Incisions:** No
**4. Decubitus:** No
**5. Dryness:** No
**6. Scars:** Yes
Abd
**7. Abnormal color:** No
**8. Tattoos with any signs/symptoms of redness, swelling, drainage or odor:** No
**9. Body piercing with any signs/symptoms of redness, swelling, drainage or odor:** No
**10. Skin tear / Duoderm / Op-site:** No
**13. Other:** No
**Additional Comments:** 54 year old white male admitted to inf for opiate detox, DM, HTN, Asthma and wound to right foot. Pt AA&Ox4 with steady gait. NA. Pt states he takes Noco 6 pills daily. Pt denies any other drugs or ETOH use. Pt with h/o DM/HTN since 2009 and Asthma x 2 years. Pt states last astma

**BAUGHMAN, STEVEN KURT** JA092J1 01B JA09
**SPN#:**00505318 **Sex:** Male **DOB:** 02/05/1960

attack x 2 weeks ago. Pt with extensive medical hx. Pt with wound to right foot 2nd digit and right hand 2nd digit wound dry with no drainage. Wounds open to air. Pt denies any N/V/D, chest pain, SOB, palpitaions or headache. Pt denies any SI/HI or AH/VH. Pt denies any c/o at this time. Pt able to make needs known. Continue to monitor. FS 213mg/dl. Peek flow 400.VS 134/85 P65 R18 T98.0 SpO2 99% RA Ht76" Wt 376.
TST placed
I have reviewed and completed the patient health assessment.
**Signed By:** Natalie Christoff, RN (April 4, 2014 6:15 AM)

**Electronically Signed by Eugene Fontenot, MD on 04/07/2014 at 7:26 AM**

**Harris County Sheriff's Office**
Health Services
1200 Baker St.
Houston, TX 77002

*June 4, 2015*
Page 1
Chart Document

**BAUGHMAN, STEVEN KURT** JA092J1 01B JA09
**SPN#:**00505318 **Sex:** Male **DOB:** 02/05/1960

**04/04/2014 - Infirmary: Infirmary Flowsheet**
**Provider: Natalie Christoff, RN**
**Location of Care: JA09 Infirmary**

## HCSO Infirmary Vital Signs

Height (in): **76** Weight (lbs): **376** Temperature (deg F): **98.0** Pulse Rate (BPM): **65**
Respiration Rate (RPM): **18** BP (mmHg) **134 / 85**
O2 Saturation (%): **100**
BG Finger Stick (mg/dl): **213 BMI**
45.93

## Infirmary Flowsheet

Diagnosis: **Opiate detox, HTN, Asthma, DM**
**Current Allergies**
PROCARDIA (Critical)

Allergies reviewed by nurse

## Assessment

**I have reviewed the patient's vital signs.**New Admit? **Yes** admit date **04/04/2014**
Diet: **Heart Healthy**
Level of consciousness: **A A & O x 3**
Psychological **Calm, Cooperative**
Hallucination: **N/A**
Motor Ability: **Steady Gait, Unsteady Gait**
Tremors: **N/A**
Skin: **Warm, Dry**
Skin Comment: **pt with wound to right foot 2nd toe and right hand 2nd digit**
Hygiene: **Self care** Elimination: **Voids**
date of last bowel movement **04/04/2014**
IV Access Device: **No IV Access**

**Electronically Signed by Natalie Christoff, RN on 04/04/2014 at 6:08 AM**

**Harris County Sheriff's Office**
Health Services
1200 Baker St.
Houston, TX 77002

*June 4, 2015*
Page 2
Chart Document

**BAUGHMAN, STEVEN KURT**  JA092J1 01B JA09
**SPN#:**00505318  **Sex:** Male  **DOB:** 02/05/1960

APPENDIX:

"S"

14th Court of Appeals Memorandum

**Affirmed, Affirmed as Modified, Affirmed as Modified and Memorandum Opinion filed June 25, 2019.**

**In the**

# Fourteenth Court of Appeals

---

**NO. 14-18-00009-CR**
**NO. 14-18-00010-CR**
**NO. 14-18-00021-CR**

---

**STEVEN KURT BAUGHMAN, Appellant**

**v.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 174th District Court**
**Harris County, Texas**
**Trial Court Cause Nos. 1532840, 1423420 & 1423421**

---

## MEMORANDUM OPINION

Appellant Steven Kurt Baughman was convicted by a jury of three offenses: two aggravated assaults with a deadly weapon and one unlawful possession of a firearm ("felon in possession").[1] In each of the three cases, appellant pleaded "true"

---

[1] The offenses are: (1) aggravated assault with a deadly weapon of complainant Machell Spear (Tex. Penal Code Ann. § 22.02(a)(2); second-degree felony) (trial court case number

to two enhancement paragraphs—a November 28, 1989 conviction for attempted capital murder and a March 29, 1985 conviction for possession of a controlled substance. The trial court assessed punishment at 30 years of confinement for each offense, to run concurrently. Baughman brings five issues on appeal: (1) whether the trial court erred by denying his motion to suppress; (2) whether the trial court erred by not including an article 38.23(a) instruction in the jury charge; whether trial counsel rendered ineffective assistance of counsel by failing to (3) present any mitigating evidence at the punishment phase and (4) properly preserve an objection to the reading of appellant's prior felony offense for attempted capital murder in his felon-in-possession indictment in front of the jury; and (5) whether the trial court erred in assessing certain duplicative court costs. We partially sustain appellant's fifth issue, affirm the judgment in trial court case number 1532840, and affirm as modified the judgments in trial court case numbers 1423420 and 1423421.

## I. Background

On the morning of April 2, 2014, complainant Machell Spear was helping her son, complainant John Spear, move into a new house. As they drove up to Machell's house in their moving van, appellant, Machell's ex-boyfriend, was standing in the driveway. Appellant began yelling at Machell that he wanted his watch back. Appellant put a gun against Machell's face and told her he was going to kill her and would kill John, too, if he "got in the way." John told his mother to run and not look back. Appellant hit Machell on the back of her head with the gun. Machell suffered a bleeding cut and a knot on her head. Machell and John both ran away. A neighbor

---

1532840 and appellate case number 14-18-00009-CR); (2) aggravated assault with a deadly weapon of complainant John Spear (Tex. Penal Code Ann. § 22.02(a)(2); second-degree felony) (trial court case number 1423420 and appellate case number 14-18-00010-CR); and (3) unlawful possession of a firearm by a person convicted of a felony at any location other than the premises where he lives (Tex. Penal Code Ann. § 46.04(a)(2); third-degree felony) (trial court case number 1423421 and appellate case number 14-18-00021-CR).

called 9-1-1.

After police responded to the scene, appellant returned to Machell's house on his motorcycle. He admitted to police that "he had a gun, but it wasn't there" and said "he threw it off of the motorcycle into a ditch" nearby. Appellant went with police to the ditch, but no gun was located. Police returned with appellant to the house. After the district attorney's office accepted charges against appellant, police placed him under arrest. Police conducted an inventory search of appellant's motorcycle before it was towed.

In the motorcycle's unlocked saddlebags, police recovered two weapons: a "32-caliber semiautomatic pistol" and a "1911 semiautomatic handgun, with three clips, three magazines." Police photographed the firearms and ammunition, took them back to the police station, and then sent them to the Harris County Institute of Forensic Sciences. Police also ran a criminal history on appellant; he had a prior felony conviction for attempted capital murder of a police officer.

Appellant was indicted for aggravated assault with a deadly weapon as to both Machell and John, and for being a felon in possession of a firearm. Appellant's felon-in-possession indictment alleged that he had been convicted of the felony offense of attempted capital murder on November 28, 1989. Appellant filed a motion to suppress "all evidence resulting from the illegal detention and/or subsequent illegal arrest of" appellant. Appellant argued that the evidence seized was the result of a search of his person and his motorcycle "without a valid search warrant and without probable cause or reasonable suspicion of criminal activity in violation of [appellant]'s constitutional rights under the Fourth and Fourteenth Amendments to the *United States Constitution*, Art. 1, Section 9, of the *Texas Constitution*, and *Tex. Code Crim. Pro.* Art. 38.23." Appellant further argued that the "search was not the result of actual consent" and "the scope of said search exceeded that authorized by

law."

The trial court conducted a suppression hearing. Retired Deputy Maxwell and Deputy Benningfield with the Harris County Precinct 4 Constable's Office testified. The trial court denied appellant's motion.

The trial court approved appellant's stipulation of evidence that he was previously convicted of the felony of attempted capital murder of a police officer. The record reflects appellant and the State agreed "that the offense which [appellant] was convicted [sic] will not be mentioned during voir dire, but that the stipulation will be admitted into evidence once the trial starts." Not the indictment W/name and nature

At appellant's arraignment, which took place after the jury was sworn, the State initially omitted reading the portion of appellant's felon-in-possession indictment, which stated that his prior felony conviction was for attempted capital murder. After a bench conference, the trial court asked [ordered] the State to "reread the indictment for the felon in possession of a firearm word for word as it's written, if you don't mind." Trial counsel then expressly stated: "Note our objection, your honor." The trial court replied: "It's noted." The State proceeded to reread the felon-in-possession indictment in its entirety. Appellant pleaded "not guilty" to all three offenses.

During trial, while Maxwell was testifying, the State offered redacted versions [was not redacted] of (1) appellant's stipulation of evidence that he was previously convicted of the felony of attempted capital murder of a police officer and (2) the judgment for that offense.[2] Trial counsel stated that he had "no objection," and the documents were admitted and published to the jury. With name and nature of previous offense

The jury convicted appellant of all three offenses. Appellant's punishment

---

[2] These documents were redacted to remove appellant's sentence of 50 years.

phase proceeded before the trial court. In all three cases, appellant entered a plea of "true" to the enhancement paragraphs related to prior felony convictions for attempted capital murder and possession of a controlled substance. The State presented testimony from a former patrol officer with the University of Houston Downtown Police Department. He described how in February 1988, when police were attempting to arrest appellant on a felony warrant for retaliation, appellant gained control of the officer's weapon and shot him, along with another university officer and a custodian. Trial counsel presented no evidence. The State recommended a sentence of 50 years. Trial counsel requested the lower range of 25 to 30 years. The trial court assessed appellant's punishment at 30 years.

Appellant moved for a new trial, arguing ineffective assistance of counsel. After holding a hearing, the trial court denied the motion. Appellant timely appealed.

## II. ANALYSIS

### A. Motion to suppress

In appellant's first issue, he contends the trial court erred by denying his motion to suppress because the State failed to establish that the police conducted a lawful inventory search. According to appellant, the inventory search was unlawful because the officer who wrote down the items in the inventory list did not testify and the list did not itemize the weapons that officers testified were discovered in the saddlebags of appellant's motorcycle.

The State responds that appellant did not preserve this issue because appellant did not raise these "improper inventory" arguments in his motion or at the hearing. Instead, appellant primarily argued in his motion that evidence was illegally seized without a warrant and without probable cause or reasonable suspicion of criminal activity. At the suppression hearing, appellant focused his argument on the timing

of when he was placed under arrest. According to the State, because appellant's issue on appeal does not comport with his grounds for suppression in the trial court, the issue is waived. We agree with the State.

An inventory search is permissible if conducted pursuant to a lawful impoundment. *See South Dakota v. Opperman*, 428 U.S. 364, 375–76 (1976); *Delgado v. State*, 718 S.W.2d 718, 721 (Tex. Crim. App. 1986). An inventory search qualifies as an exception to the warrant requirement when the State demonstrates that an inventory policy exists and officers followed the policy. *Evers v. State*, 576 S.W.2d 46, 50 & n.5 (Tex. Crim. App. 1978); *Jackson v. State*, 468 S.W.3d 189, 195 (Tex. App.—Houston [14th Dist.] 2015, no pet.). A written inventory is not required for the State to satisfy its burden. *Stephen v. State*, 677 S.W.2d 42, 44 (Tex. Crim. App. 1984) (citing *Evers*, 576 S.W.2d at 49).

At the hearing, Maxwell and Benningfield provided testimony regarding the inventory search of the items located in appellant's motorcycle. Maxwell identified the Precinct 4 "tow slip"; he was included on the slip as the primary officer on the scene. Maxwell stated that Benningfield conducted the inventory. Following Precinct 4 "protocol," before conducting the inventory, Benningfield made sure that appellant's motorcycle was going to be towed and charges against him had been accepted. According to Benningfield, when doing an inventory, police write down "the type of vehicle, the VIN number [sic], license plates, anything that's inside the vehicle, whether it be phone, wallets, anything that's in it, we write it down." Benningfield explained that the policy of Precinct 4 is to keep most items, except certain personal items and firearms, which "are a different category" of item, with the vehicle. She further explained that Precinct 4 policy permits police to look inside unlocked compartments when doing an inventory. Benningfield personally removed all the items, including the firearms and ammunition, from appellant's motorcycle

and unlocked saddlebags.

Appellant's motion to suppress did not argue that the police inventory search was unlawful. In his reply, appellant argues that no "magic words" are required to preserve a complaint and that he "raised the legality of the inventory search" at the hearing.[3] He contends that his statement—"Okay. Then the inventory search."—alerted the trial court to a concern about the inventory search." But this statement is not specific enough to preserve appellant's arguments on appeal.

Appellant further contends that "the trial court appeared to be aware of his complaint when it made its ruling based on the testimony it heard." In making its ruling, the trial court stated that, at the point when appellant was under arrest, police "obviously had the right to inventory his vehicle and whatever belongings he had in the vehicle or on himself." This statement reflects the trial court concluded that the

---

[3] The following is the entirety of appellant's argument at the hearing:

> [TRIAL COUNSEL]: It's our position that [appellant] was actually under arrest, placed under arrest when he told the police that he threw the gun away.
>
> THE COURT: So just—
>
> [TRIAL COUNSEL]: Probable cause to arrest him at that time.
>
> THE COURT: Assuming with me for the sake of argument that I agree with you and said at the point that he said I threw the gun in a ditch, if he were under arrest at that point, the statement has already been made. So, what would there be to suppress from that point forward?
>
> [TRIAL COUNSEL]: Well, unless he was under arrest when he made the statement.
>
> THE COURT: Well, you just said he wasn't arrested until after he made the statement. He couldn't have been under arrest before he made the statement.
>
> [TRIAL COUNSEL]: Okay. Then the inventory search.
>
> THE COURT: At that point, he was under arrest. So, they obviously, under the law, had the right to inventory his vehicle and whatever belongings he had in the vehicle or on himself. So, the Motion to Suppress is denied.
>
> [TRIAL COUNSEL]: Thank you, your Honor.

inventory search sufficiently qualified as a warrant exception. However, it does not indicate the trial court was aware of, considered, and determined whether any now-argued "irregularities," *e.g.*, lack of testimony from the officer who filled in the inventory list[4] or that the inventory did not list the weapons, invalidated the inventory search. Nor did appellant at any time ask the trial court to reconsider its suppression ruling based on any inventory list concerns.

We conclude that appellant's first issue is waived and therefore overrule it. *See* Tex. R. App. P. 33.1(a); *Douds v. State*, 472 S.W.3d 670, 674–77 (Tex. Crim. App. 2015); *Rothstein v. State*, 267 S.W.3d 366, 372–74 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd).

**B. Article 38.23(a) instruction**

In his second issue, appellant contends there was conflicting testimony at trial from Maxwell and Benningfield regarding which of them or possibly a Precinct 4 trainee officer "actually filled out the itemized items on the inventory slip," and whether this factual dispute required the trial court to sua sponte include an article 38.23(a) instruction in the jury charge regarding evidence not to be used.[5] Appellant argues a juror could reasonably determine that because neither deputy listed the items recovered, the State failed to meet its burden in establishing that police followed department inventory search policy. He further asserts that he suffered egregious harm from this error.[6]

---

[4] At the suppression hearing, Maxwell testified he did not fill out the tow slip. Benningfield testified that she filled out most of the tow slip, but not the "vehicle contents" section.

[5] Although appellant did not request such instruction, we consider article 38.23(a) jury-charge error, whether preserved or not. *See Middleton v. State*, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003).

[6] Because we conclude there was no error, we do not reach harm. *See* Tex. R. App. P. 47.1; *Middleton*, 125 S.W.3d at 453–54.

The State does not dispute that the record evidence is unclear as to precisely who filled out the "vehicle contents" portion of the tow slip. According to the State, however, "this evidence does not raise a factual dispute as to whether the firearms and ammunition were illegally obtained by virtue of police misconduct."

A trial judge has a sua sponte duty to prepare a jury charge that accurately sets out the law applicable to the specific offense charged. *Oursbourn v. State*, 259 S.W.3d 159, 179 (Tex. Crim. App. 2008); *see* Tex. Code Crim. Proc. Ann. art. 36.14. Article 38.23(a) requires a jury instruction only if there is a genuine dispute about a material fact that is essential to deciding the lawfulness of the challenged conduct in obtaining the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.23(a) ("No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case. In any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained."); *Madden v. State*, 242 S.W.3d 504, 510 (Tex. Crim. App. 2007). If other facts not in dispute are sufficient to support the lawfulness of the challenged conduct, then the disputed fact issue is not material to the ultimate admissibility of the evidence. *See Madden*, 242 S.W.3d at 510.

We conclude that a factual dispute over who filled in the "vehicle contents" portion of the tow slip is not essential to deciding the lawfulness of the challenged conduct in obtaining the firearms and ammunition here. There was no dispute that police removed the items pursuant to an inventory search. According to department policy, inventory searches are conducted after charges are accepted and when a

IAC

vehicle is going to be towed. Also, police are allowed to open containers in a vehicle during an inventory search. Police create an inventory list so that they will not face liability for the items turned over to the wrecker with the vehicle. There was no dispute that police conducted the inventory search of appellant's motorcycle according to these protocols. Even disputed evidence reveals that someone with Precinct 4 who was assisting at the scene—whether it was Maxwell as the "primary unit," Benningfield, or a trainee officer who "probably" "fill[ed] it out for the experience"—wrote down the items from appellant's motorcycle during the inventory search. Moreover, there was no affirmative evidence in the record regarding any policy requirement that (only) one person fill out the inventory list, much less that a deviation from such a policy would render the inventory search unlawful. *See Oursbourn*, 259 S.W.3d at 177; *Jackson*, 468 S.W.3d at 200.

Assumption Not in evide

Florida v. Wells 110 S.Ct. 1632 Deviation invalidates inventory search

Therefore, the trial court did not err in failing to sua sponte include an article 38.23(a) instruction in the charge. We overrule appellant's second issue.

**C. Appellant's ineffective-assistance-of-counsel claims**

In appellant's third and fourth issues, he argues that his trial counsel rendered ineffective assistance of counsel by failing to present any mitigation evidence at the punishment phase and by failing to properly preserve an objection to the reading before the jury of appellant's prior felony conviction for attempted capital murder in his indictment for felon in possession.

**1. Standard of review and applicable law**

When, as here, an appellant asserts ineffective assistance of counsel in a motion for new trial, we review the trial court's denial of the motion for abuse of discretion. *Parker v. State*, 462 S.W.3d 559, 562 (Tex. App.—Houston [14th Dist.] 2015, no pet.). "We view the evidence in the light most favorable to the trial court's

ruling, and we reverse only if no reasonable view of the record would support the trial court's finding." *Id.* To prevail on a claim of ineffective assistance of counsel, appellant must show by a preponderance of the evidence that: (1) trial counsel's performance was so deficient that it "fell below an objective standard of reasonableness" and (2) counsel's deficient performance prejudiced appellant's defense. *Strickland v. Washington*, 466 U.S. 668, 687–88, 692 (1984); *Perez v. State*, 310 S.W.3d 890, 892–93 (Tex. Crim. App. 2010). An appellant's defense was prejudiced if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

"Because there are countless ways to render effective assistance, judicial scrutiny of trial counsel's conduct must be highly deferential." *Ex parte Rogers*, 369 S.W.3d 858, 862 (Tex. Crim. App. 2012) (internal quotation marks omitted). "Given the difficulty in evaluating trial counsel's performance, the defendant must overcome the presumption that the challenged action might be considered sound trial strategy." *Id.* We review de novo the trial court's ultimate decision on the prejudice prong of the *Strickland* test, while giving deference to the trial court's implied resolution of underlying factual determinations. *Johnson v. State*, 169 S.W.3d 223, 239 (Tex. Crim. App. 2005); *Parker*, 462 S.W.3d at 562.

**2. Trial counsel's failure to present mitigation evidence at punishment**

Appellant first points to trial counsel's failure to present any evidence during the punishment phase. He argues that trial counsel's decision not to call available character witnesses was the result of inadequate investigation, not a strategic decision. With regard to prejudice, appellant acknowledges that 30 years is only five years more than the 25-year minimum and is 20 years below the 50 years the State

recommended. However, appellant contends that five fewer years would make a difference to someone in his position.

When one *Strickland* prong is dispositive, we need only address that prong on appeal. *Washington v. State*, 417 S.W.3d 713, 724 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd). We conclude appellant has not shown that any deficient performance by his trial counsel prejudiced his punishment defense. To evaluate prejudice in the context of a failure to investigate or present mitigating evidence, we must reweigh the evidence in aggravation against the totality of available mitigating evidence. *Id.* at 728. Here, when the trial court instead of the jury assessed appellant's punishment, we compare the evidence presented by the State with the evidence the trial court did not hear due to counsel's failures. *See id.* at 725.

At the punishment phase, the State presented detailed evidence of appellant's prior attempted-capital-murder offense from one of the police officers whom appellant shot in 1988. In his new-trial motion, appellant put forth three affidavits: one from his mother, one from his uncle, and another from a pen-pal friend from prison. The State submitted an affidavit from trial counsel.

At the new-trial hearing, the trial court stated it did not believe that "some of this testimony" from appellant's character witnesses "would have changed that outcome." The trial court stated that it "certainly heard from the mother during the [guilt/innocence] trial," so it already "had the gist" of what she would have said at punishment, *i.e.*, regarding her positive relationship with her son and his generous nature. In his affidavit, trial counsel stated that, during the guilt/innocence phase, appellant's mother discussed appellant's "normal background" and another one of his friends, an Army veteran, testified that appellant "was generous and helped him." In addition, both the affidavits from appellant's uncle and his friend similarly concerned appellant's positive relationships and generous character.

The trial court concluded that trial counsel made a "brilliant tactical decision to go to the Court for punishment" because the jury "would have probably been inclined to give [appellant] much more based on what he did in the prior." According to the trial court, trial counsel "did an excellent job convincing me, based primarily on his closing argument, that [appellant] should be sentenced based on the facts that occurred during this trial and not the horrendous prior offense that he committed and the State put on evidence about" and "did an excellent job of convincing me to assess the punishment at 20 years below not only what the State was asking for during the punishment hearing but what they had offered him in exchange for a plea." Finally, we note that trial counsel expressly requested "the lower range of punishment" between 25 and 30 years; in line with this request, the trial court assessed 30 years.[7]

Under these circumstances, we conclude that appellant failed to prove prejudice and the trial court did not abuse its discretion by denying his motion for new trial. *See Parker*, 462 S.W.3d at 565. We overrule appellant's third issue.

**3. Trial counsel's failure to preserve objection to reading of appellant's prior felony conviction for attempted capital murder in his indictment for felon in possession**

Next, appellant argues that trial counsel's failure to properly preserve an objection to the reading of appellant's prior felony conviction for attempted capital murder in his felon-in-possession indictment during his arraignment before the jury constituted ineffective assistance of counsel.

Appellant acknowledges that trial counsel "did object to the State reading to [sic] the prior felony conviction when the trial court ordered the State to read the full indictment for felon in possession of a firearm charge." Appellant contends that trial

Violation of Due Process judicial misconduct

7 Appellant has not argued that trial counsel's request in this 25-to-30-year range constituted deficient performance. CC offered 20 to plea

counsel, however, waived this previous objection by later stating he had "no objection" to the introduction of appellant's redacted stipulation and judgment when the State offered these documents during Maxwell's testimony at trial. Appellant argues that the jury's hearing that his prior felony was attempted capital murder when the State read his felon-in-possession indictment during arraignment, in conjunction with the later admission and publishing of his redacted stipulation and judgment for attempted capital murder of a police officer, prejudiced him because it "simply paint[ed] the picture of [a]ppellant being a violent person."

At the new-trial hearing, the trial court stated its recollection was that trial counsel "did object and the prosecutor obviously agreed that that portion of the indictment shouldn't be read during arraignment." The trial court further acknowledged that "if there was an error, this was [the court's] error and not [trial counsel]'s."

To prove the prior-conviction-felony element of felon in possession, the State only needs to prove the defendant's status as a felon, without any need to prove the particular type of felony conviction. *Adekeye v. State*, 437 S.W.3d 62, 72 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd); *see State v. Mason*, 980 S.W.2d 635, 641 (Tex. Crim. App. 1998). In *McIlroy v. State*, 188 S.W.3d 789, 793–96 (Tex. App.—Fort Worth 2006, no pet.), the Fort Worth Court of Appeals concluded that the trial court abused its discretion in a case when the defendant was charged with possession of methamphetamine by permitting the State to read the portion of the defendant's felon-in-possession indictment that described his prior felony offense for possession of methamphetamine. In addition, our court has stated when stipulating to evidence of a defendant's prior felony, trial "[c]ounsel could . . . just stipulate[] that [the defendant] was a convicted felon, without saying anything more." *Adekeye*, 437 S.W.3d at 72. "This tactic [could] eliminate[] the 'especially

obvious" risk of unfair prejudice associated with mentioning a prior conviction that is similar to a pending charge." *Id.*

Even assuming without deciding that trial counsel's performance during the guilt/innocence phase related to the jury's hearing about appellant's prior conviction for attempted capital murder fell below standards of professional norms, based on our review of the record as a whole, we disagree with appellant that any prejudice is shown here.[8] The State presented a strong case for appellant's guilt. *See id.* at 73 (no prejudice for purposes of ineffective assistance of counsel based on stipulation informing jury of appellant's prior felony conviction for aggravated robbery when evidence of appellant's guilt for current offenses of attempted aggravated robbery and felon in possession was overwhelming); *cf. McIlroy*, 188 S.W.3d at 797 (no harm when "overwhelming evidence exists supporting McIlroy's present conviction for possession of methamphetamine and for possession of a firearm by a felon").

Eyewitnesses Machell and John testified to appellant's violent encounter with them—appellant not only threatened to kill them with a firearm, but also attacked Machell with it. Machell testified that "[i]t felt like a thousand pounds come down [sic] on my head" when appellant hit her. Appellant admitted to having a firearm, although he maintained that he threw it into a ditch; and police recovered two firearms and ammunition from appellant's motorcycle during an inventory search. John identified one of these firearms as the one used by appellant in the assaults and described it as "the same one" appellant previously had shown to John.

During closing arguments, neither trial counsel nor the State highlighted the nature of appellant's prior felony as an attempted capital murder. *See McIlroy*, 188 S.W.3d at 797. The State merely noted that the jury "heard evidence, a stipulation

[8] Again, we need not determine the deficient-performance prong where prejudice is dispositive. *See Washington*, 417 S.W.3d at 724.

Improper Argument

that [appellant] wrote out himself that he committed the prior offense and that he was a felon on April 2, 2014."

In addition, trial counsel requested, and the trial court provided, an instruction to the jury in the aggravated-assault cases that:

> Evidence that the defendant was previously convicted of an offense can be considered by you only for the limited purpose of determining if you believe the defendant is guilty of felon in possession of a weapon and cannot be considered by you for any other purpose. Even though evidence was introduced that the defendant was previously convicted of an offense or offenses, you can only consider such evidence if you first believe beyond a reasonable doubt that the defendant was previously convicted of an offense or offenses and then you must not consider it as evidence of guilt in this case.

In all three cases, the jury charge also instructed:

> You are further instructed that if there is any evidence before you in this case regarding the defendant's committing an alleged offense or offenses other than the offense alleged against him in the indictment in this case, you cannot consider such evidence for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other offense or offenses, if any, and even then you may only consider the same in determining the motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident of the defendant, if any, in connection with the offense, if any, alleged against him in the indictment and for no other purpose.

We presume that the jury followed these instructions. *See Hutch v. State*, 922 S.W.2d 166, 170 (Tex. Crim. App. 1996).

We conclude appellant has not shown a reasonable probability that the outcome of his trial would have been different but for any unprofessional error by trial counsel. *See Adekeye*, 437 S.W.3d at 73. The trial court did not abuse its discretion by denying appellant's motion for new trial, and we overrule appellant's fourth issue.

**D. Bills of cost assessed against appellant**

Court costs are legislatively-mandated obligations resulting from a conviction. *See* Tex. Gov't Code Ann. §§ 102.021, 102.041; Tex. Code Crim. Proc. Ann. art. 102.005. Court costs are "a nonpunitive recoupment of the costs of judicial resources expended in connection with the trial of the case." *Johnson v. State*, 423 S.W.3d 385, 390 (Tex. Crim. App. 2014). Only statutorily-authorized costs may be imposed against a criminal defendant. Tex. Code Crim. Proc. Ann. art. 103.002; *Johnson*, 423 S.W.3d at 389. Although courts may impose such costs, the legislature has provided in article 102.073 of the Code of Criminal Procedure that if "a defendant is convicted of two or more offenses or of multiple counts of the same offense" "[i]n a single criminal action," then "the court may assess each court cost or fee only once against the defendant." Tex. Code Crim. Proc. Ann. art. 102.073(a).

In his final issue, appellant contends that the trial court erred in assessing duplicative court costs in all three judgments because costs may only be assessed once when, as here, a defendant is convicted of multiple offenses arising from a single criminal action. *See id.*[9] The State agrees that "the trial court should not have assessed costs in all three cases."

In each judgment, court costs are listed "as assessed." The bill of cost accompanying each judgment reflects the following total amounts assessed,

---

[9] Code of Criminal Procedure article 102.073 provides, in relevant part:

> (a) In a single criminal action in which a defendant is convicted of two or more offenses or of multiple counts of the same offense, the court may assess each court cost or fee only once against the defendant.
>
> (b) In a criminal action described by Subsection (a), each court cost or fee the amount of which is determined according to the category of offense must be assessed using the highest category of offense that is possible based on the defendant's convictions.

Tex. Code Crim. Proc. Ann. art. 102.073(a–b).

# APPENDIX T

"Trial 2 RR"

REPORTER'S RECORD
VOLUME 2 OF 7 VOLUMES
TRIAL COURT CAUSE NOS. 1423420, 1423421, 1532840
FOURTEENTH COURT OF APPEALS NOS. 14-18-00009-CR,
14-18-00010-CR, 14-18-00021-CR

FILED IN
14th COURT OF APPEALS
HOUSTON, TEXAS
3/7/2018 8:31:22 PM
CHRISTOPHER A. PRINE
Clerk

| | | |
|---|---|---|
| STATE OF TEXAS | * | IN THE DISTRICT COURT OF |
| VS. | * | HARRIS COUNTY, TEXAS |
| STEVEN KURT BAUGHMAN | * | 174TH DISTRICT COURT |

*****
***MOTION TO SUPPRESS***
*****

On December 4, 2017, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Leslie Yates, Judge presiding, held in Houston, Harris County, Texas;

Proceedings reported by machine shorthand.

Mattie Kimble, Texas CSR #7070
Deputy Court Reporter - 174th District Court
1201 Franklin
Houston, Texas 77002
832-927-3700

A P P E A R A N

**FOR THE STATE:**
**MR. STEVEN BELT**
**MS. MICALA CLARK**
**MS. CARA BURTON**
**ASSISTANT DISTRICT ATTORN**
1201 Franklin, Suite 600
Houston, Texas 77002
SBOT NOS. 24094274, 24095
Phone: 713-274-5800

**FOR THE DEFENDANT:**
**MR. TERRENCE 'TERRY' GAIS**
**ATTORNEY AT LAW**
2900 Smith, Suite 220
Houston, Texas 77006-3432
SBOT NO. 07572500
Phone: 713-225-0666

***ALSO PRESENT***

***MOLLI STEINLE***
***LEGAL ASSISTANT***

C H R O N O L O G I C A L   I N D E X

MOTION TO SUPPRESS
VOLUME 2 OF 7 VOLUMES

| December 4, 2017 | Page | Vol. |
|---|---|---|
| Appearances.............................. | 2 | 2 |
| Proceedings.............................. | 5 | 2 |
| Motion to Withdraw....................... | 5 | 2 |
| Motion to Conduct a Hearing to Replace Court-Appointed Counsel................... | 8 | 2 |
| Court's Ruling........................... | 11 | 2 |
| Court's Ruling........................... | 13 | 2 |
| Plea Bargain Offer....................... | 16 | 2 |
| Motion to Suppress....................... | 17 | 2 |

| STATE'S WITNESSES | DIRECT | CROSS | VOIR DIRE | VOL. |
|---|---|---|---|---|
| JACKIE MAXWELL......... | 20<br>40<br>47 | 27<br>44<br>48 | | 2 |
| AMY BENNINGFIELD....... | 49<br>68 | 62<br>69 | | 2 |

| | Page | Vol. |
|---|---|---|
| Arguments by Mr. Gaiser.................. | 71 | 2 |
| Court's Ruling........................... | 72 | 2 |
| Reporter's Certificate................... | 73 | 2 |

A L P H A B E T I C A L

MOTION T
VOLUME 2 O
Decembe

| | DIREC |
|---|---|
| AMY BENNINGFIELD....... | 49<br>68 |
| JACKIE MAXWELL......... | 20<br>40<br>47 |

E X H I B I

MOTION TO
VOLUME 2 O
December

| Defense No. | Description |
|---|---|
| 1 | Photograph |
| 2 | Photograph |
| 3 | Tow Slip |
| 4 | Photograph |
| 5 | Photograph |
| 6 | Photograph |
| 7 | Photograph |
| 8 | Photograph |
| 9 | Photograph |
| 10 | Photograph |
| 11 | Photograph |
| 12 | Photograph |

P R O C E E D I N G S

**December 4, 2017**

(Open court, Defendant present.)

THE COURT: All right. This is the *State of Texas vs. Steven Baughman*. Are both sides ready to proceed?

MR. BELT: State's ready, your Honor.

MR. GAISER: Your Honor, I have a Motion to Withdraw.

THE COURT: Okay. I think that we should hear that first, and then we will move forward from there as appropriate. You may proceed, Mr. Gaiser.

Motion to withdraw

MR. GAISER: Your Honor, there is a conflict between Mr. Baughman and myself as to how this case should be tried. Mr. Baughman believes certain aspects of the Penal Code apply to him. It's my studied interpretation of the law that those do not apply to him. For that reason proceeding with this trial is for, in my opinion -- I've carefully, carefully investigated the facts of the case, the law involved in the case,

I don't believe it's in his best interest to have me as his attorney. For that reason, I would move the Court to withdraw.

THE COURT: Well, let me speak with your client briefly before I rule on your Motion. That

In ~~July~~ August had Gaiser appointed in place of Rick

*brings up something that I needed*

In going through the Court's file

Motions to represent yourself tha

understand that a previous Judge

those Motions. I have, dated bac

Represent Yourself but then in Ju

subsequent Request for Replacemen

Court-Appointed Counsel or in the

for Self-Representation. My unde

Flenniken granted that. He allow

withdraw as your attorney. He ap

So, in my opinion, that Motion to

in the alternative to have a new

In my opinion, also

previous Motions that you've file

yourself, but I just wanted to cl

that that was your desire at the

to have a different new attorney

done in your case.

THE DEFENDANT: Yes,

THE COURT: So, are

Motions to represent yourself?

THE DEFENDANT: I ha

at this time, your Honor, I will

Self-Representation.

THE COURT: So what I need to find out from you, because we're not going to continually appoint new attorneys for you because you don't agree with their interpretation of the law or because there's some perceived conflict, that's not how it works. Your case is over 1300 days old. It needs to go to trial, and it needs to go today. You certainly have an absolute right to self-representation if that's what you choose. I was under the impression that when you were here before, you chose not to represent yourself and wanted a new court-appointed attorney, which was granted.

THE DEFENDANT: Yes, your Honor.

THE COURT: Okay. So what is your desire today? As I said, you're certainly free to represent yourself. We can talk about that in more length if that's what you choose. My personal opinion, and I think the opinion of most Judges and lawyers is that it's not good for the very reason that your attorney just articulated on the record. There are portions, for example, there are portions of the Penal Code that you believe apply to you, whereas he, as a very -- as you can tell from his age, very, very experienced criminal defense attorney, does not believe that those Penal Code provisions apply. I have great confidence in Mr. Gaiser. I've known him for years back when I was a

Case is 1300 days old

Contrary to law Constructive denial - Daniels v. Woodford 428 F.3d 1181

mtn denied

why denied

prosecutor. So, without gett

what your legal conflict is

you to trust his opinion abou

facts. I've been in trial wi

a good job representing his c

decision is yours.

THE DEFENDANT:

THE COURT: So,

proceed, Mr. Baughman?

THE DEFENDANT:

would like to submit this Mot

THE COURT: And

THE DEFENDANT:

Hearing to Replace Court-Appo

THE COURT: Your

court-appointed attorney is d

just continually on trial day

you. It takes them a great a

to speed on the facts and the

Certainly, in the interest of

a trial. You've been in jail

of time.

I do need to exp

I said, it's your constitutio

yourself. You are, however,

representation, which means that the Motions that your lawyer or your previous lawyer filed will be heard by the Court. I have a number of handwritten Motions that you have filed. Those will not be heard unless you want to proceed to represent yourself.

Now, Mr. Gaiser, on the record, I want to make it clear, he and I spoke off the record, he's adopting the previous Motions that were filed by Mr. Gonzalez. In the event that you go forward with Mr. Gaiser as your attorney, the plan is to pick a jury as soon as we can get one this morning, and then to hear those Motions to Suppress outside the jury's presence later this afternoon before we start testimony. So, that's the Court's plan; but I need to know how you want to proceed.

THE DEFENDANT: So, even if I represent myself, we're going to go through with picking the jury today?

THE COURT: Yes, sir, we are.

THE DEFENDANT: Well, your Honor, the reason that I moved for self-representation to start with was to cure conflicts between my previous counsel and myself. Those conflicts have not been addressed by Mr. Gaiser. He has informed me first off -- he was appointed on August 24th, and from August the 24th until

D arguing mtn to replace Gaiser?

November 20th (two weeks

October the 20th, I had no contac

all. On October the 20th he inf

going to go to trial today, that

to the fact that the State wanted

jail that I was costing them too

lawsuits, injuries and so forth;

time he would not represent my ca

He would not call the expert witn

requested. He would not request

requested, and that's where the c

Honor.

And on the day that

handed counsel a packet of notes

things needed to be done to prepa

Defendant requested the counsel r

arrange for a contact visit with

could make comments, relay invest

things to be done to prepare the

was to map out the defense and pr

trial. Counsel agreed to do so a

Defendant contacted to help him i

meeting -- he was to contact the

let him know in advance when the

be.

THE COURT: I'm sorr

interrupt you, but as you can see the Court has quite a lot on its plate this morning.

THE DEFENDANT: Yes, ma'am.

THE COURT: I need to find out from you -- Mr. Gaiser's Motion to Withdraw as your attorney is denied. I understand that you have conflicts with him as you have with the previous lawyer, but the fact that the two of you don't agree on which witnesses are appropriate to be called, or which Penal Code provisions are applicable to your case, are not matters that, I believe, require me to, again, appoint a new attorney for you. As I said, if you want to represent yourself, which is not, in my opinion, a good idea, for those very reasons that sometimes the witnesses that you think are available or would be helpful are possibly not, based on an attorney's view of the facts and the law. I need an answer from you so that we can move forward. Believe me, I understand that --

THE DEFENDANT: Under the facts, I have no choice. The Court's not leaving me a choice.

THE COURT: Sir, believe me, I understand that you're not happy with your attorney based on the fact that two very good lawyers, very experienced attorneys have been appointed in your case. I don't know who I could appoint that you would agree with their

view of the law and the facts.
you is that sometimes, for exa
told you that the case was gor
lot of the messages that he's
him. Those are scheduling mat
control. That's what the coor
telling him and he's relaying
choice about whether or not to
reset. I just wanted you to b

THE DEFENDANT:

THE COURT: He's
in some way. That is the orde
from the Court and the coordin

THE DEFENDANT:
understand that. The thing is
evidence that has come forth t
investigated and there are cer
needed to be run to discredit
basically I've been left by Mr
theory that he has discussed w

And with no defe
I'm not left with any choice,
reason that I move for a Motio
the fact that Counsel has not
theory. He has not discussed

not discussed defense with me, and I'm left going to trial blind.

THE COURT: Well, Mr. Baughman, I don't know that I agree with that given the fact that I've already sworn in two witnesses who are going to come testify for the Defense in your case. I do advise the two of you, as we move forward over the next few days, to work together as closely as you can in developing a defense; but we're going forward today with Mr. Gaiser as your attorney.

THE DEFENDANT: Your Honor, I would like to submit this Motion for the record, though.

THE COURT: And that is?

THE DEFENDANT: It is the formal Motion to Conduct a Hearing to Replace Court-Appointed Counsel.

THE COURT: Well, to the extent that your Motion is asking to conduct a hearing to replace Mr. Gaiser, that Motion is granted. However, ultimately, I'm denying your request.

THE DEFENDANT: Thank you, your Honor.

THE COURT: Any other Motions before we bring the jury over? As I said, we'll do the Motion to Suppress, two Motions to Suppress after we pick the jury. Is there any Motions in Limine or other Motions we need to take up at this time?

MR. BELT: Your Hono
in Limine from the State is we wo
of how long Mr. Baughman has been
irrelevant to this case.

THE COURT: Well, it
guilt/innocence; is it not releva

MR. BELT: It is rel
We would just ask that there be n
guilt/innocence phase.

THE COURT: That rem
Mr. Baughman out here, I need to
stipulation with him and discuss
record.

All right. One more
I have in front of me in Cause 14
Evidence. That is in the felon i
weapon case. It's signed by your
by the Prosecutor, and the stipul
stipulating that you were convict
attempt to commit capital murder
Criminal District Court No. 179 o
in Cause No. 0495549 on November
your stipulation, Mr. Baughman?

THE DEFENDANT: Yes,

THE COURT: And that

entered freely and voluntarily?

THE DEFENDANT: Yes, your Honor.

THE COURT: And you understand that you have a right to require the State to prove this because it's an element of the indictment. And by stipulating to that, you're agreeing to the evidence and they would not be required to put on live testimony?

THE DEFENDANT: Yes, your Honor.

THE COURT: And I will approve your stipulation. My understanding is that there have been agreements by both lawyers that the offense which Mr. Baughman was convicted will not be mentioned during voir dire, but that the stipulation will be admitted into evidence once the trial starts.

Court's understanding

MR. BELT: That's correct.

MR. GAISER: Yes, your Honor.

THE COURT: And there will be no mention during the guilt/innocence portion of the case the number of years which Mr. Baughman was sentenced.

MR. BELT: That's correct.

THE COURT: That's your understanding, Mr. Gaiser?

MR. GAISER: Yes, your Honor.

MR. BELT: And, your Honor, for the purposes of the record, the State's previous

recommendation in this case '
knowledge, it has been rejec
THE COURT: Tha
particularly in the cases wi
like to get those matters on
no question down the line abo
whether or not there was a co
Baughman, my understanding is
cases, you're looking at 25 y
if you're convicted and if th
enhancement paragraphs to be
offered in exchange for a gui
50 years if you wanted to ple
understanding?
THE DEFENDANT:
THE COURT: And
THE DEFENDANT:
THE COURT: And
that you and your attorney wa
any further plea negotiations
enter into at this time? Is
want to visit with your attor
Do you want to
off the record?
MR. GAISER: I

MATTIE KIMBL

within ambit with the Prosecutor, would agree to.

MR. BELT: No, your Honor, the State would not agree to it.

THE COURT: All right. Then we will pick a jury when it gets here.

MR. BELT: Yes, your Honor.

THE COURT: Thank you, gentlemen.

(A recess was taken.)

**MOTION TO SUPPRESS**

(Witnesses sworn.)

THE COURT: Both sides ready to proceed on the Motion to Suppress?

MR. BELT: State is ready.

THE COURT: We may, depending on what happened to the jury, we may have to stop it and start it later. We'll, at least, get it started.

Incorrect Argument on Suppression

It's my understanding that we're proceeding on the Motion to Suppress Evidence Obtained by Illegal Detention of the Defendant; is that correct?

MR. GAISER: Yes.

THE COURT: Mr. Gaiser, it's your Motion. You may proceed.

MR. GAISER: The -- first of all, I'd like to invoke the Rule.

THE COURT: Okay. The witnesses who I

Both sides stipulate arrest was w/o warrant

Rule Invoked

swore in and anyone else who is p

in the Motion to Suppress Hearing

invoked, which means you cannot t

another witness is testifying

your testimony in the presence of

Who is your first w

MR. BELT: Deputy M

THE COURT: Deputy

the courtroom. The other witness

outside, please, until your name

(Witnesses exit cou

THE COURT: Are you

witness? I didn't know how you w

you want to stipulate that it was

MR. GAISER: I'll s

will stipulate that the search wa

MR. BELT: The State

with that.

MR. GAISER: Then we

THE COURT: All righ

stipulated that the arrest was wi

Mr. Belt, you may p

first witness.

MR. BELT: Yes, you

Deputy Jackie Maxwell to the stan

State Testifying
Leading Witness
Δ should have obj.

19

Your Honor, as far as -- just so that the Court is aware, when Deputy Maxwell first came to the scene and approached the Defendant, he was not immediately arrested. He was not put into handcuffs; he was detained for questioning about the gun because the call was a weapons disturbance call.

THE COURT: Perhaps we need to establish that through the witness rather than through a statement of counsel.

MR. BELT: Yes, your Honor.

MS. BURTON: Judge, I didn't want to say that we had stipulated to his warrantless arrest. We're going to elicit testimony from the officer about the seizure of the evidence.

THE COURT: Well, that he was, I guess, is what the Motion says is that he was searched and stopped, brought in the motorcycle without a valid search warrant. So, in other words, this wasn't committed during the execution of a search warrant or an arrest warrant, that's all the stipulation pertains to.

MR. BELT: Okay.

THE COURT: Now you may proceed.

MR. BELT: Yes, your Honor.

MATTIE KIMBLE, CSR, RPR

JACKIE M

having been first duly sworn,

DIRECT EX

BY MR. BELT:

Q. Good afternoon, sir. yourself to the Court?

A. Jackie Maxwell.

Q. Mr. Maxwell, what's

A. I'm retired.

Q. Where are you retire

A. I retired from Harri Constable's Office.

Q. Were you with Harris Constable's Office on April 2

A. Yes, I was.

Q. Can you tell the Jud as far as Mr. Baughman is con

A. I was dispatched to Pepper Ridge in reference to weapons call, which we ended family member aggravated.

Q. And what type of wea you remember of what type of

A. It was a weapons call discharged.

04/02/14

No weapon discharged

Service Call Report

MATTIE KIMBLE

Q. When you arrived on 25410 Pepper Ridge Lane, what did you first do; or what happened first?
A. When we first arrived and the Complainant was not there. She was on another street hiding. Deputy Benningfield brought the Complainant to us. We spoke with her about what happened. She was told -- she told us that she was struck in the head with a weapon and that the weapon had been discharged three times and pointed toward the ground.
Q. And that location that you reported or was dispatched to, was that in Harris County, Texas?
A. Yes, sir, it is.
Q. Did the Complainant at the time indicate to you who may have struck her with the weapon and shot the weapon?
A. Yes, sir, she said it was Steve.
Q. Baughman?
A. Yeah, Baughman.
Q. On that date, did you ever come in contact with Mr. Baughman?
A. Yes, we did after we'd been there approximately 30 minutes or so, he came back on his motorcycle. At that point, we stopped him.
Q. How did you stop him?
A. Stood out in the road and signaled for him to

stop, and he stopped.
Q. And you say "we," how ma
scene at that time?
A. At that time, I believe
Q. Do you recall what thei
A. One was Deputy Benningf
and also Deputy or Corporal Flor
with him, which I do not remembe
Q. When you first came in c
Defendant, did you or other offic
Defendant immediately?
A. No, sir, we detained hi
Q. And when you say "detai
mean?
A. When we got him off the
officer's safety reasons, we did

Q. Was he handcuffed at tha
A. No, not to my knowledge
Q. And what type of questio
was the conversation like between
A. Well, the first thing we
and he told us who he was, which
Complainant had named. Then we s
gun?
Q. And why did you say that

A. Well, because the Complainant had stated that he had discharged weapons and or a weapon. We mainly wanted to find the weapon for our safety.

Q. What was the Defendant's response when you asked where the gun was?

A. He said he threw it in a ditch along Spring Creek.

Q. What happened after that?

A. We put him in a vehicle and went up to Spring Creek, drove down Spring Creek from Spring Creek to Aldine-Westfield, which is approximately a mile, stopping everywhere he said stop that's where he thought he had threw the weapon. We never did find the weapon, and we turned around and went back to the scene.

Q. What type of vehicle did you place Mr. Baughman in?

A. At that time, we placed him in the backseat of my patrol vehicle, marked patrol vehicle.

Q. When he was placed in the back of your patrol vehicle, was Mr. Baughman placed into handcuffs, to your knowledge?

A. I'm not sure. I don't remember if I put him -- if we put him in handcuffs then or if it was until after we had contacted the District Attorney's Office and got charges on him.

Q. Now did Mr. Baughman

gun with you?

A. Yes.

Q. So you said you didn

car, we're gonna go look for

A. No.

Q. Okay. From the time

got Mr. Baughman off his moto

say it was until you put him

vehicle?

A. Probably about 10 mi

Q. Was Mr. Baughman hel

weapon?

A. Well, he pointed to

he said he thought he threw i

Q. Now at that point, l

in the back of your patrol ve

A. No.

Q. When you were search

had told you where it might b

during that time?

A. No.

Q. And why wasn't he un

A. Why or when?

Q. Why didn't you place

these points?
A. At any of those points, there was no need. I had not talked to the District Attorney. I was getting my facts together.
Q. Let's say if Mr. Baughman wanted to leave, would he have been free to leave at that point?
A. Yes.
Q. How long did y'all search for the weapon?
A. We searched for the weapon for about 15, 20 minutes.
Q. At what point did you feel like you had enough reasonable suspicion or probable cause to call the District Attorney's Office?
A. When we got him back. We were more interested -- at that time, we were more interested in recovering the weapon because children, junior high and elementary-aged children, walk down Spring Creek to get to their school and we did not want one of the children to pick the weapon up.

Q. At what point was the Defendant handcuffed?
A. When we brought him back to the scene.
Q. And what time was he under formal arrest?
A. I'm sorry?
Q. At what time was he under formal arrest?
A. At the time when we got back to the scene.

Q. During your conversatio
he appear to you that he underst
what was going on?
A. Yes, he did.
Q. Did he, at any point, h
lawyer or anything that struck y
was under arrest?
A. No.
Q. And now, Deputy Maxwell
Defendant in the courtroom today
A. Yes, I do.
Q. Could you please point
article of clothing that he's we
A. He's got a dark-colored
blue-colored tie.
MR. BELT: Your Hon
reflect the witness has identifi
THE COURT: The rec
Q. (BY MR. BELT) Now duri
admission about the gun and wher
you feel like those admissions o
was a voluntary statement?
A. Yes, I did.
Q. And his actions what he
did you feel like his actions we

A. Yes.
Q. Did you coerce him in any way to make the admission that he had a gun?
A. No, I didn't.
Q. Did you observe any other officers, or did you have a feeling that the other officers had coerced him to admit that?
A. No, I didn't.
Q. And did you or any other officers that day promise the Defendant anything in exchange for admitting that he had a gun?
A. No, we didn't. To my knowledge, we didn't, I didn't.
MR. BELT: Pass the witness, your Honor.
MR. GAISER: May I, your Honor?

CROSS-EXAMINATION

BY MR. GAISER:
Q. So, Deputy Maxwell, what time did you arrive at the scene?
A. I arrived about 6:37, I believe it was.
Q. And I believe that's the time in your report you said that it began; is that correct?
A. Yes.
Q. You've read over your report, I assume?
A. Yes.

Q. Now when you arrived
6:30, where were the Complaina
A. Where were the Compla
Q. Yes.
A. The lady was on anoth
bushes, the reports that I got
Q. So, you didn't actual
A. I did not see her unt
the scene.
Q. Did you speak to the
son, John?
A. No.
Q. So, you didn't speak
Complainants when you arrived
A. Not until they got ba
Q. The scene was what, 2
A. Yes, sir.
Q. This was on April 2nd
A. Yes, sir.
Q. So no one was there w
except other officers; is that
MR. BELT: Your H
This is outside the scope of t
THE COURT: Overr
Q. (BY MR. GAISER) Was

arrived from the Constable Precinct 4 Office?

A. Yes, there was one other officer there at the scene.

Q. And that was officer who?

A. That's Corporal Flores.

Q. So, he was the only one there when you arrived; is that correct?

A. Well, he and the person that he -- his trainee.

Q. So, did Corporal Flores indicate to you what he knew about the case?

A. He indicated the same thing that I knew. I had already known because what he told me was the -- what was going over the radio at the time.

Q. Okay. What was going over the radio at the time?

A. Well, that the female Complainant was one or two streets behind Pepper Ridge hid in some bushes. Shortly after that, Deputy Benningfield showed up to the -- I believe, it was Long Hill address and picked up the lady and brought her back to the scene.

Q. Okay. So you were there when the Complainant, female Complainant, was brought back to the scene?

A. Yes, sir.

Q. And you spoke to her?

A. Yes, sir.

Q. What did she relate to

A. That her boyfriend had a weapon, and he had threatened her son and he discharged three

Q. Did you see anything th her story? Was she hurt in any

A. Yeah, she had -- excuse

Q. Go ahead.

A. She had a knot on her h little droplets of blood on her egg-style knot.

Q. Was there anything ther weapon had been discharged?

A. No, sir.

Q. Any cartridge casings?

A. No, sir, we didn't find

Q. Did you look for cartri

A. Yes, I looked for cartrid also looked in the ground to see the bullet had gone in.

Q. You didn't find any?

A. No.

Q. Was her son, John Spear scene?

A. Yes.

MATTIE KIMBLE, C

Q. Did you speak to him?

A. Yes.

Q. When did he arrive at the scene?

A. Shortly after she did.

Q. How many minutes would you say, 5 minutes, 10 minutes?

A. I don't know exactly how long it was, just a matter of minutes.

Q. So within a matter of a few minutes after your arrival, you had her statement about what had happened, her verbal statement about what had happened, correct?

A. Yes, sir.

Q. And then he arrived, did you take any kind of statement from him? Did you talk to him?

A. Yes.

Q. And what did he relay to you?

A. He relayed the basic same statement that she had that Steve had come to check on something and that he approached them in the back of the house. Apparently, he questioned her. She didn't give him the answer that he wanted, and he discharged three rounds into the ground and told both of them that he would kill them.

Q. Did they indicate to you how -- that Mr. Baughman was riding a motorcycle?

A. Yes, they did. As

the radio while we were head

Q. So you had reason t

motorcycle?

A. Yes, sir.

Q. Did she indicate wha

for, what he was trying to d

MR. BELT: Your

That's outside the scope of

THE COURT: Mr.

the Court how this is releva

MR. GAISER: We

peaceful mission as it relate

they had at that time.

THE COURT: Ple

to whether or not he had prob

search, if there was one.

MR. GAISER: We

belief as to why Mr. Baughma

totality of the circumstances

cause.

THE COURT: Mr.

some leeway; but this is a Mo

the trial on the merits.

Q. (BY MR. GAISER) How

Baughman arrived?

A. I'm not for sure exactly, but I would say 20 to 30 minutes.

Q. And he was riding a motorcycle?

A. Yes, sir.

Q. Did he appear to have a weapon with him at that time?

A. No, not after we did the officer search, safety search.

Q. And then after you did the safety -- well, the first thing you asked him was where is the gun?

A. I would not say it was the first thing. I don't remember the first thing verbatim, but it was somewhere along in that first bit of communication we had with him, we asked him where the weapon was.

Q. And he then replied what?

A. He said he threw it alongside Spring Creek on the road in a ditch along Spring Creek.

Q. Now, it's your testimony at that point in time he was not under arrest?

A. Yes.

Q. Okay. But after he indicated to you that he had thrown the gun away over on Spring Creek, you put him in the car; is that correct?

A. Yes. We asked him to show us where -- could he

show us where he threw it. He sa
in the car to take us to where he

Q. And he complied with tha

A. Yes.

Q. Now was he handcuffed in
him to --

A. I do not believe so. I
the minute that I put handcuffs o

MR. GAISER: Your H
witness?

THE COURT: You may

Q. (BY MR. GAISER) I'm goi
I've marked as Defendant's Exhibi
recognize that?

A. Yes, sir. That is my pa
Defendant and myself, and it appe
Benningfield's elbow.

Q. Is that you standing in

A. Yes.

Q. With the white hair?

A. Yes, sir.

Q. And glasses?

A. Yes, sir.

Q. Is that the point you pu
take him to see where the gun was

A. No, sir, that was the point that I put him in the car after I had called the District Attorney's Office; and they accepted charges.

Q. So, you're the one that spoke to the District Attorney's Office?

A. Yes, sir.

Q. Do you remember who you spoke to?

A. No, sir, I don't.

Q. You remember what Mr. Baughman was wearing when you arrived at the scene?

A. Well, from the picture that I just saw, he had on a white T-shirt and blue jeans, but I believe he also had a motorcycle jacket on that said Bandidos.

Bandido Jacket never found in evidence?? Not on Inventory

Q. Can you describe that jacket?

MR. BELT: Your Honor, we would object. That's outside the scope of this hearing.

THE COURT: Overruled.

Q. (BY MR. GAISER) Was it a leather jacket?

A. Yes, jacket or vest.

Q. You searched that vest to see if there were any weapons in that vest?

A. Yes.

Q. You didn't find any?

A. No, we did a pat down on him. We didn't do a physical hands-alone search, we did a pat down.

Δ No Weapon in Jacket/Vest

Q. After the district a

the case and Mr. Baughman was

proceed to search anywhere af

A. I did not, but Offic

did a -- it wasn't a search,

vehicle in which she found tw

all the magazines were all lo

loaded.

inventory of vehicle

MR. GAISER: Ca

marked, please?

Q. (BY MR. GAISER) I w

marked as Defendant's Exhibit

that?

A. That is his leather

in the saddlebag of the motor

D2 Not on inventory

Q. So that would be par

A. Yes, sir.

Q. Do Defendant's Exhib

depict what they purport to d

A. To my knowledge, it

MR. GAISER: I'l

State.

(Defense Exhibit

MR. BELT: No ob

THE COURT: Defe



admitted for purposes of this hearing.

(Defense Exhibit Nos. 1 and 2 admitted.)

Q. (BY MR. GAISER) Now, it was Officer Benningfield that conducted the inventory; is that correct?

A. Yes.

Q. So, she was the one that filled out the inventory slip?

A. Yes, sir.

Q. You didn't have anything to do with that?

A. Not filling out the inventory, no, sir.

Q. Let me show you what's been marked or will be marked as Defendant's Exhibit No. 3. I want to show you what's been marked as Defendant's Exhibit No. 3. You recognize that?

A. Yes, sir, that is a tow slip.

Q. Does that indicate what was found on the motorcycle?

A. Yes, sir.

Q. Is that your signature on the inventory?

A. No, sir.

Q. J. Maxwell?

A. That is not my signature, sir.

Q. Who would have put that on there?

A. I would think Officer Benningfield since she

did the inventory.

Q. Why would she put your

she's the one that did it?

A. Because I was the prima

Q. So you can't attest to

accurate description of what was

you?

A. Of my personal sight, n

MR. GAISER: I'll t

and ask that it be admitted, you

(Defense Exhibit No

MR. BELT: We would

doesn't have personal knowledge

the stand

THE COURT: Maybe I

not identify that as the tow sli

case?

MR. BELT: He did

THE COURT: Your ob

It's admitted for the purposes o

(Defense Exhibit No

Q. (BY MR. GAISER) When d

A. The inventory occurred

from the search for the weapon;

District Attorney's Office and a

D gave two descrip of gun
See (CR 1423421) at 184
arrived 15 min before Δ
Δ was not on scene when Walker arrived
when photos done? Digital Camera time & date stamp
date & time in digital camera

aggravated assault of family member.

Q. And you're the one that did that?

A. Yes, sir.

Q. Did Mr. Baughman ever describe the weapon that he claimed he had thrown out?

A. He gave two descriptions of it. First was that it was a .32 pistol; and while we were driving down checking the ditch line, he said he didn't understand what the problem was, it was only a BB gun.

Q. In any event, you did not find any weapon in the ditch there along Spring Creek?

A. No, sir.

Q. When did Sergeant Walker arrive on the scene?

A. Probably 45 minutes into the investigation.

Q. Was Mr. Baughman already in custody when he arrived?

A. No.

Q. What was the status of the investigation when Sergeant Walker arrived?

A. Well, Sergeant Walker primarily showed up because we needed photographs of our victim and also what was found in the motorcycle.

Q. So, he didn't arrive until after the motorcycle had been inventoried?

A. No, sir, he was on the scene when the vehicle

was -- the motorcycle was inv

Q. So, he witnessed it?

A. He was there.

MR. GAISER: Ju

Q. (BY MR. GAISER) Sem

the contents of the motorcycl

that correct?

A. I'm sorry, he photo

Q. Yes, sir.

A. Yes, sir. Yes, he d

Q. But you were not the

inventory slip?

A. No, sir.

Q. And the photo I show

No. 1, the photo of Mr. Baugh

depicted in the photo, that w

under arrest?

A. Yes, sir.

Q. That's after -- that

was inventoried?

A. Yes, sir.

MR. GAISER: I'l

REDIRECT EX

BY MR. BELT:

Q. Deputy Maxwell, you

victims of the case until you came back to the scene after you searched for the gun; is that correct?

A. No, sir.

Q. When did you first speak with the victims?

A. I spoke with her after we been on the scene for about 5 minutes.

Q. And do you recall that victim's name?

A. It was Machell.

Q. Do you recall her last name?

A. Spears (sic).

Q. Okay. And what did she -- was she the Complainant in this case of the aggravated assault?

A. Yes, sir.

Q. How was she -- how did the Defendant strike her with a weapon that day? What did you learn to get enough probable cause to call the District Attorney's Office?

A. She said that he had done it. Her son, John, said that he saw her do that -- or saw him do that to her.

Q. But to be clear, when you first arrived on scene, what was your concern, finding the gun or speaking with Machell and John Spear?

A. Speaking with Machell.

Q. And what was the name of Machell's son?

A. John, John, IV, I belie

Q. What was his last name?

A. Spears.

Q. And were charges accept

assault as he was the victim in

A. I'm sorry?

Q. Were charges accepted f

with John as a victim that day a

A. Yes, I believe it was.

Q. Now, was John hit with

A. No, John was not hit.

Q. Right, what happened to

A. He was there with his m

and was there when Steve said th

her and him together.

Q. Was Machell Spear threa

A. Yes.

Q. And was John Spear threa

A. Yes.

Q. Was the person who did

today in court?

A. Yes.

Q. And how did you connect

Complainants positively identify

person who threatened them and h

Prove No shots fired
1 Specs. on pistols
2 Forensics Count of Ammo in each magazine
3 No casings found

weapons found in ...

A. Yes, she did; as well as John identified him.
Q. Verbally while he was still on scene?
A. Yes, when he arrived back to the scene. They were so scared when they heard the motorcycle coming that they both hid behind vehicles.
Q. But from your knowledge on that day, your first -- the first thing you know is that there's a weapons disturbance and a gun has been fired?
A. Yes.
Q. And did they ever describe the gun to you before you went and looked for it?
A. She just said it was a black gun.
Q. What about John, did he describe it?
A. He was so scared he couldn't hardly describe hisself to be honest with you; but, no, he did not describe the weapon.
Q. At any time did they indicate it looked like a BB gun?
A. No, Machell described it as a .32.
Q. During y'all's investigation and inventory of the vehicle, did you find deadly weapons that day?
A. Yes, we did.
Q. What kind of deadly weapons were they?
A. We found a 32-caliber pistol, semiautomatic pistol, there was one in the chamber and there was, I

No shots fired on 911 tape or on Call for Service Report

not a BB gun

perjury

think, five, six, maybe ten i
found a Smith and Wesson 191
chamber, and it also had a m
of ammo.
Q. And would both of th
firearms?
A. Yes, they would.
Q. And through your inv
that Mr. Baughman exhibited a
those firearms?
A. Yes.
Q. Against Machell Spea
A. Yes, sir.
MR. BELT: Pass
THE COURT: Mr.
RECROSS-EX
BY MR. GAISER:
Q. Let me see if I have
Maxwell. You arrive on the s
frightened people, Machell an
an assault with a deadly weap
gun has been fired, correct
A. Yes.
Q. -- according to them
information is collected by y



to be credible; is that right?

A. Yes, sir.

Q. After that, Mr. Baughman comes riding up on a motorcycle, correct?

A. Yes, sir.

Q. And you ask him shortly thereafter, where is the gun, correct?

A. Yes, sir.

Q. And at that point, you place him in the patrol car and go look for the weapon; is that correct?

A. Yes, sir.

Q. And then when you don't find the weapon and you bring Mr. Baughman back to the scene, correct?

A. Yes, sir.

Q. And you let him out of the vehicle?

A. Yes, sir.

Q. And after you let him out of the vehicle, did you talk to him some more?

A. I'm sorry?

Q. After you let him out of the vehicle, did you talk to him again?

A. I don't remember, but I'm sure I probably did.

Q. You already had enough evidence to place him in custody at that point in time?

A. Yes, sir.

Δ states never let out and requested

Δ in custody

Q. You have the statements

found to be credible, and you hav

he had a firearm and threw it awa

him under arrest?

A. Not at that point.

Q. But you placed him in yo

A. Yes.

Q. And you don't remember i

not?

A. He was not when we had

was when we went looking for the

Q. When you say "we went lo

who is "we"?

A. He and I and also a shor

Walker drove down there.

Q. And where was Mr. Baughm

the car looking for the weapon?

A. He was in the backseat o

Q. I assume that's a caged

correct?

A. Yes, sir.

Q. Were you carrying a weap

A. Who?

Q. You?

A. Yes, sir.

Δ in custody

THE WITNESS: Not until I put him in the car after the district attorney had agreed to take charges.

THE COURT: Okay. I just wasn't sure about that. I wanted to clarify that. Thank you. You may step down.

THE WITNESS: Thank you.

THE COURT: Call your next witness.

MR. BELT: Your Honor, the State calls Deputy Amy Benningfield.

THE BAILIFF: Judge, this witness has been sworn.

THE COURT: Thank you.

You may proceed.

MR. BELT: Thank you, your Honor.

AMY BENNINGFIELD,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. BELT:

Q. Good afternoon, ma'am. Can you please introduce yourself to the Court?

A. Deputy Benningfield with Harris County Precinct 4.

Q. How long have you been with Precinct 4?

A. I've been with Precinct 4 since 2000.

Q. Were you with -- well,

attention to April 2nd, 2014. D

discharged or dispatched to 2541

Harris County, Texas?

A. Yes.

Q. And what was that call

A. It was regarding a weap

Q. Do you know specificall

dispatch call regarding the weap

they describe it to you?

A. I don't remember.

Q. When you arrived, what

you did?

A. I remember pulling up a

running towards my car.

Q. What female did you det

A. It was the victim, and

name.

Q. Would Machell Spear sou

A. Yes.

Q. And when she ran towards

next?

A. That's when I drove her

incident occurred.

Q. Okay. And so how far a

the actual scene of the incident?

A. I don't recall exactly. I think it was one street over.

Q. What was her demeanor when you first saw her?

A. She was just real nervous, shaking, crying.

Q. What did she tell you on that day?

A. ~~She did tell me that she was hit in the head, and she also showed me the injury.~~

Q. Did she say who hit her in the head?

A. She said her ex-boyfriend.

Q. And do you know the name of that person?

A. Baughman.

Q. Do you know his first name?

A. I'd have to look on the report for his first name.

Q. If you need to look at your report to refresh your memory, go ahead.

A. Steven Baughman.

Q. And do you see Steven Baughman in the courtroom today?

A. Yes.

Q. Could you please point to him and describe an article of clothing that he's wearing?

A. He's right here in the black suit, blue-striped tie and a blue shirt.

Comp demeanor

Comp said Δ hit her

No shots fired

When first saw Δ

J did not speak to Δ

inventorying?

A. Yes.

Q. And if it's unlocked?

A. Yes.

Q. And to your best knowledge if it was locked, you would have placed that in your report?

A. Right.

Q. Have you done that in the past?

A. I haven't had -- I don't recall anything where I've had a saddlebag locked.

Q. But it's something that you would have put if it is locked?

A. Yes.

MR. BELT: Pass the witness, your Honor.

**RECROSS-EXAMINATION**

BY MR. GAISER:

Q. So in these photos of the contents of the motorcycle, I realize they're not exhaustive in the terms of -- I mean, they seem to be selectively taken so that you don't see this object on the ground, this black object on the ground in Defendant's Exhibit No. 9 behind the motorcycle. You're saying you don't remember that?

A. I don't remember. I wasn't the one that took the photos, so I'm not sure.

Disciplined for not completing reports

Q. Does that appear to be a

A. That appears to be the w there beside that. I can't tell in the picture.

Q. You certainly remember t

A. Yes.

Q. And you remember collect

A. Yes.

Q. But you don't remember f those in your inventory, correct?

A. I do remember one of the leather vest in a pocket, and I c inside a white plastic bag.

Q. Well, would that be the in Defendant's Exhibit 6?

A. The .32 was inside the l pocket.

Q. So that's the leather ve

A. That looks like that wou

Q. And does that appear to behind the motorcycle in Defendan

A. I don't know if they cou else there. That was something e I don't know if that's the vest didn't take the pictures.

Bush's Vest

Q. Okay. All right. Thank you.

MR. GAISER: Pass the witness.

MR. BELT: Nothing further, your Honor.

THE COURT: Thank you, ma'am. You may step down.

Any further witnesses on the Motion?

MR. BELT: No, your Honor.

THE COURT: From the Defense?

So, no witnesses from the Defense on the Motion to Suppress?

MR. GAISER: No, your Honor.

THE COURT: And as soon as this stops printing, I'll entertain arguments from counsel. I won't be able to hear you right this minute.

So, before we bring the jury in, I'd like to hear some arguments on the Motion; and then we can all take about a 10-minute break before we bring the panel in.

It's Mr. Gaiser's motion.

ARGUMENTS BY MR. GAISER

MR. GAISER: It's our position that he was actually under arrest, placed under arrest when he told the police that he threw the gun away.

THE COURT: So just --

MR. GAISER: Probable cause to arrest him --

IAC

Counsel brought in Δ already under arrest

Failed to argue search invalid due to failure to abide by policy to produce invet. in search.

at that time.

THE COURT: Assu

of argument that I agree with

that he said I threw the gun

under arrest at that point, t

been made. So, what would th

that point forward?

MR. GAISER: We

arrest when he made the state

THE COURT: Well

arrested until after he made

have been under arrest before

MR. GAISER: Oka

search.

THE COURT: At t

arrest. So they obviously

right to inventory his vehicl

he had in the vehicle or on h

Suppress is denied.

MR. GAISER: Tha

MR. BELT: Thank

THE COURT: Let'

(A recess was ta

(End of Motion t

REPORTER'S CERTIFICATE

THE STATE OF TEXAS )
COUNTY OF HARRIS )

I, Mattie Kimble, Deputy Court Reporter in and for the 174th District Court of Harris County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is (see Exhibit Index) and was paid by Harris County.

WITNESS MY OFFICIAL HAND this the 7th day of March, 2018.

/s/Mattie Kimble
Mattie Kimble, Texas CSR 7070
Expiration Date: 12/31/2018
Deputy Court Reporter
174th District Court
Harris County, Texas
Houston, Texas 77002
832-927-3700

# APPENDIX

# U

"Trial 4 RR"

REPORTER'S RECORD
VOLUME 4 OF 7 VOLUMES
TRIAL COURT CAUSE NOS. 1423420, 1423421, 1532840
FOURTEENTH COURT OF APPEALS NOS. 14-18-00009-CR, 14-18-00010-CR, 14-18-00021-CR

FILED IN
14th COURT OF APPEALS
HOUSTON, TEXAS
3/7/2018 8:31:22 PM
CHRISTOPHER A. PRINE
Clerk

| | | |
|---|---|---|
| STATE OF TEXAS | * | IN THE DISTRICT COURT OF |
| VS. | * | HARRIS COUNTY, TEXAS |
| STEVEN KURT BAUGHMAN | * | 174TH DISTRICT COURT |

*****
***TRIAL ON THE MERITS***
*****

On December 5, 2017, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Leslie Yates, Judge presiding, held in Houston, Harris County, Texas;

Proceedings reported by machine shorthand.

Mattie Kimble, Texas CSR #7070
Deputy Court Reporter - 174th District Court
1201 Franklin
Houston, Texas 77002
832-927-3700

A P P E A R A [cut off]

FOR THE STATE:
MR. STEVEN BELT
MS. MICALA CLARK
MS. CARA BURTON
ASSISTANT DISTRICT ATTOR[cut off]
1201 Franklin, Suite 600[cut off]
Houston, Texas 77002
SBOT NOS. 24094274, 2409[cut off]
Phone: 713-274-5800

FOR THE DEFENDANT:
MR. TERRENCE 'TERRY' GAI[cut off]
ATTORNEY AT LAW
2900 Smith, Suite 220
Houston, Texas 77006-343[cut off]
SBOT NO. 07572500
Phone: 713-225-0666

ALSO PRESENT

MOLLI STEINLE
LEGAL ASSISTANT

C H R O N O L O G I C A L I N D E X

TRIAL ON THE MERITS
VOLUME 4 OF 7 VOLUMES

| December 5, 2017 | Page | Vol. |
|---|---|---|
| Appearances | 2 | 4 |
| Proceedings | 8 | 4 |
| Arraignment | 10 | 4 |
| Defendant's Plea | 13 | 4 |
| Opening Statement by Ms. Clark | 14 | 4 |

| STATE'S WITNESSES | DIRECT | CROSS | VOIR DIRE | VOL. |
|---|---|---|---|---|
| JACKIE MAXWELL | 16<br>72 | 49<br>76 | | 4 |
| AMY BENNINGFIELD | 78 | 86 | | 4 |
| MACHELL SPEAR | 96 | 143 | | 4 |
| JOHN SPEAR | 163 | 198 | | 4 |
| State Rests | 211 | | | 4 |

| DEFENSE WITNESSES | DIRECT | CROSS | VOIR DIRE | VOL. |
|---|---|---|---|---|
| GERALD BUSH | 212<br>226 | 219 | | 4 |
| LINDA PUGH | 227<br>241 | 236 | | 4 |
| Defense Rests | 242 | | | 4 |
| Adjournment | 243 | | | 4 |
| Reporter's Certificate | 244 | | | 4 |

A L P H A B E T I C A L

TRIAL ON
VOLUME 4
Decembe

| | DIR |
|---|---|
| AMY BENNINGFIELD | 7 |
| GERALD BUSH | 21<br>22 |
| JACKIE MAXWELL | 1<br>7 |
| LINDA PUGH | 22<br>24 |
| JOHN SPEAR | 16 |
| MACHELL SPEAR | 9 |

## E X H I B I T   I N D E X

**TRIAL ON THE MERITS**
**VOLUME 4 OF 7 VOLUMES**
**December 5, 2017**

| State's No. | Description | Offered | Admitted | Vol. |
|---|---|---|---|---|
| 1 | Map | 19 | 19 | 4 |
| 2 | Map | 19 | 19 | 4 |
| 3 | Photograph | 21 | 21 | 4 |
| 4 | Photograph | 21 | 21 | 4 |
| 5 | Photograph | 21 | 21 | 4 |
| 6 | Photograph | 21 | 21 | 4 |
| 7 | Photograph | 21 | 21 | 4 |
| 8 | Photograph | 21 | 21 | 4 |
| 9 | Photograph | 21 | 21 | 4 |
| 10 | Photograph | 21 | 21 | 4 |
| 11 | Photograph | 21 | 21 | 4 |
| 12 | Photograph | 21 | 21 | 4 |
| 13 | Photograph | 28 | 29 | 4 |
| 14 | Photograph | 28 | 29 | 4 |
| 15 | Photograph | 28 | 29 | 4 |
| 16 | Photograph | 28 | 29 | 4 |
| 17 | Photograph | 28 | 29 | 4 |
| 18 | Photograph | 28 | 29 | 4 |
| 19 | Photograph | 28 | 29 | 4 |
| 20 | Photograph | 28 | 29 | 4 |
| 21 | Photograph | 28 | 29 | 4 |

| No. | Description |
|---|---|
| 22 | Photograph |
| 23 | Photograph |
| 24 | Photograph |
| 25 | Photograph |
| 26 | Photograph |
| 27 | Photograph |
| 28 | Photograph |
| 29 | Photograph |
| 30 | Photograph |
| 31 | Photograph |
| 32 | Photograph |
| 33 | Photograph |
| 34 | Photograph |
| 35 | Photograph |
| 36 | Photograph |
| 37 | Photograph |
| 38 | Handgun |
| 39 | Handgun |
| 40 | Magazines |
| 41 | Redacted Stipulation |
| 42 | Judgment and Sentence |
| 43 | Map |
| 44 | 911 Calls |
| 45 | 911 Calls |

| Defense No. | Description | Offered | Admitted | Vol. |
|---|---|---|---|---|
| 1 | Photograph | 71 | 71 | 4 |
| 2 | Photograph | 58 | 58 | 4 |
| 3 | Two Slip | 55 | 56 | 4 |

**P R O C E**

**Decembe**

(Open court, D

THE COURT: Re

MR. GAISER: Y

THE COURT: Mr

MR. BELT: Juc

THE COURT: Ha

please.

MR. GAISER: I

the Motion to Suppress. I

the Rule for the trial.

THE COURT: It

entire trial.

MR. GAISER: Y

THE BAILIFF:

(Jury enters c

THE COURT: Th

Good morning,

you for being back with us

that there was a question a

visit with you about that b

are allowed to take notes i

you need to understand that

only. You can't share them

importantly at the very end of the case, before you go back to begin deliberations, the bailiff will collect those from you because you're not allowed to use them during deliberations. And the reason for that is because we have an official record being made of the trial, there can only be one record, and she's a trained, certified court reporter, so she gets it down very precisely, all the questions and answers.

The law provides that if when you go back to deliberate, you have a specific disagreement about a question or, you know, one or two questions, we can't give you the entire trial or someone's entire testimony, but if you have a disagreement about what an answer was, then you can request that that question and answer be read back. So we have that provision. So, understanding that you would have to turn those in at the end, is there anyone who needs a legal pad and a pen? We'll try to find one for you, if you do.

The second thing we need to do is for you to stand up and take that oath that we discussed yesterday.

(Jury sworn.)

THE COURT: Thank you. Be seated.

Mr. Belt, if you will arraign the Defendant, please.

Agg assault Ms. Spear

MR. BELT: *State of*

*Baughman.*

In the name and by

State of Texas:

The duly organized

County, Texas, presents in the Di

County, Texas, that in Harris Cou

Baughman, hereafter styled the De

or about April 2nd, 2014, did the

intentionally and knowingly, caus

Machell Spear, hereinafter called

striking the Complainant with a f

Defendant used and exhibited a de

firearm.

It is further prese

County, Texas, Steven Kurt Baughm

the Defendant, heretofore on or a

did then and there unlawfully, in

knowingly threaten Machell Spear

injury by using and exhibiting a

a firearm.

Against the peace ar

Signed by the forema

*State of Texas vs. S*

In the name and by t

*State of Texas:*

The duly organized Grand Jury of Harris County, Texas, presents in the District Court of Harris County, Texas, that in Harris County, Texas, Steven Kurt Baughman, hereafter styled the Defendant, heretofore on or about April 2nd, 2014, did then and there unlawfully, intentionally and knowingly possess a firearm at a location other than the premises at which the Defendant lived after being a convicted felon.

Against the peace and dignity of the State.

Signed by the foreman of the Grand Jury.

The *State of Texas vs. Steven Kurt Baughman.*

In the name and by the authority of the State of Texas, the duly organized Grand Jury of Harris County, Texas, presents in the District Court of Harris County, Texas, that in Harris County, Texas, Steven Kurt Baughman, hereafter styled the Defendant, heretofore on or about April 2nd, 2014, did then and there unlawfully, intentionally and knowingly threaten John Spear with imminent bodily injury by using and exhibiting a deadly weapon, namely, a firearm.

Against the peace and dignity of the State.

Signed by the foreman of the Grand Jury.

*THE COURT: And before I get Mr. Baughman's*

*response, his plea to those*

lawyers, please, at the ben

(Bench confere

THE COURT: Re

written on the felon in pos

MR. BELT: Bec

THE COURT: I

voir dire, but it's an elem

I think you need to read th

MR. BELT: I c

THE COURT: I

prejudicial, but it's part

plead to it, and the jury h

MR. BELT: Yes

THE COURT: I

read the entire indictment.

MR. GAISER: T

THE COURT: I'

MR. GAISER: I

hasn't been arraigned.

THE COURT: I

objecting.

(End of bench

THE COURT: Al

*to have you reread the indi*

possession of a firearm word for word as it's written, if you don't mind.

MR. BELT: Yes, your Honor.

MR. GAISER: Note our objection, your Honor.

THE COURT: It's noted.

MR. BELT: In the name and by the authority of the State of Texas:

The duly organized Grand Jury of Harris County, Texas, presents in the District Court of Harris County, Texas, that in Harris County, Texas, Steven Kurt Baughman, hereafter styled the Defendant, heretofore on or about April 2nd, 2014, did then and there unlawfully, intentionally and knowingly possess a firearm at a location other than the premises at which the Defendant lived after being convicted of the felony offense of attempted to commit capital murder in the District Court -- in the 179th Judicial District Court of Harris County, Texas, in Cause No. 0495549 on November 28th, 1989.

Signed by the foreman of the Grand Jury, and against the peace and dignity of the State.

MR. GAISER: To which the Defendant pleads not guilty.

THE COURT: Thank you, Mr. Gaiser.

Mr. Belt, if you cho opening statement.

MR. BELT: Yes, your will be doing the opening stateme

MS. CLARK: Thank yo

**OPENING STATEMENT BY**

MS. CLARK: Fear, fi April 2nd, 2014, John Spear woke other ordinary day. He was movin Spring, Texas; and his mother, Ma helping him move. As they were m home, this Defendant rode up on h Spear, not knowing who this indiv this Defendant approached his moth began yelling and demanding of her Spear listened as Machell respond have his watch, nor did she know Defendant's yelling escalated; and out a gun, points it at Machell an

John Spear, Machell to protect his mother; and this De weapon at John and threatens his Spear are able to flee the scene, street over, banging on a neighbor help. She's scared out of her min

the bushes and praying that this Defendant doesn't find her. John is able to escape, places a 911 call and franticly begs for help.

We're going to bring you today Deputy Maxwell, the first officer to arrive on scene. Deputy Maxwell is going to tell you about a frantic and terrified woman, Machell Spear. He's also going to tell you about a fearful and terrified man, John Spear. He's also going to tell you that weapons were recovered from this Defendant; and he's going to tell you that this Defendant is a felon and should not be in possession of a weapon, that it's against the law for this man to have a weapon.

We're then going to bring you Deputy Benningfield. Deputy Benningfield is going to tell you about Machell and how traumatize, hysterical and terrified she was. Deputy Benningfield is going to tell you about the injury that she saw on Machell, and she's also going to tell you about when she inventoried this Defendant's motorcycle she found two weapons on that motorcycle.

And after you hear from the officers, you're going to hear Machell and John; and they're going to tell you their story. They're going to relive that nightmare that was April 2nd, 2014. And after you hear

they're story and you see t
no doubt in your mind that
2014, committed the felony
and felon in possession of

THE COURT: O
Defense at this time?

MR. GAISER:
to make an opening statemen

THE COURT: V
State will ca

MS. CLARK: D

THE BAILIFF:
previously been sworn in.

THE COURT: T
You may procee

MS. CLARK: T

JACKIE
having been previously swor

DIRECT

BY MS. CLARK:

Q. Can you please int

A. My name is Jackie
retired. At the point of t
employed by Harris County

Q. Now, Deputy Maxwel

retired. What are you doing with your spare time these days?

A. Absolutely nothing.

(Laughter.)

Q. And, Deputy Maxwell, you mentioned you were a police officer. How long were you a certified peace officer?

A. For eight years.

Q. And what did you do prior to becoming a police officer?

A. I'm sorry?

Q. What did you do prior to becoming a police officer?

A. I was an inspector for an engineering firm. I inspected roads, waterline, sewer lines, storm sewer, bridges, sidewalks.

Q. Now, Deputy Maxwell, when you were a police officer, what type of training did you have to undergo to become a police officer?

A. Well, you have to, excuse me, you have to attend school for a year training, then you're certified. To become certified, you have to take a test with TCLEOSE, which is the licensing agency for all police officers in the State of Texas. You must pass that, and then you go out and try to find a department

was an officer for 8 yrs b/f ret.

04/02/14

dispatched to →

to hire you that's in need to hir

Q. Now, Deputy Maxwell, I w attention to April 2nd, 2014. We police officer on that date?

A. Yes, ma'am, I was.

Q. And who were you working

A. I'm sorry?

Q. Who were you working for

A. At that time, I was empl Precinct 4 Constable's Office.

Q. And on that date, were y particular area of town?

A. Yes, ma'am. My subdivis was Lexington Woods.

Q. And on that day were you a partner?

A. I was working alone.

Q. And on that day, were yo particular location in response t call?

A. Yes, ma'am, I was. It w

Q. Sorry?

A. And when the call droppe weapons disturbance.

Q. And is that address that

Harris County, Texas?

A. Yes, ma'am, it is.

MS. CLARK: Your Honor, may I approach the witness?

THE COURT: You may.

Q. (BY MS. CLARK) Deputy, I'm showing you what's been previously marked as State's Exhibits 1 and 2. Do you recognize the location in State's Exhibits 1 and 2?

A. Yes, ma'am, that would be the Lexington Woods area of north Harris County.

Q. And are these maps of that location?

A. Yes, ma'am, they are.

Q. And, to your knowledge, have these maps been altered in any way?

A. Not to my knowledge.

MS. CLARK: Your Honor, at this time State offers State's Exhibits 1 and 2 into evidence, tendering to defense counsel for objection.

S1+2 admitted w/o obj

(State's Exhibit Nos. 1 and 2 offered.)

MR. GAISER: I have no objection, your Honor.

THE COURT: State's Exhibits 1 and 2 are admitted.

(State's Exhibit Nos. 1 and 2 admitted.)

MS. CLARK: Permission to publish, your

Honor?

THE COURT: G

Q. (BY MS. CLARK) No remember, what time was the drop?

Call came in

A. Somewhere between

Q. And what is the pr when one of these calls dro

A. To get to the scen

Q. And what did you d scene of this crime?

when she arrived

A. When I arrived at locate the Complainant. Sh just a very few minutes, sh another officer who had gon separate from the location officer went and picked her

MR. GAISER: nonresponsive.

THE COURT: S question and answer.

THE WITNESS:

MS. CLARK: Y witness?

THE COURT: Y

Q. (BY MS. CLARK) Deputy Maxwell, I'm showing you what's been previously marked as State's Exhibits 3 through 12. Can you take a look at these, please?

Do you recognize the location depicted in State's Exhibits 3 through 8, I'm sorry, 3 through 7?

A. Yes, ma'am, that is the front yard of the home of 25410 Pepper Ridge. It's also the back portion, backyard portion of that house; and it is also the driveway of the house.

Q. And do you recognize the individual in State's Exhibits 8 through 12?

A. Yes, ma'am, that is Machell Spear, the Complainant.

Photos No dated time stamp

Q. And, to your knowledge, have any of these photographs been altered in any way?

A. Not to my knowledge, no, ma'am.

MS. CLARK: Your Honor, at this time, State moves to admit State's Exhibits 3 through 12, tendering to defense counsel for objection.

3-12 admitted w/o obj

(State's Exhibit Nos. 3 through 12 offered.)

MR. GAISER: No objection, your Honor.

THE COURT: State's Exhibits 3 through 12 are admitted.

(State's Exhibit Nos. 3 through 12

admitted.)

MS. CLARK: Permissi

THE COURT: Granted.

Q. (BY MS. CLARK) Now, Depu the location you were dispatched t

THE COURT: Can ever angle that you are? You can see c

A. I'm sorry. What was the

Q. (BY MS. CLARK) Was this dispatched to on April 2nd, 2014?

A. Yes, ma'am.

Q. And what are we looking a Exhibit 4?

S4

A. That is the backyard of t

S5

Q. And what are we looking a Exhibit 5?

A. That is the driveway to 2

S6

Q. State's 6, what are we lo

A. Again, that's the backyar Ridge.

S7

Q. And what are we looking a Exhibit 7?

A. That is the backyard of 2 along with the Complainant's vehic

Q. Now, Deputy Maxwell, when

did you meet an individual named Machell Spear?

A. Yes, I did.

Q. Is this Machell Spear in State's Exhibit 8?

A. Yes, ma'am, it is.

Q. And when was this photo taken?

A. It was taken April the 12th, I believe.

Q. Was it April 2nd, 2014?

A. April 2nd, I'm sorry, April 2nd, 2014.

Q. Sorry, Deputy Maxwell, who did you learn -- who was Machell Spear?

A. That is Machell Spear, our Complainant.

Q. And what did you learn from speaking with Machell Spear?

MR. GAISER: That would be hearsay, your Honor. We object.

THE COURT: Sustained.

Q. (BY MS. CLARK) What was Machell's demeanor when you were speaking with her?

A. She was very upset, hysterical and really shaken up.

Q. And when you were speaking with Machell Spear, did you see any injuries on her?

A. Yes, ma'am, she had on the back of her head, she had an egg-sized knot that had been split open and had blood in her hair.

Q. Deputy Maxwell, I'
Exhibit 10. Where was she
occurred?

A. Right about where

Q. And State's Exhibi
here?

A. That's where the
and had been bleeding, blee

MR. GAISER:
hearsay possibly.

THE COURT: S

MR. GAISER:
to disregard.

THE COURT: J
answer.

Rephrase your

MS. CLARK: Y

Q. (BY MS. CLARK) No
this red mark here in State

A. That is blood from

Q. Did the complainin
appear to be in pain?

A. Yes, she did.

Q. Now, after talking
learn there was a deadly we

A. Yes, I did.

MR. GAISER: Objection, your Honor, that calls for hearsay.

THE COURT: Sustained.

MR. GAISER: Ask the jury be instructed to disregard.

MS. CLARK: Your Honor, I'll rephrase.

THE COURT: I'm sorry. The jury will disregard the last answer.

Q. (BY MS. CLARK) Deputy Maxwell, can you describe the complaining witness' emotional state?

A. She was hysterical. She was shaking. She was crying. She was very upset. She was in pain.

Q. Did she still seem to be under the stress of what had occurred earlier that day?

A. Yes, she was, very much.

Q. And did she make statements relative to that event that had occurred earlier that day?

A. Yes, she said that she

MR. GAISER: Objection.

THE COURT: Overruled.

A. She stated that her and her ex-boyfriend had gotten into a verbal argument, and he had hit her in the head with a weapon and threatened her life as well as the life of her son, who was there.

Q. (BY MS. CLARK) Deputy M

what kind of weapon was involved?

A. Yes, ma'am, she told me

pistol.

Q. And did you learn whethe

exhibited this weapon to Machell

A. Yes, she did -- or he di

her face and said that he was gon

also pointed the gun at her son a

statement.

Q. And, Deputy Maxwell, did

what the complaining witness was

Defendant was upset with the comp

A. She said that the verbal

concerning his mother's watch tha

stolen.

Q. Now, Deputy, you mentione

John Spear?

A. John Spear is Machell Sp

Q. And you mentioned that t

John Spear as well?

A. Yes, ma'am, he did.

Q. And was a weapon involve

threatened John Spear?

A. Yes, ma'am. Again, he p

his face.

MR. GAISER: Your Honor, I object to him relating this as if it's not a conversation that he learned.

THE COURT: Sustained.

Q. (BY MS. CLARK) Did you learn while Machell Spear was still under the stress of the event what happened with her son?

A. Yes.

Q. And what was that?

A. That the Defendant had pointed a gun at him and threatened him and her.

Q. Deputy Maxwell, the firearm the Defendant exhibited, was that a deadly weapon?

MR. GAISER: Objection, your Honor. He can't possibly know that from her, whether or not --

THE COURT: Sustained.

Q. (BY MS. CLARK) Is a firearm a deadly weapon?

A. Yes, ma'am, it is.

Q. Now while you were working the scene, did you come into contact with the Defendant by the name of Steven Baughman?

A. Yes, ma'am, I sure did.

Q. And can you identify this individual by an article of his clothing?

firearm is a deadly weapon

No date & time

SB

A. Yes, ma'am, he's w
be a black jacket, blue shi
blue-and-white-striped tie.
MS. CLARK: Yo
reflect the witness has ide
THE COURT: Th
MS. CLARK: Yo
witness?
THE COURT: Yo
Q. (BY MS. CLARK) De
what's been previously mark
you recognize the individua
A. Yes, ma'am, that i
Q. And has this photo
your knowledge?
A. Not to my knowledg
MS. CLARK: Yo
moves to admit State's Exhi
counsel for objection.
(State's Exhib
MR. GAISER: N
THE COURT: Yo
MR. GAISER: Y
relevance of the photo. He
court.

THE COURT: What's the relevance of the photo?

MS. CLARK: Judge, we would argue that this is what the Defendant looked like on April 2nd, 2014, to give the jury an idea of what he looked like on that day.

THE COURT: Is it any different than he looks now?

MS. CLARK: We would argue a little bit different.

THE COURT: Okay.

(End of bench conference.)

THE COURT: Objection is overruled. State's Exhibit 13 is admitted.

(State's Exhibit No. 13 admitted.)

MS. CLARK: Permission to publish, your Honor?

THE COURT: Granted.

Q. (BY MS. CLARK) Deputy Maxwell, is this what the Defendant looked like on April the 2nd, 2014?

A. Yes, ma'am, it is.

Q. And what happened when the Defendant arrived to the scene?

A. We got him off his motorcycle. As he was pulling up, Ms. Spear and Mr. Spear were tremendously

upset. They both ran and hid behi protection. They were afraid he w them again.

Q. How long was the time fra arrived on scene to when the Defen scene that day?

A. I would say roughly an ho

Q. And when you detained the admit to having a gun?

A. Yes, he did.

Q. Where did the Defendant s

A. He said when he left he t along Spring Creek Drive.

Q. Where did you go to look

A. I went to Spring Creek Dr the ditches from Pepper Ridge down

Q. Were you able to find a g

A. No, ma'am, I was not able during that time period, the Defen what the problem was that it was o

Q. And was another firearm r scene later on?

A. Yes, ma'am.

Q. Where was the gun -- or w recovered from?

A. It was recovered from the right saddlebag on the motorcycle that the Defendant was driving.

Q. Deputy Maxwell, sorry, I want to back up a little bit. When the Defendant said that he had a weapon, first, what type of gun did he say it was?

A. I don't remember him saying what kind of gun it was myself.

Q. Did he say it was a BB gun when you first talked to him?

A. No, ma'am, he didn't mention BB gun until we searched about half the ditches.

Q. And was the Defendant with you when you were searching for the weapon that he said he threw?

A. Yes, ma'am, he was.

Q. Who else was with you?

A. Just he and I.

MS. CLARK: Your Honor, may I approach the witness?

THE COURT: You may.

Q. (BY MS. CLARK) Deputy Maxwell, I'm showing you what's been previously marked as State's Exhibits 14 through 37. Can you please take a look at these photos?

Deputy Maxwell, are these photos a fair and accurate depiction of the weapons you recovered that day as well as the Defendant's motorcycle?

A. Yes, ma'am, it is

Q. And, to your know

been altered in any way?

A. No, ma'am.

MS. CLARK:

moves to admit State's Exh

to defense counsel for obj

(State's Exh

offered.)

MR. GAISER:

previous objection; I have

at this point.

THE COURT:

please.

(Bench confe

MR. GAISER:

issue.

THE COURT:

verify that the picture I

included in that stack. I

MR. BELT: Y

THE COURT:

talked about that yesterda

MR. GAISER:

MR. BELT: Y

THE COURT: No, yours.

MR. BELT: Yeah, we took those out, the Bandidos.

THE COURT: You did?

MR. BELT: Yes.

MR. GAISER: I didn't see it.

(End of bench conference.)

THE COURT: All right. Then State's Exhibits 14 through 37 are admitted.

(State's Exhibit Nos. 14 through 37 admitted.)

MS. CLARK: Permission to publish, your Honor?

THE COURT: Granted.

MS. CLARK: Thank you.

Q. (BY MS. CLARK) Deputy Maxwell, going back, when you first made contact with the Defendant, was he under arrest at that point in your investigation?

A. No, ma'am.

Q. And did he agree to come with you to look for the weapon?

A. Yes, he did.

Q. And how did he do that?

A. We put him in the back seat of the vehicle, and we drove down.

Q. Was the Defendant put ...
got into your patrol vehicle?

A. Not to my knowledge.

Q. And was he arrested at
you put him in your patrol vehic
gun?

A. No, ma'am.

Q. When -- what was your p
the Defendant in your patrol veh
weapon?

A. Was to find the gun. S
close to a elementary school, an
for time for school to start and
walking down that ditch line and
weapons or weapon before any chi
accidentally discharged it.

Q. When the Defendant was
scene after you searched for the
arrested?

A. I made a phone call to
Office and gave her a rundown of
they said they would accept the
assault family member two times
handcuffs.

Q. Now, when the Defendant

Inventory of motorcycle

Started before Δ under arrest

was this the motorcycle he arrived on in State's Exhibit 31?

A. Yes, ma'am, it was.

Q. And in State's Exhibit 32?

A. Yes, ma'am, that's the motorcycle.

Q. Now, who inventoried the motorcycle after the Defendant was arrested?

A. Deputy Benningfield inventoried the vehicle.

Q. And what is an inventory?

A. It's to find out what's in the vehicle since the constable's department, once we make an arrest or any police agency when they make an arrest, we are responsible for what's on and in the vehicle. So, therefore, we have to verify what is on and in the vehicle.

Q. And was the Defendant under arrest at the time that Deputy Benningfield completed the inventory of the motorcycle?

A. Yes, he was.

Q. What was recovered from the motorcycle during Deputy Benningfield's inventory?

A. What was recovered?

Q. Or what was found on the Defendant's motorcycle?

A. We found two weapons, one was a 32-caliber

two weapons found on motorcycle

3 magazines for .45 but only 2 in incident Rpt

S27

S28

semiautomatic pistol. The

semiautomatic handgun with

Q. What are we lookin

A. That would be the

with the three clips, three

Q. Deputy Maxwell, is

State's Exhibit 26, of that

A. Yes, ma'am, it is.

Q. And what are we lo

Exhibit 27?

A. That would be the

Q. And State's Exhibi

A. That is the serial

automatic pistol, semiautom

Q. And were you watch

inventory the vehicle?

A. No, ma'am. I was

check on the subject that w

Q. So, how is it that

of these weapons?

A. When we got throug

photographing them, I saw t

that came out of -- came of

Q. Deputy Benningfiel

you State's Exhibit 20. Wh

No Personal Knowledge Hearsay

A. That is a package that had two of the magazines and also a knife.

Q. Where was this found?

A. It was found in the saddlebag on the right-hand side of the motorcycle.

Q. And, Deputy Benningfield, to go back in State's Exhibit -- sorry, State's Exhibit 16, where was the .45 found?

A. It also was found in the right-hand saddlebag of the motorcycle. I believe either in the vest or in a pair of chaps. Not on Inventory $800

Q. And in State's Exhibit 14, is this the vest you're talking about?

A. Yes, ma'am.

Q. And to open the saddlebags that were found on the Defendant's motorcycle, do you recall if they needed keys to unlock them?

A. No, ma'am, I believe they were not locked.

Q. Deputy Maxwell, I'm showing you State's Exhibit 34. Can you just describe for the jury where the guns were found?

A. It would have been behind the seat on the right-hand side, the side that we are looking at, of the motorcycle.

Q. And pointing to State's Exhibit 34, is this

little area that the guns were f

A. Yes, ma'am.

MS. CLARK: Your H witness?

THE COURT: You ma

Q. (BY MS. CLARK) Deputy Deputy Maxwell, I'm sorry, I'm s marked as State's Exhibits 39, 3 recognize State's Exhibits, 39 t

A. Yes, ma'am.

Q. And how do you recogniz through 40?

A. Well, they have my name case number that's on here.

Q. So your name is listed

A. Right there.

Q. -- on State's Exhibit 3

A. Yes, ma'am.

Q. On State's Exhibit 38 a Exhibit 40?

A. Yes, ma'am.

Q. Now looking at State's open?

THE COURT: Counse deputy check?

Checking hand gun in front of Jury

MS. CLARK: Oh, yes.

Q. (BY MS. CLARK) Deputy Maxwell, has the deputy already inspected these weapons and checked them?

A. Yes, ma'am.

Q. Prior to --

A. Prior to court this morning.

MS. CLARK: Do you still want?

THE COURT: I do.

MS. CLARK: Okay.

THE BAILIFF: Weapon is clear, ma'am.

THE COURT: Thank you. You may proceed.

MS. CLARK: Thank you, your Honor.

Q. (BY MS. CLARK) Now I'm looking at State's Exhibit 39. Can you please open State's Exhibit 39?

And do you recognize State's Exhibit 39?

A. Yes, ma'am, that's the 1911 that we found on the motorcycle.

Q. And what was done with State's Exhibit 39 at the scene?

A. At the scene, it was put in my vehicle; and I took it to the station and put it into evidence.

Q. And how did State's 39 get here today, to your knowledge?

A. Deputy Benningfield picked the weapons up and brought them down here.

Q. Now on State's Exh
altered in any way?

A. No, ma'am.

Q. To your knowledge?

A. Other than rusting

Q. Do you know why th

A. The reason the gun
Hurricane Harvey came in, o
water. That's where the gu

Q. Now looking at Sta
that, please? And what is

A. State's Exhibit 38
semiautomatic handgun along

Q. And how did State'
with State's Exhibit 38 at

A. It was carried bac
the evidence locker.

Q. And how did State'
today?

A. Deputy Benningfiel
court.

Q. And has it been al

A. Other than the rus
room, no, ma'am.

Q. And then State's E

that and tell us what it is?

A. That is two magazines, unloaded magazines, that fit the 45-caliber handgun.

Q. And what was done with State's Exhibit 40 on April 2nd, 2014?

A. Again, it was dropped into the inventory.

Q. And how did State's Exhibit 40 come to the courtroom today?

A. Deputy Benningfield brought it with her.

Q. And has it been altered in any way, to your knowledge?

A. Not to my knowledge.

MS. CLARK: Your Honor, at this time State moves to admit State's Exhibits 39, 40 and -- 39, 38 and 40, tendering to defense counsel for objection.

I'm sorry, Judge. State moves to admit State's Exhibits 38, 39 and 40, the bag and its contents.

(State's Exhibit Nos. 38, 39 and 40 offered.)

THE COURT: Any objection?

MR. GAISER: Other than my previous objection, I have no objection.

THE COURT: State's Exhibits 38, 39 and 40 are admitted.

magazines
S40
S38-40
Illegal Search Illegal Suppression

(State's Exhibit No

admitted.)

MS. CLARK: Permis

jury, your Honor?

THE COURT: Grante

Q. (BY MS. CLARK) Deputy

looking at in State's Exhibit 39

A. That is a bag, evidence

not Glock, excuse me, the 1911 w

science lab for testing.

Q. And is this your name l

A. Yes, ma'am.

Q. And what is listed here

A. That would be the case

Q. And inside this bag wit

what is that?

A. That would be the 1911

handgun.

Q. And what is this in Sta

A. That is one of the maga

weapon.

Q. And where was this reco

A. In the right-hand saddl

Q. And State's Exhibit 38,

here?

S39
Not in Incident Rpt. No ammunition Count on it in 1400-45589 Incident Rpt
S38

A. That's a bag that the weapon was sent over to the forensic science lab in with my name on the front and the case number on the side.

Q. Thank you, Deputy Maxwell. And what are we looking at in State's Exhibit 38 here?

A. That would be the 32-caliber semiautomatic handgun along with the magazine.

Q. And, Deputy Maxwell, you've mentioned that this weapon was rusted. If you can remember, what color was underneath this rust?

A. It's black semiautomatic.

Q. And, Deputy Maxwell, if you know, do you know why there's zip ties on this weapon?

A. Yes, ma'am, that's the way we secure our weapons when we turn them in.

Q. So the weapon was not recovered with the zip ties?

A. No, ma'am, the weapons were discovered with the magazines in 'em and fully loaded magazines in 'em along with one shell down the chamber.

Q. Deputy Maxwell, did this magazine have -- did this magazine have bullets in it when you recovered it from the Defendant's motorcycle?

A. Yes, ma'am, it sure did.

Q. And in State's Exhibit 30, can we see those

bullets?

A. I'm sorry. What w

Q. In State's Exhibit

in the magazine?

A. Yes, ma'am, you ca

Q. And in State's Exh

45-caliber had bullets when

Defendant's motorcycle?

A. Yes, ma'am, the ma

one down the chamber; and i

you will see that it is a h

Q. What's the signifi

A. Well, to kind of t

when you discharge the weap

hole about the size of your

it makes a two-inch hole on

Q. Now, we're looking

your name listed on this ba

A. Yes, ma'am, it is.

Q. Is your name liste

Exhibit 40 under where it s

A. Yes, ma'am, it is.

Q. And what is this n

Exhibit 40?

A. Well, it has a gla

be the case number.

Q. Can you see now?

A. Yes, ma'am, that would be the case number.

Q. What are we looking at here in State's Exhibit 40?

A. That would be two magazines that fit the 45 caliber semiautomatic handgun.

Q. And were there bullets when you recovered these magazines from the Defendant's motorcycle?

A. Yes, ma'am, and they also were hollow points.

Q. Deputy Maxwell, did you have a chance to run the Defendant's criminal history later on?

A. Yes, ma'am.

Q. And did you discover he was a convicted felon?

MR. GAISER: Your Honor, I object. That's hearsay.

THE COURT: Sustained.

MS. CLARK: Your Honor, at this time, State offers State's Exhibits 41 and 42. State's Exhibit 41 is the Stipulation of Evidence and 42 is the Judgment and Sentence of the Defendant, tendering to defense counsel.

(State's Exhibit Nos. 41 and 42 offered.)

MR. GAISER: I have no objection.

THE COURT: State's Exhibits 41 and 42 are

admitted.

(State's Exhibit No

MS. CLARK: May I p

THE COURT: You may

MS. CLARK: Your Ho

41 into the record?

THE COURT: Yes.

MS. CLARK: Cause N

*Texas vs. Steven Kurt Baughman,*

District Court of Harris County,

<u>Stipulation of Evid</u>

I, Steven Kurt Baug

the above entitled and numbered

agree to stipulate that I have pr

of a felony offense, to-wit;

I am the same Steve

convicted of the offense of atte

murder - police officer in Crimi

179 of Harris County, Texas, in

November 28th, 1989.

Signed by the Defen

Subscribed and swor

undersigned authority, on this 4t

Signed by the 174th

signed by the attorney; signed by

the 174th District Court, and signed by the attorney for the State.

State's Exhibit 42, State of Texas -- in Cause No. 495549, in the 179th District Court of Harris County, Texas.

Judgment on Plea of Guilty are Nolo Contendere before Court waiver of jury trial.

Convicted of attempted capital murder of a peace officer, date of offense, February 25th, 1988; date of judgment, November 28th, 1989; plea of guilty. State of Texas vs. Steven Kurt Baughman.

Q. (BY MS. CLARK) Now, Deputy Maxwell, were you dispatched to 25410 Pepper Ridge Lane on April 2nd, 2014?

A. Yes, ma'am, I was.

Q. And whose address was this that you were dispatched to?

A. I'm sorry?

Q. Whose address was this that you were dispatched to?

A. That was Machell Spears (sic).

Q. And, to your knowledge, did the Defendant live at that address.

A. To my knowledge, no, ma'am, he did not.

Q. And, Deputy Maxwell, to your knowledge, did the

D did not live at address

John Spears

Defendant live on that road

A. No, ma'am, to my k

Q. So if the Defendan would that be outside of hi

A. Yes, ma'am, it wou premises.

Q. And the Defendant location, would that be con

A. Yes, ma'am, it wou

Q. Based on the Defen

A. Yes, ma'am.

MS. CLARK: Yo

THE COURT: Th us to take our mid-morning to go get a snack or step o the building, you would hav security. So, I'll let you time. We'll be in a 15-min

THE BAILIFF:

(Jury exits co

THE COURT: Th welcome to step down, Mr. M

THE WITNESS:

(A recess was

(Open court, D

THE BAILIFF: All rise.

(Jury enters courtroom.)

THE COURT: Thank you. Please be seated. Counsel, you may proceed.

MR. GAISER: Thank you, your Honor.

**CROSS-EXAMINATION**

BY MR. GAISER:

Q. Deputy Maxwell, good morning.

A. Good morning, sir.

Q. What is a young fella like you doing retired? It seems like you should still be working?

A. Yeah, sometimes I feel like I need to be but it's just hard having to get up and look at that lake every morning and think about how many fish are out there and you need to get your share of them.

(Laughter.)

Q. (BY MR. GAISER) I bet that's true. Now, you worked for Precinct 4 Constable's Office for how many years?

A. Yes, sir, I did.

Q. How many years?

A. How many years? Eight years.

Q. Okay. And before that you were inspector for a construction firm?

A. Well, for an engineering firms, more than one.

Q. When did you become a p

A. Nine years ago now I gu been, what, 1998, somewhere alon

Q. So, in 2014 -- so you w officer for some other agency be for Precinct 4?

A. I was a reserve at Prec Office.

Q. And on April 2nd of 201 is that correct?

A. I was starting my shift

Q. And what time did you s

A. Somewhere between 6:00

Q. You were alone at that

A. Yes, sir.

Q. And where did -- where weapons disturbance to have take

A. I was dispatched to 254

Q. When you got there, who anyone there at 25410 Pepper Rid

A. At that time when I got anybody was there.

Q. So you were the first t

A. Well, no, if you're ask

Q. Yes.

MATTIE KIMBLE, C

A. -- then there was one other unit that had gotten there before me. If you're talking about the Complainant or witnesses to that, then, no.

Q. No, I'm talking about the officers?

A. There was one other unit that had gotten there before me.

Other unit arrived b/f

Q. And who was that officer?

A. That was then Corporal Flores.

Q. Was he the only other law enforcement officer there at the scene when you first arrived?

A. Well, he had a trainee with him; and his trainee was there.

Q. What's a trainee? What do you mean?

A. That's an officer that's just been hired by our department, and at that time we had to go through about eight weeks of training, ride-along training.

Q. So, he was there; but he was more in a learning capacity?

A. Yes, Corporal Flores' rider, yes. Corporal Flores was not. He was there but not as a trainee.

Q. Now, when you say "weapons disturbance," what do you mean by that?

A. -- There was a discharge of a firearm.

discharge of weapon

Q. That's what's meant by weapons disturbance?

A. In this particular case, yes.

Q. So there had been

this --

A. Yes.

Q. You were dispatche

had reported a weapon disch

A. Yes, sir.

Q. And when you got t

were law enforcement people

A. At that time when

was all who was at that loc

Benningfield was dispatched

where the Complainant was.

Q. All right. And yo

communication?

All through Call for service

A. Yes, sir.

Q. Deputy Benningfiel

another location relative t

disturbance?

A. Yes, sir.

Q. And when you say 6

about in the morning, corre

A. Yes, sir.

Q. So sometime before

weapons discharge at that l

No Report From dispatch or 911

A. Yes, sir.

Q. Now, when you identified several photographs that were admitted into evidence, did you take those photographs?
A. No, sir, I did not.
Q. Who took those photographs?
A. Sergeant Walker.
Q. Did -- now State's Exhibit 4 depicts a vehicle, correct?
A. Yes, sir.
Q. And you stated that was the Complainant's vehicle; is that right?
A. Yes, sir.
Q. You learned that that was the Complainant's vehicle while you were there?
A. Yes, sir.
Q. And the door was open as it's depicted in this photo?
A. Yes, it was.
Q. And that was open like that when you arrived?
A. Yes, it was.
Q. Now, at some point, the complaining witness, Machell, you remember her last name?
A. Spears (sic).
Q. State's Exhibit 8, this is Machell Spear, correct?

only blood on head

retrieve watch

Came didnt have it

No injuries to John

A. Yes, sir, that is correc
Q. On the front of her shir
designs. Those aren't blood. Ar
are those blood on her shirt?
A. It's designs.
Q. The only blood you detec
correct?
A. Yes, sir.
Q. Did you actually see the
A. Yes, sir, I did.
Q. And you spoke to Machell
what this disturbance was about?
A. Yes, sir. She told me t
had come over wanting to retrieve
Q. Did she say what kind of
A. She said it was a Rolex.
Q. Did she say whether or n
of the watch?
A. She told me she did not
nor did she know where it was.
Q. Now, did you interview J
A. Yes, sir, I did.
Q. Did he have any injuries
A. No, sir, he did not.
Q. Did he complain of havin

A. Other than being scared, no, sir, he did not.

Q. Now, Ms. Spear claimed that she had been hit on the head with a firearm; is that correct?

A. Yes, sir.

Q. And eventually you recovered two firearms, correct?

A. Yes, sir.

Q. Were you present when the motorcycle was searched?

A. Yes, sir.

Q. Did you conduct the inventory?

A. No, sir, I did not.

Q. I want to show you what's previously been marked as Defendant's Exhibit 3, ask you if you recognize that document?

A. I recognize it as being a wrecker slip from Harris County Precinct 4 Constable's Office. It has our address on it and listed items.

Q. Are those the items that were found in the motorcycle?

A. Yes, sir.

MR. GAISER: Your Honor, at this time, I would tender this to the State and offer it into evidence.

(Defense Exhibit No. 3 offered.)

D3

D3 admitted w/o obj

MR. BELT: No

THE COURT: D admitted.

(Defense Exhi

Q. (BY MR. GAISER) is called Harris County Co No. 4 wrecker slip, did yo that?

A. No, sir, I did no

Q. Did you ever check accurate?

A. Yes, sir.

Q. How did you do th

A. At the office.

Q. Okay. So, you're determined it was accurate signature?

A. No, sir, I did no

Q. But it appears th document?

A. Yes, sir.

Q. Why would that be

A. Because I was the officer that was dispatche

Q. So this was your

A. Yes.
Q. And you checked this?
A. Yes, sir.
Q. At some time to make sure it was accurate?
A. Yes, sir.
Q. And it indicates that -- let's see what was found on the motorcycle. Can you read the list of items that were found in the motorcycle, please?
A. There was a leather vest, a jean pocket, miscellaneous straps, tool mats, a large flashlight, miscellaneous papers, Black Hawk gloves, two sets of keys, two holsters and a black cell phone.
Q. Let me show you what's been marked as State's Exhibit No. 32, can you see that?
A. Yes, sir.
Q. What -- there's an object lying on the ground behind the motorcycle, can you tell us what that is?
A. No, sir, no, sir, I can't.
Q. I want to show you what's been marked as Defendant's Exhibit No. 2. Do you recognize that? What's depicted there?
A. Yes, sir, that is a vest, black vest.
Q. That's a black leather vest?
A. Yes, sir, along with a pouch.
Q. Does it fairly and accurately depict what you

what found in motorcycle

S32

D2

saw out there that day?
A. Yes, sir.
MR. GAISER: I ten
offer Defendant's Exhibit No. 2
(Defense Exhibit N
MR. BELT: No obje
THE COURT: Defend
admitted.
(Defense Exhibit N
MR. GAISER: Publi
THE COURT: Grante
Q. (BY MR. GAISER) That i
No. 2, and that's the black leat
talking about, correct?
A. Yes, sir.
Q. Does it appear that the
in a pocket or holster in that v
A. Yes, sir, it appears th
Q. That's one of the weapo
out there that day, correct?
A. That is correct.
Q. That's depicted in Stat
leather vest, correct?
A. Yes, sir.
Q. That's listed on the in

D2 admitted w/o obj.

weapon recovered from vest

Not on Tow Slip
Not in inventory
Had Vest on?

A. Yes, sir.
Q. You remember finding a leather jacket?
A. I'm sorry?
Q. Do you remember finding a leather jacket?
A. I believe and I may be mistaken, but I believe I took a leather jacket off of the Defendant, but it could have been a vest. It's been four years since I was there.
Q. And when -- I believe you testified that you were on the scene about an hour before Mr. Baughman rode up on his motorcycle?
A. Yes, sir.
Q. And I take it at that point, you say that Machell Spear and her son, John Spear, were frightened and hid behind the car?
A. Yes, sir.
Q. And when the Defendant rode up on his motorcycle, did he stop?
A. Well, we had two officers in the street; and he stopped him from going on.
Q. I assume they waved him down?
A. Yes, sir.
Q. He didn't try to run away, did he?
A. No, sir.
Q. Did you speak to him right away?

No Weapon on me.

D had gun
thrown

A. Yes, sir.
Q. What did you say t
A. Well, the first th
did a body -- not a body se
him for officer security to
weapons on him; and then we
was.
Q. What was the weath
A. It was sunny.
Q. Warm?
A. Well, it wasn't wa
either. It was fairly nice
Q. You were comfortab
A. Yes, sir.
Q. And when you asked
did he say?
A. What did he say?
Q. Yes.
A. He said he had a g
Q. What did he say ha
A. He said he threw t
a ditch on Spring Creek Dr
Q. Now, you testified
in saying that we put him t
down to Spring Creek; is th

A. Yes, sir. We asked him to get in the vehicle, and he got in the vehicle, and we went looking for the weapon.

Q. Was he in the front or the back?

A. He was in the back.

Q. Did your vehicle have one of those screens that provides security from whoever might be in the back?

A. Yes, it did.

Q. He was in the back, and you had patted him down?

A. Yes, sir.

Q. Did you find any weapons when you patted him down?

A. Not on him, no, sir.

Q. And he said, he told you a location where he had thrown a pistol away; and you drove to that location, correct?

A. Yes, sir.

Q. Did he get out of the car when you arrived at that location?

A. No, sir.

Q. Did he direct you where to go to look for the pistol?

A. Yes, sir. He told me where to stop, and I stopped. I said where at in the ditch? He said, I

no weapon on Δ

stayed in car

don't know where it landed; but

Q. And you keep saying "we

referring to yourself alone?

A. Yes, sir, but I'm from

never say I did anything. You a

people there, you include everyb

Q. Really. So, when you s

you're saying "I"; is that corre

A. Yes, sir, he and I.

Q. You don't mean to imply

people with you on this search f

than --

A. None other than the Def

Q. He sat in the car?

A. Yes, sir.

Q. Were the windows up or

A. They were down.

Q. So he could talk to you

A. Yes, sir.

Q. Did you have a conversa

were there?

A. I asked him was I in th

direction.

Q. And --

A. And he stated he though

Just her + Δ

windows down

ime did you spend looking for this

ow for sure; but if I had to guess,
) minutes or so.
is this a drainage ditch we're

e water in it?
t did not have water at that time.
owledge, did anyone else ever go to
on to see if there was a pistol?
alker drove all the way down to
d got out of his vehicle at least one
emember.
e to talk to Sergeant Walker to know
search was, correct?

'd have to talk to Sergeant Walker to
stive that search was, correct?
t, yes, sir.
rove back to 25410 Pepper Ridge after
rch for the gun, correct?
we did.
ou arrived there, is that when you
under arrest?

A. No, sir. When I arrived there, I called Harris County District Attorney's Office and gave them a rundown of what I had; and the district attorney -- assistant district attorney accepted the charge of aggravated assault family member two times.

Q. You say "family member," what do you mean by family member?

A. They were in a dating relationship.

Q. Was he in the dating relationship with John Spear?

A. No.

Q. But he was in -- as far as you knew, he was in a dating relationship with Machell Spear; is that correct?

A. That is correct.

Q. That's what she told you, right?

A. Yes, sir.

Q. Did you ask Mr. Baughman anything about that relationship?

A. I don't recall whether I did or not.

Q. Did you question Mr. Baughman about what had transpired that day?

A. I did.

Q. And that's before he was placed under arrest?

A. Yes, sir.

dating relationship

TAC Motion To Suppress Custodial Statement

Q. And Mr. Baughman told you that he had gone there to retrieve a watch; is that correct?

A. That is correct.

Q. Gone there to retrieve his mother's Rolex watch, correct?

A. That is correct.

Q. He said that it had been taken by Machell Spear, didn't he?

A. Yes, sir, he did.

Q. Now, the search of the motorcycle, that happens after Mr. Baughman is under arrest, correct?

A. Excuse me, yes, sir.

Q. What is the reason for conducting a search of the vehicle at that point?

A. That is to make an inventory of everything that's in the motorcycle because once we have the vehicle towed, whether it be a car or a motorcycle, then we are responsible for any and everything that's in the bike or in the vehicle. So, for our protection, we list what's in there before we turn it over to a wrecker driver.

Q. So that's so the constable won't have any liability if there's a claim made that something was stolen, correct?

A. That is correct.

retrieve watch stolen by Cony

Inventory Maxwell did not Sign Tow Slip

Q. Now, how did they get motorcycle?

A. I'm not sure whether t saddlebag or whether that was a they just opened it up.

Q. You know if they used

A. No, sir, I do not.

Q. Who would know that?

A. Officer Benningfield.

Q. Is Officer Benningfiel conducted the inventory?

A. Yes.

Q. And is she the one tha list?

A. I'm not sure who prepa

Q. Okay. But you signed it?

A. No, sir, I did not sig my signature on that piece of p

Q. So you don't know who name to that inventory?

A. No, sir, I don't. Our a trainee there, we probably al it out for the experience; and or he did.

Q. Is there a reason that -- I'm sure there's a reason why, but the firearms and the ammunitions were not included in the inventory?

A. Yes, sir, because I took those with me back to the station along with the Defendant and filled out a property, and with all firearms they're automatically sent to the forensic science department.

Harris County Forensic Science Report

Q. Is that Harris County Forensic Science Institute?

A. Yes.

Q. And I take it they would conduct any testing that might have occurred on those weapons?

A. Yes, sir.

Q. And at some point after they've conducted testing, they would return those to the constable's office, I take it?

A. Yes, sir.

Q. And that's where they were today. Officer Benningfield or Deputy Benningfield picked them up, correct?

A. Yes, sir.

test on weapons

Q. So if anybody had requested a determination of whether there was any blood or human tissue on those firearms, that would have been done by the Harris County Institute of Forensic Science, correct?

A. Correct.

Q. Who would have req

A. Who would have req

Q. Yes, sir.

A. I guess the forens

no testing requested

Q. Well, when you sen request any kind of testing evidence that you send to t

A. I did not request

Q. Were you in charge

A. Yes, I was.

Q. So it would have b testing of those firearms,

A. Yes, sir.

Q. And you didn't req human tissue on the firearm

A. Correct.

test to see if fired

Q. Now, I take it whe leaves a distinctive odor fired; is that correct?

A. That is correct.

Q. And I take it you of test on the firearms in

A. I'm sorry. Run th

Q. I take it you cond

on these firearms?

A. No, sir, I didn't.

Q. But yet they indicated that a firearms had been discharged, correct?

A. Yes, sir.

Q. How many times did they say it had been shot?

A. Three times.

no cartridge casings

Q. You find any cartridge casings to support that?

A. No, sir, I did not.

Q. Did they say where the gun had been fired?

A. In the backyard near the back porch.

no evidence of shots fired

Q. Did you look to see if there were any holes or evidence of firearms discharged there?

A. Yes, I did.

Q. Did you find anything?

A. No, sir, I did not.

Q. Who transported Mr. Baughman after he was placed under arrest, who transported him to whatever location he was taken to?

A. I did.

Q. In your patrol car?

A. Yes, sir.

Q. And I take it he was in handcuffs at that point?

A. Yes, sir, at that point when I spoke with the

perjury states he violated poliy

DA and got charges against him,

handcuffs.

Q. Okay. Is there a poli

Constable's Office about handcu

the back of a patrol car?

A. Yes, sir.

Q. What is that policy?

A. The policy is to handc

behind their back.

Q. But you didn't handcuf

took him to look for the pistol

A. No, sir, I don't belie

Q. So that was a violatio

A. Yes, sir.

Does not know inventory policy

Q. Now, are you familiar

Constable's Office policy with

searches?

A. I know that we are sup

inventory search.

Q. Do you know any of the

policy?

A. It's been four years s

not sure, they may have changed

Q. Does the policy allow

locked apartments?

A. I'm not sure.

Q. Mr. Baughman at some point was definitely wearing the black leather coat or jacket; is that correct?

Bandido Jacket

A. I believe he was wearing a jacket of some sort, yes.

Q. And you took some photos of him there out at the scene, correct?

A. Photos were taken of him at the scene, yes, sir.

Q. Let me show you what's been marked as Defendant's Exhibit No. 1. You recognize that photograph?

A. Yes, sir.

Q. Does it fairly and accurately depict what it purports to show?

A. Yes, sir.

MR. GAISER: Your Honor, at this time, I would like to tender Defendant's Exhibit No. 1 to counsel from the State and offer it into evidence.

D1 admitted w/o obj

(Defense Exhibit No. 1 offered.)

MR. BELT: No objection.

THE COURT: Defense Exhibit 1 is admitted.

(Defense Exhibit No. 1 admitted.)

MR. GAISER: Publish it?

Need date & time stamp on photos Digital camera had date & time

What D wear

THE COURT: You

MR. GAISER: Th

Q. (BY MR. GAISER) Is Mr. Baughman out there? Is picture of you and Mr. Baugh April 2nd, 2014?

A. Yes, it is.

Q. That's when you're from the scene and he's unde

A. Yes, sir.

Q. And he's wearing a

A. Correct.

Q. And that's you stan

A. Yes, sir.

Q. Who is the deputy's

A. That appears to be

Q. I'm not going to as

A. You work with someb of know what they look like.

MR. GAISER: I' Honor.

MS. CLARK: Bri

**REDIRECT E**

BY MS. CLARK:

Q. Deputy Maxwell, why

the inventory search in Defendant's Exhibit 3?

A. Because we are required to take them and put them into storage.

Q. And where were those guns taken from the scene?

A. They were taken to 7900 Will Clayton and put into evidence there; and at some point in time, they were transferred over to Cypresswood Station.

Q. But were the weapons stored in the same location as the other evidence that was inventoried from the scene?

A. Yes, ma'am.

Q. Now when you and the Defendant were going to look for the gun, did the Defendant go willingly with you to search for the weapon?

A. Yes, he did.

Q. Was the Defendant under arrest when you went to search for the weapon?

A. No, he wasn't.

Q. And the statements the Defendant made to you were you coercing the Defendant or threatening the Defendant to make those statements?

A. No, ma'am, I wasn't.

Q. Were those statements voluntary?

A. Yes, they were.

Q. Now defense counsel talked to you a little bit

about a family member that was li

was made; and, to your knowledge,

also be a former dating relations

A. Yes, ma'am, under state

Q. And can a family member

relation?

A. Yes, ma'am.

Q. And, Deputy Maxwell, why

any testing of blood or human tis

A. I didn't see the necessi

Q. Why not?

A. It -- I didn't think abo

that time.

Q. And after being the firs

and talking to the complaining wi

who was injured in this scene?

A. I knew she was injured,

Q. And did the complaining

identify the Defendant as the ind

with the weapon?

A. Yes, she did.

Q. Now, Deputy Maxwell, can

jury what the backyard of the com

looked like?

A. It's a backyard, had a bi

backyard; and the van was in the concreted driveway. Underneath the outside portion of the house, it had a stone walkway area.

Q. Were there bushes in the backyard, if you remember?

A. I really don't remember.

Q. Deputy Maxwell, have you searched for gun casings before?

A. Yes, I have.

Q. And how -- is it difficult or easy to find gun casings?

A. They're gon' be difficult to find. I've gone to scene three days afterwards and found shell casings that weren't visible the day of incident.

Q. Why is it difficult to find them?

A. Well, they're hid under grass. There's no telling for sure which way the shell casings went. There's no possible -- there's just no way to tell which way the shell casing was ejected out of the weapon, which way the person discharging the weapon was standing at the time.

Q. Deputy Maxwell, knowing that a gun had been discharged and casings had been left at the scene, at a scene that's similar to this, would it be difficult to find those casings in your experience?

A. Yes, it would be.

Q. In a scene that's

from that scene, would it

A. Yes, it would.

Q. Why is that?

A. They could have b

on, mashed under the groun

MS. CLARK: F

RECROSS

BY MR. GAISER:

Q. Deputy Maxwell, d

the house?

A. No, sir.

Q. Did you notice wh

vacant?

A. Ms. Spear stated

house.

Q. So, the implicati

is that correct, at some p

A. Yes.

Q. And just so it's

fire a semiautomatic pisto

that are in evidence, what

the shell casings and the

to happen? What happens w

semiautomatic weapons?

A. When you discharge your weapon, the breech comes back, it kicks the empty shell out, it closes back up putting another round down the chamber.

Q. So the shell casings are ejected from a semiautomatic weapon when it's fired?

A. Yes, sir.

Q. Did Machell Spear say which weapon or what kind of weapon she saw being --

A. She indicated that it was a .32.

Q. She knew it was a .32 pistol?

A. She indicated to me that it was, yes, sir.

Machell

MR. GAISER: I pass the witness.

MS. CLARK: No further questions, your Honor.

THE COURT: May this witness be excused?

MS. CLARK: Yes, your Honor.

THE COURT: Thank you, sir. You may step down, and you are excused.

THE WITNESS: Thank you.

THE COURT: Call your next witness.

MS. CLARK: State calls Deputy Benningfield.

THE BAILIFF: Judge, this witness was previously sworn in.

THE COURT: Thank

THE BAILIFF: Just

speak loud and clear.

THE COURT: You ma

MS. CLARK: Thank

**AMY BENNING**

having been previously sworn, t

**DIRECT EXAMI**

BY MS. CLARK:

Q. Deputy, can you please the jury?

A. I'm Deputy Benningfiel Precinct 4.

Q. And how long have you b

A. Since 2000.

Harris County P4 Since

Q. How long have you been officer?

A. Since 2003.

Q. And what kind of traini undergo to become a police offic

A. Of course, went to the the laws and did a lot of physic

Q. And what's your current

A. I'm a patrol deputy. I division at the time.

Q. And I want to draw your attention to April 2nd, 2014, where did you work on that day?
A. I was working in our east district. I was assigned to the contract with Northgate Crossings.
Q. And were you working alone or with a partner?
A. Alone.
Q. And were you dispatched to a particular location that day in regards to a weapons disturbance?
A. Yes.
Q. If you can remember, what was that location?
A. I have it on the report. I don't remember off the top of my head, but --
Q. You can refresh your memory?
A. Okay. It was location at 25410 Pepper Ridge Lane in Spring.
Q. And is that address in Harris County, Texas?
A. Yes.
Q. And what happened when you arrived on scene?
A. I remember as I was coming on my way to the scene, I remember a female running to my car hysterically. She was really nervous.
Q. And did you later learn who that individual was?
A. Yes.
Q. And who is that?

A. That was Ms. Spear.
Q. Deputy, I'm showing
marked and in evidence as St
the individual that you met?
A. Yes.
Q. And what was Machel
when you came into contact w
A. She was really nerv
Q. And did she seem un
that had just happened?
A. Yes.
Q. And did she make an
stress of that event that da
A. Yes, I can't recall
soon as she came up to me or
Q. What did she say to
MR. GAISER: I
THE COURT: Res
MS. CLARK: The
predicate for excited uttera
THE COURT: Can
witness, please?
MS. CLARK: Yes
THE COURT: The
Q. (BY MS. CLARK) At

made those statements to you, was she under the stress of the event that had just happened?

A. Yes.

Q. And what were those statements that she made to you?

A. I remember her stating that she was hit in the head with a gun. I can't remember word for word, but that is one of the things I do remember.

Q. And did you see any visible injuries on Machell Spear?

A. Yes.

Q. And what were -- what did you see?

A. I saw, looked like a little cut on her head that was also a knot from what I felt; and I saw some blood.

Q. Deputy, I'm showing you State's Exhibit 9, what are we looking at here in State's Exhibit 9?

A. It looks like a slight gash on her head.

Q. Is that what you saw on that day?

A. Yes.

Q. And did you learn how Machell Spear received those injuries?

A. I remember her telling me that she was hit in the head with a pistol.

Q. By who?

A. By the Defendant, Baug

Q. And is the pistol that deadly weapon?

A. Yes.

Q. And did you learn what Defendant and the complaining w had?

A. She stated it was her e

Q. And while you were work come into contact with an indivi Baughman?

A. Yes.

Q. Do you see that individ today?

A. Yes.

Q. Can you please identify article of his clothing?

A. He's wearing a dark sui striped tie.

MS. CLARK: Your Ho reflect that the witness has ide

THE COURT: The rec

Q. (BY MS. CLARK) How did with this Defendant?

A. I saw him pull up on hi

Q. And what was the Defendant instructed to do when he rode up on his motorcycle?

A. He was advised to stop and get off of the motorcycle.

Q. I'm showing you State's Exhibit 34. Was this the motorcycle the Defendant rode up on?

A. Yes.

Q. And what did you do after the Defendant was instructed to get off his motorcycle?

A. I waited. The other deputies, I can't remember what they done; but once he got off of the motorcycle, that's when other deputies spoke with him.

Q. And what did you do after the deputies spoke with the Defendant?

A. I just waited on the side.

Q. What happened after the Defendant was arrested, what did you do?

A. Once charges are accepted and that's when I went through the motorcycle for inventory of the vehicle to be towed, and that's when I found items in the motorcycle.

Q. Sorry, Deputy, I want to back up a little bit. When the Defendant approached this scene and was speaking with the other officers, did you see the Defendant get into a patrol vehicle and leave the scene?

A. Yes.

Q. How long do you th

if you can remember?

A. I don't remember.

Q. Do you know what t

deputy were doing?

A. From what I unders

pistol that he supposedly t

Q. And when the Defen

check the Defendant's motor

A. Yes.

Q. And what did you c

A. Just looking for a

for the tow slip to do inve

Q. And what is an inv

A. It's just anytime

we look inside the vehicle

vehicle at the time of the

Q. And what protocol

inventorying a vehicle?

A. When you know the

have to -- like on this sit

charges to be accepted; and

just searched it for anythi

make sure we have it on tha

Q. And when a container is found inside a vehicle when you're inventorying it, are you allowed to open that container?

A. Yes.

Q. What about if the container is locked, are you allowed to open it?

A. Yes, once the person is in custody.

Q. And what did you find in the Defendant's saddlebag of the motorcycle?

A. I found several items; and two of them were, of course, the pistols, the guns.

Q. I'm showing you State's Exhibit 16. What are we looking at here in State's Exhibit 16?

A. A handgun.

Q. And where were these handguns found?

A. One was found in a white plastic bag in the saddlebag, and the other one was found in the pocket of a leather vest.

Q. Do you remember which handgun was found where?

A. The .32 was found in the pocket of the leather vest, and the .45 was found in a plastic bag of the motorcycle.

Q. And what was done with these guns after you found them in the Defendant's motorcycle?

A. That's when they had the photos taken of the

guns, and the other deputy took

Q. And do you recall whet

locked?

A. I don't recall them be

MS. CLARK: Pass t

THE COURT: Mr. Ga

MR. GAISER: Thank

**CROSS-EXAMI**

BY MR. GAISER:

Q. You transported Machel where you picked her up back to Pepper Ridge Lane; is that corre

A. Yes.

Q. She was in your patrol

A. Yes.

Q. In the front seat or th

A. I think I had her in th

Q. Why would you put her i

A. If I can recall, I thin stuff in the front seat.

Q. And when you arrived at location, Mr. Baughman was not t

A. No, he wasn't.

Q. Was Ms. Spear's son, Jo

A. I can't remember if he

up.

Q. But at some point in time, did he arrive?

A. Yes.

Q. And do you know what time it was that you arrived at the Pepper Ridge address?

A. No, I don't remember.

Q. Was it in the morning?

A. I believe it was in the morning, but I don't know how early or late in the morning.

Q. So were you on patrol that day?

A. Yes.

Q. By yourself?

A. Yes.

Q. How long had you been on duty?

A. At that time, I think I was working from 6:00 a.m.

Q. So you hadn't been on duty very long before you got this call?

A. No, probably not. I don't remember what time I got the call.

Q. Do you remember what the dispatch was, what the wording of the dispatch was?

A. No, I don't.

Q. You were just told to go to this address?

A. I knew it was a call about weapons disturbance.

no key for saddlebag

It was either weapons distur

weapon.

Q. Now when Mr. Baughm

you have any conversation wi

A. No.

Q. Did anyone have any

A. I don't remember.

Q. And you don't remem

to get into the saddlebag?

A. From what I can rec

to use a key on the saddleba

Q. You don't recall.

Precinct 4 Constable's Offic

the locked compartment to co

A. Yes.

Q. So, if a -- say if

locked, you would be allowed

what was -- what you needed

A. I wouldn't. I log

certain compartment, I go ah

unable to open the trunk.

Q. So, if indeed, the

would have needed a key?

A. Correct.

Q. So you had no conve

up.

Q. But at some point in time, did he arrive?

A. Yes.

Q. And do you know what time it was that you arrived at the Pepper Ridge address?

A. No, I don't remember.

Q. Was it in the morning?

A. I believe it was in the morning, but I don't know how early or late in the morning.

Q. So were you on patrol that day?

A. Yes.

Q. By yourself?

A. Yes.

Q. How long had you been on duty?

A. At that time, I think I was working from 6:00 a.m.

Q. So you hadn't been on duty very long before you got this call?

A. No, probably not. I don't remember what time I got the call.

Q. Do you remember what the dispatch was, what the wording of the dispatch was?

A. No, I don't.

Q. You were just told to go to this address?

A. I knew it was a call about weapons disturbance.

no key for saddlebag

It was either weapons distur

weapon.

Q. Now when Mr. Baughm

you have any conversation wi

A. No.

Q. Did anyone have any

A. I don't remember.

Q. And you don't remem

to get into the saddlebag?

A. From what I can rec

to use a key on the saddleba

Q. You don't recall.

Precinct 4 Constable's Offic

the locked compartment to co

A. Yes.

Q. So, if a -- say if

locked, you would be allowed

what was -- what you needed

A. I wouldn't. I log

certain compartment, I go ah

unable to open the trunk.

Q. So, if indeed, the

would have needed a key?

A. Correct.

Q. So you had no conve

D not injur

A. No.

Q. Did you notice anything on Mr. Baughman, whether or not he was injured in any way?

A. No.

Q. You didn't notice it, or he was not injured?

A. I didn't notice any injury.

did inventory

Q. And you -- you're the one that conducted the inventory and made the list of items that were found in the motorcycle, correct?

A. Correct.

Q. So I'm going to show you Defendant's Exhibit 3 and ask you if that's the document that you created that day?

A. Correct, the first half of it, the vehicle, excuse me, the vehicle information is what I entered, is what I wrote down on this form.

Q. Okay. That it's a motorcycle?

A. Yes.

Q. Put down the VIN number?

A. Yes.

Q. And the case number?

A. Yes.

Q. The year of the motorcycle?

A. Yes.

Q. The fact that it's a Harley Davidson Road King?

didn't write inv.

A. Yes.

Q. It's black?

A. Yes.

Q. And license plate was up

A. Yes.

Q. And you're removing the

Baughman has been arrested, corre

A. Correct.

Q. Now this information dow

inventory vehicle contents, did y

A. I did look through the s

with the inventory, but I was not

those items down.

Q. I noticed Deputy Maxwell

the bottom of the inventory?

A. Yes.

Q. Would that mean he is th

those objects?

A. I can't remember for sur

assuming, was put on there becaus

unit.

MR. GAISER: May I p

THE COURT: You may.

Q. (BY MR. GAISER) So, can

A. Yes.

Q. So it says, "leather vest," you did not write that?

A. My eyes aren't that good. From here it looks like my handwriting on that one, but most of the rest of that -- there we go, thank you.

Q. Here it says "leather vest"?

A. Okay. No, I did not write that.

Q. Jean jacket?

A. No.

Q. Miscellaneous straps?

A. No.

Q. Tool something mats, did you write that?

A. It doesn't look like my handwriting.

Q. Large flashlights?

A. That doesn't look like my handwriting right there.

Q. Miscellaneous papers, did you write that?

A. I don't think I wrote that.

Q. Black gloves, two pairs, did you write that?

A. That doesn't look like my handwriting.

Q. Two sets of keys, did you write that?

A. Honestly that kind of looks like my handwriting, but I can't remember to tell you for sure that I remember writing.

Q. Two holsters, did you write that?

A. That does kind of

Q. Black cell phone?

A. That does not loo

Q. Do you know who w

or when

A. No, I don't -- I d them.

Q. You remember two

A. I don't remember.

Q. You don't remembe

A. No.

Q. What happens to t towed?

A. It gets taken to

Q. Is that the count

A. Yes.

Q. And these items t inventory, what happens to inventoried?

A. The items, as far with the vehicle. As far and take, usually we'll ta phone or a wallet, we'll t

Q. So those would be on the bike?

A. Yes.

Q. And then the bike would be towed away with those items in the saddlebag of the bike?

A. Yes.

MR. GAISER: I'll pass the witness.

MS. CLARK: Nothing further, your Honor.

THE COURT: May this witness be excused?

MS. CLARK: Yes, your Honor.

THE COURT: Thank you, ma'am. You may step down. You are excused.

THE WITNESS: Thank you.

Call your next witness.

MR. BELT: Your Honor, the State calls Machell Spear.

THE COURT: I don't know if the bailiff told you, just so you know, your lunch has been ordered. My understanding it's going to be here about 12:15. So, unless y'all need to take a break, we'll just continue until it arrives. Is that acceptable? Does anybody need to take a break?

JURORS: No.

THE COURT: Okay. If at any time I go too long and you do, just kind of wave at me so I'll know that you're uncomfortable.

MR. BELT: Your Honor, may I approach the exhibits?

Rule Invoked

THE COURT: You maa

MR. GAISER: May II

THE COURT: You maa

(Bench conference..

MR. GAISER: He nee

THE COURT: As soo back, we'll release the jury. I

MR. BELT: Oh.

THE COURT: There' courtroom.

MS. BURTON: Do you witness and bring the bailiff ba

(End of bench confe

THE COURT: If you your right hand to be sworn. I been sworn, yet.

THE WITNESS: No, m

THE COURT: Stand r

(Witness sworn.)

THE COURT: Just a instructions, then I'm actually jury for lunch so you don't need now. The Rule has been invoked, be in the courtroom when another You can also not discuss your tes

of another witness. So if you're speaking with one of the lawyers, just please make sure it's out of the earshot of the other witnesses. If you'll just have a seat on the first row, I'm getting ready to release the jury for their lunch break.

Deputy, can I get one of the other deputies in here to take the jury out? I believe he's putting their lunch in the jury room. I need another bailiff to take the jury out. Their lunch has arrived.

THE BAILIFF: Yes, ma'am.

THE COURT: All right. Ladies and gentlemen, I understand that your lunch has arrived so you may go with the deputy.

THE BAILIFF: All rise.

(Jury exits courtroom.)

THE COURT: Thank you. Be seated. We'll be in about a 45-minute break.

(A lunch break was taken.)

(Open court, Defendant present.)

THE BAILIFF: All rise.

(Jury enters courtroom.)

THE COURT: Thank you. Please be seated.

Mr. Belt, you may call your next witness.

MR. BELT: State calls Machell Spear, your Honor.

THE BAILIFF:

previously been sworn in.

THE COURT: Th

THE BAILIFF:

clearly.

THE COURT: Yo

MR. BELT: Tha

MACHEL

having been first duly swor

DIRECT E

BY MR. BELT:

Q. Good afternoon, ma

introduce yourself to the j

A. Hi, my name is Mac

Q. Ms. Spear, where d

A. I live in Aldine S

Q. How long have you

A. About 40 years.

Q. Have you lived in

A. No.

Q. Where have you liv

A. I was born in Penn

Q. And what do you do

A. I'm sorry, what?

Q. What is your profe

A. I'm a personal shopper.
THE COURT: Can y'all hear?
JUROR: It's a little bit low.
THE COURT: You might want to move up a little closer to that microphone. Thank you.
Q. (BY MR. BELT) Do you have any kids?
A. Yes, I do.
Q. How many?
A. Three.
Q. What are their names?
A. John, Heather and Thomas.
Q. How old are they?
A. 30, 28 and 23.
Q. And do you have any grandkids?
A. I do.
Q. How many?
A. Three.
Q. What are their names?
A. Natalie, Logan, and Zoe.
Q. Do they all live in the area?
A. No, they don't.
Q. John Spear is your son. Specifically, where does he live?
A. He lives in Spring.
Q. Spring, Texas?

04/02/14

helping son move

A. Yes.
Q. How long has he lived
A. Probably about six yea
Q. Would you consider you son?
A. Yes.
Q. And I want to bring yo April 2nd, 2014. Was that a to Spear?
A. Yes, it was.
Q. And can you tell the j that day? How did that day sta
A. I was at my son, John' from one house to his new house
Q. Now, Ms. Spear, I want previously entered as State's E you were talking about, this is
A. Yes, that's the house
Q. Is that house located
A. No, Spring.
Q. Is Spring the city, bu
A. Yes, Harris County.
Q. And that's in Texas?
A. Uh-huh, yes.
Q. Now I'm showing you wh

marked as State's Exhibit 4. Does this accurately depict the backyard on April 2nd, 2014?

A. Yes, where the driveway is on the side of the house and part of the back.

Q. Whose van is this?

A. That was my son's.

Q. And what about this little bike here, do you know whose that is?

A. One of the kids that were there, one of the nieces.

Q. One of the nieces. How many kids lived at that house?

A. Well, the son that lived there was a teenager, just one, but they always had family functions at that home. So, there were a lot of kids there.

Q. So John was living there at that time?

A. He moved, like, the day before.

Q. From that house?

A. Yeah.

Q. Now, on State's Exhibit 5, what are we looking at here?

A. That's the driveway.

Q. Okay. And this van here, is that John's van?

A. Yes.

Q. And then on State's Exhibit No. 6, what are we

looking at here?

A. That's the back, th

to the garage right there an

house.

Q. And then State's Ex

picture of the van?

A. Yeah.

Q. All right. Now, Ms

you about, a little bit more

time -- what were you doing

A. We were taking the

last bit of their property o

Q. And where were y'al

A. To their new house.

Q. Where was that hous

A. Same area.

Q. Who was in the van

A. Just my son, John.

Q. How long had y'all

A. It was our first tr

like 6 o'clock in the mornin

Q. In the morning?

A. Uh-huh.

Q. What was the weathe

still?

A. It was still dark.
Q. And when you got to the house, were the lights still on?
A. Yes --
Q. Okay.
A. -- they were on.
Q. And that picture I showed you of the van, that's where y'all stopped and parked?
A. Yes.
Q. Now when you parked the van -- who was driving?
A. My son.
Q. And where were you located?
A. I was in the passenger's seat right beside him.
Q. And when you stopped, what did you see in the driveway near the garage?
A. I saw Steven standing beside his motorcycle.
Q. Now, the visibility that morning, you talked about it being dark. How dark would you say it was?
A. Oh, I don't even remember the moon being out that day. It was really dark, but I could see a darker shadow.
Q. And so when you see this shadow, how do you know that it was Steven?
A. I knew because of the motorcycle and his size.
Q. So what about this motorcycle, where was the

motorcycle?
A. It was parked right th
the garage doors.
Q. Can I just approach an
So, you're saying the motorcycl
garage?
A. Yes.
Q. Okay. Where was Steve
A. He was standing right
Q. Right beside it, so in
A. Yes, that area.
Q. Would State's Exhibit
where you were looking that mor
A. Yes.
Q. But it's just a little
guess?
A. Yeah.
Q. Was this light on that
A. That porch light, yes.
Q. So there was some visi
A. Yeah.
Q. And when you mean the s
you mean by that?
A. His build.
Q. Big build?

A. Big man.

Q. Okay. Now, let's talk about how you know, you say Steven, you mean Steven Baughman?

A. Steven Boeman (sic).

Q. Boeman, let's talk about how you know the Defendant, when did y'all first meet?

A. I believe it was in January of 2014.

Q. About four months before this incident occurred?

A. Yes.

Q. And how did you meet, online or --

A. I was accidentally calling him. I was calling somebody else, and I accidentally got ahold of him, and I did repeatedly and we were talking and told him we should meet. He seemed like a fun person.

Q. And was Steven nice to you when y'all first met?

A. Yes.

Q. And how did it end up to a relationship?

A. Well, we met; and we liked each other.

Q. Okay. What would you characterize your relationship as?

A. Well, first had me -- the first time I went with him was to his home, have dinner with his mother and I thought somebody like that, that's a good person.

Q. And would you consi
your boyfriend at the time?

A. Yes, I would.

Q. How long did you an
2014?

A. It wasn't long at a
half, something like that.

Q. Did y'all have any
relationship?

A. No.

Q. And where -- was he
you living with him?

A. I lived with my fat
mother's house.

Q. Where did your fath

A. He lives in Aldine.

Q. And your father is

A. Yes.

Q. Now why would you s
at that point?

A. Why would I be?

Q. Yeah.

A. Well, he's older no
my husband and I needed a p
father's house.

Q. How far away from say John's house on Pepper Ridge was your father's house?
A. Probably at least 15 miles.
Q. 15 miles, okay. And did Steve -- did the Defendant ever spend the night with you at your dad's house?
A. No.
Q. Did you ever spend the night with the Defendant?
A. Yes.
Q. How many times would you say you spent the night?
A. Oh, I don't know, probably at least ten. I'm not real sure.
Q. Would you say that you were in love with the Defendant?
A. No.
Q. You were just dating?
A. Just dating.
Q. Well, then if you're not in love with him, what changed? What ended the relationship?
A. I didn't want to be around him anymore. I was getting scared of him.
Q. Why would you be scared of the Defendant?
A. He wasn't a very nice person.

why relationship ended

Q. Just not a nice person
A. And self-involved too
Q. So the relationship end
time you hear from the Defendant
A. On April the 2nd.
Q. The day in question?
A. Uh-huh. I didn't see
a month, month and a half.
Q. So how far would you sa
stance like when you first saw h
A. He was mad.
Q. You could tell that fro
A. Well, yeah, because he
looked terrible and his eyes wer
looking.
Q. And when did you first
or when you got out?
A. No, I first noticed it
Q. When was the first time
out of the van?
A. I went into the house f
I said hello to Steven.
Q. And what did he say?
A. He told me he wanted hi
Q. Is that all he said?

didn't see D →

D mad

CW said, "Dark couldn't see"

First noticed when after she got out

A. He said, "I want my watch back you stupid bitch."

Q. So he cursed at you?

A. Yes, he did.

Q. What was your response to that?

A. I don't have it.

Q. And then you went inside the house?

A. Yeah, I had to use the restroom. I went in.

Q. So, let's talk about that watch. What did he mean by the watch? What watch is he talking about?

A. He claims that I stole a Rolex watch from him.

Q. Whose Rolex watch?

A. His mother's.

Q. And what type of Rolex watch was this?

A. I don't know different types. It's just a gold Rolex watch.

Q. Have you ever seen this Rolex watch?

A. No.

Q. When he said this to you, was this a surprise?

A. Yes.

Q. And did the Defendant ever bring this up in the past about his mother's Rolex watch?

A. He wanted to show it to me one time, but I didn't see it.

Q. Why do you think the Defendant thought you

would had stolen this watch

A. I don't think he r

watch. I thought he was up

see him anymore and just tr

towards my family.

Q. Well, let's say th

wear jewelry?

A. No, I do not.

Q. Why?

A. I'm allergic to go

Q. What does gold do

A. It does exactly wh

glasses. It gives me sores

Q. And this watch he'

your knowledge, was a gold

A. Yes.

Q. Where did he say h

this watch from?

A. I had found a fake

Q. You had found a fa

A. Yeah.

Q. When did you find

A. Oh, gosh, I don't

him I didn't want to see hi

Q. Did you think that

A. I think he thought that would be a good way to get back towards me.

Q. But that watch, that fake watch you're speaking of, that was not the Defendant's mother's Rolex?

A. No, it was not.

Q. Was it even a Rolex?

A. No, it was not.

Q. And you weren't wearing any jewelry that day?

A. No.

Q. Now back to the garage here, you went inside, how long were you inside?

A. Just a few minutes, long enough to go to the restroom and come back out.

Q. Were you worried at this point after he had cursed at you about the watch?

A. No, I really wasn't.

Q. Why were you not worried?

A. I never thought he was going to do anything mean to me.

Q. Because he had never done anything --

A. He's never done anything mean to me before.

Q. And who stayed outside while you were inside?

A. My son was outside when I went in.

Q. And who is your son, again, John Spear?

A. John Spear.

Arms length away to Δ Jeff

A couple of steps away, arms lenth away

Q. All right. Do you kno

the Defendant on the motorcycle

A. When I came outside, h

distance to the Judge, fairly c

Q. What was their body la

out from the restroom?

A. Steven seemed really a

Q. At John?

A. No, just agitated in g

Mom, if you took something from

back, and I told him I didn't d

Q. And was the Defendant

John?

A. No.

Q. When you come back out

him?

A. I was really close, jus

his back towards where the gara

was just across from him, and I

him I didn't have anything of hi

leave me alone.

Q. How would you describe

when he was talking to you?

A. He was, like, loud and

Q. Yelling?

A. Yeah.
Q. Cursing?
A. Uh-huh.
Q. And what did you see, what do you remember him wearing that day?
A. He had on a vest.
Q. What color vest?
A. I believe it's black.
Q. Would it be a leather vest?
A. Yeah.
Q. And what kind --
A. Blue jeans.
Q. What kind of shirt underneath?
A. I don't remember the shirt underneath. I think it was a white T-shirt, but I can't say for sure and jeans.
Q. Jeans. When you first looked at him and he's agitated, do you see any weapons on him?
A. No.
Q. You don't. When is the first moment that you see a weapon?
A. It was just a few minutes after I'd come out from using the restroom that he started yelling at me and then put a gun in my face right here, told me he was gonna kill me.

Δ had black vest on

when saw weapon

BS

Q. Do you remember wha
A. I can't remember an
on my face I can't remembe
butt of it. He had it in hi
Q. So where -- could y
which hand, or tell the jury
the gun?
A. It was with his rig
this real fast and put the g
my eyes because I didn't wan
come out and kill me. (Witn
Q. Take your time if y
Ms. Spear, had
carry a weapon on his waist
A. Yes.
Q. How is that?
A. Because he always h
Q. Always?
A. Well, he claimed to
and I've seen them before an
them on him and stuff when h
Q. Did he ever brag ab
A. Not sharing them.
Q. Had you ever seen t
past?

what gun looked like

Which hand did he have gun in

Knew Δ carried gun

A. Yes, I have.

Q. And what did they look like?

A. Little handguns.

Q. What color, do you remember what color?

A. One of them had a brown handle.

Q. A brown handle?

A. Uh-huh, and I believe the other one was black.

Q. Where would the Defendant typically keep his weapons on him in the past?

A. He always had one on his waist or in his boot. I did see them, just leave them laid.

Q. And, to your knowledge, did the Defendant have a license to carry these weapons?

A. No.

Q. And so on the day, on April 2nd, 2014, you said his right hand, where did his right hand first go?

A. It was right here on the side.

Q. Right side of his body?

A. I think so, yeah.

Q. And would that be a location that you've even seen in the past where he would keep a weapon?

A. I've seen him have some kind of a band around him and, you know, maybe two guns at a time, I don't know.

Q. But that location on April 2nd was close --

Coached Perjury

Coached by Belt

A. It was right here -- Tha
because it happened very fast.

MR. GAISER: Objec
Honor.

THE COURT: Sustai
question/answer.

MR. BELT: Yes, yo

Q. (BY MR. BELT) Now let'
You said you didn't see it. Why
weapon?

A. The way he was holding

Q. What does that mean?

A. I mean, it was in his h
at first, I guess it wasn't that
expecting that.

Q. Were you paying much at
happened when he put it to your

A. I closed my eyes.

Why she closed his hand

Q. Why did you close your

A. I was scared. I didn't
a gun blow my brains out.

Q. If he had no violent hi
would you think the Defendant wa
brains out that day?

A. I believe if somebody

they're gonna use it.

Q. And did that -- when he put it to your -- forehead, did it feel like plastic on your forehead?

A. No, it was cold.

Q. Like what type?

A. Cold metal.

Q. And when he did that, did he say anything after he pointed it to your forehead?

A. He says, "Give me my watch you stupid fucking bitch. I'm gonna kill you, and I'm gonna have your whole family killed."

Q. And what were you thinking after he said that?

A. I didn't know what to think. I was just praying to God and closed my eyes, prayed to God. I didn't do this, please see me through. I have kids. Leave me alive, I want to watch my grandkids grow up.

Q. How long would you say your eyes were closed?

A. For a couple of minutes. It felt like a couple of minutes.

Q. Did you feel pressure on your forehead?

A. Yes.

Q. Did he want it to push into your forehead?

A. I just felt like, I could just feel it like right there, so it felt like to me, I don't want to miss you.

All together John & Machell Coached by Belt in hallway after Rule invoked

how long eyes closed

Coached by Belt

Q. Were you in fear of ... he did that to you?

A. Yes.

Q. Were you in fear fo... to you?

A. Yes, I was.

Q. Now after this is h... anything other than I'm gonn... your family?

A. I ran, I didn't --

Q. You ran?

A. Yes.

Q. Where was John whil... the Defendant had the gun --

A. He was to my right, ... beside me.

Q. To your right?

A. Yes.

Q. Did John do anythin...

A. Well, he told me, M... don't look back; and I told ... closed. He says, Mom, just ... back. So I opened my eyes a... could see that he was gonna ... that's when I took off to ru...

fear

She ran

Arms reach from Δ

they're gonna use it.

Q. And did that -- when he put it to your forehead, did it feel like plastic on your forehead?

A. No, it was cold.

Q. Like what type?

A. Cold metal.

Q. And when he did that, did he say anything after he pointed it to your forehead?

A. He says, "Give me my watch you stupid fucking bitch. I'm gonna kill you, and I'm gonna have your whole family killed."

Q. And what were you thinking after he said that?

A. I didn't know what to think. I was just praying to God and closed my eyes, prayed to God. I didn't do this, please see me through. I have kids. Leave me alive, I want to watch my grandkids grow up.

Q. How long would you say your eyes were closed?

A. For a couple of minutes. It felt like a couple of minutes.

Q. Did you feel pressure on your forehead?

A. Yes.

Q. Did he want it to push into your forehead?

A. I just felt like, I could just feel it like right there, so it felt like to me, I don't want to miss you.

Q. Were you in fear o

he did that to you?

A. Yes.

Q. Were you in fear fo

to you?

A. Yes, I was.

Q. Now after this is h

anything other than I'm gonn

your family?

A. I ran, I didn't --

Q. You ran?

A. Yes.

Q. Where was John whil

the Defendant had the gun --

A. He was to my right,

beside me.

Q. To your right?

A. Yes.

Q. Did John do anythin

A. Well, he told me, M

don't look back; and I told

closed. He says, Mom, just

back. So I opened my eyes a

could see that he was gonna

that's when I took off to ru

Q. Was there a point in which the Defendant struck you with anything?

A. Yeah, as soon as I turned around, he hit me in the back of the head with the gun.

Q. When you turned --

A. When I turned to run, I turned this way, my son was on this side, I turned this way to take off running. I wanted to get help, that's when I got hit in the head.

Q. Can you show the jury, point to where you got hit?

A. Yeah, right here (indicating).

MR. BELT: Your Honor, may the record reflect the witness has identified where she was hit with the weapon by the Defendant?

THE COURT: The record will so reflect.

Q. (BY MR. BELT) On the back of your head?

A. Yes.

Q. Now, I'm going to show you what's been already admitted as State's Exhibit 8. Who is this person?

A. That's me.

Q. Okay. And this is what you were wearing that day?

A. Yes.

Q. Who was the gentleman in the background?

A. That's my son, John.

Q. John Spear. And now

State's Exhibit 10, is this al

at in State's Exhibit 10?

A. That's where he hit m

Q. And on State's Exhibi

portion here?

A. That's blood.

Q. Whose blood is it?

A. Mine.

Q. Where did that blood

A. Come from being hit i

Q. And on State's Exhibi

thing we're looking at here?

A. Yes.

Q. The blood from your h

A. Yes.

Q. And then also State's

look at it?

A. It's the spot.

Q. Okay. Now, Ms. Spear

you over the head with a -- it

you with, correct?

A. Uh-huh.

Q. How do you know it was

A. Well, my son told me;

heavy."

MR. GAISER: Objection, hearsay.

THE COURT: Sustained.

MR. GAISER: Judge, I ask the jury be instructed to disregard.

THE COURT: Disregard that portion of her answer. You can't testify to what someone else said.

MR. GAISER: Move for a mistrial.

THE COURT: Overruled.

Q. (BY MR. BELT) Ms. Spear, without saying what John told you, what did you experience? How did you know it was a gun that hit you in the head?

A. It felt like a thousand pounds come down on my head. My ears started ringing. I nearly fell, but I didn't. I stayed strong. I could just feel that it was heavy.

Q. And it happened, did it happen almost immediately after he had it pointed to your head?

A. Yes.

Q. So would you say there's no doubt in your mind that you were struck by the gun that was pointed at your head?

A. No doubt.

Q. And when you were struck on the head, did you feel pain?

Coached by Belt

No doubt in mind struck w/ gun

A. Yes.

Q. On a scale of one to
cut off, how would you evalua
Defendant?

A. I want to say an eig

Q. Okay. When he -- wh
with the firearm on the head,
consciousness?

A. Did not.

Q. Did you fall down to

A. No, I stumbled a lit
because it hurt.

Q. And when the Defenda
did he say anything?

A. If he did, I can't r

Q. And what did you do
head?

A. I kept running, went
to wake somebody up to call 9
door, so then I ran to the st
traffic to help me.

Q. Now going back to wh
you, would you say the Defend
commission of this assault?

A. Yes.

Stumbled

What she did after hit w/ gun

Leading

Not in knowledge

Q. And would you say that he exhibited a firearm in the commission of this assault?

A. Yes.

Q. Now, do you have experience with firearms?

A. No, I don't.

Q. Have you ever shot a gun?

A. I have.

Q. What kind of gun have you shot?

A. A rifle.

Q. Have you seen other people shoot handguns before?

A. Yeah, target practice.

Q. Have you ever shot a handgun before?

A. No.

Q. But, you know, to your knowledge and your experience, would you consider a firearm a deadly weapon?

A. Yes, I would.

Q. Now, what happened -- when you ran off, where did the Defendant go?

A. He stood there, stayed there and with my son, I guess. I went to a few houses. I finally stopped a truck in the street and he unlocked his door, was gonna help me and I heard my son yelling, Mom, where you at? Mom, where you at? He's gonna shoot, and I turned and I,

Coached by Belt

Perjury, Coached by Belt

there ▷ went

said, John, I'm over here. 'Caus
one eye.

MR. GAISER: I'm goi
nonresponsive.

THE COURT: Sustaine

Q. (BY MR. BELT) We'll jus
chop it up.

MR. BELT: Your Hono
witness?

THE COURT: You may.

Q. (BY MR. BELT) Ms. Spear
what's been previously marked as
you recognize State's Exhibit 43?

A. Yes.

Q. What is State's Exhibit

A. It's the map where I was
happened and where I ended up.

Q. Is it a fair and accurat
assault that happened on April 2n

A. Yes.

Q. To your knowledge, has i
altered in any way?

A. No.

MR. BELT: Your Hono
State would offer State's Exhibit

S43 admitted w/o obj

opposing counsel for any objection.

(State's Exhibit No. 43 offered.)

MR. GAISER: No objection.

THE COURT: State's Exhibit 43 is admitted.

(State's Exhibit No. 43 admitted.)

MR. BELT: Your Honor, permission to publish?

THE COURT: That's granted.

Q. (BY MR. BELT) Now, Ms. Spear, would it aid the jury in your testimony in explaining State's Exhibit 43 if you came down and interacted with the television, if you were able to point to it instead of sitting way over there?

A. Well, where the red dot is, that's where I was.

Q. Would it help the jury if you could come down and point with the TV with me?

A. Okay.

MR. BELT: Your Honor, may the witness step down and interact with the exhibit?

THE COURT: She may.

Q. (BY MR. BELT) Come on down, Ms. Spear.

A. (Witness complies.)

Q. You can move around here. I want to clarify on State's Exhibit No. 43, these blue dots here, that's not your path or any path you took that day, correct?

A. Correct.

Q. That was just pla directions to a different

A. Yes.

Q. What are we looki Exhibit No. 43?

A. That's my son's h

Q. All right. And w were when you were struck

A. I was right here

Q. After you're stru you go from there?

A. I went to this ho my immediate neighbor that

Q. And why did you g

A. I saw a light on.

Q. And did they answ

A. No, they didn't.

Q. Where did you go neighbor's house?

A. I went to this ne

Q. And what did you

A. Same thing, nobod

Q. And why were you

A. To try to get som



Q. After that house, where did you go?
A. I went to one more, the next one.
Q. Could you point to it?
A. This one right here (indicating).
Q. And what happened there?
A. Same thing, no answer.
Q. And, again, you went there because you wanted somebody to call 911?
A. Yes.
Q. After that house, where did you go?
A. To the street, right here, Pepper Ridge Lane.
Q. And what were you doing on Pepper Ridge Lane at that point?
A. I was jumping in traffic to stop somebody for help.
Q. Did anybody stop?
A. Yes.
Q. And that was the man you talked about with the truck, correct?
A. Yes.
Q. Did you know this man?
A. No, I didn't.
Q. And did he help you in any way?
A. He begin to, he was going to.
Q. Why didn't he get to help you?

A. My son came around the c
back of the truck and the man got
off and I fell in the street. I
vehicle. I was attempting to. W
into the street.
Q. Was your son, John, able
A. He was in the bed of the
Q. He was. So you fall off
you fall?
A. I went and hid behind th
Q. And how long did you hid
A. Just a couple of minutes
Q. Did you ever end up on L
A. Yes, I did.
Q. How did you end up on Lo
A. I jumped fences through
streets over because I wanted to
Q. You're saying you jumped
you say you jumped these fences?
A. Five foot fences.
Q. What kind?
A. Wooden.
Q. Now, did you ever end up
Lane?
A. Yes.

Q. And what happened at 25410 Long Hill Lane?

A. I knocked on the door, a woman answered and I asked her to call 911 because a man was after me; and I told her please get me help and I'll stay outside. She asked me to come in. I told her, no.

Q. Thank you, Ms. Spear. You can return to your seat.

A. (Witness complies.)

Q. Now this woman you talked about, did you know that she lived at 25410 Long Hill Lane?

A. I do not.

Q. What did she look like?

A. She was an elderly woman.

Q. Was she nice to you?

A. Very nice.

Q. What was your demeanor at this point?

A. I think I was, like, really nervous, shaking, screaming, crying, like, you know, I was scared for my life; and I told her a man with a gun was after me. If she would please call the police. I told her that my son and I got separated, and I didn't know if he was able to get in touch with the police or not.

Q. But at some point later the police did arrive?

A. Yes.

Q. Where did they arrive at?

A. At the woman's ho

Q. So you're aware t that house called 911?

A. Yes, I heard her with 911, there's a woman

Q. Okay.

MR. BELT: Y State would offer State's record does include a busi within 14 days. We'll ten any objection.

(State's Exhi

MR. GAISER: your Honor?

THE COURT:

(Bench confer

MR. GAISER: don't know which one is or

MR. BELT: S intends to play the first about, her son called 911 15 seconds. We intend to only at this point.

MR. GAISER:

THE COURT:

Hearsay & 6th Amend violation

for 14 days.

MR. GAISER: And it also denies him the right to confront this witness. This is going to be -- it's clearly making a testimonial declaration.

MR. BELT: Your Honor, the State would argue that this is -- the statements that you're gonna hear in this 911 were not meant for trial at this point. The people, the voices you hear on the 911 do not know this woman, Ms. Spear; and, furthermore, this is an ongoing emergency.

THE COURT: I can't tell that unless I listen to it.

MR. BELT: That's true, Judge.

(End of bench conference.)

THE COURT: All right. Ladies and gentlemen, on occasion there are matters that come up that I need to visit with the lawyers about outside your presence. This is one of those occasions. So I'm going to give you about a 15-minute break to go with the deputy, please.

THE BAILIFF: All rise.

(Jury exits courtroom.)

THE COURT: Ms. Spear, you may step down.

(Witness exits courtroom.)

THE COURT: And I believe you said this 911

tape was made by the son of the

she went to.

MR. BELT: Yes, yo

THE COURT: Who is

by?

MR. BELT: That is

THE COURT: I'll l

my ruling, but it's unlikely tha

far removed from the incident is

be admissible, but I'll listen t

determination.

MR. BELT: Yes, yo

(Publishing 911 ca

THE COURT: Mr. Ga

MR. GAISER: It's

THE COURT: It's n

MR. GAISER: Just

by a business record affidavit c

hearsay, and it violates my clie

this witness.

THE COURT: But in

is it not non-testimonial eviden

ongoing emergency? It's clearly

The guy making the call was arme

was frightened.

MR. GAISER: He arms himself with a gun. Just because he has a gun in the house doesn't mean --

THE COURT: He tells the operator he's afraid to open the door to the woman. I'm just trying to understand your objection that it was testimonial.

MR. GAISER: It is testimonial. It certainly is testimonial.

THE COURT: It certainly is not testimonial. It's made during an ongoing emergency to offer evidence --

MR. GAISER: What this witness is saying, what this woman is saying outside his door.

THE COURT: That might make it hearsay. I don't know that it makes it testimonial.

What's your response to the fact that there's hearsay within hearsay in this 911 call, both the 911 operator and the gentleman making the call are just repeating what other people have told them.

MR. BELT: Yes, your Honor. The State's response would be that even though it is hearsay within hearsay, the non-testimonial part of it is describing events that are currently happening, emergency-type events describing details of what's going on to give the officers a better idea of what's going on. The non-testimonial part of it would overcome the hearsay.

544 (us?) admitted over obj

THE COURT: We
overcomes the hearsay. I t
separate exception, and the
given that it's either an e
sense impression in repeati
objection is overruled.

MR. GAISER: B

THE COURT: Bo
overruled.

MR. GAISER: T

THE COURT: Br

THE BAILIFF:
All rise.

(Jury enters c

THE COURT: Th

The Defense's
No. 45 are overruled.

MR. BELT: Sta
Exhibit No. 45.

(State's Exhib

THE COURT: It

(State's Exhib

MR. BELT: Per
Honor?

THE COURT: Gm

(Publishing State's Exhibit 45.)

Q. (BY MR. BELT) Ms. Spear, the 911, did that depict what happened when you went to that neighbor's house?

A. Yes, I did go to their house.

Q. And after that 911 was placed, were you ever allowed to go into that house?

A. No.

Q. Why on the 911, I think they talked about you were hiding in some bushes. Why did you go into some bushes?

A. I was hiding in the bushes because I heard his motorcycle.

Q. Whose motorcycle?

A. Steven's.

Q. How close did you hear the motorcycle?

A. It was real close. It sounded like it was just down the road.

Q. But, again, why would you hide in bushes from the Defendant?

A. I was scared he was going to kill me.

Q. With what?

A. A gun.

Q. And what was your concerns as far as your son, was he with you at this point?

A. No, he wasn't; and I[

been shot. I had no idea if

Q. Why did you think th

shot?

A. Because Steven had a

Q. And you mean by afte

Defendant point the gun at you

A. No, but when I turne

that my son was gonna fight wi

think.

Q. Okay. But you've nev

the Defendant in the past?

A. No.

Q. How long were you in

A. Oh, I don't know it f

don't know how long I was in t

Q. What got you out of t

A. An officer pulled up.

Q. You know that officer

A. I do not know her nam

Q. Was she in uniform?

A. Yes.

Q. And at this point, di

dark or was it getting light?

A. It was still dark. I

still dark

lighter, but it was still dark.

Q. How did this female officer get your attention?

A. I saw the headlight pull up from the bushes I was in and I saw her spotlight and then I just knew it was a police officer and I knew they would help me.

Q. Did you speak with this female officer?

A. I did.

Q. Were you still in a very high-emotional state when you spoke with this officer?

A. I was hysterical, yes.

Q. And the statements that you made to this officer, were they made during a period where you were still in this hysterical state?

A. Yes.

Q. Now what kind of -- what was the conversation with you and this female officer?

Ran to cop

A. Well, she didn't even get out of the car, I ran to her.

Q. Why did you run to her?

A. I ran because I wanted her help. I wanted her to help me find my son to make sure he was okay and to get Steven.

What she told officer

Q. And what was y'all's conversation?

A. I told her that I was hit in the head with the gun, and that I was scared that he was killing my son or

did something with my son, pl

Ridge and make sure my son wa

Q. And did she comply w

A. Yes, she did.

Q. Was she nice to you?

A. She was.

Q. And did she, at that

your son's house?

A. Yes, we parked right

the street.

Q. Now your son's house

live at that house?

A. No.

Q. Did he ever live at

Ridge house?

A. Not that I know of.

Q. So none of those hou

that we showed you would be t

correct?

A. No.

Q. I want to talk about

motorcycle. Do you know the

motorcycles?

A. Yes.

Q. And do you know the

MATTIE KIMBL

Still Dark

lighter, but it was still dark.

Q. How did this female officer get your attention?

A. I saw the headlight pull up from the bushes I was in and I saw her spotlight and then I just knew it was a police officer and I knew they would help me.

Q. Did you speak with this female officer?

A. I did.

Q. Were you still in a very high-emotional state when you spoke with this officer?

A. I was hysterical, yes.

Q. And the statements that you made to this officer, were they made during a period where you were still in this hysterical state?

A. Yes.

Q. Now what kind of -- what was the conversation with you and this female officer?

Ran to cop

A. Well, she didn't even get out of the car, I ran to her.

Q. Why did you run to her?

A. I ran because I wanted her help. I wanted her to help me find my son to make sure he was okay and to get Steven.

What she told officer

Q. And what was y'all's conversation?

A. I told her that I was hit in the head with the gun and that I was scared that he was killing my son or

did something with my son, pl

Ridge and make sure my son wa

Q. And did she comply w

A. Yes, she did.

Q. Was she nice to you?

A. She was.

Q. And did she, at that your son's house?

A. Yes, we parked right the street.

Q. Now your son's house live at that house?

A. No.

Q. Did he ever live at Ridge house?

A. Not that I know of.

Q. So none of those hou that we showed you would be t correct?

A. No.

Q. I want to talk about motorcycle. Do you know the motorcycles?

A. Yes.

Q. And do you know the

MATTIE KIMBL

motorcycles?

A. Yes.

Q. How many motorcycles would you say the Defendant's owned?

A. He had two.

Q. Two, what type of motorcycles were they?

A. Harley Davidsons.

Q. Both of them?

A. Yes.

Q. What were the color of both of them?

A. Black.

Q. And was there anything special about these Harley Davidsons?

A. They were pretty.

Q. Well, I'm going to show you State's Exhibit 32. Now, is this one of the motorcycles that the Defendant owned?

A. Yes.

Q. And was this the same motorcycle that you saw the Defendant near at the Pepper Ridge address?

A. Yes.

Q. And now you've seen this motorcycle before, correct?

A. Yes, I have.

Q. Have you ever ridden on this motorcycle?

A. Yes.

Q. How many times would you

that motorcycle?

A. About four maybe.

Q. Have you known the Defen

that is my motorcycle; I own this

A. Yes, I asked him. One t

it on Facebook, and I asked him,

Q. It's his bike. Do you k

that bike?

A. I do not.

Q. You're aware that there

bike, correct?

A. Yes.

Q. Have you ever seen the D

in those saddlebags?

A. No.

Q. Have you ever known the

weapons while he's riding that bi

A. Not in it.

Q. But on his person --

A. On his person.

Q. -- while he's driving th

ever driven the motorcycle and ha

were riding on the motorcycle?

D carry weapon on his person

A. Yes.

Q. How did that make you feel?

A. It made me feel awful. I don't like guns.

Q. In the time that you've known the Defendant, has he ever loaned this bike out to any of his buddies or family members?

A. No.

Q. Would you be surprised that he had loaned this bike out to someone?

A. Yes, I would.

Q. Why?

A. Because he loved his bikes, and they're very expensive.

Q. *And this bike, what did you -- now when you* came, when the officer brought you back to the scene, did you see this bike as we see it on this photo?

A. The bike wasn't there when she brought me to the scene.

Q. Where was the bike?

A. He was on it.

Q. Oh, he was on it?

A. He was on it. He wasn't even at the scene.

Q. So tell me how the Defendant gets back on the scene?

A. We were standing in the street, the police were

on both sides of the stree talking to one of the offi and I looked and I told he it was at a distance where and the closer he got I re them that's him, that's hi

Q. And what did the

A. They just surroun

Q. Did they arrest h

A. Yes, they did.

Q. Now did they put of?

A. Yes.

Q. Did they ever go the Defendant talk about g

A. Did not.

Q. How close would y Defendant?

A. I got in the car

Q. Whose car?

A. The police car, t sick and afraid.

Q. Why were you feel

A. I was sick when h was gonna shoot me.

Q. How long would you say you saw the Defendant?
A. Maybe two seconds.
Q. Two seconds?
A. Yeah.
Q. So you didn't really see anything?
A. No, I just saw him stand up, get off the bike and that lady officer, I believe it was, put me in her car.
Q. So you didn't see the whole interaction between the Defendant and the officers?
A. No.
Q. And obviously this happened almost four years ago?
A. Yes.
Q. Now when you saw the Defendant get off the bike, was he wearing that leather vest you talked about earlier?
A. He was not.

Showing Maxwell lied

Q. Okay. So when you see the Defendant, get off the bike, does this look like more about what he was wearing?
A. Yes.
Q. And what does this T-shirt say right here?
A. Harley Davidson.
Q. And his bike was a Harley as well?

A. Yes.
Q. And this is Mr. Baughm
A. Yes.
Q. Now do you see the Def today?
A. Yes, I do.
Q. Can you please point t describe an article of clothing
A. He's right there (poin and tie.
MR. BELT: Your Ho reflect the witness has identif court?
THE COURT: The re
Q. (BY MR. BELT) Now at of the officer's vehicle, what
A. They put him in a vehi
Q. Okay, what happens to
A. He was standing outsid got in the car, and I can't rem
Q. How did it make you fe
A. Just sick, I was happy sick that we went through somet
MR. BELT: Pass th
THE COURT: Mr. Ga

MR. GAISER: Yes, your Honor.

CROSS-EXAMINATION

BY MR. GAISER:

Q. Ms. Spear, hi.

A. Hello.

Q. You're doing okay?

A. Shaking.

Q. You're okay to talk?

A. Yes, sir, I am.

Q. You're working now as a personal shopper?

DA Got her a job? She's a thief so check for arrest since

A. Yes, sir.

Q. What does that entail?

A. I'm sorry, what?

Q. What does that mean? What do you do?

A. Oh, I work in a store and I get a list, I have to go buy everything that the person wants that's on the list.

Q. What store is that?

A. Kroger.

Q. Okay. So someone calls an order in and then --

A. They do it online, and then I get a little computer and go around and get their stuff.

Q. And put it in boxes?

A. No, I put it in bags inside of crates.

Q. Then they come pick it up?

A. Yes.

Q. How long have you bee

A. Just over a year.

Q. Back in 2014, in Apr working then?

thief & meth prostitute

A. No, sir.

Q. Had you been working

A. I had worked off and daughter-in-law's insurance co

Q. You mentioned that yo father?

A. Yes.

Q. And did I hear you wr your husband had recently left split up with your husband?

why?

A. We've been split up.

Q. When you knew Mr. Bau him, is that the right name, B

A. That's what I thought

Q. Is that what you call

A. Steven, Steven Boeman

Q. So Mr. -- you called

A. Yes.

Q. And you were split up split up with your husband be



157

face at the time, I was hysterical and scared for my life.

Q. You say he had a gun in his right hand?

A. Yes.

Q. What kind of gun was it?

A. I didn't see the whole gun, I just saw the barrel of it. It was a handgun, a pistol.

Q. A small handgun of some sort?

A. Yes.

Q. In his right hand?

A. Yes.

Q. And you turned around, why did you turn around?

A. To run to get help.

Q. And it was while your back was turned that you were hit on the head?

A. Yes.

Q. What did he have in his left hand?

A. I don't know.

Q. You know if he had another weapon in his left hand or a flashlight?

A. I don't, don't remember.

Q. You just remember being hit really hard on the back of the head?

A. Yes, I remember that.

Q. You didn't see it when he hit you?

MATTIE KIMBLE, CSR, RPR

A. No.

Q. Do you know a fella na

A. Who?

Q. Gerald Bush?

A. Gerald Bush.

Q. Jerry Bush?

A. No.

Q. Would you know the dif and a .32 pistol?

A. No.

Q. You wouldn't -- So, if s mentioned a .32 pistol to them, correct, would it?

A. Not me, I don't know. o

Q. Now this -- you say wh the street that a truck stopped

A. I'm sorry. I didn't h

Q. A truck stopped when y

A. I jumped in front of t yes.

Q. And it stopped?

A. Yes.

Q. You remember the drive

A. A man, I don't remembe

Q. What did you say to th

MATTIE KIMBLE,



A. I told him somebody was after me with a gun and my son, if he would please help us to get out of there.

Q. Did he reply?

A. He unlocked the door, and I was about to get in. I don't remember talking to him. I was scared.

Q. And where was John?

A. He was running down the road from his house towards where I was at that time.

Q. Did he get in the truck?

A. He did get in the back of the truck, in the bed.

Q. He got in the bed of the truck?

A. Yes.

Q. But you never saw Mr. Boeman point a gun at John?

A. I did.

Q. Oh, you did?

A. When I was standing in the street to stop the truck, I heard him screaming, Mom, he's gonna shoot and when I turned to look, Mr. Boeman was like this and my son was running.

Q. That was down the street away from you?

A. Yeah, just a couple driveways over.

Q. And it was dark out?

A. Yes.

Perjury

See Direct 4RR 134:8

Perjury

Perjury

Q. And you saw that?

A. Saw his shadow.

Q. And it was still da

over to the house on --

MR. BELT: Par

approach?

THE COURT: Gr

(Bench confere

Belt trying to draw attn. away from CW perjury

MR. BELT: You

Defendant making a lot of co

jury could hear. We would a

to speak out loud to Mr. Gai

MS. BURTON: H

THE COURT: Ta

MS. BURTON: I

he's saying. He's talking t

From what I've seen all day,

nodding and actions towards

THE COURT: Wi

MR. GAISER: I

doing, stop doing it.

THE COURT: Ok

IAC In front of jury

MR. GAISER: C

myself now?

(End of bench



161

Q. (BY MR. GAISER) You know any other people who ride motorcycles beside Mr. Boeman?

A. Not many, a couple.

Q. So you've seen other people that ride motorcycles?

A. Yes.

Q. And you knew Mr. Boeman had two Harley Davidsons?

A. Yes.

Q. And they were both black, correct?

A. I believe so.

Q. Did you ever go with Mr. Boeman to a jewelry supply store?

A. Yes, I did.

Q. When was that?

MR. BELT: Your Honor, we object to relevance.

MR. GAISER: It has to do with the Rolex, Judge.

THE COURT: Okay. Overruled.

A. It was when we were dating.

Q. (BY MR. GAISER) You went to the jewelry supply store. Where was that located?

A. I don't remember where that was located.

Q. And you're allergic to gold?

CW shoplifted here

MATTIE KIMBLE, CSR, RPR

Gold allergy perjury coached by prosecutor

A. Yes.

Q. Have you ever owned any

A. I did.

Q. When was that?

A. I used to wear a gold w

Q. That's when you were ma

A. Yes.

Q. And you were allergic t

A. No.

Q. You were not allergic t of time?

A. No, it's a new allergy.

Q. It's a new allergy?

A. Yeah, allergies change

MR. GAISER: I'll Honor.

MR. BELT: No furt witness, your Honor; and she may would like.

THE COURT: Okay. ma'am. Thank you. You may step

THE WITNESS: Okay

THE COURT: Call y

MR. BELT: The Sta

THE COURT: I don'

MATTIE KIMBLE,

I guess you guys are okay to push forward? All right.

THE BAILIFF: Judge, this witness has not been sworn in.

THE COURT: Raise your right hand to be sworn.

(Witness sworn.)

THE BAILIFF: Adjust your chair and mic, speak loud and clear.

THE COURT: You may proceed.

MR. BELT: Thank you, your Honor.

**JOHN SPEAR,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

BY MR. BELT:

Q. Good afternoon, sir. Can you please introduce yourself to the jury?

A. Yes, I'm John Spear.

Q. John, where do you live?

A. I live in Spring.

Q. How long have you lived in Spring?

A. About seven years now.

Q. Can you tell the jury a little bit about your upbringing there in Spring? Where did you go to school?

A. I went to Aldine, Aldine High School.

Q. And have you lived in Harris County all your

life?

A. Yes, sir.

Q. Are you married?

A. Yes, sir.

Q. How long you been m

A. Ten years now.

Q. Who are you married

A. Petra.

Q. And do you have any

A. Just they're grown

Q. How many kids do yo

A. Two stepchildren.

Q. And what do you do

A. Plumber.

Q. How long have you b

A. Basically my whole grandfather was doing it whe was born into it.

Q. Let's talk about yo

A. Machell Spear.

Q. And who is your dad

A. John Spear.

Q. So you're a junior?

A. Yes, sir.

Q. What's your grandpa

A. R.T.
Q. And do they all live near you?
A. Yes, sir.
Q. And they've lived there their whole life?
A. Yes, sir.
Q. Now, John, I want to talk about April 2nd, 2014. Was that a tough day for you?
A. Yes, sir.
Q. If you need to take a break, whatever you need, just let me know. Where were you living at on April 2nd, 2014?
A. I was living in Spring off of Pepper Ridge Lane.
Q. 25410 Pepper Ridge Lane?
A. Yes, sir.
Q. And what was happening on April 2nd?
A. Somebody tried to kill my mom.
Q. Let's back up before we get there. Now, were you moving out of that place or moving into that place?
A. I was moving out.
Q. Who was helping you?
A. My mother.
Q. And how were y'all, did y'all have a U-haul or anything?
A. Just a van with a trailer.

04/02/14

Q. Whose van was it?
A. Mine and my wife's.
Q. And what kind of van wa
A. A Dodge Grand Caravan.
Q. What color?
A. White.
Q. And was anybody else li
the time?
A. What was that?
Q. Who was all living at t
A. Just me and my wife.
Q. Any kids living there a
A. Not at the time, no.
Q. Would the kids sometime
A. Yes, sir.
Q. And so they would have,
and kid's rooms inside that hous
A. Yes.
Q. Now, on April 2nd, abou
you to move that day?
A. It took us all day the
of the next day.
Q. Now, let's talk about w
earlier, when you pulled in to y
as far as it relates to Steven B

A. My mom she said someone was there so I got out to look and Steven was there. My mom got out, went to talk to him, and he struck her with the gun, hit her on the head with a gun, said that she had stole a watch from him.

Q. Let's take it piece by piece, okay? Now I'm going to show you State's Exhibit No. 3. This is the house you're talking about?

A. Yes, sir, that's my house.

Q. That was your house at the time. And this, State's Exhibit No. 4, what are we looking at right here?

A. That's my van.

Q. The same van you used to move that day?

A. Yes, sir.

Q. The same van you were driving that day?

A. Yes, sir.

Q. And this is State's Exhibit No. 5, what are we looking at here?

A. My van and my house.

Q. And now State's Exhibit No. 7, just another picture of your van, correct?

A. Yes, sir.

Q. And this is your backyard at that address?

A. Yes, sir.

Q. Now, let's focus in

No. 6, looking at State's Ex

driver of the vehicle. Woul

good viewpoint as you saw Mr

up?

A. Yes, sir.

Q. And where on State'

you saw Mr. Baughman?

A. He was standing by

garage there.

Q. This box I'm pointi

A. Yes, sir.

Q. What was near Mr. B

A. His motorcycle.

Q. What kind of motorc

A. I don't know what k

but it was like a Harley or

Q. What color?

A. I don't remember

Q. How good was the li

A. You could barely se

Q. So how did you know

A. Because my mom yell

Q. And did you know th

A. I knew that she had

Steven.

Q. But you didn't know his last name?

A. No, I didn't know his last name.

Q. Did you know how long they had been dating?

A. A couple of months.

Q. Had you met Mr. Baughman?

A. One time, yeah.

Q. And can you describe what that meeting was like?

A. It was ridiculous.

Q. Why was it ridiculous?

A. Because he showed me a gun, pulled out a gun and showed it to me, two guns actually that day, and I didn't really like him at all.

Δ never showed him a gun

Q. What kind of gun did he show?

A. I don't know what kind of gun it was. It was a little pistol.

Q. What color was it?

A. Brown, had brown handles on it and it was like a silver.

Q. Would you say like a big gun -- do you know the difference --

A. No, it was a small gun, like a medium-sized gun.

Q. Do you know the difference between say like a

50-cal handgun and a small .22?

A. It was small.

Q. It was more of a small

A. Yes.

Q. And where did he pull t

wooden handle gun from that day?

A. His waistband.

Q. Where on his waistband?

A. Like right here.

Q. On his right side?

A. On his right side.

Q. Okay. And what did he

to you?

A. I have no idea.

Q. You feel like maybe he

A. Maybe he's bragging. H

it. I have no idea.

Q. And before this, had you

Defendant with a handgun before?

A. No, sir.

Q. And did you ask him, hey

handgun?

A. No, sir.

Q. Just kind of out of nowh

doing when he showed it to you?

A. We were just talking.
Q. Were you playing anything, any games or anything?
A. We were just talking.
Q. And what other guns did he show you?
A. He pulled another one out from his boot.
Q. His boot.
A. It was a black gun. I don't know what kind of gun it was, either.

Desert Eagle to big to put in one's boot

Q. Now same question, would it be more on the big 50-cal side or the small .22?
A. It was a bigger gun.
Q. Bigger gun; all black?
A. All black.
Q. And do you recall which foot he pulled that gun out?
A. I believe from his left foot.
Q. His left foot, and did he do anything with that black gun?
A. No, he just showed it to me.
Q. How did that make you feel when he showed you the guns?
A. Made me feel like maybe he was --
MR. GAISER: Objection, your Honor, it's not relevant.

THE COURT: Su
Q. (BY MR. BELT) No guns, did anything else hap
A. No.
Q. Did you -- did the longer?
A. No, him and my mom
Q. Were you happy tha
A. I was happy that h about the situation, no.
Q. Were you happy tha
A. No.
Q. You didn't have a Baughman?
MR. GAISER: O Mr. Baughman is irrelevant.
THE COURT: Su
Q. (BY MR. BELT) On relation to April 2nd, 2014
A. What do you mean?
Q. Was it a week ago?
A. About a month.
Q. About a month?
A. About a month, yea
Q. Did you have any i

in between that time?

A. No, sir.

Q. And now back to April 2nd of 2014, when you saw him, how did you know -- describe his body as far as what he looked like when you saw him?

A. Just big.

Q. A big guy?

A. Yeah, big guy.

Q. Do you recognize what he was wearing that day?

A. I know he was wearing all black.

Q. All black?

A. Yeah.

Q. What about his pants?

A. I guess he was wearing dark jeans.

Q. But it was dark that night?

A. But it was dark, yeah.

Q. And what happens when you pull up, put the van in drive, tell us what happened after that?

A. My mom seen somebody standing by the garage door, so she yelled at me. She's like somebody's standing by the garage. So, I got out to check who it was, well, to see who it was. And then, I guess, she noticed that it was her boyfriend. So, she's like, hey, Steven, and she started walking over there; and he hit her with the gun on top of the head.

Q. Well, before he hit her mom go inside of the house?

A. She went to the restroo

Q. How long do you think s

A. Maybe two or three minu

Q. While she's in the rest doing?

A. I was just standing the was going on.

Q. Were you talking with t

A. Yeah, I talked to him.

Q. Was it a confrontation?

A. No confrontation, nothi

Q. Just, you know, small t

A. Just small talk.

Q. Did he say anything dur

A. He did. He said someth stolen a watch or something and he came to get the watch from my

Q. When you heard that, di about that?

A. I didn't know anything

Q. So when your mom comes first thing the Defendant says?

A. He pulled the gun out a

Q. Did he say anything?

A. Just that she was a thief that she stole a watch and he wanted his F'ing watch back.

Q. I know that this is a courtroom, it may be uncomfortable cursing, but when you say "F'ing," did you mean he said "fucking"?

A. Fucking watch back, yeah.

Q. And did you ever tell or talk to your mom once he accused her of stealing this watch?

A. No, sir.

Q. And now when you say he pulled a gun out, where did he pull a gun out?

A. His waistband.

Q. Right side? Left side?

A. Right side.

Q. And what did he -- with his right hand?

A. With his right hand.

Q. Where did he put the gun?

A. To my mom's head.

Q. Right to her head?

A. Right to her head.

Q. Now this gun that you're talking of, will you describe what the gun looked like?

A. It had brown handles and it was silver, kind of silver looking.

What D said to his mom

Where D pulled gun out

168: 18-21 Dark Couldn't See D How did CW see gun? Coached by DA

Q. So earlier you ta
about this silver gun with
the same gun that you saw?

A. That's why I reme
because I seen it up close
sitting right there when h
time. We were sitting in
time he pulled it out, I wa
like the same gun.

MR. BELT: Yo
witness?

THE COURT: Y

Q. (BY MR. BELT) Al
going to show you what's be
State's Exhibit 38. I know
rust, but take a look at th
the same gun?

A. It's the same gun

Q. This is the same g
mom's head?

A. Yes, sir.

Q. And this is the sa
month ago from the Defenda

A. Yes, sir.

Q. Now when you saw

Was shown photos by DA to describe the guns

Leading CW

A bit on right index finger

mom's head, was his finger on that trigger?

A. Yes, sir.

Q. And looking at State's Exhibit No. 25, this might be a better photo of that gun, is that that gun I just showed you?

A. Yes, sir.

Q. With the brown handle and the silver?

A. Yes, sir.

Q. And then looking at State's Exhibit No. 16, what about this gun up here? Is this the same gun that I just showed you?

A. Yes, sir, yes, sir.

Q. What about this gun right here, this black gun, do you recognize this gun?

Previous testimony showed him both guns?

A. I seen -- the other gun he had was black, but I can't a hundred percent tell you that it was that one because I didn't see it as close as I seen the other one.

Leading CW

Q. Okay. But like you said earlier, his finger was on the trigger when he pointed it at your mother?

A. Yes, sir.

Q. And did he threaten your mother's life?

A. Yeah, he said he was gonna kill her; and that he would kill me, too, if I got in the way.

Q. So he -- would you consider that threat of

imminent serious bodily injury

A. Yes, sir.

Q. As well as to you?

A. Yes, sir.

Q. Now, I kind of want to have experience with guns?

A. Yes, sir.

Q. You ever fired a pisto

A. Yes, sir.

Q. Have you ever fired a s

A. Yes, sir.

Q. How about a rifle?

A. Yes, sir.

Q. What about a BB gun?

A. Yes, sir.

Q. What kind of BB gun hav

A. Just a little 177-calib

Q. Rifle?

A. Rifle and the little pi

Q. So you know about BB gu handguns?

A. Yes, sir.

MR. GAISER: Objec not qualified as a firearms expe

THE COURT: Overru

A. I just wouldn't think she would do anything like that, first off. Second off, I would think if she stole a $10,000 watch, she would have some kind of money or something, you know.

Q. Did you ever see your mom wearing watches?

A. No, sir, she can't wear watches.

Q. Why?

A. Any watch or anything she puts on, the battery it won't work. Something on her body makes the battery go out.

Q. Do you know if she has some kind of allergy to gold or anything like that?

A. She does, yes.

Q. So she wouldn't be able to wear a gold watch?

A. No, she wouldn't be able to wear a gold watch.

Q. And did the Defendant ever say that this watch he wanted back was a gold Rolex?

A. He said it was a gold Rolex, yeah.

Q. Did the Defendant demand -- once your mom and you said we don't have anything, did he ever demand money from you or your mother?

A. He wanted money, yeah.

Q. How much money?

A. For the watch, $10,000 is what he said she owed for the watch.

Q. Really, and he curse

A. Yeah, he cursed at my

Q. Now, you said that h weapon. Was that the same we her forehead?

A. Yes, sir.

Q. Describe to the jury

A. He struck her just l

Q. But what happened in having the watch, how do we g detail by detail with the jury

A. He just hit her, whe have it, he hit her.

Q. At that point, did y her eyes while the gun was po

A. She did, she had her

Q. Were you scared for y

A. Yes.

Q. Did you ever try to happened?

A. I did get in between walked away. I told my mom to there, and that's basically wh

Q. Is that when she turn mom, where is she positioned?

A. She was in front of me at this point.

Q. And when he hits her on the head, do you know where on her head?

A. He hit her about right here.

Q. Okay. And did you see blood come out of your mom?

A. I didn't see the blood come out, no.

Q. Did you observe any reaction from your mom? Like did she scream?

A. Yeah, she screamed. She screamed and she fell.

Q. Did it appear to you that she was in pain from being hit?

A. Right.

Q. And how far did she fall?

A. She fell all the way on the ground.

Q. What did you do in response to that?

A. I just picked her up. I grabbed her and held her.

Q. Why did she want to run away?

A. Fucking piece of shit.

Q. Hey, it's okay.

A. You're a piece of shit, loser.

MR. BELT: Your Honor, could we take a break?

THE COURT: Ladies and gentlemen, please go

with the bailiff.

THE BAILIFF: A

(Jury exits cou

THE BAILIFF: H

MR. BELT: John

MR. GAISER: Th

he said that.

(Witness exits

THE COURT: Be

It was in respo

specifically asked by the Sta

please have your client stop

I want to find out from the w

way because both the clerk ar

noticed it, so did I. Seriou

is a courtroom. This isn't a

THE DEFENDANT:

I'm not doing anything.

THE COURT: I d

what you were doing. You wer

he was glaring at you.

THE DEFENDANT:

him.

THE COURT: He

THE BAILIFF: Y

THE COURT: Absolutely.

(Witness enters courtroom.)

THE COURT: Sit down, what was that about? This is a courtroom, sir. You need to act accordingly. Why did you do that?

THE WITNESS: Because he's looking at me smiling, and it's not funny that I watched him beat my mom up with a gun.

THE COURT: I understand.

coached by Belt

THE WITNESS: It hurts my heart. I don't want to sit here and cry in front of everybody. I'm sorry.

THE COURT: If you have another outburst like this, it's going to cause a problem in the trial; you understand that?

THE WITNESS: Yes, ma'am.

THE COURT: So my suggestion to you is don't look at him.

And, Mr. Gaiser, I would ask you again to please advise your client to stop nodding and making faces both to the witness and to the jurors because everyone in this courtroom other than you have noticed it and I can understand why you haven't because you're on the other side of him, you're questioning the witnesses, but he's definitely doing it.

MR. GAISER: Well

him earlier to stop.

THE COURT: I unde

MR. GAISER: But

reflect what happened.

THE COURT: I'm fa

reflects that the witness start

client. Does it, Mattie?

THE COURT REPORTER

THE COURT: Anyth

like the record to reflect?

MR. GAISER: Well

reflects that he said

THE COURT: I thin

MR. GAISER: I do

it while the jury was going out

were still in the courtroom.

THE COURT: Okay.

ask her. Mattie, did you write

said and that the jury was in t

THE COURT REPORTER

that he said:

QUESTION: "Why di

ANSWER: "Fucking

QUESTION: "Hey,

ANSWER: "You're a piece of shit, loser."

THE COURT: I think there was another comment after that when the jury was going out.

MR. GAISER: Yes, there was.

THE COURT: So let the record reflect that as the jury was filing out of the courtroom, to my recollection, he also called him a mother fucker, right?

MR. GAISER: Thank you, your Honor.

THE COURT: Right, is that pretty accurate? So, no more outburst. Your testimony is going to be over, you'll leave the courtroom. In all likelihood the case that you're the Complainant on will be dismissed; you understand? You can't act like that.

THE WITNESS: Yes, ma'am.

THE COURT: I understand it's upsetting.

MR. BELT: Your Honor, the State, can we ask Mr. Spear on direct why he made --

THE COURT: No, we're not going to belabor this. It's over. It happens again, we'll take it up again with a proper Motion, okay?

MR. BELT: Yes, your Honor.

MR. GAISER: Judge, in view of the fact that the jury has been prejudiced by his comments, I move for a mistrial.

THE COURT: Denied.

THE BAILIFF:

THE COURT: Go

(Discussion be off the record.)

(Open court, D

THE BAILIFF:

THE COURT: Th Sorry, I had f direct or cross.

MR. BELT: Dir

THE COURT: Al

MR. BELT: Tha

Q. (BY MR. BELT) Now, where your mom was running a at some point?

A. Yes, sir.

Q. Where did you run t

A. The neighbor's hous

Q. And what did you do

A. Called the police.

Q. And did you know wh point?

A. No, sir.

Q. Now, was there a tr attempted to wave down?

A. Yes, sir.

Q. Who waved that truck down?

A. My mom.

Q. Do you know the person who was driving that truck?

A. No, sir, it was one of my neighbors.

Q. And did they stop and let you guys in?

A. They stopped to let my mom in, but they ended up driving off.

Q. Do you know why they drove off?

A. No, sir.

Q. All right. And so I wanted to show you what's previously been marked as State's Exhibit 43. So, if we're looking at, on State's Exhibit 43 where it shows your address on Pepper Ridge, which way did you run?

A. I ran away from the blue dots.

Q. So this pointing down towards State's Exhibit 43?

A. Yes, sir.

Q. And you just ran to these neighbors?

A. Yes, sir.

Q. And did you have a cell phone on you?

A. Yes, sir.

Q. And why didn't you call 911 at your house? Why did you do it at a neighbor's house?

A. Well, it kind of slipped

everything that was going on ther

Q. Talking about your mind,

your mind as far as --

A. I thought my mom was gon

gonna get killed.

Q. Because of what the Defe

A. Because of what he was s

Q. I mean, not only did he

life, did he make threats to anyb

A. Yeah, he made threats ab

go kill my grandfather, that he w

brother and that he was gonna kil

Q. Even your kids?

A. Even my kids.

Q. Now at any point did you

A. I did hear gunshots

Q. Do you know where those

A. From my house.

Q. From where the Defendant

A. Yes, sir.

Q. Did you see the Defendan

gun?

A. I didn't see him fire th

Q. But you heard a --

A. I heard gunshots, yes.

Q. And I want to kind of backtrack a little bit about your past, okay. Now, have you ever been, do you have a criminal history, a criminal past as far as theft goes?

A. As far as what?

Q. Theft?

A. Well, I stole one time. I got in trouble for it.

Q. Were you convicted of that theft?

A. No.

Q. You were not. Were you convicted of theft on July 7th, 2015?

A. Yes, sir.

Q. And you spent some time in jail?

A. Yes, sir.

Q. And that theft, that was a Class B misdemeanor?

A. I believe so.

Q. It wasn't a felony?

A. No, it wasn't a felony.

Q. Now, John, I'm going to play -- you've talked about this 911, okay. I know it might be emotional, but I'm going to play this 911 okay?

(Publishing State's Exhibit 45.)

MR. GAISER: May we approach, your Honor?

CW is a thief admitted

(Bench confer

THE COURT: S

Is this in ev

MR. GAISER:

need the record to reflect

this. Is this a separate e

THE COURT: H

admitted into evidence?

MR. BELT: Ye

MR. GAISER:

they're playing --

THE COURT: I

offered and admitted was th

house. You've never asked

MR. BELT: It

THE COURT: O

exhibit number?

MR. BELT: Ye

THE COURT: S

MR. GAISER:

he makes, that Mr. Spear ma

have no objection to that p

THE COURT: O

MR. GAISER:

are two 911 calls on this e

THE COURT: Contained within the same exhibit.

MR. GAISER: And the first 911 call is the one my objection relates to.

THE COURT: Thank you.

MR. GAISER: Not the second one.

THE COURT: Thank you.

(End of bench conference.)

(Publishing State's Exhibit 45.)

MR. BELT: Sorry, Judge, technical difficulty.

(Publishing State's Exhibit 45.)

Q. (BY MR. BELT) All right. John, now after did you speak with officers at this point?

A. Yes, sir.

Q. Did officers go on scene?

A. Probably, I think seven or eight.

Q. And did you give a statement to the officers about what happened?

A. Yes, sir.

Q. And how long would you say the officers were on scene?

A. About an hour.

Q. Did you ever see the Defendant come back to your house?

D coming back to scene

Not Bandido Jacket as Maxwell testified to (2RR 35:13)

Δ -

Meth addict high on Meth

A. Yes, sir.

Q. Tell the jury how you s

A. I heard the motorcycle,

on the motorcycle in the street,

the same clothes he had on whene

on a white T-shirt when he came

Q. I'm going to show you S

he looked like when he came back

A. Yes, sir.

Q. So when you saw him by

he had something black over this

A. Yes, sir.

Q. But that's the same jea

earlier?

A. Yes, sir.

Q. Okay. So did you see t

hear the Defendant say anything?

A. No, sir.

Q. Did you keep your space

A. Yes, sir.

Q. Why did you do that?

A. Well, they had me in th

handcuffed.

Q. Why did they have you h

A. Because I was freaking

Q. But they just didn't know everything what was going on?

A. No, sir.

Q. You didn't have any weapons?

A. No, sir.

Q. How long were you in the back of the that cop car?

A. Probably like 30 minutes.

Q. And they eventually let you go?

A. Yes, sir.

Q. You weren't charged with anything?

A. No, sir.

Q. And who is the first person you talked to after you get out of the car?

A. My mom.

Q. And what's that conversation like?

A. Just making sure she was okay, how she was feeling and all that. I was worried about her.

Q. Did she appear to be okay when you saw her?

A. Not really.

Q. How did she appear?

A. She seemed like she was out of it, like she was dizzy.

Q. Could you see any injuries on her head?

A. Yeah, she had a big ol' lump and cut on her

head.

Q. Did you see any bl

A. Yeah, she had bloo

Q. Now that lump and

that the general area where

the firearm?

A. Yes, sir.

Q. And just so we're

lived at that house, correc

A. No, sir.

Q. Do you know where

A. No, sir.

Q. But nowhere in tha

A. Not that I know of

Q. And had you ever s

A. No, sir.

Q. Did you ever know

motorcycle?

A. No, sir.

Q. Because you didn't

A. No, sir.

Q. And did you ever m

wife?

A. No, sir.

Q. But during all of

for?

A. My mom.

Q. Your mom, why is that?

A. Because she got hit with the gun.

Q. You love your mom?

A. Yeah, I love my mom.

Q. I know this is going to be tough, John, but do you see the Defendant in the courtroom?

A. Do what now?

Q. Do you see the Defendant in the courtroom today?

A. Yeah.

Q. And can you point to him and describe an article of clothing he's wearing?

A. Yeah, he's wearing a white and blue tie with a blue shirt and a black, or black-covered shirt.

MR. BELT: Your Honor, may the record reflect the witness has identified the Defendant?

THE COURT: The record will so reflect.

MR. BELT: Pass the witness, your Honor.

THE COURT: Mr. Gaiser.

CROSS-EXAMINATION

BY MR. GAISER:

Q. Mr. Spear, you and I have never talked before, have we?

DA showed him photos A never had a firearm

A. No, sir.

Q. And you were pretty dis

A. I can't hear you.

Q. You were pretty upset a

A. Yeah, I still am upset.

Q. Is it okay if I ask you

A. That's fine.

Q. The -- I believe you te Mr. Boeman or Baughman; do you k

A. No.

Q. You just know him as St

A. Steven.

Q. And you met him one tim

A. One time.

Q. And how long before thi was it that you met Steven?

A. About a month.

Q. So that would have been March or late February?

A. Yes, sir.

Q. And that was the point two firearms?

A. Yes, sir.

Q. And where did that take

A. In my garage.

Q. There at that house?

A. Yes, sir.

Q. So he'd been to that house before?

A. One time, yes.

Q. He knew where you lived?

A. Yes, sir.

Q. And -- but that was the only time you met him before?

A. Yes, sir.

Q. Now, he drives up. Is it still -- when you drove up to your home that morning, it's still dark outside?

A. Yes, sir.

Q. Have you already been doing some moving that morning?

A. The night before, yes, sir.

Q. Had you been up all night moving?

A. No, sir.

Q. So that was the first move --

A. The morning.

Q. -- that day. And your mother was with you?

A. Yes, sir.

Q. Now I believe you testified that he hit her in the face; is that right?

A. In the head, face, I mean, he hit her, swung

the gun and hit her in the

Q. Do you know if it

A. No, it wasn't in t

Q. So when you said hit her in the face with th

A. No.

Q. He hit her on the testimony?

A. On the side of the

Q. So the statement o

A. I guess so, yeah.

Q. And he was saying this was going on, he was t

A. Yes, sir.

Q. Did you know anyth

A. No, sir.

Q. Did you know anyth a Rolex watch in a ditch in

A. No, sir.

Q. Do you know if tha about that that evening?

A. No, sir.

Q. Nothing was said a

A. No, sir.

Q. How long did this

Dark outside

hit mom on head or Run

Contradiction to fit DA's story

Perjury See testimony of Mechell previously given

your mother --

A. I couldn't tell you that, sir. I was confused. I didn't know what was going on myself, and he hit my mom, so I couldn't tell you how long it went on, I have no idea. It had to go on long enough for him to hit my mom.

Q. Yes, but my question is, you arrived, he's standing in the driveway next to a motorcycle?

A. Yes.

Q. And your mother approaches him, correct?

A. Yes.

Q. Did he hit her immediately or was it --

A. No.

Q. It was sometime later?

A. A little bit later, yeah.

Q. Did she go in the house?

A. She went in the house to use the bathroom.

Q. And she came back out?

A. That's when he hit her when she came back out.

Q. And you didn't hear any conversations that occurred?

A. Yeah, that she stole a watch.

Q. And what was her reply?

A. That she didn't steal a watch.

Q. And you've never saw your mother with a watch?

A. No, sir.

Q. And, in fact, she doesn

correct?

A. No, sir.

Q. So if she had a watch,

--

A. It would be something t

question, what are you doing wit

Q. If you saw it?

A. If I saw it, yeah.

Q. Are you saying -- I bel

has on a black leather jacket?

A. Yes.

Q. When you saw him later,

jacket on?

A. No, sir.

Q. So you really didn't kn

him at that time, you didn't kno

A. No, I didn't know him a

Q. You just know you'd see

time when he showed you a couple

A. Yes, sir.

Vision problem

Q. Mr. Spear, do you have

A. I do at this point, yea

Q. Did you have a vision p

A. Yeah.

Q. What was the problem?

A. I could only see out of one eye.

CW only sees in 1 eye

Q. Which eye can you see out of?

A. My right one.

Q. Did you have an accident at some point in time?

A. I got --

MR. BELT: Objection.

THE COURT: Sustained.

MR. GAISER: I want to make sure it has nothing to do with the incident.

Q. (BY MR. GAISER) Does your vision problem have anything to do with this incident?

A. No, sir.

dark

Q. So, when you see him there in the dark, you don't even know if your mother knows the guy at that point?

A. Well, I knew she knew him because she wouldn't have called out his name. So, obviously, she knew him.

Q. Okay. Now, when you're speaking to 911 and your mother is at another house, they tell you that she's at another place with the police. Where were you when you're making that 911 call?

A. A couple houses down at my neighbor's.

Q. If I show you this State's Exhibit 43, you see

the red marker there?

A. Yeah.

Q. And that's --

A. I was three houses the left-hand side. The sa little red spot is on, just left.

Q. So somewhere right

A. Yes, sir.

Q. You ran to that sp

A. Yes, sir.

Q. But first you met

A. No, I didn't meet were in the street. The tr they were there to help my

Q. Where was this?

A. In the middle of t

Q. But where?

A. In between the rec where I was telling you I m

Q. Someplace right in

A. Yes, sir.

Q. Where I'm pointing

A. Yes, sir.

Q. Like the next hous

A. Yes, sir.
Q. Was the truck stopped in the road?
A. Yes, sir.
Q. Was there a driver in the truck?
A. Well, I'm assuming there was, it was sitting there running and the truck drove off.
Q. You spoke to the driver?
A. No, I didn't speak to the driver.
Q. So when you're talking about speaking to the driver on the 911 call?
A. He just yelled and said to get out of his truck.
Q. So he yelled and told you to get out of the truck?
A. To get out of the back of his truck.
Q. That's what you did?
A. That's exactly what I did. I got out of his truck.
Q. Did you hurt yourself getting out of the truck?
A. Yeah.
Q. What happened?
A. I scraped by legs all up.
Q. Then you ran to this other house?
A. Across the street to the house where I made the call from.

A was not at scene & no shots fired

No shots ever fired

Meth-head

Q. Was your mother there w
A. I didn't see her anymor had went somewhere else. She we
Q. So when this truck is s the street, do you know why it w
A. No, I have no idea why assuming they were there to try
Q. But you didn't see your
A. I seen her at the truck the driveway, yes. And then whe quit paying attention to everyth just keep running.
Q. So your mother was at t the gunshots?
A. She was at the truck, y
Q. And where were you?
A. Running towards the tru
Q. So you were running?
A. Away from my house, tow
Q. Okay. And that's when How many gunshots?
A. Two or three.
Q. Now, you say how many - or Steven, as you knew him, hit with a pistol?

A. Yes.

Q. Did he have more than one pistol?

A. Yes.

Q. He had two pistols?

A. He had two pistols.

Q. One in each hand?

A. No, not one in each hand. He had one in his hand, and I don't know what he did, if he dropped the one that he had in his hand, but he pulled another one out of his boot.

Q. So when you say --

A. So, I don't know whether he put the other one up or he dropped it, I have no idea.

Q. So when you told the 911 operator that he had two guns, one in each hand; that was incorrect?

A. I guess so.

Q. You were pretty upset?

A. I was afraid. I was upset. I mean, how would you feel if your mom get hit with a gun?

Q. Yeah, I'd be scared stiff.

A. Yeah, you would be upset, right?

Q. Of course, I would be as scared as could be. I'd be worried about my mother, and I'd be worried about myself. I would want to get away. I'm sure that that's what you felt. You wanted to get your mother away,

A had a gun in each hand

Hallucinations meth addict paranoid

wanted to get her to safety

A. Right.

Q. So when you start

excited and upset, maybe yo

A. I was excited and

Q. So maybe you'd mak

A. Maybe I did make a

that I didn't make a mistak

had the day that he came to

brown handles, and the day

my mom with it, no, I did n

I'm a hundred percent posit

with the gun with the brown

Q. Okay. But you don

today?

A. I don't remember e

clearly, no.

Q. You remember ever

ever seen Mr. Steven, as yo

pointing a finger at your m

A. No, because he did

at her. He had the gun poi

pull the gun out from his w

Q. What part of her b

A. Her head.

?

Meth-head hallucination



209

Q. And did he ever point it at you?
A. Yeah.
Q. When was that?
A. When my mom started to walk away.
Q. So your mother started walking away. At what point did she start running?
A. That she start running?
Q. Yeah.
A. She didn't run, she walked. She was dazed out, how could she run?
Q. Was she knocked down?
A. She was knocked out, and she got up. I picked her up, held her.
Q. You picked her up and helped her to her feet?
A. And helped her to her feet.
Q. And then she left?
A. She left, yeah, she walked off.
Q. So you were still there --
A. Yeah, I was there the whole time. I never went anywhere.
Q. -- after your mother walked away?
A. After she walked away.
Q. What did Steven or Steve say about this watch?
A. He didn't say much about it. He just said that my mom owed him money about a watch that she stole, and

MATTIE KIMBLE, CSR, RPR

he wanted his watch back, and he
Q. How much money was that
A. I think $10,000, $9,000
Q. So the statement on the about $7,000?
A. Well, I can't tell you don't know the exact amount. All several thousand dollars.
Q. It was an expensive watc
A. It was an expensive watc
Q. And you've never seen yo expensive watch?
A. No.
Q. When was it that you wer What year was that?
A. I don't know. I don't r
Q. Class B theft?
A. I don't remember.
Q. Is that here in Harris C
A. It was in Harris County.
Q. That was just a mistake?
A. Yeah.
Q. On your part?
A. On my part, yeah.
Q. You would never commit t

MATTIE KIMBLE, C

mother commit theft of a Rolex, would you?

A. No, sir.

MR. GAISER: I'll pass the witness.

THE COURT: Anything further, Mr. Belt?

MR. BELT: No, your Honor. May this witness be excused?

THE COURT: Yes, you may be excused, sir.

THE WITNESS: Thank you.

THE COURT: Call your next witness.

MR. BELT: Your Honor, the State rests.

THE COURT: Ladies and gentlemen, I'm going to give you a brief recess; and then we'll resume in about 15 minutes.

THE BAILIFF: All rise.

(Jury exits courtroom.)

THE COURT: Is the Defense ready to proceed when the jury gets back?

MR. GAISER: I guess, if you make me.

THE COURT: Well, it's only 3:30. You have your witnesses here?

MR. GAISER: Yes, your Honor.

(A recess was taken.)

(Open court, Defendant present.)

THE COURT: All right. Let's go.

THE BAILIFF: Yes, ma'am.

All rise.

(Jury enters

THE COURT: T

The Defense r

MR. GAISER:

THE COURT: Y

MR. GAISER: the witness stand, and I do or not.

THE COURT: H

MR. GAISER: sworn.

THE COURT: T

THE BAILIFF: and chair, speak loud and c

MR. GAISER:

THE COURT: Y

GERA

having been first duly swor

DIRECT

BY MR. GAISER:

Q. Tell the ladies an you are?

A. My name is Gerald

Q. How old a man are

A. 33.
Q. Do you live in Harris County?
A. I do.
Q. Have you lived in Harris County all of your life?
A. I have not.
Q. How long have you lived in Harris County?
A. Last eight years.
Q. How about Texas, how long have you lived in Texas?
A. Majority of my life.
Q. You married or single?
A. Married.
Q. Children?
A. No.
Q. What do you do for a living?
A. I'm an auto mechanic.
Q. How long have you been doing that?
A. Since I got out of the military in '04.
Q. What branch of the military were you in?
A. Army.
Q. And what year did you get out?
A. 2004.
Q. How long were you in the Army?
A. Three years.

knew D in 04/14

Q. Now, do you know this ge left?
A. I do.
Q. How is it you know him?
A. We were friends. We pre
Q. How long ago?
A. About four years ago.
Q. Do you know his name?
A. Steven.
Q. Did you call him Steven you refer to him?
A. Yeah, I've always pronou
Q. But mostly you call him
A. Yeah.
Q. Now, did you know Steven
A. I did.
Q. How did you know him? Wh relationship did you have with hi
A. We were friends. I hung lot. His mom used to cook dinner
Q. Were you married back th
A. I was.
Q. Did your wife know him?
A. She did.
Q. What was your wife's nam

A. Cassandra.
Q. Now did you know Steven Baughman to have a motorcycle?
A. He did.
Q. What kind of motorcycle did he have?
A. He had two of them. He had a 2013 Road King, I believe, that was black; and then like a '99 or 2000 Super Glide that was blue.
Q. Let me see if I can find the photograph and ask you if you can identify this. Well, let me show you what's been marked as State's Exhibit 32. You recognize that motorcycle?
A. Yes, I do.
Q. Is that one of the motorcycles Steven Baughman owned?
A. Yes, it was.
Q. Now, did you ever have occasion to -- did you own a motorcycle?
A. I did own a motorcycle. I actually totaled the motorcycle.
Q. When did you own a motorcycle?
A. I owned a motorcycle from April of 2014, several years prior to that.
Q. What happened to your -- well, what kind of motorcycle was that?

A. I had a Harley Ro
Q. What color was it
A. Red.
Q. And did you ever motorcycles?
A. I did.
Q. Was that a freque
A. Occasional, yes.
Q. Occasionally. Wh Davidson Road King?
A. I barrel rolled i 75 miles an hour.
Q. Were you injured?
A. A little bit, not it.
Q. Was the motorcycl
A. There was nothing
Q. -- destroyed?
A. Yeah.
Q. And that was -- w
A. That would have b serves, I think it was Apr
Q. Did you know, wer Baughman being arrested on
A. His mom had told

Q. Where were you when she told you?
A. I was at her house.
Q. So he was not there, I take it?
A. No.
Q. Did you ever ride Mr. Baughman's motorcycle?
A. Very frequently after I wrecked my motorcycle, he let me use his.
Q. How often would he let you use his motorcycle?
A. Three or four times a week.
Q. And which motorcycle did you ride?
A. Mainly the black Road King.
Q. Did you at that time back in April of 2014 own any firearms?

did he own firearm

A. I did.
Q. Do you remember what firearms you owned?
A. I got a Sauer, I believe it was a .32, an older model; and I had a Dessert Eagle .45.
Q. How is it that you came in possession of those firearms?
A. One of them was given to me from a friend, and the other one I got off Craig's List.
Q. Either by gift or by purchase?
A. Right.
Q. If I showed you a couple of weapons, would you be able to recognize if those are similar to or the same

as the firearms that you owned?
A. Yes, sir.
MR. GAISER: May I
your Honor?
THE COURT: You may
MR. GAISER: I'd as
weapons have been cleared.
THE BAILIFF: Weapo
THE COURT: Thank y
Q. (BY MR. GAISER) First
you a firearm that's contained i
I'd ask you to pick it up, take
you can identify that.

S38 his gun

A. Yes, absolutely.
Q. How so?
A. This is the one that wa
Q. And State's Exhibit 39

S39 his gun

appears to be another firearm.
you, and ask you if you recogniz
A. Yes.
Q. What is it?
A. That's the .45 I bought
Q. You're sure of that?
A. Uh-huh.
Q. Okay. Is there any rea

MATTIE KIMBLE, C

have been found in Mr. Baughman's motorcycle?

A. I left them there when --

Q. When did you leave them there?

A. I don't recall the exact date, but I rode his bike home to my house and returned to his house. When I went home to my house, I put them in the bike, returned back to his house and left them sitting in the saddlebag.

Q. Now when was that?

A. Like I say, I don't recall the exact day; but it was the same day his mom told me he was arrested.

Q. You're sure of that?

A. Yeah.

Q. Are you friends with Mr. Baughman?

A. I was.

MR. GAISER: I'll pass the witness.

**CROSS-EXAMINATION**

BY MR. BELT:

Q. Mr. Bush, good afternoon. My name is Steve Belt. How are you doing?

A. All right.

Q. Now, you haven't lived -- you said you haven't lived in Harris County all your life. Did you live anywhere else?

A. What's that?

left in D's saddlebag

Q. Where else have yo
County?

A. I've lived all ove
I was stationed in Tacoma,
Louisiana.

Q. And you were disch
correct?

A. Yes.

Q. Be an honorable di

A. Yes.

Q. Now you met Mr. Ba
bar you said?

A. Yes, sir.

Q. And is this a dive
Chipotle?

A. It was like a litt
guys that rode motorcycles

Q. Like a biker's bar

A. Yes.

Q. And you've been go
four years?

A. No, I actually --
haven't had contact with hi

Q. But before that, w
friend?

A. No, not really, I mean, we were acquaintances.

Q. Did you do any work with him during those four years?

A. No.

Q. He never brought you his bike to work on as a mechanic?

A. I think I tinkered on his carburetor once or twice but other than that, no.

Q. And you stated that the bike that Mr. Gaiser showed you is your bike?

A. No, that was his bike.

Q. That's his bike?

A. I totaled my bike and told Steven I needed to get on another bike, otherwise, I was gonna lose my nerve to ride a bike again and he threw me the keys to his.

Q. Okay. Now the Sauer .32, who gave you that gun?

A. That was given to me by an old friend who's passed away now.

Q. Do you have a name for this old friend?

A. It was given to me by his daughter, named Holly. He had a nickname, and I don't really know his full name.

Q. He's a friend, you don't know his name?

A. I was in a motorcycle c

Q. And the Dessert Eagle ..

A. I bought that off Craig

Q. From who?

A. Honestly, I don't know.

Q. When did you buy that o

A. I bought it before I ha month before I had my accident. on the 14th of April.

Q. You bought the .45 afte

A. Yes, it was either Apri when I had the accident. Like I four years ago. I just remember

Q. I got you. Now the -- y arrested, but you weren't there t

A. I was there later that e

Q. Right, but you weren't t before the Defendant got arrestec

A. I was earlier in the mor dropped his bike off. My car was took my car and went home.

Q. I got you. No, I'm sayi charged with aggravated assault, correct?

A. Correct.

Q. Against two people, correct?
A. Okay.
Q. John and Machell Spear?
A. Okay.
Q. You're aware of that, right?
A. Right.
Q. But you weren't there when all this stuff went down?
A. Absolutely not.
Q. And -- but you know if you heard that your friend, Steven Baughman, had done these things, you would say that's a bad thing, correct?
A. Yes.
Q. And that him having a bunch of guns, that's a bad thing, right?
A. Yeah, like I said, the guns were mine; that's why I immediately went down to the investigator and told them they were my guns.
Q. Now, what investigator are you talking about?
A. There was an investigator that came over to Steven's mom's house. I don't really know his name.
Q. When did you speak to this investigator?
A. I take it was within a week of his arrest.
Q. So when you found out that he was arrested, why didn't you go straight to this location where he was

arrested at?
A. Well, I didn't kno
that time. I came over to
evening, and she told me he
Q. You're aware that
constable's office, correct
A. I have no idea who
Q. This investigator
arrested for having your gu
A. Right.
Q. -- did you go to t
them, hey, it's a big mista
A. I did not. Like I
investigator that I believe
department that his mom gav
and I went and spoke with t
Q. I understand that,
that guy you spoke with was
A. Because he gave me
detective.
Q. But you didn't kee
A. Not after four yea
Q. You don't remember
A. I know he's out in
remember his name exactly.

Q. And so -- but this offense that you heard about, this happened in Harris County, Texas?

A. As far as I know.

Q. And on April 2nd, 2014, that was the date that you remember this happened?

A. I'm not sure of the exact date.

Q. Okay. You're not exactly sure of the date that your friend got arrested?

A. No.

Q. Is that right?

A. Right.

Q. So I kind of -- sorry, I just want to talk about this investigator some more. Is he wearing a uniform when you spoke to him?

A. No.

Q. But he told you he was a police officer?

A. As far as I remember, I believe his card was a detective card.

Q. Detective card with a police agency?

A. Yes.

Q. Okay. But you're sure it wasn't an investigator for the Defendant?

A. No.

Q. You're not sure?

A. Like I said, I believe it was a detective.

have to have key

That's my belief.

MR. BELT: Pass the

THE COURT: Mr. Gai

**REDIRECT EXAMI**

BY MR. GAISER:

Q. Mr. Bush, is your memory remember whether or not your moto occurred before or after Mr. Baug

A. Before.

Q. On the day he was arrest mother; is that correct?

A. Yes.

Q. Now this motorcycle that Mr. Baughman's motorcycle, did yo turn it on?

A. You had a fob.

Q. It's like a --

A. Like a little round thin without it.

Q. What about the saddlebag

A. You have to have a key f

Q. So, if you -- when you p saddlebag of a motorcycle, would do you remember?

A. I don't remember. Very

SB not lock?

saddlebags.

MR. GAISER: Pass the witness.

MR. BELT: No questions, your Honor.

THE COURT: May this witness be excused?

MR. GAISER: Yes, your Honor.

THE COURT: Thank you, sir. You may step down, and you're excused.

Call your next witness.

MR. GAISER: I would call Linda Pugh.

THE BAILIFF: Judge, this witness has been sworn in.

THE COURT: Thank you.

THE BAILIFF: Scoot up and speak into the mic.

THE WITNESS: Okay.

**LINDA PUGH,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

BY MR. GAISER:

Q. You settled in?

A. I think so.

Q. Tell the jury what your name is?

A. Linda Pugh.

Q. Ms. Pugh, you know this gentleman seated to my left here?

D's mother

A. He's my only son.

Q. That's your son?

A. Yes.

Q. Now, where do you

A. In Oklahoma.

Q. How long have you

A. I have been going

friends to Oklahoma for ab

Q. Before that, wher

A. At 14930 Masita D

Q. How long did you

A. About 18 years.

Q. So back in 2014,

address?

A. Yes, I was.

Q. Who lived there w

A. Steven.

Q. Steven Baughman l

A. Yes, yes.

Q. Is Steven's fathe

A. No, he isn't.

Q. When did he pass

A. About 2011 I thin

Q. When he was alive

A. He was manager of

for the Peruvian Oil Company.

Q. How long did he hold that job?

A. Oh, he was in the oil field for particularly the time that we married in 1959. I don't know. We lived in Colombia. In 1982, we moved back to the states.

Q. Now when your husband retired from work, did he receive any sort of recognition?

A. He always received different awards. My husband invented the double edge shale shaker screens.

Q. That's with the oilfield, right?

A. Yes, it is.

Q. It's not for the kitchen?

A. No.

Q. But he had received several awards?

A. Yes, he did.

Q. Among those awards did he receive a watch?

A. Yes, I believe that was from Mr. Taun (phon.) I believe it was a Citizen's watch.

Q. All right. Did he ever receive a Rolex watch?

A. No.

Q. It was a Citizen's watch?

A. Yeah, he -- it really wasn't from the oilfield, it was a gift from Mr. Taun that he did business with in Singapore. I received a Rolex watch as a gift from Mr.

Taun.

Q. Oh, you did?

A. Yes, I did.

Q. Now, who is Mr. Taun?

A. Mr. Taun was a business

warehouses and products in Singa

house. My husband called me and

Taun wanted us to go out to eat

Houston, and I said, well, I jus

in the oven, why don't you bring

so he came to our home, and the

town, we went to the Old San Fra

he said he had a gift for me if

approve.

MR. BELT: I'm sorr

THE COURT: Sustair

question and answer.

Q. (BY MR. GAISER) Did he

A. Yes, he gave me a gift.

Q. What did he give you?

A. He gave me a Rolex watc

diamonds for the numbers.

Q. Was it a gold watch?

A. Yes, sir.

Q. White gold?

A. Yes, it was white.
Q. And so you remember about when that was?
A. It was about between 1989 and 1990.
Q. What did you do with that watch? Did you wear it?
A. I wore it occasionally. My children said I didn't move around enough to keep it wound, and so I preferred a battery watch.
Q. Was that a lady's watch?
A. Yes, it was a lady's watch.
Q. Did -- at some point in time, did you give that watch to Mr. Baughman?
A. Yes.
Q. When was that? What transpired that caused you to give the watch to him?
A. It was about 2013 and -- or '14 somewhere along in there, and I had a car problem and I didn't have the money to pay for it. My husband had died.
Q. What kind of car did you have?
A. At that time I can't remember if I had a black Lincoln or if it was the white Mercury Marquis, one or the other, and I had a car problem.
Q. You had a problem?
A. Yes, I had a car problem; and it was gonna cost a thousand dollars to fix it. And I laughed, and I told

Steven I wanted to borrow a
I'll give you collateral, a
Rolex watch. He said, Mom,
collateral; and I laughed a
gave the watch to Steven.
Q. So he reluctantly
A. Yes, he did.
Q. You know what he d
A. He put it in his r
Q. Did you ever come
Spear?
A. I was introduced t
occasions, yes.
Q. Where would that h
A. In my home.
Q. She came to your h
A. Yes, she did.
Q. Did you prepare di
A. No, I did not.
Q. Did she stay overn
A. No, she did not.
Q. Did you ever meet
A. No, the only time
Clay County Courthouse.
Q. Why were you at th

MR. BELT: Your Honor, we would object to relevance and speculation as to what she was there for.

THE COURT: Overruled.

Q. (BY MR. GAISER) Why were you at the Clay County Courthouse?

A. I was there to get a copy of the police report where I had reported my watch stolen, and this group of people that had been described to me were standing in a circle talking to who I thought was a detective because of the thing that he wore on his belt, and then I heard them call my name and they said Linda Pugh --

MR. BELT: Your Honor, we would object to hearsay.

THE COURT: Sustained.

Q. (BY MR. GAISER) Based upon what you heard, did you have a opinion as to a suspect for the theft?

MR. BELT: Your Honor, we still object to this backdoor hearsay and also speculation. She's not a police officer. She wouldn't know.

THE COURT: Response?

MR. GAISER: Well, I don't think she has to be a police officer to have a suspect as to her stolen watch.

THE COURT: Well, it sounds like speculation. So, that question, that objection is

sustained.

Q. (BY MR. GAISER) Did yo
well, strike that. Who did you
County Courthouse? You said you
that right?

A. I saw John Spear. I sa
father. I saw John Spear's wife

Q. They were all there at
Courthouse?

A. Yes, they were; and the
my attention was they said that

MR. BELT: Your Hon

Q. (BY MR. GAISER) You ca
people said.

A. Oh, okay.

Q. (BY MR. GAISER) What d
courthouse were you in?

A. Just the entry, I was s
just right by where you get the

MR. GAISER: Excuse

(Sotto voce discuss
and Ms. Steinle.)

Q. (BY MR. GAISER) Was th
substation in Harris County?

A. Yes, it was.

Q. It wasn't Clay County?

A. No, it was on Clay Road just off of Highway 6.

Q. Ms. Pugh, do you have a good memory?

A. Yes, I do.

Q. Have you been diagnosed with any sort of dementia or problems with your memory?

A. No, I have not.

Q. Now you were at the Clay Road Substation to report your watch stolen. Do you remember when that was?

A. I was there to pick up the report ten days after I had reported it stolen.

Q. Do you remember when that was?

A. No, it was in April, I believe, of 2013.

Q. Was it before or after your son was arrested in this matter?

A. It was after.

Q. Now, when -- how many times would you say -- had you met John Spear before then?

A. No, no, I hadn't; his mother told me that he came --

MR. BELT: Your Honor, I object to hearsay.

THE COURT: Sustained.

THE WITNESS: I'm sorry.

Q. (BY MR. GAISER) Have you seen John Spear

today?

A. Yes, I have.

Q. You remember what

A. A red shirt.

Q. How did you come been stolen?

A. Well, because the named Manny, and he called son, and then there were s out in the garage and they

MR. BELT: Yo

THE COURT: O

Q. (BY MR. GAISER) full name by any chance? bell?

A. Manny who?

Q. Manuel Cruz.

A. I honestly don't

Q. You remember the

A. I remember the na

MR. GAISER: Honor.

**CROSS-**

BY MR. BELT:

Q. Good afternoon, M

Belt. I'm with the State, I just have a few questions for you, okay? Now, the -- when you were talking about John Spear, you said you met him or you saw him at the courthouse on Clay Road, correct?

A. That's correct.

Q. You never seen him before that?

A. No, I hadn't.

Q. And you hadn't seen him until today?

A. That's true.

Q. Almost four years later?

A. That's true.

Q. And you never met his dad before the courthouse, right?

A. That's right.

Q. And not after?

A. That's right.

Q. And you've never seen John Spear's wife before the courthouse?

A. That's true.

Q. And you haven't seen her since?

A. No, I haven't.

Q. Now, you're aware that the Clay Road Courthouse, that's a municipal courthouse?

A. Yeah, I guess, it's a courthouse on Clay Road.

Q. But it's not the big courthouse here downtown?

A. No.

Q. Not this courthouse that

A. No.

Q. And you said you were ge report. What -- that offense rep recall what that number was?

A. No, I don't believe I do

Q. And you didn't bring tha you today in court?

A. No, but the attorney has like it, I'm sure he will share i

Q. Yes, ma'am. Now, you fo Defendant was arrested on April t

A. No.

Q. Your son was arrested on

A. No, sir, it was April th booked in until the 4th.

Q. Yes, ma'am. You know yo motorcycles?

A. Yes, he does.

Q. He owns two motorcycles?

A. He did.

Q. He did, and they were Ha

A. Yes, they were.

Q. And you're aware that yo

A. No.

Q. That he owns a .32 Sauer pistol?

A. No.

Q. That he also owns a .45 Dessert Eagle caliber weapon?

A. No, as far as I knew, there were no weapons in our house except -- what do you call those things, pellet guns that my brother-in-law gave to me.

Q. Okay. And those pellet guns, they're the rifle pellet guns?

A. No.

Q. Now, you're aware that he wears these weapons on his waistband, correct, your son does?

A. If he doesn't have any, he doesn't wear them on his waistband.

Q. And he wears the .45 in his boot?

A. He doesn't have a .45.

Q. Yes, ma'am. Now this investigator came and spoke with you about the arrest sometime after he was arrested, correct?

A. An investigator did come and want to take pictures of the motorcycle, which he did. He also sat on the motorcycle to see if he could reach the saddlebag. Yes, he did.

Q. That investigator, you recall his name?

A. No, I really don'

though, today.

Q. That investigator

department, is he?

A. I don't have any

Q. That investigator

for the Defense, for your

A. If you say so.

Q. Okay. But you're

A. I don't know who

think that that was a woma

can't recall her name. I

it, but she was with Defen

Q. Do you carry a pu

A. Yes, I do.

Q. You always carry

A. Yes.

Q. And would you --

let's say you had that Rol

Rolex in a purse?

A. No.

Q. And when we're ta

only met Machell Spear one

A. That's not true.

Q. How many times?

A. Two or three.
Q. Two or three?
A. Uh-huh.
Q. But only met her at your house?
A. That's true.
Q. And you're aware that she did -- and your son never lived with Machell?
A. No, he never did.
Q. And she never lived with your son?
A. No, she never did.
MR. BELT: I'll pass the witness, your Honor.
THE COURT: Mr. Gaiser.
MR. GAISER: Just a couple of questions.

**REDIRECT EXAMINATION**

BY MR. GAISER:
Q. When you talk about a female investigator, are you talking about the investigator that works for me, Molly Steinle?
A. Oh, I didn't know I said anything about a female investigator.
Q. Okay.
A. I thought it was the first investigator that came to my home and he was a male, and he's out in the hallway now.

Q. Well what -- you were ta
with two last names?
A. Oh, I was talking about
County has -- when you can't affo
they have this program.
Q. Public Defender?
A. Public Defender, that's
has two last names and if I thoug
I could remember, but it's been a
I heard that name.
Q. I bet you could. Thank
MR. GAISER: I don'
questions.
MR. BELT: Nothing
THE COURT: May this
Thank you, ma'am.
deputy will help you if you need
THE WITNESS: Okay.
THE COURT: Call you
MR. GAISER: The Def
THE COURT: Mr. Belt
rested. Anything further from th
MR. BELT: Nothing f
State rests and close.
MR. GAISER: We clos

THE COURT: All right. Ladies and gentlemen, that completes the evidence portion of the trial. Because of the lateness of the hour, I need to prepare the Court's Charge that we discussed during voir dire. That's going to take some time, so I'm going to release you a little bit early. When you come back tomorrow at 9:00, you'll hear closing arguments of counsel. So, have a good evening. Please remember my earlier instructions about not discussing the case, not doing any independent research. I hope you have a good evening. I understand the weather is changing out there so you might want to bring a jacket tomorrow.

Yes, sir.

JUROR: The notes, do they have to stay here?

THE COURT: Yes, they do. The bailiff will take those from you and lock them up somewhere.

JUROR: Okay.

THE BAILIFF: All rise.

(Jury exits courtroom.)

(Adjourned until 12/6/17.)

REPORTER'

THE STATE OF TEXAS )
COUNTY OF HARRIS )

I, Mattie Kimble, for the 174th District Cou Texas, do hereby certify t contains a true and correc portions of evidence and o writing by counsel for the this volume of the Reporte above-styled and numbered in open court or in chambe

I further certify the proceedings truly and exhibits, if any, admitted

I further certify preparation of this Report Index) and was paid by Har

WITNESS MY OFFICIA March, 2018.

/s/Matti
Mattie K
Expirati
Deputy C
174th Di
Harris C
Houston,
832-927-

# APPENDIX

# V

"MICHAEL MORTON ACT"

LETTER From Travis County



**Rosemary Lehmberg ✯ Travis County District Attorney**
P.O. Box 1748 Austin, Texas 78767 • Telephone: 512-854-9400 • Fax: 512-854-9534
e-mail: district.attorney@co.travis.tx.us • www.traviscountyda.org

April 8, 2014

Art Acevedo
Chief of Police
Austin Police Department
715 East 8th Street
Austin, Texas 78701

Dear Chief Acevedo:

The 83rd Texas Legislature recently passed SB 1611, otherwise known as *The Michael Morton Act.* This new law adds many requirements that prosecutors and law enforcement officers must follow for all criminal cases that commence after January 1st, 2014. Our office is now required to produce to defense counsel electronic duplicates of all evidence, potential evidence and information related to a case. The law requires that we must disclose to defense counsel "any exculpatory, impeachment, or mitigating document, item, or information in the possession, custody, or control of the State that tends to negate the guilt of the defendant or would tend to reduce the punishment for the offense charged." This requirement includes evidence in the possession of *any* law enforcement agency that has investigated the case.

For this reason, before we can present a case to a grand jury, we need to make sure that your agency has submitted to us each and every piece of evidence or information connected with a case in your possession, in the possession of any other employee of your agency or in the possession of any other law enforcement agent you have worked with on the investigation. We ask that you provide this evidence and information *without regard to whether or not it appears to you to be relevant or material to the case.* In searching for this evidence and information, we ask that you check all files, computer directories and other records and inquire with all individuals who may have worked on the case, or who may have retained records associated with the case, to ensure that absolutely every item associated with a case has been provided to us.

This request for evidence and information includes, but is not limited to, ***any and all***:

- Investigative reports or offense reports and report supplements in the case
- Investigative reports or offense reports and report supplements in any related cases (e.g., codefendants)
- Names, contact information and identifiers for any and all persons interviewed in connection with the case, including any victim(s)
- Witness statements and interview notes, whether audio or videotaped, typed, handwritten, or otherwise memorialized, of any and all persons interviewed in connection with the case, including any victim(s)
- Correspondence/communications with all witnesses, victim(s), the defendant and counsel for any of these individuals, including letters, emails, text messages, voicemails, instant messages, etc.

- The defendant's and codefendants' statements and interview notes, whether audio or videotaped, typed, handwritten or otherwise memorialized
- 911 recordings with any possible connection to the case, and any transcriptions
- Photographs taken in connection with the investigation, including crime scene photos, autopsy photos, and victim injury photos
- Line-ups, show-ups and any materials compiled to prepare line-ups or show-ups in connection with the case, even if never shown to a witness/victim
- Video or audio recordings of the events at issue or the location at issue, including surveillance videos, patrol car videos and security camera footage, and any transcriptions of recordings
- Scientific reports and test results, including: autopsy reports, drug/substance analysis, ballistic reports/analysis, fingerprint analysis, DNA testing, blood or breath testing results, computer/cell phone forensic analysis, etc.
- Names, contact information and identifiers for any and all experts ever consulted in connection with the case
- Correspondence with scientific experts or other expert consulted in connection with the investigation and copies of their reports and supplements
- Written correspondence, including memoranda, emails and text messages sent or received to anyone in connection with the investigation
- Offers, suggestions, or implications of leniency made to any person or entity in connection with the case, even if not acknowledged, written or recorded
- Search warrants, search warrant affidavits and any documents or evidence used in the preparation of search warrants
- Copies of every document, correspondence, card, receipt, calendar, journal, ledger, or other writing seized or obtained from any person or entity in connection with the case
- Digital images/copies and forensic reports of all electronic data of any correspondence seized in connection with the case, including computers, USB drives, CDs, DVDs, cell phones, tablets, digital cameras and other devices capable of digital media storage
- Evidence inventories and photographs of all physical evidence seized or obtained from any location, entity or person in connection with the investigation
- Medical records obtained in connection with the investigation
- Other business records, including, but not limited to, bank records, sales records, phone records, utility records, real estate documents, postal records, government documents, etc.
- Spreadsheets, graphs, exhibits, flow charts, diagrams and any other compilations or summaries of any evidence prepared in connection with the case, including, but not limited to, business records
- Copies/images of any digital communications, images or other social media evidence obtained in connection with this investigation, including but not limited to web pages, Facebook/MySpace pages and posts, emails, text messages, instant messages and Twitter posts, the date and method of capture of the social media data and the name and contact information of the individual who captured the data
- Court records, evidence and sworn testimony from any other criminal cases, or civil or administrative proceedings related to the investigation
- Criminal history of the defendant
- Criminal histories of any and all persons interviewed in connection with the case
- Notes and memoranda created by law enforcement officers in connection with the case

If you feel that a particular item or information should be redacted or excluded from discovery, feel free to make that concern known when providing the data. However, *please do not make any redactions or exclusions from the material you provide to our office.* A prosecutor will make an assessment of what material may lawfully be redacted or excluded in compliance with Texas law before providing discovery to defense counsel.

In addition, the State's obligation to provide discovery does not end with the referral of a case for prosecution, with indictment by grand jury, or even upon conviction of the defendant under investigation. Therefore, we ask that, henceforth, you provide us with any additional information or evidence (see above list) you may receive in connection with a case.

We thank you for your hard work and your service to the public.

Sincerely,

Rosemary Lehmberg

respectively: $239.00 (trial court case number 1423420, second-degree aggravated assault of John), $239.00 (trial court case number 1423421, third-degree felon in possession), and $329.00 (trial court case number 1532840, second-degree aggravated assault of Machell). Appellant and the State do not dispute that there are overlapping identical court costs among the three cases,[10] but disagree slightly as to our remedy. Appellant requests that we modify the judgments in trial court case numbers 1423241 and 1532840 to delete the identical court costs. The State requests that we delete the identical court costs awarded in trial court case numbers 1423420 and 1423421, and not modify the costs assessed in trial court case number 1532840.

Article 102.073(b) states that "each court cost or fee of which is determined according to the category of offense must be assessed using the highest category of offense that is possible based on the defendant's convictions." Tex. Code Crim. Proc. Ann. art. 102.073(b). Therefore, because the third-degree felony conviction for felon in possession was the lower category of offense of which appellant was convicted, we delete $234.00 in duplicative costs in trial court case number 1423421. *See id.*; *Guerra v. State*, 547 S.W.3d 445, 447 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (deleting duplicative costs in lower-category offense).

As to whether to delete the identical costs in either trial court case number 1423420 or 1532840 (each a second-degree felony for aggravated assault with a deadly weapon), we agree with the State that costs should be deleted in case number 1423420. This is because in cases involving case numbers within the same category of offense, appellate courts generally retain the identical costs in the case number

---

[10] Appellant contends that the overlapping amount of court costs is $234.00. The State contends this amount is $239.00. Appellant properly does not request removal of the $5.00 "arrest w/o warrant/capias" fee because this fee applies separately to each of his convictions. *See* Tex. Code Crim. Proc. Ann. art. 102.011(e); *Guerra v. State*, 547 S.W.3d 445, 447 (Tex. App.—Houston [14th Dist.] 2018, no pet.) ("By the plain language of the statute, the arrest fee applies to each conviction.").

that includes the higher/highest amount of additional, nonduplicative fees.[11] Here, that is case number 1532840, so we delete the duplicative costs in case number 1423420. Therefore, we partially sustain appellant's fifth issue.

## III. CONCLUSION

We affirm the judgment in trial court case number 1532840 (appellate case number 14-18-00009-CR). We modify the judgments in trial court case numbers 1423420 (appellate case number 14-18-00010-CR) and 1423421 (appellate case number 14-18-00021-CR) by deleting $234.00 in duplicative fees, such that the "total amount assessed" in each criminal bill of costs is $5.00, and as so modified, we affirm the judgments.

/s/ Charles A. Spain
Justice

Panel consists of Justices Wise, Zimmerer, and Spain.

Do Not Publish — TEX. R. APP. P. 47.2(b).

[11] *See Cain v. State*, 525 S.W.3d 728, 734 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd); *Robinson v. State*, 514 S.W.3d 816, 828 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd); *Williams v. State*, 495 S.W.3d 583, 589–90 (Tex. App.—Houston [1st Dist.] 2016, pet. dism'd) (op. on reh'g).